In re JOINT EASTERN AND SOUTHERN DISTRICTS ASBESTOS LITIGATION.

Bernadine K. FINDLEY, as Executrix of the Estate of Hilliard Findley, Uma Lail Caldwell, as Executrix of the Estate of Odell Caldwell, Edward Lindley, Joseph C. Jones, and James William Barnette, Jr., on behalf of themselves, and all others similarly situated as beneficiaries of the Manville Personal Injury Settlement Trust, Plaintiffs,

v.

Robert A. FALISE, Louis Klein, Jr., Christian E. Markey, Jr., and Frank Macchiarola, not individually but solely in their capacities as Trustees of the Manville Personal Injury Settlement Trust, Defendants.

In re JOHNS-MANVILLE CORPORATION, et al., Debtors.

Index No. 4000.
Civ. A. Nos. 90–3973 (E.D.N.Y.), 90–7518 (S.D.N.Y.)
Nos. 82 B 11656 (BRL)–82 B 11676 (BRL).

United States District Court, E. and S.D. New York.

Jan. 19, 1995.

Caplin & Drysdale, New York City by Elihu Inselbuch, James Sottile, IV, Christian R. Pastore, Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc., San Francisco, CA by Harry F. Wartnick, Baron & Budd, Dallas, TX by Frederick M. Baron, Rose, Klein & Marias, Los Angeles, CA by Robert B. Steinberg, Ness, Motley, Loadholt, Richardson & Poole, P.A., Charleston, SC by Ronald L. Motley, Joseph F. Rice, Wilentz, Goldman & Spitzer, P.C., Woodbridge, NJ by Christopher M. Placitella, Philip Pahigian, for the Class.

Paul, Weiss, Rifkin, Wharton & Garrison, New York City by Leslie Gordon Fagen, Jean McMahon, for Future Claimants.

Pepper, Hamilton & Scheetz, Philadelphia, PA by Francis J. Lawall, Charles H. Carpenter, Steele & Sales, P.S., Seattle, WA by Katherine Steele, for Distributor Subclass.

Debevoise & Plimpton, New York City by Anne E. Cohen, Roger. E. Podesta, for Codefendant Subclass.

Lani A. Adler, New York City, for Subclass of Claimants with Pre–November 1990 Settlements and Judgments.

John H. Faricy, Jr., Minneapolis, MN, for MacArthur Subclass.

Weitz & Luxenberg, P.C., New York City by Perry Weitz, Richard Nemsoff, for Subclass of Present Claimants.

Cohen, Shapiro, Polisher, Shiedman & Cohen, Philadelphia, PA by Roberta Golden, Robert Lapowsky, Judah Labovitz, for Pacor Settlement Trust.

Law Offices of Peter G. Angelos, Baltimore, MD by Peter G. Angelos, Timothy J. Hogan, for Maryland Plaintiffs.

Goldberg, Persky, Jennings & White, P.C., Pittsburgh, PA by Craig L. Vandergrift, Theodore Goldberg, Robert L. Jennings, for Pennsylvania Plaintiffs.

Cooney & Conway, Chicago, IL by Kathy Byrne, Gavin & Gavin by James C. Gavin, Greitzer & Locks, Philadelphia, PA by Lee B. Balefsky, Thomas W. Henderson, Pittsburgh, PA, Hal Pitkow, Washington Crossing, PA, Robert E. Sweeney Co., L.P.A., Cleveland, OH by Robert E. Sweeney, for Various Other Claimants.

Carla G. Hancock and Maxine Smith, Vivian, LA, for J.C. Smith.

Pollack & Greene, New York City by Harold Goldfuss, for Laura Goldfuss.

Zeldonia J. Jackson, Fort Worth, TX, for Estate of George E. and Tena Lee Jackson, Sr.

Berlack, Israels & Liberman, New York City by Carole L. Fern, for Keene Corp.

Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY by Michael P. Murphy, Wiley, Rein & Fielding, Washington, DC by Bert W. Rein, Keith S. Watson, for U.S. Fidelity & Guar. Co.

Whiteford, Taylor & Preston, L.L.P., Baltimore, MD by Louis G. Close, Jr., Gardner M. Duvall, for Porter Hayden Co.

Jeffrey M. Weiner, Wilmington, DE for DI Distributors, Inc.

Myles O'Malley, William Rausnitz, Barbara Zelluck, Newark, NJ, for Nat. Asbestos Victims Legal Organizing Committee and White Lung Information Centers of New York and New Jersey.

James Fite, Paul Safchuck, Baltimore, MD for White Lung Ass'n.

David T. Austern, Patricia Dansbury, Manville Personal Injury Settlement Trust, Fairfax, VA, Donovan, Leisure, Newton & Irvine, New York City by James L. Stengel, Laurie S. Dix, Richard De Marco, Steven Fink, for Manville Personal Injury Settlement Trust.

Mark Peterson, Rand Institute, Santa Monica, CA, Special Advisor to the Courts.

Before WEINSTEIN, Senior District Judge, Eastern District of New York, also sitting by designation in the Southern District of New York, and BURTON L. LIFLAND, Chief Bankruptcy Judge, Southern District of New York.

*AMENDED MEMORANDUM, ORDERS AND FINAL JUDGMENT*

Table of Contents

I. Introduction ....................................................................479

II. Prior Proceedings ..............................................................485
 A. Trust's Initial Operating Difficulties ......................................485
 B. Class Action and First Settlement ..........................................487
 C. Appeal and Remand ..........................................................487

III. Present Proceedings ...........................................................488
 A. Proceedings on Remand ......................................................488
 B. Amended Complaint ..........................................................489
 C. Settlement Negotiations ....................................................491
 1. Notice of Settlement and Hearings .......................................492
 2. Summary of Settlement ...................................................493
 a. *Pro Rata* Shares ....................................................493
 b. Removal of Trust from Tort System ....................................494
 c. Scheduled Disease Values .............................................495
 d. Settlement of Claims Outside Trust Distribution Process ...............496
 [1.] Codefendants' Claims ...........................................496
 [2.] Distributors' Claims ..........................................496
 3. Amendments During Fairness Hearings .....................................497
 D. Rule 706 Court-Appointed Panel Projections of Future Claims ..................498
 1. Background and Role of Panel ............................................498
 2. Panel Projections .......................................................498
 3. Impact of Trust and Rule 706 Projections ................................501
 E. Graphic Representations of Effect of Settlement ..............................502
 F. Objections to the Settlement .................................................509
 G. Amended Memorandum, Orders and Final Judgment ................................510
 1. Request by Berlack, Israels & Liberman on Behalf of the Keene Corp. ......511
 2. Motions to Intervene ....................................................511
 3. Motions for Additional Findings of Fact in Relation to USF & G ..........512
 4. Motion to have the Courts Disapprove the MacArthur Fund .................512
 5. Motions to Eliminate Escrow Requirements for Trust Payments in Maryland....512
 6. Motions to Authorize Claims Payments Starting February 1, 1995 ..........512

IV. Power to Modify Trust Payments Under New York Law ..............................512
 A. New York Substantive Law Applicable ..........................................512
 B. Origins of Trusts in English Equity ..........................................515
 1. Development of Equity Jurisdiction ......................................515
 2. Trusts in Equity ........................................................517
 C. Equity Antecedents in New York ...............................................518
 1. History of Equity Courts ................................................518
 2. Reception of English Substantive Law ....................................521
 3. Equity in Twentieth Century New York ....................................524
 D. Aspects of Equity Substantive Jurisprudence in Modern Adjudications ...........525
 1. Equity is Flexible ......................................................525
 2. Equity Provides Remedies to the Otherwise Remediless ....................526
 3. Equity is Equality ......................................................526
 4. Equity Fills the Vacuum Created by Failure to Legislate .................527
 5. Limitations on Modern Equity Jurisprudence ..............................527
 E. New York Trust Law Permits Deviation .........................................528
 1. Consent of All Beneficiaries Not Needed .................................530
 2. Benefits of Deviation to Most ...........................................533
 3. Administrative vs. Distributive Provisions ..............................535

478

F. Trust Law in Other States ................................................. 536
 1. Case Law ........................................................... 536
 2. Statutes ........................................................... 538
G. Application of Trust Law to the Facts .................................... 540

V. State and Federal Law on Contribution and Settlement ...................... 540
 A. Varied Approaches ..................................................... 540
 B. Problem Solved by Settlement .......................................... 545

VI. Maryland Contribution and Set–Off Issue ............................... 546
 A. Choice of Law ......................................................... 547
 B. Contribution Among Multiple Tortfeasors ............................... 548
 C. Dispute Among the Parties ............................................. 550
 D. Proposals ............................................................. 553
 1. Plaintiffs ......................................................... 553
 a. Maryland Plaintiffs ............................................. 553
 b. Plaintiff Class ................................................. 553
 2. Third Party Defendants ............................................. 554
 a. Distributors .................................................... 554
 b. Codefendants .................................................... 554
 3. Manville Trust ..................................................... 555
 E. Resolution by Maryland State Courts ................................... 556

VII. Fees ................................................................. 556
 A. Adoption of 25% Maximum ............................................... 557
 B. Authority to Limit Attorneys' Fees .................................... 558
 1. Obligations to Review Fees Under Rule 23 ........................... 558
 2. Court Authority to Limit Fees in Future Claims ..................... 559
 a. Power of the Courts to Regulate Attorney Conduct ............... 559
 b. Courts as Protectors of Litigants .............................. 560

VIII. Satisfaction of Procedural Requirements ............................. 562
 A. Jurisdiction .......................................................... 562
 B. Class Action .......................................................... 562
 1. Rule 23 Prerequisites .............................................. 562
 a. Numerosity ..................................................... 563
 b. Commonality .................................................... 563
 c. Typicality ..................................................... 563
 d. Adequacy of Representation ..................................... 563
 2. Limited Fund ....................................................... 564
 3. Future Beneficiaries ............................................... 565
 C. Fairness, Reasonableness and Adequacy ................................. 565
 1. Notice to Class .................................................... 565
 2. Standards .......................................................... 566
 3. Settlement Provisions .............................................. 567
 4. New York Trust Law ................................................. 569
 5. Hard Fought, Arms–Length Negotiations .............................. 569
 6. Opinion of Counsel and Reaction of Class Members ................... 569
 7. State of the Litigation and Risk if It Continues ................... 570
 8. Public Interest .................................................... 570
 9. Suffering Claimants ................................................ 570

IX. Amendment to Bankruptcy Statute ....................................... 570
 A. Statute ............................................................... 570
 1. Future Reorganizations ............................................. 571
 2. Existing Plans ..................................................... 571
 B. Compliance by Settlement .............................................. 572
 C. Continuing Injunction ................................................. 572
 D. Implications as to Corpus ............................................. 572

X. Appointments ........................................................... 573

XI. Future of Trust ....................................................... 573

XII. Orders and Stays ..................................................... 573

XIII. Fee Applications .................................................... 574

XIV. Conclusions ............................................................574

Addendum A Settlement Stipulation

Addendum B Amendments to Settlement Stipulation

WEINSTEIN, Senior District Judge:

## I. Introduction

It is time to end the incredibly convoluted and complex Manville asbestos litigation. It is now terminated, subject to appeals.

This non-opt-out diversity class action was brought by Beneficiaries of the Manville Trust, most of whom are persons claiming to be injured by asbestos produced by the Johns–Manville Corporation ("Manville" or "Corporation"). Hundreds of thousands of workers and others have been seriously harmed by Manville and other vendors of asbestos products who had long known of the dangers of their products, but had failed to warn properly or to take other adequate protective steps. The resulting national disaster led to Manville's bankruptcy. During the bankruptcy proceedings, the Manville Personal Injury Settlement Trust ("Trust") was organized under New York law. Most of the Corporation's assets—primarily 80% of its equity and the proceeds of its insurance policies—were assigned to the Trust. The Corporation itself was set free of its liability; all claims were to be made against the Trust. *See In re Johns–Manville Corp.,* 68 B.R. 618, 635 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom. Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir. 1988).

As a result of low estimates of potential claims, the Trust's assets immediately proved grossly inadequate. *See In re Joint E. & S. Dist. Asbestos Litig. (Findley v. Blinken),* 129 B.R. 710, 754–60 (E. & S.D.N.Y.1991) [*Findley I*], *vacated,* 982 F.2d 721 (2d Cir. 1992) [*Findley II*], *modified on reh'g,* 993 F.2d 7 (2d Cir.1993) [*Findley III*]. When the distribution plan was confirmed in 1986, it was estimated that the Trust would receive approximately 83,000 to 100,000 claims over the course of its life into the middle of the next century. To date, the Trust has received approximately 240,000 claims and it is expected to receive hundreds of thousands more. Moreover, the projected value of the claims was but a fraction of what had to be paid to each claimant. Unforeseen litigation expenses—running at the rate of $52 million per year—and heavy Trust administration expenses further depleted the assets. Current projections indicate that, in the absence of a settlement, over 400,000 claimants, representing over $18 billion in claim liability, will never receive any compensation for their injuries from the Trust. *See* Figure 1. Figure 1 and subsequent figures in this Memorandum were prepared by the Trust. They reflect reasonable assumptions borne out by the record of these proceedings. *See* Table 2, below, comments to the assumptions in that table and other tables and graphics based upon these assumptions.

480

Figure 1

Settlement of a Rule 23(b)(1)(B) non-opt-out class action was approved to ensure some payment to all claimants. *See Findley I,* 129 B.R. 710. The Court of Appeals rejected the first Settlement because additional subclasses needed to be organized. *Findley II,* 982 F.2d at 739–44. Although the Court of Appeals remanded for designation of new subclasses, it otherwise approved certification of the non-opt-out class action. *Findley II,* 982 F.2d at 739. It also found subject matter and personal jurisdiction under 28 U.S.C. § 1332, and *in rem* and *quasi in rem* jurisdiction over the Trust and its Beneficiaries. *Findley II,* 982 F.2d at 734–35.

Following designation of new subclasses and strenuous negotiation among them, and extensive trials and motions, a new Stipulation of Settlement ("Settlement Stipulation") was submitted. Fairness and other hearings were held.

All federal procedural requirements have now been complied with. The only serious open question remaining is a substantive one: since, under *Erie* doctrine, New York law applies, would New York courts have the power to authorize the Trust to pay all unpaid present and future claimants—probably in the order of about 500,000—an equal percentage of the values of their claims from limited Trust assets? Or would New York courts hew to the literal procedures of the original trust instrument, paying a few tens of thousands of claimants and their lawyers the billions of dollars they have not yet taken from the Trust, leaving many hundreds of thousands of equally deserving claimants with nothing?

 The answer is not disputable. Acting under Rule 23 of the Federal Rules of Civil Procedure, covering applicable procedural requirements, and New York state substantive doctrines of trusts, federal courts have both the power and the obligation to approve and enforce the new Settlement. The purpose of the Trust is "to use the assets in the trust estate to deliver fair, adequate and equitable compensation to bona fide beneficiaries, whether presently known or unknown, without overpaying or underpaying any claims." Trust Agreement, § 2.02. Due to unforeseen circumstances, it is now impossible to achieve that purpose absent a modification in the trust distribution procedures. The Courts have the power under New York law to permit deviation from a trust's terms where the trust's purpose cannot be achieved without such deviation. The subclasses, representing all parties with an interest in the trust, have agreed via the Settlement that a *pro rata* distribution of trust assets achieves that purpose. The Courts concur.

The parties have asked the Courts to decide separately the issue of the effect of the Settlement on claims "arising under Maryland law." Settlement Stipulation, ¶ 4. Applying standard rules of conflicts and deference to state courts, this matter is left for resolution by the Maryland courts.

The decisions in the class action are made by the district courts for the Eastern and Southern Districts. They are concurred in by the Bankruptcy Court for the Southern District of New York since that court has continuing oversight of the Trust. The word "Courts" in the opinion is to be construed to mean the district court or courts, the bankruptcy court, or all three, when applicable. Where power may be exercised only by less than all of the courts, that court or courts is deemed referred to by the term "Courts."

Before the United States District Courts for the Eastern and Southern Districts of New York is a motion seeking final certification of a class and subclasses consisting of present and future Beneficiaries of the Manville Personal Injury Settlement Trust, and approval of a settlement among the class, the subclasses and the trustees of the Trust. Also pending are motions before the district courts and the bankruptcy court for the Southern District of New York for various appointments related to the Settlement.

Settlement follows almost four years of litigation and negotiations. It resolves the impasse arising from the deep insolvency of the Trust and its resulting inability to carry out the purposes for which it was created. Many of the issues raised by the Settlement were fully covered in the Courts' prior detailed and extensive decision, *Findley I,* 129 B.R. at 710–976. *Findley I* is adhered to by the Courts. Since only issues raised by the Court of Appeals in *Findley II* and *Findley III* or strongly urged now need to be addressed, the discussion below is attenuated.

Because of substantial infusions of cash made largely through payments by Manville to the Trust pursuant to the 1990 settlement agreement, prudent financial management by the new trustees and Trust employees, and a sharp reduction in legal fees and costs of administering the Trust, there is ample cash to carry out the new, 1994, Settlement. The realistic settlement provisions now before the Courts are workable, fair and sound.

Table 1, prepared by the Trust, demonstrates the projected impact of the Settlement, particularly its goal of ensuring that all claimants are compensated equitably given the Trust's limited resources.

Table 1

Estimated Projected Impact of Proposed Settlement

| Key Results 1988–2049 | With Settlement | Without Settlement |
|---|---|---|
| Cumulative amount paid | $4,994,000,000 | $2,615,000,000 |
| Cumulative claims paid | 503,921 | 71,641 |
| Payment percentage | | |
| 1994–1997 | 10.0% | 100.0% |
| Final percentage | 13.6% | 100.0% |
| Cumulative unpaid liability | $0 | $18,510,000,000 |
| Cumulative unpaid claims | 0 | 432,280 |

Table 1 and all of the graphics are based upon assumptions prepared by the Trust, summarized in Table 2, and found supportable by the Courts.

Table 2

Projected Impact of Proposed Settlement
Assumptions Underlying Graphics and Calculations

| Operations | With Settlement | Without Settlement |
|---|---|---|
| Date stay on claim payments is lifted | January 1, 1995 | January 1, 1996 |
| Payment order | First–In–First–Out (FIFO) | Trial Docket |
| Method of payment | 10.0% of liquidated claim value from 1995–1997. Increased to 13.6% from 1998–2049 | 100% of liquidated claim value at time of settlement |
| Year Trust's assets are exhausted | 2049 | 2000 |
| Annual maximum claims paid | 75,000 | 7,500 |
| Operating costs per claim: 1995–2000 (excluding ADR & litigation costs) | $164 | $2,321 |
| Total ADR & Litigation costs: 1995–2000 | $7,000,000 | $212,000,000 |

Liabilities

| | | |
|---|---|---|
| Claims settled as of 12/31/92 | 29,407 | 29,407 |
| Backlog of unsettled claims— 12/31/92 | 171,725 | 171,725 |
| Future claim filings 1993–2049 | 302,789 | 302,789 |
| TOTAL | 503,921 | 503,921 |
| Average liquidated value per claim (1995–2000) | $42,820 | $42,820 |
| Claim Inflation | 4.2% beginning in 1997 | N/A (since the Trust would exhaust its assets by the year 2000, the unpaid liability is expressed in current dollars) |

Assets

| | | |
|---|---|---|
| Year Manville common stock is sold | 1996 | 1998 |
| Selling price per share | $12.71 | $7.00 |
| Value of 20% profit sharing rights | $306,000,000 | $159,000,000 |
| Year of Schuller Note sale | 1994 | 1994 |
| Schuller Note net proceeds | $369,000,000 | $369,000,000 |
| Year proceeds received on second bond | 2013 and 2014 | 2000 (assumes consent of Manville Corp. and Manville Property Damage Trust) |
| Proceeds received on second bond | $150,000,000 | $32,300,000 |
| Rates of return on assets | | |
| Pre-stock sale | 5.50% | 5.50% |
| Post-stock sale | 8.89% | 5.50% |

*See also* assumptions in Fairness Exhibit F15. The figures attributed to the sale of the Schuller notes require some explanation. Exhibit F15 assumed that the Trust would sell a Trust Bond (approximately $400 million) in 1994 and 1995. The Trust actually

exchanged the Bond for notes of Schuller International Group, Inc. (approximately $379 million) with the intention of selling the notes for approximately $369 million (net) in a public offering.

Ultimately, the above assumptions result in a greater than 10% *pro rata* share. Because of the uncertainty of many key assumptions, a lower initial *pro rata* share of 10% payment was incorporated into the Settlement. The projections assume a review in 1998 of the *pro rata* calculations, a future increase in the *pro rata* share to 13.6% and a supplemental payment to all previously settled claimants to bring their *pro rata* percentage to 13.6%.

The form of the Settlement—in light of subsequent statutory changes—substantially enhances the value of the Manville stock since there is full assurance against any asbestos claims being made against Manville and assets can be disposed of at a time, and under conditions, most favorable to the Trust. This in part accounts for the differences between the Trust's projected selling prices of the stock given the Settlement ($12.71/share) and in the absence of the Settlement ($7/share).

In the Courts' view, the Trust's assumptions, charts and figures showing the projected selling price for the stock under the Settlement may be based on an overly optimistic view of market behavior, while those depicting the stock's selling price in the absence of the Settlement may be based on overly pessimistic assumptions. Nonetheless, the 10% initial payment and opportunities for adjustment in the *pro rata* share assure the adequacy of the Settlement even if the assets of the Trust turn out to be more or less valuable than expected. A fairer estimate of the value of the stock without the Settlement might be about $10 a share, and with the Settlement might be about $12 a share. At the Courts' request, the Trust prepared an additional summary of the projected impact of the Settlement assuming a price of $10 a share, reproduced in part as Table 3, below. This change in assumptions narrows the difference between the total amounts paid with and without the Settlement, but there remains a difference in favor of the Settlement in the order of over a billion dollars. The graphics and tables supplied by the Trust are used in this Memorandum, even though they include the Trust's assumptions in Table 2, because they clearly illustrate the situation for visual purposes with and without the Settlement.

Table 3

Estimated Projected Impact of Proposed Settlement
(assuming sale of stock at $10 a share in 1996)

| Key Results 1988–2049 | With Settlement | Without Settlement |
|---|---|---|
| Cumulative amount paid | $4,499,000,000 | $3,128,000,000 |
| Cumulative claims paid | 503,921 | 83,618 |
| Payment percentage | | |
| 1994–1997 | 10.0% | 100.0% |
| Final percentage | 12.0% | 100.0% |
| Cumulative unpaid liability | $0 | $17,997,000,000 |
| Cumulative unpaid claims | 0 | 420,303 |

II. Prior Proceedings

The Trust was established by a trust agreement dated November 28, 1988 (the "Trust Agreement") executed pursuant to the Second Amended and Restated Plan of Reorganization (the "Plan") of the Johns–

Manville Corporation and affiliated entities. The Plan was confirmed as fair and equitable pursuant to 11 U.S.C. § 1129. *In re Johns–Manville Corp.*, 68 B.R. 618, 635 (Bankr. S.D.N.Y.1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns–Manville Corp.*, 843 F.2d 636 (2d Cir.1988).

Pursuant to the Plan and the Trust Agreement, the Trust assumed all liabilities for all health claims and for "Other Asbestos Obligations" of Manville. Further litigation of these claims against Manville was enjoined to protect the value of Manville's equity, most of which was contributed to the Trust. The principal purpose of the Trust is "to use the assets in the trust estate to deliver fair, adequate and equitable compensation to bona fide beneficiaries, whether presently known or unknown, without overpaying or underpaying any claims." Trust Agreement, § 2.02. Beneficiaries of the Trust include persons suffering, or persons who in the future will suffer, from asbestos-related diseases caused in whole or in part by exposure to Manville asbestos or asbestos-containing products (generally, "Asbestos Health Claimants"). Other Beneficiaries include entities formerly joined with Manville as defendants in tort litigation brought by Asbestos Health Claimants, including other manufacturers of asbestos and asbestos-containing products who have claims against Manville for contribution ("Codefendants"); and distributors of Manville asbestos or asbestos-containing products who have claims for indemnity or contribution against Manville ("Distributors").

The Plan was approved by the Manville creditors, including more than 90% of the members of the class of Asbestos Health Claimants, and a Legal Representative for Future Claimants appointed by the Bankruptcy Court. The Trust was established in November 1988. Immediately, it became apparent that the Trust would be unable to compensate the vast majority of Trust Beneficiaries, and that, unless the distribution process were changed, a comparatively small number of Beneficiaries and their attorneys would receive all of the Trust's assets. In addition, the assets would be seriously depleted by heavy litigation expenses and excessive Trust administration costs.

The settling parties have long agreed that the Trust is incapable of meeting all its obligations and that the operation of the Trust and the rules by which it compensates Trust Beneficiaries must be adjusted if all of the Trust's Beneficiaries are to be treated equitably. Until now, however, they have been unable to agree on the form that the adjustments should take. The Courts must now determine whether the instant action meets the requirements of Rule 23 governing class actions, including whether the Settlement proposed by the parties is fair, reasonable and adequate.

## A. Trust's Initial Operating Difficulties

Upon consummation of the Plan on November 28, 1988, the Trust received from Manville and its insurers insurance proceeds, cash, accounts receivable and accrued interest totaling $869 million. The Trust also received 80% of Manville's common stock, and beginning in 1992 became eligible to receive up to 20% of Manville's annual profits. In addition, Manville executed two bonds with an aggregate face value of $1.8 billion and a $50 million note; the bonds were payable in annual installments of $75 million commencing in August 1991 and extending through 2014.

When the Plan was confirmed on December 18, 1986, the Disclosure Statement issued in connection with the Plan estimated that over its life, the Trust would receive approximately 83,000 to 100,000 claims which would be liquidated at an average cost of $25,000 per claim; with the cost increasing four percent annually after 1986. While the architects of the Plan recognized that the actual amounts, numbers and timing of future demands could not be determined precisely, they believed that the Trust would be able to make full payment of the liquidated value of all claims, provided the timing of claims coin-

cided with the timing of payments from Manville to the Trust and the number and the cost of claims did not exceed then current estimates.

The number of claims filed and the settlement amounts of claims resolved during the initial period of Trust operation were, however, substantially greater than had been estimated. During 1989, its first year of operation, the Trust settled 14,000 claims at an average value of over $40,000, far in excess of the $25,000 originally estimated. By March 31, 1990, the Trust had received over 140,000 claims, substantially more than the estimate expected over the life of the Trust stated in the Disclosure Statement. As of October 30, 1994, approximately 240,000 claims had been filed with the Trust. Of these, the Trust has settled approximately 30,000, while over 200,-000 remain pending. The Trust was not only spending far more to satisfy claims than had been expected, but receiving far more claims as well.

In addition, a high volume of litigation against the Trust in courts across the country rapidly exhausted the Trust's available cash. This resulted, in large measure, from two factors. Under the Plan's Claims Resolution Procedures, Annex B to the Trust Agreement, an Asbestos Health Claimant could sue the Trust if it did not process the claim within 120 days. Because of the unexpectedly large number of claims filed, claims processing often took longer than the 120 days allowed. As a result, many claimants were entitled to sue the Trust, and the Trust found itself scheduled to participate in hundreds of trials each month.

Second, pursuant to the Co–Defendants' Procedures, Annex F to the Trust Agreement, governing Codefendants' claims for indemnity and contribution against the Trust, Codefendants were permitted to implead the Trust into pending lawsuits against the Codefendants 240 days after consummation of the Plan. The Codefendants impleaded the Trust into tens of thousands of cases.

As a result of both the Asbestos Health Claimants' and the Codefendants' rights to force the Trust into litigation, the Trust had been named in over 90,000 cases in state and federal courts by the Spring of 1990. This exacerbated the Trust's cash-flow problems since the Trust spent in excess of $40 million on outside defense counsel fees during part of 1990 alone and would, if no action were taken, be spending more than $52 million a year for counsel on litigation expenses. Added to the amounts paid to claimants and excessive costs of administering the Trust, these expenditures materially diminished the Trust assets available to compensate Beneficiaries.

To staunch this rapid depletion of the Trust's assets, a district judge sitting in the United States District Courts for both the Eastern and Southern Districts of New York, and the Chief Judge of the United States Bankruptcy Court for the Southern District of New York, after consulting with Justice Helen E. Freedman of the supreme court of New York (supervising asbestos litigation in New York City) and other trial judges, entered several stay orders in July and August of 1990. These stays prevented the Trust from paying any Trust Beneficiaries except for claimants who could prove exigent health circumstances or extreme economic hardship.

On September 18, 1990, the Trust moved for an order determining that the financial assets of the Trust were so limited that there existed a substantial risk that payment of present and prospective asbestos-related claims for personal injury and wrongful death would be placed in jeopardy. The Courts referred this issue to Special Master Marvin E. Frankel who, after evidentiary hearings, reported on November 3, 1990. He concluded that the Trust was "deeply insolvent" and that its assets and expectations of future receipts were so limited that there was a substantial risk that payment of claims asserted by Beneficiaries, including present and prospective asbestos-related claims for personal injury and wrongful death, were in jeopardy. Special Master's Report dated

November 3, 1990, reprinted in *In re Joint E. & S. Dist. Asbestos Litig.,* 120 B.R. 648, 661–68 (E. & S.D.N.Y.1990).

Special Master Frankel's conclusions are still fully applicable. There have been no relevant substantial changes since he issued his report.

### B. Class Action and First Settlement

On November 19, 1990, the instant action was commenced when five plaintiffs who had previously asserted Asbestos Health Claims against the Trust filed suit on behalf of themselves and on behalf of all Trust Beneficiaries. The plaintiffs' complaint invoked the Courts' diversity and bankruptcy jurisdiction and sought to establish an equitable restructuring and allocation of the Trust *res* among all Beneficiaries. Simultaneously with the filing of the complaint, the parties filed a proposed stipulation of settlement providing the terms on which the parties believed the matter should be resolved. *See generally In re Joint E. & S. Dist. Asbestos Litig.,* 120 B.R. 648 & *Findley I.*

The Courts appointed the five plaintiffs as class representatives. The plaintiffs retained as counsel the firms of Rose, Klein & Marias, of Los Angeles, California; Ness, Motley, Loadholt, Richardson & Poole, P.A., of Charleston, South Carolina; Baron & Budd, of Dallas, Texas; Wilentz, Goldman & Spitzer, of Woodbridge, New Jersey; and Cartwright, Slobodin, Bokelman, Borowsky, Wartnick, Moore & Harris, Inc., of San Francisco, California. Class counsel retained Caplin & Drysdale, Chartered, of New York, New York and Washington, D.C., as of counsel. All these counsel are highly skilled and well known specialists in the plaintiff mass tort bar.

Following notice and extensive hearings on class action certification and the fairness of the proposed settlement, the Courts, on February 13, 1991, certified the plaintiffs' suit as a mandatory non-opt-out class action under Rule 23(b)(1)(B) of the Federal Rules of Civil Procedure. The February 13th Order also certified the class, which is defined as all Beneficiaries of the Trust "each of whom has or will have a claim either for wrongful death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of a death or personal injury claim." *See Findley I,* 129 B.R. at 776. On June 27, 1991, the Courts issued a final judgment approving the settlement, making permanent the prior stay of proceedings against the Trust, and reaffirming an injunction contained in the Plan that enjoined suits against Manville.

Objecting Asbestos Health Claimants and Codefendants who opposed the settlement filed appeals. They challenged the Courts' diversity jurisdiction and bankruptcy jurisdiction, the certification of a non-opt-out class action and the approval of the settlement. The MacArthur Company, a former distributor of Manville products, and its affiliated companies ("MacArthur") also appealed, arguing that the class was not properly certified and that MacArthur's rights under a stipulation and order (the "MacArthur Stipulation") could not be altered by the settlement.

### C. Appeal and Remand

The United States Court of Appeals for the Second Circuit held that although bankruptcy jurisdiction did not lie, diversity subject matter jurisdiction existed over the class action and that the Courts' *in rem* and *quasi in rem* jurisdiction allowed the Courts to exercise personal jurisdiction over the Beneficiaries and the Trust. *Findley II,* 982 F.2d at 735. The Court of Appeals also indicated that a Rule 23(b)(1)(B) non-opt-out class would be proper in this action, provided that subclass designations appropriate to the unique facts of this case and the terms of the proposed settlement were made to ensure that "the consent of groups of claimants who are being treated differently by the settlement is being given by those who fairly and adequately represent only the members of each group." *Findley II,* 982 F.2d at 739.

The Court of Appeals vacated the judgment approving the settlement and remanded the case for further proceedings, having

concluded that appropriate subclasses had not been designated and thus proper consent to the settlement had not been obtained. *Findley II*, 982 F.2d at 751. Specifically, in connection with the then-proposed settlement, the Second Circuit held that separate subclasses would be required for: (1) the Codefendants; (2) MacArthur; (3) those health claimants who had filed claims against the Trust "sufficiently early ... to assure the full payment of their claims before the trust runs out of money"; (4) those health claimants who had not filed early enough to claim an early place in the "FIFO (First In First Out) queue" ensuring that they would receive payment of their claims before the Trust ran out of money; (5) "Level One" health claimants (those with the most serious diseases); and (6) "Level Two" health claimants (those with non-debilitating conditions). *Findley II*, 982 F.2d at 739–44. The panel's ruling depended in part on the panel's then view that the settlement drew distinctions between categories of Beneficiaries which required separate representation for them.

On rehearing, the Second Circuit panel modified its conclusions by holding that Rule 23 did not require the creation of subclasses of health claimants based on their position in the FIFO queue because, based on the evidence submitted on rehearing, a claimant's place in the FIFO queue was never intended to confer a substantive right to payment of his or her claim. *Findley III*, 993 F.2d at 11. Subclasses based on FIFO standing were therefore not required.

III. Present Proceedings

A. Proceedings on Remand

On remand the Courts conditionally certified six subclasses and, after consultation with all parties, appointed subclass representatives. The plaintiff class representatives and their appointed counsel continued as representatives of the entire class of Trust Beneficiaries, subject to representation by subclass representatives with respect to those issues on which the interests of the class and the subclass diverged. The Courts continued

the appointment of a Legal Representative of Future Claimants and designated the following subclasses: Codefendant Manufacturers, Manville Distributors, MacArthur, Present Claimants, Future Claimants and Claimants with Pre–November 19, 1990 Settlements and Judgments—the date the class action was commenced. No subclasses were certified for "Level One" and "Level Two" claimants because the parties advised the Courts that any future settlement would not distinguish among Asbestos Health Claimants in ways requiring separate representation.

The Codefendant Manufacturers subclass representatives are Owens–Corning Fiberglas Corporation, Owens–Illinois, Inc., and the members of the Center for Claims Resolution, Inc., each of which is a former manufacturer or distributor of asbestos products which was sued regularly as a codefendant with Manville or the Trust. But for the stays, Manville or the Trust could still be a codefendant in asbestos litigation now brought against members of the Codefendant subclass. Each Codefendant subclass representative has contribution claims against the Trust typical of the claims of other codefendant manufacturers. Lead counsel for the Codefendant subclass are Roger E. Podesta and Anne E. Cohen of Debevoise & Plimpton, of New York, New York. These highly skilled counsel have represented the interests of the Codefendants throughout this litigation including serving as court-appointed representatives of Codefendant beneficiaries with respect to the first settlement of this case. They and their firm have substantial experience in complex and "mass tort" litigation and represent a major manufacturer defendant in asbestos litigation around the country.

The Distributors subclass representatives are the E.J. Bartells Corporation and J.T. Thorpe Co., both of which were major distributors of asbestos-containing products manufactured by Manville. Both have claims for contribution and indemnity against the Trust typical of those of other Manville distributors. The Distributors subclass is represented by Katherine Steele of Steele & Sales, P.S. of Seattle, Washington, and Francis Lawall of Pepper, Hamilton & Scheetz, a

major national law firm headquartered in Philadelphia, Pennsylvania. Both counsel are highly skilled. Ms. Steele has represented E.J. Bartells for more than eight years in its asbestos-related litigation, and has ably asserted the Distributors' position in this case since 1991. Mr. Lawall represented Pacor, Inc., a substantial Manville distributor, in its bankruptcy and in connection with claims against the Trust and has substantial expertise in complex bankruptcy and mass tort proceedings.

MacArthur Co. represents the MacArthur subclass, which consists solely of it and two affiliated companies. Its claims are substantially identical to those of its affiliates. The MacArthur subclass is represented by MacArthur's long-time counsel, John Faricy. Mr. Faricy has skillfully and tenaciously asserted MacArthur's interests throughout this litigation. He also represents other distributors in connection with claims against asbestos manufacturers.

The present claimants subclass is represented by Perry Weitz of the firm of Weitz & Luxenberg, in New York, New York. Mr. Weitz has represented thousands of plaintiffs in asbestos and other mass personal injury suits, including cases in which Manville or the Trust was a defendant. He is a highly skilled member of the mass tort plaintiff bar.

Leslie Gordon Fagen is the Legal Representative of Future Claimants. He and his large firm, Paul, Weiss, Rifkin, Wharton & Garrison, New York, New York, represent the future claimants subclass. Mr. Fagen and his firm have no conflict of interest with any Beneficiary. He and his partners are nationally known and highly skilled litigators in complex cases.

Lani A. Adler, formerly of Grais & Phillips, New York, New York and now an independent practitioner, represents those pre-November 19, 1990 judgment and settlement claimants who did not accept certain settlements with the Trust modified during the pendency of this class action, described below. Ms. Adler is a highly skilled litigator, fully familiar with complex federal practice.

David Austern, the Trust's General Counsel, assisted by Patricia Dansbury, and the Trust's outside counsel, James L. Stengel of Donovan, Leisure, Newton & Irvine, assisted by Laurie S. Dix, Richard De Marco and Steven Fink, conducted the litigation with great skill and with full fiduciary sensitivity to the rights of all claimants, present and future. These attorneys ensured that the Trust's interests were well represented in court and in the complicated negotiations leading to the Settlement.

All counsel in the case have ably and diligently represented their clients' interests. The many tens of millions of dollars of legal fees expended in the original bankruptcy and subsequent proceedings, including those following *Findley III*, were required by the emphasis of our judicial system on due process and strict compliance with procedural rules designed for less complex litigation.

### B. Amended Complaint

The named plaintiffs filed a "First Amended Class Action Complaint," captioned *Findley v. Falise*, (the "Amended Complaint") on October 8, 1993. The complaint seeks "an *equitable distribution* of the assets of the Trust among all Trust Beneficiaries." *See* Settlement Stipulation 2 (emphasis added). It alleges, as did the original complaint, that the assets of the Trust are insufficient to permit the Trust to continue to pay all claims in full without jeopardizing the payment of claims of other Trust Beneficiaries. Amended Complaint, ¶ 21. It seeks an equitable allocation of the Trust's assets among its Beneficiaries based on New York trust law and a restructuring of the Trust's procedures to substantially reduce Trust expenses. *Id.*, ¶ 22. The Courts' jurisdiction over the action and the parties is predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332 and the Courts' jurisdiction over the Trust and the Trust *res*. *Id.*, ¶¶ 3 and 4.

The Trust filed an Answer to the Amended Complaint on October 22, 1993, and the Co-defendant subclass filed an Answer on February 11, 1994. In December 1993, counsel for the Subclass of Manville Distributors and the Legal Representative of Future Claimants successfully moved to intervene as representatives of their respective subclasses. A subclass complaint was filed by the Legal

Representative of Future Claimants on November 19, 1993, to which Answers were filed by the Trust and the Subclass of Codefendant Manufacturers. A number of Trust Beneficiaries then moved for judgment on the pleadings dismissing the Amended Complaint. The Courts, by Orders dated December 19, 1993, denied the motions, as well as an application by some claimants for leave to appeal from that interlocutory order pursuant to 28 U.S.C. § 1292(b).

On March 15, 1994 a full trial of all issues raised by the pleadings commenced before the Courts. It continued with adjournments until July 25, 1994, when, as noted below, it was aborted by a settlement.

Because certain issues concerning claims arising under Maryland law were not resolved by the Settlement, with the consent of all parties a separate trial of the "Maryland Issue" was held by the Courts. It was intended to resolve the "issue of appropriate set-off rules that should be developed with respect to Manville or the Trust in connection with claims arising under Maryland law in the context of a fair and adequate resolution of these proceedings." Settlement Stipulation, ¶ 4. The Maryland claimants did, however, approve all other aspects of the Settlement. This narrow issue, by the consent of all parties, was severed from the rest of the issues resolved by the Settlement and tried on August 2, 1994. It is resolved, as indicated in greater detail below, by allowing Maryland courts to decide and apply Maryland law in individual litigations. Where, under Maryland conflicts law, the law of another state governs, the Settlement provisions applicable to that other state will apply to the extent that Maryland's choice of law rules provide.

The Courts relied on evidence in all proceedings involving the bankruptcy of Manville and actions against the Trust in the Courts, including the fairness hearings. That evidence demonstrated the following:

As of the commencement of the instant proceeding, the Trust had paid $679 million to approximately 15,700 claimants. By September 30, 1994, the Trust had paid $1.072 billion to approximately 29,010 claimants, including approximately $14 million to eight codefendants and distributors.

Of this amount, approximately $343 million was paid during 1994 to approximately 11,300 plaintiffs who had either settled with, or won a judgment against, the Trust prior to November 19, 1990. These claimants argued that because their claims had been finally determined prior to initiation of the instant class action, they were entitled to full payment. They ultimately accepted payments equal to approximately 70% of their claims' full value. These payments were challenged by some present claimants whose claims had not been settled or reduced to judgment prior to November 19, 1990. Payments were upheld on appeal. *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 151, 154–57 (2d Cir. 1994). Those relatively few persons who have not yet accepted these discounted payments constitute the Subclass of Claimants with Pre–November 1990 Settlements and Judgments.

The Trust retained the Resource Planning Corporation ("RPC") to prepare an estimate of future claims to be received over the life of the Trust. RPC has determined, to an acceptable degree of probability, using standard and well accepted statistical methods, and based on the Trust's experience, that between 303,000 and 328,000 claims will be filed against the Trust between 1993 and 2049. The settling parties acknowledge that there is inherent uncertainty in these predictions and that there is a possibility that the number of claims actually received may fall outside any projected range. RPC recommended that the estimate be reviewed at least every three years. This recommendation has been incorporated into the Settlement and provides the best assurance possible of fair and equal compensation to all Trust Beneficiaries.

The Trust and RPC have also undertaken an analysis of the likely liability associated with current and future claims. Using a sample drawn from approximately 167,000 then-current claims, current liabilities were projected as being in excess of $6.7 billion. Based on reasonable assumptions about claimant behavior, claim inflation and other factors affecting claim valuation, the Trust's

experts estimate the Trust's total liability for future claims to be between $21 billion and $25 billion in nominal dollars, *i.e.*, not reduced to present value.

The Trust retained Houlihan, Lokey, Howard & Zukin ("HLH & Z") as experts to analyze the likely value of the Trust's assets under a variety of scenarios. Based upon HLH & Z's analysis, a reasonable valuation of the Trust's assets ranges from $1.8 billion to $2.5 billion. *See* Asset Analysis dated 2/28/94, Exhibit B to Expert Witness Statement of Donald V. Smith.

A committee appointed by the Courts pursuant to Rule 706 of the Federal Rules of Evidence has made a comprehensive study leading to predictions of future claims using a more sophisticated analysis than did the RPC. The panel examined a wider variety of assumptions than RPC and concomitantly found a much wider possible variation in future claims. Reasonable extrapolations from the Rule 706 Panel conclusions are, however, quite close to those of the RPC. This independent work of the Rule 706 Panel, as well as the procedures for regular reevaluations of claims and assets, furnishes strong assurance that the debacle of lack of adequate assets to pay current claims will not be repeated.

Comparison of the range of liability totals and the estimates of the value of the Trust's assets shows that: (1) the Trust remains a limited fund; and (2) the only means by which the equivalent treatment of similarly situated claimants can be assured is by a *pro rata* reduction in the amounts paid for claims, that is, by paying each claimant the same percentage of damages suffered.

Evidence of Trust assets and liabilities provides a prudent basis for the agreement of the parties on an initial *pro rata* payment of 10% of the value of claims. The "deep insolvency" of the Trust found by Special Master Frankel continues. Unless the manner in which the Trust operates and pays claims is restructured to include a *pro rata* payment scheme, the Trust will be unable to fulfill its purpose of delivering "fair, adequate and equitable compensation to bona fide Beneficiaries, whether presently known, or un-

known, without overpaying or underpaying any claims."

## C. Settlement Negotiations

The parties began new settlement discussions in 1993 shortly after the Court of Appeals handed down its revised decision after rehearing in 1993. Those negotiations continued for more than a year. Each of the subclasses appointed by the Courts, the Class Counsel, the Trust, and any other person who wished to be heard, participated actively in the negotiations. There were many face-to-face meetings among the parties and numerous telephone conferences. Draft settlement papers were repeatedly circulated among the parties. Many lawyers and lay persons also communicated views to the class and subclass representatives.

The negotiations were hard-fought, with each attorney vigorously representing the interests of his or her constituents. As the Settlement demonstrates, the negotiations were extraordinarily complex and required the settling parties to reach consensus on a panoply of issues. The principal problems included:

- developing efficient claims resolution procedures;
- developing consensus on scheduled disease categories and values;
- deciding how the Trust would be removed from the tort system;
- satisfying existing indemnity and contribution claims by the distributor and codefendant manufacturer Beneficiaries and determining treatment of future claims for contribution by codefendant Beneficiaries and future claims for indemnity by distributor and other Beneficiaries;
- dealing with MacArthur's claim of rights under the MacArthur stipulation; and
- resolving Trust management and continuing oversight issues;

By September 1993, the parties had made substantial progress with respect to the development of efficient claims resolution procedures and scheduled disease categories and values, but other issues remained substantially unresolved. On September 28, 1993,

after hearing reports of the negotiations, the Courts fixed a trial date of February 1, 1994, and set a schedule for motions and for discovery under the supervision of Magistrate Judge John L. Caden. As the trial progressed, settlement discussions continued. Just before the Codefendants were to present their case, the parties sought and obtained an adjournment to continue negotiations. Intensive bargaining followed, leading to the Settlement now presented.

Mark Peterson, the Special Advisor appointed by the Courts, participated in every stage of the discussions. He testified at the fairness hearings that he had ample opportunity to observe the intense hard-fought negotiations and their arms-length, non-collusive nature. The Settlement was not the product of fraud or collusion.

Class counsel and counsel for each of the subclasses made substantial efforts to inform and consult class or subclass members concerning the ongoing negotiations. Because of the close-knit nature of the bars of the plaintiffs, defendants and insurers, all those lawyers whose clients' rights were affected were aware of these negotiations. As a practical matter, any of them had access to the negotiations had they wished to participate, be heard or be informed. The Courts were at all times open to any motions, including any to intervene.

Drafts of the proposed settlement documents were widely circulated among class and subclass members. In June 1993, a draft of a proposed Trust Distribution Process ("TDP") was circulated to all lawyers representing claimants against the Trust and to all *pro se* claimants. The Amended Complaint included a draft TDP as an attachment. The Complaint and the proposed TDP were reported on in *Mealey's Litigation Reporter: Asbestos* and Andrews Publications' *Asbestos Litigation Reporter*, leading periodicals in the field. They made copies available to their readers. *See* Findley *Fairness Hearings to Run First Week of November*, Mealey's Litig.Rep.: Asbestos, Oct. 7, 1994, at 4; Findley *Parties Announce Basic Terms of Settlement*, Asbestos Litig.Rep., Aug. 5, 1994, at 30,339; *Weinstein, Lifland Approve Notice to Class, Set Fairness Hear-*

*ing*, Asbestos Litig.Rep., Sept. 2, 1994, at 30,532. In addition, class and subclass counsel disseminated drafts of the TDP to interested class members. Counsel for the class and each subclass made themselves available to respond personally to inquiries from class members and others throughout the negotiation process.

On July 25, 1994, a stipulation of settlement signed by the Trust, all class and subclass representatives and the J.T. Thorpe Company, (the "Settlement Stipulation"), together with various annexed exhibits, was filed. *See* Addendum A, attached to and made a part of this Memorandum, Orders and Judgment. The settling parties filed a motion on August 18, 1994 seeking an order setting a hearing to determine whether the agreement embodied in the Settlement Stipulation should be approved as fair, adequate and reasonable, and asking the Courts to order a proposed form of notice to the class of the Settlement and of the fairness hearings. The motion was heard on September 1, 1994. The Courts then finally certified the class and subclasses, approved the proposed form of notice and scheduled fairness hearings to begin on November 1, 1994 to determine whether the Settlement should be approved as fair, adequate and reasonable.

1. Notice of Settlement and Hearings

Pursuant to the Courts' order of September 1, 1994, widespread notice of the Settlement and the fairness hearings was disseminated. The notice described the nature of the class action, indicated the time and place of the fairness hearings and described in substantial detail the principal features of the Settlement. The notice also stated that the Settlement, if approved, would be binding on all class members, and that any class member or other person could appear at the fairness hearings and present objections to the Settlement.

Between September 30, 1994 and October 12, 1994, the notice was published twice in the following publications: USA Today (National Edition); New York Law Journal; New York Times; Washington Post; New Orleans Times Picayune; San Francisco Chronicle; Dallas Morning News; Atlanta

Journal and Constitution; Chicago Tribune; Los Angeles Times; Baltimore Sun; and Philadelphia Inquirer. The notice was also published in general circulation newspapers in Seattle, Washington; Houston, Texas; Miami, Florida; Charleston, South Carolina; Norfolk, Virginia; Boston, Massachusetts; St. Louis, Missouri; Cleveland, Ohio; Kansas City, Missouri; and Detroit, Michigan. In addition, thirty- and sixty-second public service announcements ("PSAs") were distributed to radio stations. It is estimated by News/Broadcast Network, the company hired to distribute the PSAs, that the PSAs were heard by 18 million people between the middle of September and the end of October 1994.

Finally, a package containing the notice and the Settlement Stipulation was sent by first class mail to all plaintiffs' attorneys who represent Trust Beneficiaries; all attorneys representing Codefendants; all members of the Manville Distributors subclass; all pro se claimants; all other persons or organizations listed on the class action service list; the "Property Damage Trust" created in connection with the Plan; the Manville Corporation; all subscribers to the Professional Negligence Law Reporter; all subscribers to the Association of Trial Lawyers of America's Products Liability Law Reporter; and the National Asbestos Victims Action Organization Committee.

Pursuant to the Courts' order, any member of the public who appeared was heard at the fairness hearings. Any documents offered were made part of the record.

### 2. Summary of Settlement

The following summary is designed to assist the reader. The actual Stipulated Settlement and TDP, attached as Addendum A, as amended by Addendum B, governs.

Under the terms of the Settlement, the rights and duties of all class members and the rights and duties of the Trust with respect to class members are governed by the TDP, except that certain contribution claims, certain indemnity claims, the claims of the members of the MacArthur Subclass and the claims of the J.T. Thorpe Company (a member of the Manville Distributor Subclass) based on an agreement with the Trust dated April 29, 1989, will be resolved as described below. All other claims of Trust Beneficiaries, including claims for contribution and indemnity, are to be processed and paid under the TDP. Payment under the TDP constitutes complete and total satisfaction of such claims under the bankruptcy reorganization plan and thus provides additional protection against suits naming Manville as defendant—suits which can only lessen the value of the Trust's assets.

The ultimate goal of the Settlement is for all claimants to share equally in the burdens imposed by the Trust's limited fund status. The TDP seeks to accomplish that goal by paying all claimants—whether Asbestos Health Claimants, Codefendants or Distributors—over time as equivalent a share as possible of their claims' values, and by adopting numerous measures designed to reduce significantly the Trust's operating and litigation expenses and to maximize the amount the Trust can obtain from its assets and pay to Beneficiaries.

#### a. *Pro Rata* Shares

To ensure equitable treatment of all claimants, present and future, in light of the Trust's deep insolvency and inability to pay all Beneficiaries in full, the TDP provides that each claimant will receive a *pro rata*—equal percentage—share of his or her claim's liquidated value. The percentage to be paid will be set by the Trust with the concurrence or consultation of a number of persons outside the Trust. They are first, the Selected Counsel to the Beneficiaries ("SCB"), a group of lawyers representing health claimants appointed by the Courts under the Plan. The SCB is charged with representing the interests of Trust Beneficiaries, and toward that end is granted certain rights vis-a-vis management of the Trust. Second, the Special Advisor, the successor to the Advisor to the Courts, in effect a Special Master. Third, the Legal Representative, the successor to the attorney for the subclass of future claimants.

The percentage of a settled claim to be paid will be set in the future by the Trust with the concurrence of the SCB and the

Legal Representative, after consultation with the Special Advisor. The SCB is, as of now, essentially the representative of present plaintiffs. The Special Advisor is Mark Peterson. The Legal Representative is Leslie Fagen. *See* Part X, *infra.* Provision for future replacements, if necessary, is provided. This system of checks and balances will not inhibit the Trustees from managing the Trust and its assets efficiently. It will ensure that all Beneficiaries, present and future, are protected and treated equally.

The same *pro rata* share applies to present and future Asbestos Health Claimants, Codefendants, Distributors and all other Trust Beneficiaries. Thus, no future claimant can justifiably object to the plan on the ground that conflicts of interest prevented his or her interests from being fully protected.

The initial *pro rata* share of 10% agreed to among the parties is based on a conservative and sound present valuation of the Trust's assets and present expectations about the value of present and future Trust liabilities. The TDP provides that periodically (at least every three years, or more frequently if desired by the Trust, the SCB or the Legal Representative) the Trust shall reevaluate its assets and expected liabilities to determine whether the *pro rata* share should be increased or decreased. If it is increased, the TDP provides for equalizing payments to be made to claimants who previously liquidated claims at a lower percentage. If the *pro rata* share is decreased, however, claimants who have been paid at a higher percentage will not be required to refund any money to the Trust. These procedures will provide reasonable assurance that the Trust will value, and will be in a financial position to pay, present and future claims in substantially the same manner.

This flexibility is essential since no one can project claims and assets into the future with certainty. As time passes the divergences between expected and actual results can constantly be adjusted to protect beneficiaries. The Rule 706 Panel results demonstrate that such an adjustment is essential in view of the wide differences between possible high and low numbers of future claims.

### b. Removal of Trust from Tort System

The goal of reducing the Trust's litigation and operating expenses is addressed in a number of provisions. The Settlement relieves the Trust of the burden of attending and participating in litigation brought by Asbestos Health Claimants against Codefendants and Distributors. Moreover, the TDP should substantially replace the time-consuming and costly process previously employed by the Trust in which it individually negotiated every claim filed.

Section H of the TDP provides the means by which the Trust is removed as an active party from the tort system. It requires *all* Trust Beneficiaries to dismiss all actions presently pending against the Trust, enjoins them from filing any new actions, requires them to pursue claims against the Trust only in accordance with the TDP, and provides that "the Trust will make no appearance in any court," except in very limited circumstances.

Section H also governs the resolution of claims for contribution and indemnity in litigation between Trust Beneficiaries, as well as the calculation of set-offs. Resolution of these issues was extremely difficult. First, as noted in some detail below, settlement had to take account of the different laws of all fifty states. Second, settlement had to resolve the problem of whether plaintiffs, other manufacturers or distributors would take or share the losses due to payment of Manville claims at only a percentage of their value. In most asbestos litigation there are many codefendants. The law regulating the shares of settling and non-settling defendants and possible contributors and indemnitors is complex and in many states unclear. The presence of bankruptcies and limited asset trusts complicates the problem which involves possible shifting of billions of dollars in assets and liabilities from one set of parties to another.

To promote preservation of the Trust's assets, Section H provides that set-offs "shall be the preferred method of satisfying Codefendant claims," and permits Codefendants to obtain set-offs for the Trust's share even where an Asbestos Health Claimant has not yet liquidated his claim against the Trust.

Set-offs will be measured by reference to applicable local law. When applicable law measures a set-off by reference to the amount paid by a settling defendant, that amount will be the *pro rata* share of a claim's liquidated value that has been or actually will be paid by the Trust, or, in a case where the plaintiff has not liquidated his or her claim against the Trust, the *pro rata* share of the scheduled value assigned by the TDP to the plaintiff's scheduled disease.

As an alternative, Codefendants may also file claims for contribution with the Trust. Such claims will be valued as if the Codefendant had stepped into the claimant's shoes and will be processed in the same fashion as an asbestos health claim.

Section H also provides that "[i]n return for limiting the right of Co-defendants to implead the Trust ..., the Trust shall be treated in litigation between Beneficiaries of the Trust as a legally responsible tortfeasor under applicable law, without the introduction of further proof." TDP § H.1.(d). There is one exception to treatment of the Trust as a legally responsible tortfeasor, applicable in the event that a health claimant, in a jurisdiction in which the judgment against a joint tortfeasor is reduced with reference to the apportioned liability share of released or absent parties, waives his or her claim against the Trust.

Section H also provides that "[i]n any litigation between Trust Beneficiaries, all Beneficiaries shall retain their respective rights provided by applicable law to introduce evidence at trial in state or federal court." TDP § H.1(b). It permits Trust Beneficiaries to assert third-party claims against the Trust "for the sole purpose of listing the Trust on a verdict form or otherwise as necessary to ensure that any verdict reduction in respect of Manville (or Trust) liability share is made pursuant to applicable law." TDP § H.1.(c).

### c. Scheduled Disease Values

The TDP contains numerous provisions intended to reduce significantly the Trust's operating expenses. It establishes a schedule of asbestos-related disease categories and values that will enable most claims to be resolved more quickly, while retaining for each claimant the right to elect individual claim evaluation. *See* TDP § D. This "matrix" process permits the vast majority of claims to be evaluated by the application of "scheduled" values for defined disease and claimant categories. It will substantially increase the rate at which the Trust processes claims and materially reduce per claim transactional and processing costs.

The Trust has already instituted new procedures for handling claims under the TDP matrix. It has implemented procedures which will enable it to make matrix offers on some 100,000 claims in the first twelve month period after the Settlement is approved.

The disease categories and values were extensively negotiated by the parties. The scheduled values were established based on the Trust's experience in settling claims and the values at which plaintiffs' claims are presently being liquidated in the tort system. They are intended to reflect the full and fair settlement value a claim against Manville would have if pursued individually with the Trust or settled prior to trial in the tort system. Since claimants can obtain these full values for their claims (subject to *pro rata* reduction as described above) without the need for individual evaluation and negotiation or resort to the tort system, the parties expect that most claimants will settle their claims at scheduled values.

The scheduled diseases and their corresponding scheduled values are as follows:

| Category | Scheduled Disease | Value |
|---|---|---|
| I | Bilateral Pleural Diseases | $12,000 |
| II | Nondisabling Bilateral Interstitial Lung Disease | $25,000 |
| III | Disabling Bilateral Interstitial Lung Disease | $50,000 |
| IV | Other Cancer | $40,000 |
| V | Lung Cancers (One) | $60,000 |
| VI | Lung Cancers (Two) | $90,000 |
| VII | Malignant Mesothelioma | $200,000 |

The detailed criteria that a claim must meet to receive an offer for the scheduled value for one of the seven scheduled disease categories are set forth in Section D of the TDP.

The TDP provides that the claimant or the Trust may elect to have the claim individual-

ly evaluated by the Trust. The liquidated value of a settled claim cannot exceed the "maximum value" for a relevant disease category unless the claim is deemed "extraordinary." An "extraordinary claim" is one in which a claimant with an asbestos disease was exposed only to Manville asbestos products, where Manville asbestos products constituted the overwhelming majority of the claimant's asbestos exposure, or where special damages are exceptionally large. An extraordinary claim may be individually valued and liquidated for an amount in excess of the maximum value for the particular Scheduled Disease.

All unresolved disputes over categorization and valuation of claims are subject to arbitration under procedures set forth in the TDP. Claimants whose valuation disputes are not resolved by non-binding arbitration may elect to enter the tort system. If and when a claimant enters the tort system, initial payment of any judgment will be limited to the *pro rata* share multiplied by the maximum value provided for the disease category in which the claim is placed by the Trust and the claimant or by arbitration (or, for extraordinary claims, the *pro rata* share times the greater of the Trust's last offer and the arbitrator's award).

The excess amount, if any, of any judgment will be payable from a second pool of funds that will not become available until all claimants have received 50 percent of the liquidated value of their claims. It appears doubtful that the second pool will ever be funded.

The maximum values are as follows:

| Category | Scheduled Disease | Maximum Value |
|----------|-------------------|---------------|
| I | Bilateral Pleural Disease | $ 30,000 |
| II | Nondisabling Bilateral Interstitial Lung Disease | $ 40,000 |
| III | Disabling Bilateral Interstitial Lung Disease | $300,000 |
| IV | Other Cancer | $200,000 |
| V | Lung Cancers (One) | $400,000 |
| VI | Lung Cancers (Two) | $400,000 |
| VII | Malignant Mesothelioma | $500,000 |

#### d. Settlement of Claims Outside Trust Distribution Process

##### [1.] Codefendants' Claims

Some claims asserted by the various subclasses and certain of their members are resolved by the Settlement separately and apart from the claims governed by the TDP. Contribution claims by Trust Beneficiaries arising from judgments or verdicts entered against Trust Beneficiaries on or before July 25, 1994 will be paid from a fund of $35 million established and held by the Trust (the "Codefendants' Fund"); this fund will be distributed only to pay Codefendants' obligations to Asbestos Health Claimants in accordance with the Statement of Codefendants' Distribution Principles, Exhibit B to the Settlement Stipulation. The Codefendants' evidence demonstrated that they have sustained well over $500 million of judgments in asbestos cases from July 9, 1990 (when the Courts first stayed payments by the Trust) to July 25, 1994 which would give rise to contribution claims against the Trust. Over $80 million in judgments were sustained prior to November 19, 1990, which the Codefendants claimed entitled them to be paid similarly to plaintiffs who obtained judgments or settlements against the Trust prior to that date. *See In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d at 154–57.

In all, many billions of dollars have been paid by Codefendants and their liabilities have been substantially increased by the Manville and other bankruptcies. The result has been that the tort system has—arguably unfairly—shifted to some of the most responsible and well-financed defendants the costs attributable to the most culpable. The TDP could not solve this problem, but it sought to avoid exacerbating it.

##### [2.] Distributors' Claims

Distributors' claims are settled by a variety of formulae. Given the size of the claims, potential for future claims and need to avoid litigation, the details are necessarily complicated.

Indemnity claims by members of the Manville Distributors Subclass arising from loss-

es paid by them on or before July 25, 1994 will be satisfied from a fund of $9.5 million established by the Trust (the "Distributor Fund"), the assets of which will be distributed in accordance with the Manville Distributor Subclass Settlement Fund Distribution Procedures, Exhibit C to the Settlement Stipulation. The $9.5 million fund for Distributors resolves all Distributors' indemnity claims for asbestos-related losses paid before the date of settlement. The Distributors have demonstrated that they incurred more than $100 million in losses defending, settling and paying judgments in asbestos-related cases prior to July 25, 1994. Some $18 million of such losses were incurred prior to November 19, 1990. Like the Codefendants, the Distributors asserted that this entitles them to be paid in a fashion similar to plaintiffs who had judgments against or settlements with the Trust before that date. Even if all Distributor Indemnity Claims were paid at the 10% *pro rata* share, these claims have a potential value in excess of the $9.5 million proposed settlement.

J.T. Thorpe Co., a representative of the Manville Distributors Subclass, contends that an April 29, 1989 letter agreement (the "Letter Agreement") between it and the Trust (Exhibit D to the Settlement Stipulation) provides it with the right, separate and distinct from the rights of other members of the Manville Distributors Subclass, to unlimited and full payment of its claims against the Trust. J.T. Thorpe Co.'s additional rights against the Trust created by the Letter Agreement will be extinguished by the Trust's payment of $1.2 million to J.T. Thorpe Co. and the processing of its indemnity claims at a fixed "Distributor Indemnity Claim" percentage of 100%, as defined and set forth in Section H of the TDP. Thorpe argued that the April 25, 1989 agreement could not be modified in this restructuring to provide for *pro rata* payments. If that argument were to succeed, the Trust would be liable for the $7 million in asbestos-related losses already incurred by Thorpe as well as all future losses.

MacArthur contends that the Stipulation and Order entered on June 30, 1988 by the U.S. Bankruptcy Court for the Southern Dis-

trict of New York in the *Johns–Manville* bankruptcy provides it with unique rights, including the right to full payment of its claims against the Trust. To resolve MacArthur's claims, the Trust will pay $10 million to a segregated fund (the "MacArthur Fund") which will be used by MacArthur for, *inter alia*, the payment of expenses to be incurred by MacArthur in litigation and claims seeking to enforce insurance rights. The purposes of the MacArthur Fund, its governing principles and the uses to which its assets can be put are set forth in the MacArthur Fund Principles, Exhibit E to the Settlement Stipulation. MacArthur in return forever waives and releases any Trust Claims it has asserted and also waives and releases any claims it has or may have, now and in the future, against the Trust or Manville, except claims for a breach of the Settlement Stipulation and claims to a share of the Codefendants' Fund.

MacArthur's evidence showed that it has incurred in excess of $75 million in losses in defending, settling and paying judgments in asbestos cases for which it asserts claims for contribution and indemnity against the Trust. MacArthur believes that it will incur many millions of dollars in additional such losses in the future.

### 3. Amendments During Fairness Hearings

During the fairness hearings, a number of amendments to the Settlement Stipulation were proposed and agreed on by the parties and the class and subclass representatives. *See* Addendum B, attached to and made a part of this Memorandum, Orders and Judgment. The hearings were kept open to permit comment by anyone interested.

"[E]xcept insofar as the Court finds technical, perfecting, and non-substantive changes necessary and reasonable," a settlement should be approved without alteration. *Liddell v. Board of Educ.*, 567 F.Supp. 1037, 1047 (E.D.Mo.1983). The parties "have the power to agree upon changes" and the court may approve changes in connection with a fairness hearing. *Bronson v. Board of Educ.*, 604 F.Supp. 68, 73 (S.D.Ohio 1984).

Here, the changes are technical, perfecting and non-substantive. They were agreed to "during arms-length negotiations, such as those that proceeded [sic] the drafting and the approval of [the] agreement," *Bronson,* 604 F.Supp. at 73, by all of the parties who drafted the original Settlement. The amendments were widely publicized by giving notice to all persons interested in the litigation. The Courts considered them during continuations of the fairness hearings. All interested parties have had the opportunity to object. None have done so. The amendments are approved as technical amendments which are fair, reasonable and necessary.

### D. Rule 706 Court–Appointed Panel Projections of Future Claims

#### 1. Background and Role of Panel

On December 7, 1990, the Courts, during the *Findley v. Blinken* litigation, found that a panel of neutral experts was required to determine the feasibility of developing a statistical model that would ensure reliable projections of future claims against the Trust. The Courts appointed Professor Margaret A. Berger as an expert pursuant to Federal Rule of Evidence 706 on December 7, 1990. Professor Berger was charged with reporting on the feasibility of developing such a model, as well as the procedures required to produce the projections, and was empowered to aid the Courts in selecting a panel of experts to perform such a task under her supervision. She consulted with many members of the academic and non-academic community in preparation for the panel's work and during its activities.

Professor Berger testified at the fairness hearings considering the *Findley v. Blinken* proposed settlement on January 22, 1991, and was subject to examination by the parties. She commented on the difficulty of estimating future claims, but expressed the view that reasonably accurate estimates could be made and that a panel of experts should be appointed. Professor Berger subsequently produced and filed with the Courts an Interim Rule 706 Report on April 2, 1991, setting forth the procedures necessary for such projections. It recommended the impanelment of experts to undertake the assignment.

She proposed that studies be conducted by Professor Kenneth G. Manton, Research Professor of Demographic Studies at Duke University, supervised by Dr. Joel E. Cohen, Professor of Populations at Rockefeller University, and that the other panel members be identified at a later date. On April 22, 1991, the Courts adopted Professor Berger's recommendations in their entirety.

On July 15, 1991, Professor Berger submitted a Second Interim Rule 706 Report naming the additional individuals she proposed for the Rule 706 Panel. The Courts approved her recommendation on August 8, 1991, and the Rule 706 Panel was assembled. The 706 Panel's combined expertise is unprecedented in litigation of this sort, and its findings reflect a combination of the best scholarship in the area and the Panel's remarkable dedication.

#### 2. Panel Projections

The Rule 706 Panel developed a series of projections from a model using statistical information obtained from the National Cancer Institute (whose program, Surveillance Epidemiology and End Results (SEER), identifies cases of cancer throughout the country) and the Trust claims experience, as well as other sources. It then made various assumptions about the model components for which data are lacking or for which alternative assumptions are equally plausible. The Panel subsequently submitted two reports to the Courts during the *Findley v. Falise* litigation setting forth its results, the second report incorporating additional computations and data analysis. Dr. Kenneth G. Manton and Professor Eric Stallard authored the reports, with significant supervision from Dr. Joel E. Cohen.

Professor Stallard and Dr. Cohen as well as Professor Berger testified at the trial and were available for cross-examination as to their methodology and findings before the Courts on March 15 and May 11, 1994. The Rule 706 Panel testified that although the exact number could not be determined, plausible projections of future claims ranged from 176,000 to 619,000 for the time period

1993–2049, with the Rule 706 Panel's preferred projection of future claims being 314,000. A preferred projection in this context is not the projection deemed most likely to come true, but the projection for which each component in the model is the best estimate of that component. The breakdown by alleged diseases for the Rule 706 Panel projection of 314,000 future claims is set forth below in Table 4. It reflects the changing percentages of the more serious diseases based largely on differences in latency periods.

Figure 2

CLASS ACTION SETTLEMENT ALLOWS TRUST TO PAY OVER 200,000 CLAIMANTS DURING FIRST 3 YEARS
ANNUAL NUMBER OF CLAIMS PAID

Prepared by the Trust

In his May 11, 1994 testimony, Dr. Cohen concurred with the parties in stressing the necessity of periodically re-estimating the future claims against the Trust in order to utilize fully the Rule 706 Panel projections. The Settlement is consistent with that recommendation.

### 3. Impact of Trust and Rule 706 Projections

The opinions of both the Resource Planning Corporation and the Rule 706 Panel were considered by the Courts in evaluating the fairness of the Settlement. The wide variation in the Panel's estimates reflects the difficulty of predicting future events. Nevertheless, courts have to make such decisions constantly in connection, for example, with cases in which infants, structured settlements, and future disabilities are involved. The fact that it is impossible to achieve a perfect estimation is not a basis for failing to decide. Courts must consider all the available information and decide the case as best they can.

In deciding to rely on the consistent projections advanced by Resource Planning Corporation and the 706 Panel, the Courts need not find that they are "more probable than not." What is required is a reasonable projection, which is distinct from the preponderance standard used in tort litigation. The Courts decide this issue not as factfinders, though if they were, they would use the computations of the 706 Panel which are based on appropriate scientific and statistical standards. *Cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, ——, 113 S.Ct. 2786, 2798, 125 L.Ed.2d 469 (1993). Rather, the Courts are accepting for fairness determinations the best estimates of the best experts and of the many lawyers and parties who hammered out the Settlement terms using their enormous experience and judgment.

The Courts' decision to accept the figures is based upon an "intuitive" analysis, relying in part upon their own wide experience. *Cf., e.g.,* James L. Kainen, *The Rationalist Tradition at Trial,* 60 Fordham L.Rev. 1085, 1085 (1992) (distinguishing between "narrative holists" and "logical atomists") (review-

ing Terence Anderson & William Twining, *Analysis of Evidence: How to Do Things with Facts Based on Wigmore's Science of Judicial Proof* (1991)); Peter Tillers, *Mapping Inferential Domains,* 66 B.U.L.Rev. 883 (1986). *See generally* James S. Liebman, Relevance and Scientific Proof Revisited: Probabilistic Proof and Decisionmaking, *in* Second Supplement: The Rules of Evidence 5 (materials compiled in Fall 1994 course supplement for Columbia Law School evidence class) (on file in the instant case); James S. Liebman, Psychological Perspectives on Lay Factfinding Under Conditions of Uncertainty: Heuristics and Holistics, *in* Second Supplement: The Rules of Evidence, *supra,* at 236. Courts cannot wait for the near certainty that may come with a post hoc perspective. While there is a wide range of plausible outcomes, the two sets of experts consulted in this case reasonably agreed on similar outcomes as most likely, and the parties concur. The Courts in this case have evaluated critical assumptions in the experts' analyses and have supplemented the evidence in their assessment of the Settlement with their own extensive experience with asbestos litigation, knowledge of the bar and the financial incentives affecting its behavior, and some knowledge of the future capital and managerial demands on the bar's energies.

If there is any deviation from the projections, it will soon become obvious and be accommodated by an adjustment in the *"pro rata* share" percentage. The Settlement provides, as already emphasized, for the Trust to re-estimate the value of its total assets and its total liabilities at least every three years and to determine whether a revised *pro rata* percentage should be applied. *See* TDP § G.1(d).

The Settlement and the experts' work, particularly that of the Rule 706 Panel, are examples of how science and law can be related in a complex matter with legal, technical and social ramifications of the kind before the Courts. *Cf., e.g.,* Jean Macchiaroli Eggen, *Toxic Torts, Causation, and Scientific Evidence After* Daubert, 55 U.Pitt.L.Rev. 889 (1994); Joseph Sanders, *Scientific Validity, Admissibility, and Mass Torts After* Daubert, 78 Minn.L.Rev. 1387 (1994); Amy

Schutz, Note, *The New Gatekeepers: Judging Scientific Evidence in a Post–Frye World,* 72 N.C.L.Rev. 1060 (1994).

### E. Graphic Representations of Effect of Settlement

The Settlement will ensure an equitable distribution of the Trust's funds and avert the financial disaster which would otherwise cause the Trusts' limited assets to go solely to a relatively small number of plaintiffs and their attorneys who filed first.

It is estimated that in the absence of a settlement, the Trust's assets would be exhausted within a few years following payments to the first 71,641 claimants (many of whom have already received 100 cents on the dollar). The Settlement will enable the Trust to compensate over 500,000 claimants, including those whose illnesses have not yet been manifest but which may be just as serious as those suffered by claimants who filed earlier. Figures 2 and 3, prepared by the Trust, demonstrate the projected effect of the Settlement on the Trust's ability to meet its obligations to individual claimants in terms of annual claims paid and overall claims paid. The increased number of claimants paid results partly from the smaller payments made *pro rata* to each claimant and partly from the increased assets available because of reduced Trust expenses, increased value of Trust's monetized assets and interest spread over many years. *See* Figures 3, 4, 5 and 6, below.

Table 4

Projections of Claims of Males in 1993-2049, by Disease

| Alleged Disease | 1993-2049 | 1993-94 | 1995-99 | 2000-04 | 2005-09 | 2010-14 | Projection Interval 2015-19 | 2020-24 | 2025-29 | 2030-34 | 2035-39 | 2040-44 | 2045-49 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Mesothelioma | 23,714 | 1,556 | 4,445 | 3,890 | 3,730 | 3,201 | 2,508 | 1,858 | 1,238 | 719 | 440 | 128 | 2 |
| 2 Lung cancer | 35,816 | 2,376 | 6,667 | 6,152 | 5,630 | 4,824 | 3,825 | 2,791 | 1,729 | 1,025 | 667 | 129 | 0 |
| 3 Colon/rectal cancer | 4,460 | 291 | 837 | 807 | 711 | 627 | 505 | 342 | 202 | 105 | 33 | 0 | 0 |
| 4 Other cancer | 5,297 | 378 | 1,019 | 937 | 874 | 716 | 525 | 398 | 245 | 111 | 66 | 28 | 0 |
| 5 Asbestosis | 114,010 | 14,458 | 31,113 | 22,724 | 16,960 | 12,003 | 7,819 | 4,581 | 2,357 | 1,230 | 587 | 178 | 0 |
| 6 Disputed asbestosis | 43,992 | 5,335 | 11,852 | 8,976 | 6,837 | 4,855 | 3,083 | 1,724 | 759 | 396 | 164 | 11 | 0 |
| 7 Pleural plaques/thickening | 41,478 | 5,350 | 11,880 | 8,696 | 6,249 | 4,273 | 2,543 | 1,344 | 659 | 322 | 137 | 25 | 0 |
| 8 Non-asbestos related | 31,578 | 3,662 | 8,118 | 6,089 | 4,717 | 3,621 | 2,523 | 1,395 | 704 | 350 | 230 | 160 | 7 |
| 9 Missing Diagnosis/No Record | 13,308 | 1,236 | 2,914 | 2,553 | 2,020 | 1,765 | 1,387 | 827 | 534 | 43 | 13 | 16 | 0 |
| Total | 313,651 | 34,642 | 78,845 | 60,824 | 47,728 | 35,883 | 24,717 | 15,260 | 8,427 | 4,302 | 2,338 | 674 | 9 |

Row Percents

| Alleged Disease | 1993-2049 | 1993-94 | 1995-99 | 2000-04 | 2005-09 | 2010-14 | 2015-19 | 2020-24 | 2025-29 | 2030-34 | 2035-39 | 2040-44 | 2045-49 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Mesothelioma | 100.00 | 6.56 | 18.74 | 16.40 | 15.73 | 13.50 | 10.57 | 7.84 | 5.22 | 3.03 | 1.86 | 0.54 | 0.01 |
| 2 Lung cancer | 100.00 | 6.63 | 18.61 | 17.18 | 15.72 | 13.47 | 10.68 | 7.79 | 4.83 | 2.86 | 1.86 | 0.36 | 0.00 |
| 3 Colon/rectal cancer | 100.00 | 6.53 | 18.77 | 18.10 | 15.93 | 14.06 | 11.33 | 7.66 | 4.52 | 2.36 | 0.73 | 0.00 | 0.00 |
| 4 Other cancer | 100.00 | 7.14 | 19.24 | 17.69 | 16.49 | 13.51 | 9.91 | 7.52 | 4.63 | 2.09 | 1.25 | 0.52 | 0.00 |
| 5 Asbestosis | 100.00 | 12.68 | 27.29 | 19.93 | 14.88 | 10.53 | 6.86 | 4.02 | 2.07 | 1.08 | 0.52 | 0.16 | 0.00 |
| 6 Disputed asbestosis | 100.00 | 12.13 | 26.94 | 20.40 | 15.54 | 11.04 | 7.01 | 3.92 | 1.73 | 0.90 | 0.37 | 0.03 | 0.00 |
| 7 Pleural plaques/thickening | 100.00 | 12.90 | 28.64 | 20.97 | 15.07 | 10.30 | 6.13 | 3.24 | 1.59 | 0.78 | 0.33 | 0.06 | 0.00 |
| 8 Non-asbestos related | 100.00 | 11.60 | 25.71 | 19.28 | 14.94 | 11.47 | 7.99 | 4.42 | 2.23 | 1.11 | 0.73 | 0.51 | 0.02 |
| 9 Missing Diagnosis/No Record | 100.00 | 9.29 | 21.90 | 19.19 | 15.18 | 13.26 | 10.42 | 6.21 | 4.02 | 0.32 | 0.10 | 0.12 | 0.00 |
| Total | 100.00 | 11.04 | 25.14 | 19.39 | 15.22 | 11.44 | 7.88 | 4.87 | 2.69 | 1.37 | 0.75 | 0.21 | 0.00 |

Column Percents

| Alleged Disease | 1993-2049 | 1993-94 | 1995-99 | 2000-04 | 2005-09 | 2010-14 | 2015-19 | 2020-24 | 2025-29 | 2030-34 | 2035-39 | 2040-44 | 2045-49 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Mesothelioma | 7.56 | 4.49 | 5.64 | 6.40 | 7.82 | 8.92 | 10.14 | 12.18 | 14.69 | 16.72 | 18.82 | 18.92 | 20.67 |
| 2 Lung cancer | 11.42 | 6.86 | 8.46 | 10.11 | 11.80 | 13.44 | 15.48 | 18.29 | 20.52 | 23.82 | 28.53 | 19.16 | 0.00 |
| 3 Colon/rectal cancer | 1.42 | 0.84 | 1.06 | 1.33 | 1.49 | 1.75 | 2.04 | 2.24 | 2.39 | 2.45 | 1.40 | 0.00 | 0.00 |
| 4 Other cancer | 1.69 | 1.09 | 1.29 | 1.54 | 1.83 | 1.99 | 2.12 | 2.61 | 2.91 | 2.58 | 2.84 | 4.11 | 0.00 |
| 5 Asbestosis | 36.35 | 41.73 | 39.46 | 37.36 | 35.54 | 33.45 | 31.63 | 30.02 | 27.97 | 28.60 | 25.11 | 26.44 | 2.30 |
| 6 Disputed asbestosis | 14.03 | 15.40 | 15.03 | 14.76 | 14.32 | 13.53 | 12.47 | 11.30 | 9.01 | 9.21 | 6.99 | 1.68 | 0.00 |
| 7 Pleural plaques/thickening | 13.22 | 15.44 | 15.07 | 14.30 | 13.09 | 11.91 | 10.29 | 8.81 | 7.81 | 7.49 | 5.88 | 3.68 | 0.00 |
| 8 Non-asbestos related | 10.07 | 10.57 | 10.30 | 10.01 | 9.88 | 10.09 | 10.21 | 9.14 | 8.35 | 8.15 | 9.85 | 23.68 | 77.04 |
| 9 Missing Diagnosis/No Record | 4.24 | 3.57 | 3.70 | 4.20 | 4.23 | 4.92 | 5.61 | 5.42 | 6.34 | 0.99 | 0.56 | 2.33 | 0.00 |
| Total | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 | 100.00 |

* This chart is taken from Table F of Panel exhibit 2, introduced into evidence at trial. It has been modified so that the first two columns, rather than reflecting data for 1990-2049 and 1990-94, reflect data for 1993-2049 and 1993-94.

Figure 3

CLASS ACTION SETTLEMENT TRUST PAYS AN ADDITIONAL 432,000 CLAIMANTS
(CUMULATIVE NUMBER OF CLAIMANTS PAID)

Prepared by the Trust

The Settlement also will increase the assets available for distribution to claimants. Factors leading to this result are: 1) reductions in operating costs as claims are speedily processed under the TDP's matrix system; 2) reductions in litigation costs as the Trust is removed from the tort system; 3) interest accrued over the extended payment period; and 4) greater proceeds from liquidation of Trust assets. The last factor follows from the ability of the Trust under the Settlement to sell its assets over the course of a period of years in ways that will maximize revenue (*e.g.*, perhaps in securing a "control premium" for the transfer of a significant bloc of Manville stock). *See* discussion in Part IX.D, *infra*, on the effect of the bankruptcy statute amendments. In the absence of the Settlement, the Trust would be forced to dump its Manville assets at firesale prices to satisfy legally enforceable judgments against it. Figure 4, prepared by the Trust, demonstrates the projected effect the Settlement will have in maximizing payments to claimants and minimizing operation and litigation expenses. Figure 5, prepared by the Trust, demonstrates that the Settlement is projected as making available an additional $2.4 billion of Trust assets for claims payment. Of that figure, $800 million is attributed to an increase in Manville's equity, $1.4 billion is attributed to an increase in investment income and $200 million to a reduction in expenses.

Figure 4

CLASS ACTION SETTLEMENT MINIMIZES EXPENSES ALLOWING FOR MORE MONEY TO CLAIMANTS

Figure 5

**CLASS ACTION SETTLEMENT TRUST PAYS $2.4 BILLION MORE TO CLAIMANTS**
(CUMULATIVE PAYMENTS TO CLAIMANTS)

* Difference is attributable to increase in Manville assets of $800 million, increase in investment income of $1.4 billion and reduction in expenses of $200 million.

Prepared by the Trust

**508**

The TDP is designed neither to overcompensate nor to undercompensate claimants. As Figure 6, prepared by the Trust, demonstrates, the last dollar of trust assets will be exhausted by compensation of the last claimant—to the full extent of the Trust's liability to that claimant as provided under the TDP. No money will be left when the Trust closes down, and no claimant will go uncompensated. As indicated in Part XI, *infra*, consolidation with other bankruptcy trusts and use of insurance-type disbursement agencies would enable early suspension of the Trust's activities with the savings in administrative costs available to pay claimants.

Figure 6

As indicated previously, the projections described above and the graphics that represent the effect of the Settlement depend on assumptions of the Trust found generally acceptable by the Courts, but doubtful in some respects that do not affect the fairness of the Settlement. *See* text accompanying Tables 1, 2 and 3, in Part I, *supra.* The TDP provides for revision of the *pro rata* percentage applied to claims in the event that the projections diverge from the actual experience of the Trust.

### F. Objections to the Settlement

The Courts have considered all objections made to the Settlement. Since the Settlement is sound and necessary in view of the financial condition of the Trust and consistent with the law described below, the objections must be rejected as without merit.

A small number of lawyers representing much less than one percent of the class, as well as a small number of lay persons, object to the Settlement on the following grounds: the Courts lack power to modify the trust, *but see* Part IV, *infra* (demonstrating that power to modify does exist); more money should be obtained from Manville, *but see* Part IX, *infra* (indicating that protection of the Corporation increases its value for the claimants); pre-bankruptcy claimants must receive more than later claimants, *but see Findley III,* 993 F.2d 7 (holding that FIFO is not mandated); parties should be permitted to opt out because a limited fund class action is illegal, *but see Findley I,* 129 B.R. at 830–34, *approved on this ground, Findley II* 982 F.2d 721 (approving a non-opt out 23(b)(1)(B) class action); further subclasses are needed because more seriously ill claimants should receive a greater proportion of funds, *but see* Parts III.C.2.a & c, *supra* (describing payments based on historical differences in value and equal percentages for all claimants); and the states should be permitted to interpret their contribution laws to protect plaintiffs, *but see* Part III.C.2.d, *supra,* and Part V, *infra* (indicating that the Settlement takes into account the multiplicity of state laws in a reasonable way).

Some claimants believe that they would do better to opt out of the class or to forego their claims against the Trust entirely, thus enhancing their claims against other defendants by avoiding a set-off. On November 22, 1994, a full hearing was conducted on a motion to opt out of the class action brought by claimants from the District of Columbia.

The instant proceeding is a non-opt-out class action pursuant to Federal Rules of Civil Procedure 23(b)(1)(B). *See Findley I,* 129 B.R. at 830–34 (denying earlier opt out requests); *Findley II,* 982 F.2d at 735, 739. The class action binds all parties and no one can be permitted to opt out without destroying the delicate balances and fairness created by the Settlement. *Cf. Waldron v. Raymark Indus., Inc.,* 124 F.R.D. 235, 238 n. 1 (N.D.Ga.1989) (terming the "idea of a mandatory class action with opt out rights ... oxymoronic").

Individual claimants who desire to forego their claims against the Trust are free to do so in individual cases; except where the TDP provides otherwise, *see* TDP § H.3(d)(ii)(B), the consequences of that decision are a matter of state law to be decided in the light of the Settlement. The Courts are satisfied that all the procedural requirements for approving the class action settlement have been met (*see* Part VIII, *infra*) and that all parties have been adequately represented.

■ United States Fidelity & Guaranty ("USF & G") objects to the use of Trust assets to create a fund supporting litigation by MacArthur against various insurance companies. Members of the MacArthur subclass have asserted that USF & G has insurance coverage obligations for the subclass members' asbestos-related claims and that USF & G had notice of these claims from at least August, 1991. USF & G has denied any obligation to pay asbestos-related claims of any members of the MacArthur subclass.

USF & G had notice of the instant litigation in early July, 1994, if not before. It could have asserted its interests while the case was being tried and the Settlement negotiated. In any event, the Courts have heard USF & G at length and find no merit in its contentions. Cooperation between and among defendants and plaintiffs to enforce bona fide insurance claims in order to in-

crease assets available for good faith settlements is an established and sound method of providing appropriate compensation to the injured. *See* Part VIII.C.3, *infra.* USF & G may have no past or present subrogation or indemnity claim even remotely affecting Trust assets. It denies that it has any obligations toward MacArthur and, therefore, denies that it will have any future subrogation or indemnity claim. Conceivably, it might have such claims if it loses in litigation said to be pending elsewhere between it and MacArthur. That issue of insurance coverage is for other courts to decide.

It may be that in the pending litigation between insured and insurer, the insurer will be able to defend on the ground that the insured's settlement was unreasonable or that it denied the insurance company rights under the policy of subrogation. *Cf.* William S. Anderson, Comment, *Placing a Check on an Insured's Bad Faith Conduct: The Defense of "Comparative Bad Faith"*, 35 S.Tex. L.Rev. 485 (1994). Those and like issues can be decided by the court trying that litigation. The Courts have no information or warrant justifying an advisory opinion on such matters.

■ There is a strong policy in favor of settling disputes without full and expensive litigation. *See, e.g., McDermott, Inc. v. AmClyde,* — U.S. —, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994); *Carson v. American Brands,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981); Kenneth R. Feinberg, Mass Torts: Cases and Materials, 6–1 (1994) (on file in the instant case); 6A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure* § 1525.1 (1990 & 1994 Supp.) (power of court to encourage settlement); *id.* § 1522, at 224–26 (same); Eric D. Green, Jonathan B. Marks & Ronald L. Olson, *Settling Large Case Litigation: An Alternative Approach,* 11 Loyola L.Rev. 493 (1978); Francis E. McGovern, *Resolving Mature Mass Tort Litigation,* 69 B.U.L.Rev. 659 (1989); David Rosenberg, Comment, *Of End Games and Openings in Mass Tort Cases: Lessons from a Special Master,* 69 B.U.L.Rev. 695 (1989); *cf.* Fed.R.Evid. 408 ("Evidence of conduct or statements made in compromise negotiations is ... not admissible."); Fed.R.Civ.P. 16(a)(5) ("facilitating the settlement of a case"). It would be contrary to public policy to permit an insurance company to interject itself into an enormous litigation involving hundreds of thousands of people in order to block a reasonable settlement in which it has no direct interest.

The Courts note their gratitude to the uncompensated lay persons who testified at the fairness hearings for their devotion to the many people injured by asbestos. The Courts are deeply touched by the stories of suffering recounted by non-lawyers at the fairness hearings and in correspondence. Were it possible for the Courts to obtain the additional funds that the lay objectors think is available, the Courts would happily pay every claimant 100% of his or her claim. Unfortunately, no additional source of assets is available. The past cannot be recreated.

### G. Amended Memorandum, Orders and Final Judgment

The Courts issued a Memorandum, Orders and Judgment on December 15, 1994 ("December 15 Memorandum"). At the end of the Memorandum, the Courts noted that they "would appreciate any errors ... being promptly brought to their attention so that, if necessary, an amended document can be issued forthwith." The instant Amended Memorandum incorporates suggestions made and issues raised by various parties and intervenors following issuance of the December 15 Memorandum, the more substantive of which are described below. In addition, a number minor alterations were made by the Courts on their own initiative which do not substantively alter the impact of the judgment on the parties.

All parties and individuals that had an interest in the litigation had the opportunity to bring issues to the Courts' attention for inclusion in the Amended Memorandum. The December 15 Memorandum was distributed to the parties, to all individuals who appeared at the Fairness Hearings, and, via overnight service, to the 76 attorneys and other parties on the class action service list maintained by the Trust. In addition to the parties, the class action service list includes

representatives of claimants, *pro se* claimants, and individuals who, during the four-year history of this litigation, requested to be added to the list. Copies of the Memorandum were available through the asbestos newsletters. The Trust also sent, on December 16, 1994, by regular mail, a memorandum to approximately 1,000 attorneys representing Trust claimants providing notice of the Memorandum's issuance, a description of its contents, and the Courts' request to bring any errors to their attention.

The December 15 Memorandum explained that there was no need for the Courts' to impose a stay on Trust payments pending appeal insofar as "payments under the TDP only 'become effective 30 days after the entry' of this Memorandum, Orders and Judgment." December 15 Memorandum at 219. Once it became clear that various parties and individuals would be seeking amendments to the Memorandum, the Courts issued an order on January 3, 1995, consolidating all post-Memorandum motions for a hearing on January 17, 1995. That order also stated that the 30–day period provided for in the Stipulated Settlement would begin to run from the day of the Amended Memorandum's issuance, and offered USF & G the opportunity to submit a motion to intervene if it believed that intervention might affect any appeal rights.

At the January 17, 1995 hearing, the Courts heard full argument and considered the following papers submitted by the parties and proposed intervenors: 1) a Stipulation and Order submitted by all the parties requesting various technical corrections; 2) a request submitted by Berlack, Israels & Liberman on behalf of the Keene Corporation that the December 12, 1994 "Clarification of the Administrative Procedures for the Contribution Claim Fund" be annexed to the Courts' Memorandum, Orders and Judgment; 3) separate motions to intervene filed by USF & G and Porter Hayden Co.; 4) a motion by the Manville Trust, the Plaintiff class, and all the subclasses for additional findings of fact and amendments in relation to the USF & G posture with respect to its MacArthur obligations; 5) a motion by USF & G seeking to have the Courts disapprove the portion of the Settlement relating to creation of the MacArthur Fund, or in the alternative, to stay approval of that Fund until USF & G's obligations to MacArthur are determined in litigation pending in a federal district court in the Northern District of California; 6) motions by the Plaintiff class and the Maryland Plaintiffs to eliminate the Courts' escrow requirements for Trust payments in Maryland; 7) an Order to Show Cause filed by the Trust seeking authorization to pay claims starting February 1, 1995; and 8) other requests, supporting documents and briefs.

With respect to the issues considered at the January 17, 1995 hearing, the Courts made the following determinations. There being no opposition, most of the proposed corrections submitted by the parties in their errata stipulation were accepted by the Courts and incorporated in this Amended Memorandum, Orders and Final Judgment. As to the other issues, they are addressed individually below.

1. Request by Berlack, Israels & Liberman on behalf of the Keene Corp.

Keene Corp. seeks to annex a clarifying memorandum to Exhibit B of the TDP, which together with the Stipulated Settlement is reproduced as Addendum A of the opinion. Keene originally objected to the Settlement on the grounds that the Distribution Principles for the Contribution Claims Fund discriminated against Chapter 11 debtors. The clarifying memorandum was developed by agreement of all the parties to resolve Keene's objection. There being no opposition to Keene's request, the clarifying memorandum now appears as part of Exhibit B, reproduced in Addendum A, *infra.*

2. Motions to Intervene

In the interest of ensuring a full hearing on the issues in dispute, USF & G's and Porter Hayden's motions to intervene are granted pursuant to Rule 24(b) of the Federal Rules of Civil Procedure, providing for permissive intervention in the court's discretion. Permissive intervention is appropriate where "an applicant's claim or defense and the main action have a question of law or fact

in common" and where intervention will not "unduly delay or prejudice the adjudication of the rights of the original parties." Fed. R.Civ.P. 24(b). The Courts express no opinion on USF & G's or Porter Hayden's standing to appeal.

### 3. Motions for Additional Findings of Fact in Relation to USF & G

Various movants have requested that the Courts issue additional findings of fact in respect of USF & G's history in this litigation. USF & G opposes this effort in part because such findings might affect litigation pending in California which will determine USF & G's obligations to Western MacArthur. There is no reason or warrant for the Courts to interject themselves into the ongoing litigation between USF & G and members of the MacArthur subclass.

### 4. Motion to have the Courts Disapprove the MacArthur Fund

■ USF & G seeks to have the courts disapprove that portion of the "Proposed Settlement" relating to the MacArthur Fund. Alternatively, it requests that the Courts stay approval of creation of the MacArthur Fund until a federal case pending in California determines USF & G's obligation with respect to Western MacArthur. Courts considering stipulations of settlement can either approve them or reject them, but they cannot modify them in substantial ways. *See Huertas v. East River Housing Corp.*, 813 F.2d 580, 582 (2d Cir.1987); *Jeff D. v. Andrus*, 899 F.2d 753, 758 (9th Cir.1989); *see also* Part III.C.3, *supra*. Therefore, the Courts decline USF & G's invitation to modify the settlement provisions as they relate to MacArthur. With respect to USF & G's request for a stay pursuant to Rule 62 of the Federal Rules of Civil Procedure, the Courts have considered the arguments presented and for the reasons stated orally on the record conclude that there is no reason to issue a stay.

### 5. Motions to Eliminate Escrow Requirements for Trust Payments in Maryland

In the December 15 Memorandum, the Courts noted that "[t]here may be a question under Maryland law of whether Maryland Plaintiffs or Codefendants or Distributors are entitled to the 10% payments attributable to Maryland claimants." The Courts therefore directed that the amount attributable to Maryland claimants under the Settlement, estimated as $50,216,000, *see* Fairness hearings court exh. 2 (Letter from David T. Austern, General Counsel, Manville Personal Injury Settlement Trust, dated November 23, 1994), be escrowed pending resolution of the "Maryland Issue" by the "Maryland Courts." Having heard full argument on this issue, the Courts are now persuaded that there is no reason to escrow these funds because there is no dispute over how that money will be paid. The vast majority of money will be paid to claimants who will not have judgments resulting from trials against codefendants or distributors, so the contribution and applicable set-off issue will not arise. Where a claimant does in fact obtain a judgment after trial against codefendants, the judgment codefendants will receive credit for the Trust's payment. The question is not whether credit for the Trust's payment will be given, but how much the set-off will be. Thus, permitting these payments to be made will not adversely affect any other litigant.

### 6. Motions to Authorize Claims Payments Starting February 1, 1995

The Trust seeks to pay claimants beginning January 16, 1995, or, alternatively, on February 1, 1995. The motion is denied. *See* Part XII, *infra*.

## IV. Power to Modify Trust Payments Under New York Law

### A. New York Substantive Law Applicable

■ Federal courts sitting in diversity apply the substantive law of the forum state on outcome determinative—*i.e.*, substantive—issues. *Erie R.R. v. Tompkins*, 304 U.S. 64, 80, 58 S.Ct. 817, 823, 82 L.Ed. 1188 (1938); 28 U.S.C. § 1652 (1988). This includes choice of law principles governing substantive law that a state court sitting in the forum state would apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941).

The trust of personal property was created in New York. New York law would therefore apply in interpreting the trust instrument. *See* Est.Powers & Trusts Law § 7–1.10 (McKinney 1992) (practice commentary by Margaret Valentine Turano).

■ In the instant case, the Courts' determination that New York law applies is supported by the fact that the original trust agreement specifies that New York law is to govern. Trust Agreement, § 6.11 ("This Trust Agreement shall be governed by, administered under and construed in accordance with, the laws of the State of New York."). New York generally gives effect to choice of law clauses in trust instruments where some substantial contact with New York has been shown. *Cf.* N.Y.Est.Powers & Trusts Law § 7–1.10 (governing choice of law clauses in trusts created by non-New York domiciliaries); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (upholding application of forum selection clause in personal injury case).

■ Another reason for utilizing New York law is that a majority of the trustees—three of the five trustees—resides in the state. New York law applies to trusts created by non-domiciliaries which specify that New York law is to govern, if "the trustee of the trust is a person residing in this state." N.Y.Est.Powers & Trusts Law § 7–1.10(a)(2). *A fortiori,* New York law applies under the same circumstances, but where the trust was created by a domiciliary. *See generally* 8 Harold L. Korn & Arthur R. Miller, *New York Civil Practice,* ¶ 7701.10 (1992) (describing conflict of laws in trust context). Here the bankruptcy court sitting in New York, the equivalent for this purpose of a domiciliary, created the Trust.

■ Before applying the law of the forum state, the federal court must determine what the law is. The greatest weight is given to decisions of the highest court, in this case the New York Court of Appeals, as well as the state's constitution and statutes. *Erie,* 304 U.S. at 78, 58 S.Ct. at 822; *Travelers Ins. Co. v. 633 Third Assocs.,* 14 F.3d 114, 119 (2d Cir.1994). Where state law is uncertain or

ambiguous, the district court must predict how the highest state court would resolve the uncertainty or ambiguity. *Travelers Ins. Co.,* 14 F.3d at 119; *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. 1380, 1388–91 (E. & S.D.N.Y.1991), *rev'd in part on other grounds sub nom. In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.),* 971 F.2d 831 (2d Cir.1992). In making this prediction, the district courts are not bound by lower state court precedents that they believe would not be affirmed on appeal. *Commissioner v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). The court may consider any material that a state court would consider, including how other jurisdictions have approached the issue and " 'scholarly works and other reliable data tending to indicate how the New York Court of Appeals would resolve the [issue].' " *Travelers Ins. Co.,* 14 F.3d at 119 (quoting *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. at 1391).

In New York, district courts are in a somewhat different position from the federal Court of Appeals since the latter can certify a question to the state's highest courts. The District Court is left to research and reason alone. *See In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. at 1397 (describing when certification of questions by federal courts is appropriate).

The instant case represents a massive illustration of the use of equity. The federal procedure is essentially equitable. Rule 23 represents a prime example of the victory of equity over law under modern federal rules. *See* Eileen B. Hershenov, *The Effect of Equity on Mass Tort Law,* 1991 U.Ill.L.Rev. 269; Stephen N. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective,* 135 U.Pa.L.Rev. 909 (1987). These procedural issues have been resolved in favor of a settlement of this class action. *Findley I,* 129 B.R. at 830–34 and *Findley II,* 982 F.2d 721 *passim.*

■ What remains now are the substantive equitable issues. A trust, once set up with the approval of the bankruptcy court, becomes an independent entity subject to the law of the state which controls it.

The Court of Appeals for the Second Circuit did not extensively address the question of New York substantive law of trusts, emphasizing instead the bankruptcy nature of the proceedings. *See Findley II,* 982 F.2d 721. Its passing reference to the Courts' power to modify the trust and its operations merely highlighted the issue for future treatment by the trial court. *Findley II,* 982 F.2d at 744–45. Thus it cited only *In re Albert,* 111 Misc.2d 884, 445 N.Y.S.2d 355 (Sup.Ct.1981), a trust case, non-controlling on the substantive equity issue we must now address. *Albert* has been cited in court opinions only twice since it was handed down in 1981—by this court in *Findley I,* and then again by the Second Circuit Court of Appeals in *Findley II.*

*Albert* related to a spendthrift trust designed specifically pursuant to specialized New York statutes and case law to protect beneficiaries such as children of settlors from their own incapacity by limiting trust modification. It involved a trust set up by a father in 1960 and funded by 3½% treasury bonds probably worth less than $50,000, to provide a college education for his son. After his father's death, the son sought reinvestment of accumulated income. The court in *Albert* held only that it had no power to authorize reinvestment contrary to the terms of the trust, an authority less, it suggested, than its power to permit invasion of principal for the benefit of an income beneficiary—which it refused to exercise because of the absence of any "emergency." *Albert,* 445 N.Y.S.2d at 358, 362 (citing practice commentaries in N.Y.Estates, Powers & Trusts Law (McKinney) by Patrick Rohan and I. Leo Glasser, 445 N.Y.S.2d at 360–61).

A spendthrift trust, such as that in *Albert,* is quite different from the instant Trust. It is to the Manville Trust what a horse and buggy is to a space shuttle.

With respect to trusts of the nature of those before us, the Courts stand in the position of a state court with the historical powers of the Chancellor. There is some confusion in federal case law about the courts' powers over trusts for bankruptcy and other federal substantive purposes. *See In re Secured Equip. Trust of Eastern Air Lines, Inc.,* 38 F.3d 86, 88–91 (2d Cir.1994) (discussing confusion and lack of agreement on what constitutes a business trust); *Cutler v. 65 Sec. Plan,* 831 F.Supp. 1008, 1014–19 (E.D.N.Y.1993). These federal precedents are of little utility in analyzing the New York law of trusts relating to protection of beneficiaries and a trust corpus. To understand the present New York substantive law of trusts it is necessary to set forth in some detail the history and governing principles.

The central issue in this case is not whether the Settlement is fair—it is—or whether the Courts are required to protect the interests of current and future Beneficiaries—as to this there can be no doubt that the answer is yes. The issue is whether the Courts have the power to act equitably to protect all those claimants against the Trust who were injured by Manville asbestos. This subject requires an extended discussion of the substantive power of New York courts—and thus of federal courts acting as state courts under *Erie.*

Since New York, as one of the original thirteen colonies, received English law at the time of the Revolution, there is no way of avoiding a brief survey of English equity which evolved smoothly into New York's law of trusts. After all, "[t]he Common Law of England is the substratum of American jurisprudence." 1 Alden Chester, *Courts and Lawyers of New York* 3 (1925); *see also,* Henry W. Scott, *The Courts of the State of New York* 56 (1909) ("From the first formal English possession, the English common law has received judicial sanction and controlled the decisions of the New York Courts."); *cf.* Julius Goebel, Jr., *Cases and Materials on the Development of Legal Institutions* 311 (1946) (noting that the experience in this respect of the Western states was different from that in the original colonies). An attempt to understand this history in interpreting the law "is not a duty, it is only a necessity." Oliver Wendell Holmes, Jr., *Learning and Science,* in *Collected Legal Papers* 138, 139 (1920), *quoted in* Harold J. Berman, *The Origins of Historical Jurisprudence: Coke, Selden, Hale,* 103 Yale L.J. 1651, 1738 (1994).

## B. Origins of Trusts in English Equity

The modern trust is uniquely the product of over half a millennium of the exercise of equity jurisdiction. *See T.J. Moss Tie Co. v. Wabash Ry.*, 11 F.Supp. 277, 284 (S.D.N.Y. 1935) ("[T]rusts are creatures of courts of equity . . . ."). Correlatively, modern equity jurisdiction owes its vitality in large part to the extraordinary historic popularity of trusts.

### 1. Development of Equity Jurisdiction

Modern equity jurisdiction emerged as a result of the inability of the rigid early English common law to accommodate the transition from a feudal society to an increasingly complex social order. A number of aspects of the early common law are singled out by commentators as particularly hastening its relative decline, and equity's concurrent rise.

One factor was the constricting limitations of the common law courts' jurisdiction, stemming in part from their dependence on the writ system. *See* 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 21 (1881); *see also* Subrin, *supra*, at 915–18. The jurisdiction of the common law courts was dependent on the central authority's power to issue royal writs, which was constrained once Magna Carta was granted by King John in 1215. *See* Charles Herman Kinnane, *A First Book on Anglo–American Law* 288 (2d ed. 1952). The writ system of Westminster, it must be recalled, was one of the King's techniques for drawing power to himself by providing a better form of justice than the traditional courts. *See* Goebel, *supra*, at 33. Issuance of new writs was almost completely ended in 1258 by the Provisions of Oxford, which transferred much of the power to grant new legal remedies to the Parliament. 1 Pomeroy, *supra*, § 21. Parliament, however, was disinclined to fashion novel remedies due to its conservatism and general unfamiliarity with the field. There were only a limited number of writs, and those that existed could not be readily adapted to create new causes of action. If no existing writ corresponded substantially with the action the plaintiff sought to bring, then no remedy was available. *Id.*

Another factor that contributed to the early common law's inadequacy was the courts' "blind conservativism," evidenced by their unrelenting adherence to precedent. *Id.* § 16. One historian explains that "there is no parallel in civilized jurisprudence to the dogged conservativism with which the common-law judges perpetuated injustice by adhering to the bad as well as the good rules of the early common law . . . ." Kinnane, *supra*, § 105(b), at 290. The courts' tendency to inflexibility was exacerbated by the severe punishment meted out by Edward the First, in the latter part of the thirteenth century, to those judges who dared to depart from the established course. *Id.* § 105(a). For other factors that led to equity's rise, see 1 Pomeroy, *supra*, §§ 18–20 (describing the common law's antagonism to Roman law, and Chancery's absorption of Roman principles).

The King's Council's "extraordinary jurisdiction" developed to accommodate the inability of the traditional courts to resolve satisfactorily the legal disputes both within and beyond their limited jurisdiction. *See* George Spence, "The History of the Court of Chancery," *reprinted in* 2 *Select Essays in Anglo–American Legal History* 224–32 (1908) (compiled and edited by a committee of the Association of American Law Schools). In King Edward I's time, the members of the Council were prelates and barons, the judges of the King's Bench, Common Bench, and Exchequer, and the masters or chief clerks of the chancery. Frederick W. Maitland & Francis C. Montague, *A Sketch of English Legal History* 114 (1915). The Council might exercise jurisdiction when a party sought its intervention to rectify the errors of the lower courts, or when the ordinary rules of law were insufficient to provide a remedy. *Id.* at 115–16. In some instances intervention occurred where justice in the common law courts could not be expected due to the imbalances in power between the parties. Kinnane, *supra*, § 107(a); Maitland & Montague, *supra*, at 122; *see also* Spence, *supra*, at 242 (describing the Chancellor's extraordinary jurisdiction to protect the poor, weak and friendless).

The Chancellor, a member of the King's Council, became the instrument through

which this extraordinary jurisdiction was exercised. A number of theories attempt to account for the King and Council's delegation of the jurisdiction to the Chancellor. The Chancellor was the King's first minister, president of the council and its most learned member. Maitland & Montague, *supra*, at 120; *see also* Spence, *supra*, at 232 ("[T]his great officer was the principal actor as regards the judicial business which the Select Council, as well as the Great Council, had to advise upon or transact."). Because he was typically a high churchman, and thus assumed to be experienced in issues of conscience and morality, the Chancellor appeared to be well suited to the position. Kinnane, *supra*, § 107(b). One explanation advanced for the Chancellor's role in equity is that delegation to him was simply the most convenient way to handle the crush of cases that fell outside the common law. *Id.* (citing Plucknett, *A Concise History of the Common Law* 138–39). In any event, the Chancellor's office had some familiarity with the administration of justice because it was his office that issued the writs that were the foundation of the common law system. *Id.*; Spence, *supra*, at 224.

The justice dispensed by the Chancellor was initially through direct delegation by the King and the Council. Spence, *supra*, at 234. The petitions referred to the Chancellor by the King and Council were addressed to the "mercy and grace" of the King. Kinnane, *supra*, § 107(b); Spence, *supra*, at 236. At first, these petitions were referred either to the Chancellor or to other officials, but the Chancellor increasingly dominated from the time of Edward I (1272–1307). By Edward III's reign (1327–1377), petitions were routinely referred to the Chancellor alone, and "the court of the chancellor was the ordinary court for determinations involving the prerogative power to grant special remedies not available in the ordinary law courts...." Kinnane, *supra*, § 107(b); *see also* Spence, *supra*, at 236 (describing the rise of the Court of Chancery "as a distinct court for giving relief in cases which required Extraordinary remedies"). One historian advances 1474 as the year in which the Chancellor first rendered decrees on his own authority. Kin-

nane, *supra*, § 107(b) (citing 1 Holdsworth, *History of English Law* 404).

The growing jurisdiction of the Chancery Court caused significant friction with the common law courts—specifically, the Courts of Common Pleas, Exchequer and the King's Bench. Goebel, *supra*, at 228. The Chancellor's jurisdiction necessarily interfered with that of the common law courts since an appeal to the Chancellor might result in a reversal of an ordinary court's judgment. Spence, *supra*, at 249; *Some Aspects of Fifteenth–Century Chancery*, 31 Harv.L.Rev. 834, 834 (1917–1918). Furthermore, in his exercise of jurisdiction, the Chancellor was to be guided by "Honesty, Equity, and Conscience," Spence, *supra*, at 238, nebulous goals at best. And so equity was criticized for being unpredictable and arbitrary. Kinnane, *supra*, § 109(a).

In time, the Chancellor's jurisdiction ceased to be "extraordinary." One historian explains that "grace, conscience, right and natural law ... came to be supplanted by rule as the basis of the chancellor's court." *Id.* § 109(b). As the same kinds of cases came repeatedly before the Chancellor, the exercise of equity jurisdiction became routinized and mundane. Concurrently, chancellors began to accept the idea of the binding nature of precedent, and equity "took on the character of law." *Id.*; *cf.* Maitland & Montague, *supra*, at 126 (as the Chancellor's case load expanded, the exercise of his "conscience" became the exercise of a "technical conscience").

The conflict between law and equity reached a head in 1616, when Lord Coke, as Chief Justice of the leading common law court, provoked a clash between the two systems. Goebel, *supra*, at 228; Kinnane, *supra*, § 109; Maitland & Montague, *supra*, at 124; Berman, *supra*, at 1684–86. The common law courts at the time were viewed as the protectors of the rights of the citizens, in contrast to the Court of Star Chamber and the Court of Chancery, which were seen as under the royal thumb. Kinnane, *supra*, § 109(c). In the Case of Commendams, (1616) (*Colt v. Bishop of Lichfield*, Hobart 193), a common law court had ruled against a defendant although an important witness was

prevented from testifying by being induced to become drunk. On appeal, the plaintiff violated the Chancellor's order and was imprisoned for contempt. Lord Coke threatened to prosecute Lord Chancellor Ellesmere, but the King supported the Lord Chancellor even to the extent of his interfering with the common law courts to secure justice. *See* 1661 opinion of Francis Bacon and others collected in Goebel, *supra*, at 234–39; *see also* Kinnane, *supra*, § 109(d); Berman, *supra*, at 1684–86. Thus equity emerged triumphant.

### 2. Trusts in Equity

One cause of action not recognized or protected by the common law courts was that premised on the "use," the English precursor of the modern trust. Uses originated in thirteenth and fourteenth century England, drawing upon similar devices pioneered under German and Roman law. *See* Elias Clark, Louis Lusky & Arthur W. Murphy, *Gratuitous Transfers: Cases and Materials* 417 (3d ed. 1985) (on the German and Roman roots of the use and trust); Oliver Wendell Holmes, Jr., *Early English Equity*, 1 Law Q.Rev. 162 (1885), *reprinted in* Oliver Wendell Holmes, *Collected Legal Papers* 4–5 (1920) (describing German origins). In the second half of the fourteenth century uses proliferated as a popular method for evading feudal obligations and other ancient burdens of ownership. The owner of property (feoffor) would transfer the land to a person (feoffee) to manage, either for the feoffer's own use and enjoyment or for that of a third party (cestui que use). Common law did not recognize the cestui que use's interest in the property; hence, the cestui que use had to rely on the good will of the feoffee. *See generally* Clark, Lusky & Murphy, *supra*, at 417.

Chancery, in contrast, recognized the "equitable title" held by the cestui que use in the property, and by doing so, greatly expanded the power of this developing technique to escape medieval clogs on property. *See generally* James Barr Ames, *The Origin of Uses and Trusts*, 21 Harv.L.Rev. 261 (1907). A feoffee's breach of faith could be remedied by the Chancellor, who would make the feoffee live up to his promises, or else require the feoffee to transfer seisin to the cestui. *See* Ames, *supra*, at 265–66; *The Statute of Uses and Active Trusts*, 17 Mich.L.Rev. 87, 89 (1918). The first known recorded decree in favor of a cestui que use dates to 1446. Ames, *supra*, at 265; Clark, Lusky & Murphy, *supra*, at 417.

Chancery's willingness to enforce uses is undoubtedly one of the main reasons it emerged as a powerful independent court distinct from the common law courts. *See, e.g.,* Clark, Lusky & Murphy, *supra*, at 423; Holmes, *supra*, at 2; Maitland & Montague, *supra*, at 122–23 ("It seems possible that this nascent civil jurisdiction of the chancellor would have come to naught but for a curious episode in the development of our land law."); Spence, *supra*, at 247–49 (explaining that if English common law had not been so antagonistic to Roman law (the source of trusts), equitable jurisprudence might not have become established).

The benefits of the use were legion, explaining its extensive application from the thirteenth century onward. In the thirteenth century, Franciscan friars availed themselves of the use's separation of legal title and beneficial use to mitigate the effects of their vows of poverty. While friars could not own land, they could transfer legal title to someone else to hold on their behalf. *See* Clark, Lusky & Murphy, *supra*, at 419. The device was also used to circumvent mortmain statutes, defeat creditors' interests, and circumvent early prohibitions on testamentary devises of land. *Id.* at 419–20. By far the most significant application of the use was to escape the feudal obligations that attached at death of the owner of land. *Id.* The use became so popular that by 1500, it is estimated that a large portion of English land was held in uses. *Id.* at 421.

The Statute of Uses was adopted in 1535 under King Henry VIII. 27 Hen. 8, c. 10. While the preamble to the statute described the ways in which the use had been utilized to evade common law rules, the main concern was the application of the use to defeat revenue collection by the crown. Clark, Lusky & Murphy, *supra*, at 423–25. The effect of the Statute of Uses was to extinguish the legal

estate in the feoffee and to confer legal title on the cestui que use, thereby subjecting him to the liabilities of ownership.

Through agreement of the Chancellor and the judges, three major areas of uses were left intact following passage of the Statute of Uses: uses on personal property; the use on a use; and the active use. In terms of the Chancellor's continuing jurisdiction, the survival of the active use was the most important. An active use arises when the feoffee does not merely hold legal title but when he has active obligations to perform. *See generally The Statute of Uses and Active Trusts, supra.* The active use was spared from extinguishment because "saving [it was] necessary in order to carry out the purpose of the trust— ... otherwise the intent of the creator would be defeated." *Id.* at 87. Apart from preserving an important part of the Chancellor's jurisdiction, *see* Maitland & Montague, *supra,* at 123–24, the active use is significant as the antecedent to the modern active trust. For a description of the survival of the use upon a use, the antecedent to the modern passive trust, see generally Ames, *supra,* at 270–74; Austin W. Scott, *The Trust as an Instrument of Law Reform,* 31 Yale L.J. 457, 464 (1922). We now pick up the story in the New World.

### C. Equity Antecedents in New York

#### 1. History of Equity Courts

The first High Court of Chancery was established in New York in 1683. *See* 1 *Legal and Judicial History of New York* 292 (Allen Chester ed., 1911); Scott, *supra,* at 150–51; Joseph H. Smith, *Adolph Philipse and the Chancery Resolves of 1727, in Courts and Law in Early New York: Selected Essays* 30 (Leo Hershkowitz & Milton M. Klein eds., 1978). Prior to establishment of that court, equity jurisdiction existed in the town courts to the extent of five pounds, and the Court of Sessions and Assize, which had unlimited jurisdiction. Scott, *supra,* at 150 (noting that "[t]he procedure in vogue in the colony was conformed, as closely as possible, to the High Court of Chancery in England"). Establishment of a separate equity court departed from the Dutch—pre-English colonizers—concept which did not distinguish between law and equity, and in which one tribunal heard all cases. *Id.* at 149. The need for the court increased as growth of commerce and speculation in land grants gave rise to controversies which the existing courts were unable to resolve. 1 *Legal and Judicial History of New York, supra,* at 292; Scott, *supra,* at 150. The text of the 1683 act provided:

> There shall bee a Court of Chancery within this province which said Court shall have power to heare and determine all matters of Equity and shall be Esteemed and accounted the Supreme Court of this province And be it further Enacted That the Governor and Council bee the said Court of Chancery, and hold and keep said Court; And that the Governor may Depute or nominate in his stead a Chancellour, and be assisted with such other persons, as shall by him bee thought fitt and Convenient. Togerther with all necessary Clerkes and other officers as to the said court are needful.

*See* 1 *Legal and Judicial History of New York, supra,* at 294 (quoting 1 Colonial Laws of New York 128); *see also* 1 Chester, *supra,* at 404–05, 408.

In 1688, when New York was annexed to the Dominion of New England, chancery jurisdiction was vested in the Dominion governor or his appointee, as Chancellor, under the Dominion Judicature Act of March 1686–1687. Smith, *supra,* at 30. The New York Judicature Act of 1691 continued a court of chancery comprised of the Governor and Council until its expiration in 1698. *See* 1 *Legal and Judicial History of New York, supra,* at 294; Smith, *supra,* at 30; *see also* 1 Chester, *supra,* at 408–09; Scott, *supra,* at 152–53. From that point on through the rest of the colonial period, "the only authority for the exercise of equity jurisdiction by ... successive governors was by ordinance, or executive order." 1 *Legal and Judicial History of New York, supra,* at 295. The crown's policy was not to give up its "prerogative claim to equitable jurisdiction," or to permit provincial governments to circumscribe its claim. *Id.*

Although an equity jurisdiction existed through the offices of the Governor during the remainder of the colonial period, there was substantial public opposition to it. *See generally* 1 Chester, *supra*, at 408–12; Scott, *supra*, at 154–64. In 1708, 1711, 1727 and 1735 the assembly passed various resolutions declaring opposition to courts of chancery in view of the threat they posed to liberty. Lawrence M. Friedman, *A History of American Law* 54–55 (2d ed. 1985); 1 *Legal and Judicial History of New York, supra*, at 297–99; Solon Dyke Wilson, *Courts of Chancery in the American Colonies*, 18 American L.Rev. 226 (1884), *reprinted in* 2 *Select Essays in Anglo–American Legal History, supra* at 779, 792–95. Opponents cited the chancery courts' exercise of power as the king's representative rather than as a legislatively constituted judiciary. 1 *Legal and Judicial History of New York, supra*, at 295. The dispute centered on "whether the crown, by virtue of royal prerogative and without an act of Assembly, could establish a court of equity in the province, whether consisting of the Governor and Council, the governor alone, or the Exchequer side of the Supreme Court of Judicature." Smith, *supra*, at 30; *see also* Goebel, *supra*, at 272–77 (reproducing June 1734 debate between William Smith and Joseph Murray before the assembly on the issue); Scott, *supra*, at 154, 158–59. That the court of chancery was the medium for collecting quit rents reserved on land sold by the crown generated antipathy to the court among land holders. 1 *Legal and Judicial History of New York, supra*, at 295; Scott, *supra*, at 156.

In light of opposition to the court, some governors were hesitant to exercise their equitable powers or to appoint judges to a court of chancery. *See, e.g.,* 1 *Legal and Judicial History of New York, supra*, at 295 (describing the hesitancy of Lord Bellomont to make appointments despite the need for such a court); Smith, *supra*, at 31 ("Apparently no courts of equity were held under Lord Lovelace or Lieutenant Governor Richard Ingoldesby."); Wilson, *supra*, at 792–95 (describing resistance of Governor Rip Van Dam). Other governors were not so reticent. 1 *Legal and Judicial History of New York, supra*, 295–97 (describing the actions of Governor Nanfan, Governor Cornbury, Governor Hunter and others in ensuring the existence of courts of equity during their tenures). Undoubtedly some of the early Dutch–English settler antipathies for each other and their systems of justice were being worked out in court practice.

Although the chancery court's ties with England royalty made it controversial, a need for its jurisdiction was apparent. For example, the Earl of Bellomont bemoaned: "There is great want of a Court of Chancery here, but nobody here understands it rightly," and some time later, "I am extremely importuned to erect a Court of Chancery, many people being liked to be ruined for want of one." *See* Wilson, *supra*, at 792.

The assembly's opposition reached its peak in a 1727 showdown between Governor Burnet and Adolph Philipse, a member of the assembly who had lost a case in the court before Governor Burnet. *See generally* Smith, *supra* (providing a detailed account of the dispute and its aftermath); Wilson, *supra*, at 793. At Philipse's prodding, the assembly resolved

> That the erecting or exercising in this Colony [of] a Court of Equity or Chancery, (however it may be termed) without Consent in General Assembly, is unwarrantable, and contrary to the laws of *England*, a manifest oppression and grievance to the subjects, and of pernicious Consequence to their Liberties and Properties.

*See* Smith, *supra*, at 33 (emphasis in original). The assembly resolved further that it would prepare an act to "declare and adjudge all Orders, Ordinances, Decrees and Proceedings" of the court of chancery to be "illegal, null and void, as by Law and of Right" at its next meeting. *See id.* Some reforms of the court's administration ensued. While controversy continued into the eighteenth century, the court continued to sit. Wilson, *supra*, at 795.

At the time of the American Revolution, the following courts existed in New York: the justices' courts, the courts of sessions, the courts of common pleas, the supreme court, the court of admiralty, the prerogative court, the court of the governor and council

and the court of chancery. 1 *Legal and Judicial History of New York, supra,* at 323. Once the courts were severed from their English kingly source, they became theoretically powerless. *Id.* at 323–24.

During the Revolutionary War, the Constitutional Convention of 1777 reestablished the rule of law and the courts. It recognized all of the courts except for the prerogative court and the court of the governor and council. *Id.* at 324. The remaining courts "continued under the same names that they had before borne, practically in the same form and with the same powers and jurisdiction." *Id.; see also In re Steinway,* 159 N.Y. 250, 257, 53 N.E. 1103, 1105 (1899) ("While [the Constitution of 1777] neither created nor continued the supreme court or the court of chancery, ... it treated both as existing tribunals.... explicitly recogniz[ing] them as continuing in power under the state government as they had previously existed under the colonial government."). The first constitutional convention appointed Robert R. Livingston to be New York's first post-Revolutionary Chancellor. 1 *Legal and Judicial History of New York, supra,* at 327. The most significant difference in the post-Revolution period was that the courts now derived their power from a constitutional foundation rather than as a matter of royal prerogative. *See generally* 3 Chester, *supra,* at 865–74 (history of Court of Chancery after the American Revolution).

With the severance of the English royal connection with the courts of chancery, the people embraced the institution they had previously reviled. A court of chancery was "considered to be necessary under the democratic State government." 1 *Legal and Judicial History of New York, supra,* at 327.

Seven chancellors in all led the post-revolutionary court of chancery before the procedural merger of law and equity that occurred in 1846 and effectively ended the court as a separate institution. As noted below, however, the substantive branch of equity continued and burgeoned. Of the seven Post-Revolution chancellors, two had dramatic and lasting impacts on modern equitable jurisdiction and substance that extended far beyond the borders of New York. These two were Chancellor James Kent, the state's third

chancellor, who presided from 1814 to 1823, and Chancellor Reuben H. Walworth, the state's last chancellor, who presided from 1828 to 1847.

Chancellor Kent is credited with beginning the practice of handing down written opinions. He has been referred to as the "founder of the equity jurisprudence of this country." *Id.* at 336 (quoting Irving Brown, *Judicial History of the Commonwealth, in* 3 *The Public Service of the State of New York* 17). Kent explained the expansive powers of the Chancellor thus:

For the nine years I was in that office there was not a single decision, opinion, or dictum of either of my two predecessors cited by me, or even suggested. I took the court as if it had been a new institution and never before known in the United States. I had nothing to guide me, and was left *at liberty to assume all such English chancery powers and jurisdiction* as I thought applicable under our constitution. This gave me grand scope, and I was only checked by the revision of the senate or court of errors.

*Id.* at 334 (emphasis added). The freedom from precedent that Chancellor Kent felt did not express itself in ad hoc decision-making, but was channelled through the Chancellor's rigorous analysis of the existing law, English precedents and of the facts in the individual cases before him:

My practice was first to make myself perfectly and accurately (mathematically accurately) master of the facts. It was done by abridging the bill, and then the answer, and then the depositions, and by the time I had done this slow and tedious process, I was master of the case, and ready to decide it. I saw where justice lay, and the moral sense decided the case half the time. Then I sat down to search the authorities until I had exhausted my books.

*Id.*

The other influential New York chancellor, Walworth, was regarded as "the great artisan of our equity laws," and "the greatest equity jurist living" (the latter an appellation for Chancellor Walworth attributed to Justice Story). Chancellor Walworth's most sig-

nificant contribution to New York equity practice was probably his revision and standardization of the rules of the court of chancery. *Id.* at 336.

The court of chancery was abolished as a separate and distinct court in July 1847, pursuant to the Constitution of 1846, but equity as well as law jurisdiction was transferred to the newly organized supreme court. *See* Constitution of 1846, art. 6, § 3 and art. 14, §§ 5–9, *reprinted in* 7 *Sources and Documents of United States Constitutions* 192, 199, 207–08 (edited and annotated by William F. Swindler, 1978); *see also Bronx Gas & Elec. Co. v. Public Serv. Comm'n*, 190 A.D. 13, 180 N.Y.S. 38, 43 (App.Div. 1st Dep't 1919) (under the Constitution of 1846, "the [supreme] court ha[d] jurisdiction to hear and determine any justiciable question of which the common-law or chancery courts of England would have had cognizance"). *See generally* J. Hampden Dougherty, *Constitutional History of the State of New York* 170 (2d ed. 1915); Ralph E. Kharas, *A Century of Law–Equity Merger in New York*, 1 Syracuse L.Rev. 186 (1949), *reprinted in Selected Essays on Equity* 65 (compiled and edited by Edward D. Re, 1955).

The merger represented a change in procedure and "not [an] alteration in the substantive rules of equity or the common law." Kharas, *supra*, at 67; *see also* Friedman, *supra*, at 391–93 (describing procedural streamlining goals behind 1848 adoption of the Field Code, with its section 62 declaring the "distinction between actions at law and suits in equity ... abolished"). Pre- and post-merger cases emphasized the continued vitality of a flexible substantive equity drawing on rich precedents and able to meet new situations. That substantive stream—particularly as to trusts—was traceable directly to early English decisions and was constantly refreshed by developing needs.

### 2. Reception of English Substantive Law

As already noted, the pre-Revolutionary New York court of chancery was closely associated with English royal prerogative. New York law, in reliance on both precedent and pre-existing statutes and on English authorities such as Blackstone, was largely En-glish from the day that the New York post-Colonial courts reopened. That ongoing dependence of New York law on English law appears in New York statutes to this date. *See* N.Y.Jud.Law § 140–b (McKinney 1983).

New York Law in the 17th Century was an amalgam of the "Bible Codes" and the Dutch civil law system, with English common law superimposed. Herbert A. Johnson, *The Advent of Common Law in Colonial New York*, *in* Herbert A. Johnson, *Essays on New York Colonial Legal History* 37, 37–38 (1981). *See generally* Friedman, *supra*, at 44–45. In 1683, with a grant to the Duke of York, the English system came to predominate. *See Grant of New Netherland, & c, to the Duke of York* (1683), *reprinted in* 7 *Sources and Documents of United States Constitutions*, *supra*, at 161, 161–62; *see also* 1 Chester, *supra*, at 301–31; 2 J. Hampden Dougherty, *Legal and Judicial History of New York* 9–10 (1911); Goebel, *supra*, at 261; Scott, *supra*, at 62–64. Among its provisions, the Duke's charter established English-type counties, provided that laws promulgated pursuant to the charter "be not contrary to the laws and statutes of this Our Realm of England but as near as may be agreeable thereto," and reserved to the King the right of hearing appeals. *See Grant of New Netherland, & c, to the Duke of York, supra*, at 161–62.

The "cutting edge of reception was by usage of the courts." Herbert A. Johnson, *English Statutes in Colonial New York*, *in* Johnson, *supra*, at 199 [hereinafter Johnson, *English Statutes* ]. One account explains the process by which colonial law developed as "a layman's version of English legal institutions":

> 'How did the common law of England get over here, and to stay? In an opinion written a little more than fifty years after the Declaration of Independence, Justice Story said of the common law that "our ancestors brought with them its general principles and claimed it as there birthright." This is at best a figure of speech, and I greatly doubt that Story meant it as more than that. If there had been lawyers among those who sailed to Virginia in 1607 and to Plymouth in 1620, they would un-

doubtedly have brought the principles of the common law along with them as their most precious baggage, but the time for lawyers in America had not yet come. The historian-jurist Daniel J. Boorstin gives us a better picture of colonial law as it was in the beginning:

Legal proceedings of the early years give us the impression of a people without much legal training and with few lawbooks who were trying to reproduce substantially what they knew "back home." Far from being a crude and novel system of popular law, or an attempt to create institutions from pure Scripture, what they produced was instead a layman's version of English legal institutions.'

Eva H. Hanks, Michael E. Herz & Steven S. Nemerson, *Elements of Law* 5–6 (1994) (quoting Harry W. Jones, *The Reception of the Common Law in the United States*, in *Political Separation and Legal Continuity* 93–94, 96–99, 105 (Harry W. Jones ed., 1976)).

Importation of English statutory law began in earnest in the eighteenth century, with the influx of English statutes and case reports. Johnson, *English Statutes, supra,* at 193. Johnson explains:

At first the reception of English statutes was accomplished by usage, but as the colonial period drew to a close the New York General Assembly passed a number of acts designed to incorporate by reference a substantial group of Parliamentary statutes that deal with such disparate subjects as real and personal property law, decedents' estates and wills, criminal law and procedure, and court administration.

*Id.* at 194.

This wholesale voluntary incorporation of English statutory law actually represented an attempt to insulate the colony from compelled "Parliamentary dilution and innovation"—it reflected the revolutionary impulse. *Id.* at 195. According to Johnson, eighteenth-century New York jurisprudence viewed it as

axiomatic that the common law of England and the statutes declaring the common law passed by Parliament prior to 1691, were applicable to New York and were part of the law of the province. In 1764 Chief Justice Daniel Horsmanden voiced the widespread feeling among the legal profession, that not only the statutes declaring the common law were included in New York law as of 1691, but also that all pre-1691 Parliamentary statutes that *altered* the common law had also been received.

*Id.* (emphasis in original). *But cf. id.* at 197 (all the statutes passed by Parliament prior to 1691 were not actually in force in the province).

The most systematic effort at statutory reception occurred late in the colonial period—in the years leading up to the Revolution. *Id.* In 1767, the General Assembly passed an act which "mentioned thirty-one English Parliamentary enactments by their titles and the regnal years of their enactment, and 'extended' their provisions to the province of New York." *Id.* at 204. In its preamble, the act stated its purpose: "that the Laws of this Colony should conform nearly as possible with the Laws of England...." *See id.* This act, however, was "disallowed by the Privy Council in the name of the King when it was submitted to that body for review and approval." *See id.* at 206.

In response to the disallowance, the New York General Assembly enacted specific statutes to incorporate, statute by statute, the very English statutes they had sought to carry over under the 1767 act. *See id.* at 209. In explanation, Johnson proffers that "[t]he New York General Assembly seems to have been determined to witness very clearly the need of New York as a province to identify with the law and constitution of the mother country and to claim equality of treatment and rights with their fellow subjects within the realm." *See id.* at 210.

Immediately after the Revolution started, New York took action to put itself formally into the mainstream of English jurisprudence. The Constitution of 1777 adopted by the Constitutional Convention provided that:

such parts of the common law of England, and of the statute law of England and Great Britain, and of the acts of the legis-

lature of the colony of New York, as together did form the law of the said colony on the 19th day of April, in the year of our Lord one thousand seven hundred and seventy-five, shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall, from time to time, make concerning the same.

Constitution of 1777, § 35, *reprinted in* 7 *Sources and Documents of United States Constitutions, supra,* at 168, 177–78; *see also* Goebel, *supra,* at 299.

In 1786, the New York legislation adopted "An act for revising and digesting the laws of this state." The Act provided that the common law and statutory law of England, together with the acts of the colonial legislature, that constituted the colony's law as of April 19, 1775, would continue to be the law of the state except as abrogated by the constitution or altered by the legislature. *See* Elizabeth Gaspar Brown, *British Statutes in American Law 1776–1836* 69 (1964); Friedman, *supra,* at 110. The great English font of law up to that point continued, subject to new legislation and case law. In devising the new precedents under the common law, including equity, the courts were free to, and did, utilize ongoing post-Revolutionary English cases as persuasive if not binding authority.

Samuel Jones and Richard Varick, who were charged by the 1786 legislation with revising and digesting the New York laws, submitted substitutes for some of the English statutes that were then in force during the 1787–1788 sessions of the New York legislature. Their work resulted in the reenactment of a number of English statutes, including among others, "An ACT concerning Uses," on February 20, 1787. 2 Laws of the State of New York 68 (Jones & Varick eds., 1789), *cited in* Brown, *supra,* at 71.

In 1788, the legislature passed "An Act for the Amendments of the Law, and the better Advancement of Justice." *See* Brown, *supra,* at 71. Its concluding section declared "[t]hat after the first day of May next, none of the Statutes of England, or of Great–Britain, shall operate or be considered as Laws of this State." *See id.*

The New York Constitution of 1821, which superseded that of 1777, continued the basic reception provision; it provided that

Such parts of the common law, and of the acts of the legislature of the colony of New York, as together did form the law of the said colony on the nineteenth day of April, one thousand seven hundred and seventy-five, and the resolutions of the congress of the said colony, and of the convention of the State of New York, in force on the twentieth day of April, one thousand seven hundred and seventy-seven, which have not since expired, or been repealed or altered; and such acts of the legislature of this State as are now in force, shall be and continue the law of this State, subject to such alterations as the legislature shall make concerning the same. But all such parts of the common law, and such of the said acts or parts thereof as are repugnant to this constitution, are hereby abrogated.

Constitution of 1821, § 13, *reprinted in* 7 *Sources and Documents of United States Constitutions, supra,* at 181, 188. This clause was incorporated verbatim into the Constitution of 1846, art. 1, § 17, *reprinted in* 7 *Sources and Documents of United States Constitutions, supra,* at 192, 193, and the Constitution of 1897, art. 1, § 16, *reprinted in* 7 *Sources and Documents of United States Constitutions, supra,* at 234, 236. It is carried forward through the grant of jurisdiction to the supreme court of the state of New York in both law and equity as noted below. *See* Part IV.C.3, *infra.*

Brown suggests that, if taken together with the 1788 act, section 13 of the Constitution of 1821 "would seem to have ended the use of English or British Statutes as such in New York." Brown, *supra,* at 72. The legislature wanted to clarify the confused situation during the Revolution when British troops occupied much of New York. It passed "An Act concerning the Revised Statutes" on December 10, 1828, that explicitly stated

3. None of the statutes of England or Great Britain shall be considered as laws of this state; nor shall they be deemed to

have any force or effect in this state, since the first of May in the year one thousand seven hundred and eighty-eight.

4. No statutes passed by the government of the late colony of New York, shall be considered as law in this state.

*See id.* at 72; *see also* Friedman, *supra,* at 111.

The legislature's efforts to exclude English law came to naught. Chancellor Walsworth, in *Bogardus v. Trinity Church,* 4 Paige 178, 198–99 (1833), *aff'd* 15 Wend. 111 (1835), held that English statutes brought by the settlers to the colony had become part of the colony's common law. As common law, the statutes survived the constitution of 1821, at least to the extent that they were not altered by the legislature or were "repugnant" to the state constitution. *See generally* Brown, *supra,* at 73–75; Friedman, *supra,* at 111.

This checkered history can be summed up as follows. The independent New York State's substantive law was largely English common, equity and statutory law from the day the post-Revolutionary New York courts reopened. Reception of English substantive rules was accomplished largely by usage. Even the New York constitution of 1777, adopted in the fervor of the Revolution, stated that the English common law and statutes that "form[ed] the law of [New York] on [April 19, 1775] shall be and continue the law of this State, subject to such alterations and provisions as the legislature of this State shall … make concerning the same." The constitutions of 1821, 1846, and 1897 contained similar provisions. "Common law" included equity for this purpose. Language preserving the connection to pre-Revolutionary English law and equity is now contained in New York Judiciary Law § 140–b's description of the jurisdiction of the New York supreme court. *See* Part IV.C.3 *infra.*

The rich waters of equity continued—and still continue—to nourish the substantive law on both shores of the Atlantic. In the late colonial and the early post-colonial period, as the New York bar became increasingly sophisticated, there was more and more reliance on English equity principles. *See, e.g.,* 1 Julius A. Goebel, Jr., *The Law Practice of Alexander Hamilton* 21–22, 171 (1964); 2 *id.*

at 3, 12, 27, 53 (1969); Eugene H. Nickerson, *The Lawyer's Bookshelf,* N.Y.L.J., January 29, 1965, at 4 (reviewing 1 Julius A. Goebel, Jr., *The Law Practice of Alexander Hamilton* ) (noting the book's "description of New York chancery procedure of the time and its historical development and setting").

### 3. Equity in Twentieth Century New York

The New York Court of Appeals recognized this history and the supreme court's as well as its own equitable powers when it held in 1899 that "we have the powers of the court of kings bench and the court of chancery as they existed when the first constitution was adopted, blended and continued in the supreme court of the state, except as modified by constitution or statute." *In re Steinway,* 159 N.Y. 250, 258, 53 N.E. 1103, 1105 (1899) (holding that a statute mandating various bookkeeping requirements did not abrogate a stockholder's common law right to inspect corporate books). It relied upon the history of the reception of English statutory law into New York common law, earlier constitutional provisions, and the survival of equity jurisdiction through its merger, and then through subsequent statutory provisions.

In his authoritative review of the history of the New York supreme court, Robert Fowler explained that the supreme court's ancient jurisdiction remained even after the merger of law and equity:

while its jurisdiction had been enlarged by its union with the Court of Chancery, its ancient jurisdiction still remains unimpaired. The Supreme Court of the Province was the instrument by which the great body of the jurisprudence of the English Common Law was applied to New York.... It was from the act of 1691 that the Supreme Court of this State inherited not only the traditions of the Saxon *Aula Regis,* but the best fruits of the centuries of English law.... [S]o important is this act in its every aspect, that always in the history of this State, it will be still the link which connected the judicial system of New York and the very dawn of English law.

Robert Ludlow Fowler, *Organization of the Supreme Court of Judicature of the Province of New York,* 19 Albany L.J. 209, 211 (1879).

Under the current New York constitution, the supreme court of New York has "general original jurisdiction in law and equity...." N.Y. Const. art. 6, § 7; *see* 8 Harold L. Korn & Arthur R. Miller, *New York Civil Practice* ¶ 7701.03 (1992). The New York Surrogate Court has *concurrent* equitable jurisdiction with respect to various matters, including trusts. *See* Surrogate's Court Procedure Act ("SPCA") art. 2, § 201 (vesting in the surrogate court "full equity jurisdiction" with respect to "all matters relating to estates and the affairs of decedents"); *id.* art. 6, § 12 (same); *id.* art. 2, § 207 (jurisdiction over "lifetime trusts"); *id.* § 209(6) (same); *id.* art. 15, § 1501 (application of SPCA over trusts generally); *id.* § 1509 (surrogate's power over lifetime trust is the same as that of a justice of the supreme court). New York Judiciary Law § 140–b describes the scope of the supreme court's equity jurisdiction as follows:

> The general jurisdiction in law and equity which the supreme court possesses under the provisions of the constitution includes all the jurisdiction which was possessed and exercised by the supreme court of the colony of New York at any time, and by the court of chancery in England on the fourth day of July, seventeen hundred seventy-six, with the exceptions, additions and limitations created and imposed by the constitution and laws of the state. Subject to those exceptions and limitations the supreme court of the state has all the powers and authority of each of those courts and may exercise them in like manner.

The cases and commentary sometimes do not clearly delineate the continued existence of both procedural and substantive equity. Both streams continue, influenced by the statutes controlling trusts, changes in the New York Civil Practice Law and Rules regulating procedure and case law. *See, e.g.,* 1 Korn & Miller, *supra,* ¶¶ 101.04, 103.01 (1993).

With respect to federal courts sitting in New York, as to procedural aspects, the Federal Rules of Civil Procedure have drawn on essentially the same sources as New York to incorporate and modify such procedures as those regulating the ancient equitable class action. *See* Hershenov, *supra,* at 284–86, and authorities there cited. Equity offered, and offers, new procedural devices that liberalized and revolutionized, and can still liberalize, common law methods of adjudication. Even when procedural equity became somewhat circumscribed by precedent, it never lost the "gung ho problem solving [attitude] with the concomitant pragmatic, flexible, and activist view that was embodied in that jurisprudential cast." *Id.* at 275.

A federal district court judge sitting in New York under *Erie* exercises the same broad substantive powers as the modern Chancellor sitting as a New York State supreme court justice, supported by more than 500 years of equity jurisprudence. We turn now to equity's current substantive aspects.

### D. Aspects of Equity Substantive Jurisprudence in Modern Adjudications

#### 1. Equity is Flexible

The spirit of equity is reflected in its substantive flexibility. Equity's disfavor of rigid adherence to substantive rules, where such adherence would result in injustice, is ingrained in New York's law of trusts. New York codified the *Claflin* doctrine, *see Claflin v. Claflin,* 149 Mass. 19, 20 N.E. 454 (1889) (treating the then current House of Lords trust rules as too restrictive), and protection of spendthrift trusts in the context of a broad statutory reform of New York's property law that "eschewed the technicality of the ancient law in favor of doctrines of modern liberality." Gregory S. Alexander, *The Dead Hand and the Law of Trusts in the Nineteenth Century,* 37 Stan.L.Rev. 1189, 1214 (1985). Writing about how the modern statutes emphasized private intentions, Professor Alexander explains:

> The increasing emphasis on intentionality in the pre-Classical treatment of property law was frequently associated with discussion about the law/equity distinction, particularly as it bore upon the character of the law of trusts.... During the pre-Classical period American lawyers still

considered equity to be the province of greater rationality. Equity was very commonly associated with liberality and the common law with technicality. The conflict was frequently related to differences between the law of trusts and the law of legal estates, approving equitable doctrines over their counterparts in the common law. The basis for this preference was trust law's allegedly greater responsiveness to private intentions, in contrast with the propensity of the common law to insist on using technical words to frustrate the will of the parties.

*Id.* at 1215; *see also* Kinnane, *supra,* § 111 (Equity "mak[es] a place for reason, as distinguished from technicality and adherence to precedent.").

Chancellor Kent explained that " 'in the exercise of chancery jurisdiction over executory trusts, the court does not hold itself strictly bound by the technical rules of law, but takes a wider range, and more liberal view, in favor of the intention of the parties.' " Alexander, *supra,* at 1215–16 (quoting 4 J. Kent, *Commentaries on American Law* 303–04 (14th ed. Boston 1896)). The passage of modern state statutes dealing with trusts, thus, represented a triumph of liberality over technicality, · of equity over law, and a belief in the preeminence of the settlor's intent. *See generally id.* at 1210–19.

The New York Court of Appeals accepted this flexible characterization of New York equity jurisprudence in *In re Herzog,* 301 N.Y. 127, 137, 93 N.E.2d 336, 340 (1950), when it rejected slavish adherence ·to a trust's language· to the extent that such adherence would undermine the trust's overall purpose. The court explained that "[s]ubstance must not be destroyed in deference to the naked word." *In re Herzog,* 301 N.Y. at 136, 93 N.E.2d at 340 (citing Judge Cardozo's expansive opinion in *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917)). In deciding to permit alteration of a trust's express terms following a change in circumstances, Judge Dye, an authority on the power of New York courts, explained:

> To say that the language of the underlying instrument is paramount and controlling over the primary agreement it was de-

signed to implement is to exalt language over substance and work an unwarranted forfeiture of a clearly discernible purpose. It is axiomatic that the law does not favor forfeiture or penalties but strives to effectuate the purpose and intent which may be gathered not only from the instrument itself but from the circumstances surrounding its making and its expressed purpose and intent.

*In re Herzog,* 301 N.Y. at 137, 93 N.E.2d 336.

2. Equity Provides Remedies to the Otherwise Remediless

Early English equity was characterized by its willingness to provide remedies to those who would otherwise go without in the courts of common law, whether due to the limited nature of early common law actions or to the relative powerlessness of the person seeking its application. *Cf. Harvey v. Harvey,* 2 P.Wms. 21 (1722) ("[This] court would do what, in common presumption, the father, if living, would, nay, ought to have done, which was, to provide necessaries for his children."). Equity's crowning substantive achievement was its recognition of, and nurturance of,. uses into the modern trust, a development already described. The requirement that those seeking application of the Chancellor's extraordinary jurisdiction be otherwise "without a remedy at law" survives in a number of manifestations, including the prerequisite for those seeking· modern equitable remedies such as injunctions.

Modern courts applying New York's substantive law of equity have the continuing obligation to protect the rights of the powerless who come before them. Regardless of whether power imbalances between the parties are due to differences in resources or difficulties with securing adequate representation (*e.g.,* children, unascertained remaindermen, and intended but shut-out beneficiaries), courts of equity must ensure that fairness—not resource or representation imbalances—controls the result of the litigation.

3. Equity is Equality

The "equalizing" obligation of courts of equity finds expression in· one of equity's maxims, that "Equality is Equity." Pomeroy

explains that the significance of this maxim is that equity, in contrast to the common law, "regards and maintains, as far as possible, the rights of *all* who are connected by *any* common bond of interest or obligation." 1 Pomeroy, *supra*, § 406, at 444 (emphasis in original). With respect to litigation involving creditors' interest in a common fund, application of this maxim results in equity preferring an equal, *pro rata*, distribution of rights and liabilities:

> Whenever several persons are all entitled to participate in a common fund, or are all creditors of a common debtor, equity will award a distribution of the fund, or a satisfaction of the claims, in accordance with the maxim, Equality is equity; in other words, if the fund is not sufficient to discharge all claims upon it in full, or if the debtor is insolvent, equity will incline to regard all the demands as standing upon an equal footing, and will decree a *pro rata* distribution or payment.

*Id.* § 407; *see also id.* § 410 ("[W]here the assets are not sufficient to satisfy all demands in full ... the court always proceeds on the principle that equality is equity, and of apportioning the property *pro rata* among all the creditors.").

### 4. Equity Fills the Vacuum Created by Failure to Legislate

Equity steps in to modify unjust law or to fill lacunae in the rules governing trusts when legislation has not. If the early Parliament had been more comfortable with the exercise of legislative power in such areas as trusts, it is possible that equity law as a complement to and corrector of common law would never have developed.

In more recent times, many commentators have characterized the continuing contribution of equity in its ability to shape solutions and prevent injustice where legislative relief is not forthcoming. For example, Chancellor Cottenham, stated "I think it is the duty of this court [of equity] to adapt its practice and course of proceeding to the existing state of society and not by too strict an adherence to forms and rule, established under different circumstances, to decline to administer justice, and enforce rights for which there is no

other remedy." Kinnane, *supra*, § 112 (quoting *Vanderbilt v. Mitchell*, 72 N.J.Eq. 910, 67 A. 97 (Ch.1907)). Kinnane writes "there is some likelihood that some, if not indeed much, of our future legal development, not provided for by legislation, will occur in courts exercising equity powers, rather than in courts exercising common-law powers." *Id.; cf.* Subrin, *supra*, at 913 (noting the "obligation of judges, particularly federal ones, to use historic equity powers in order to breathe life into sacred constitutional rights and to permit such rights to evolve and expand as society attempts to become more humane," (citing Owen Fiss, *The Social and Political Foundations of Adjudication*, 6 Law & Hum.Behav. 121 (1982))).

Trusts, like other equitable devices adapted by judges attempting to fashion solutions to mass toxic tort problems, have played a central role in the equitable tradition of filling legislative vacuums. In 1922, Professor Scott recognized the historic role of trusts in accommodating society's changing requirements through our legal system. *See* Austin W. Scott, *The Trust as an Instrument of Law Reform*, 31 Yale L.J. 457 (1922) (describing the role of the trust in undermining the feudal system; in changing the economic position of women; and in enabling businesses to accomplish a variety of goals).

### 5. Limitations on Modern Equity Jurisprudence

Equity is not shapeless and unconstrained. Chancellors incorporate statutes and

> imitate the common law whenever they can, and depart from it reluctantly at the call of natural justice and common honesty. Common honesty requires that a man shall observe the trust that has been committed to him. If the common law will not enforce this obligation it is failing to do its duty. The chancellor intervenes, but in enforcing trusts he seizes hold of and adopts every analogy that the common law presents.

Maitland & Montague, *supra*, at 125–26. Equity can be conceived of as "a system 'auxiliary' to law," with its "'peculiar province' ... correcting defects in the stricter common law." Subrin, *supra*, at 932 (de-

scribing theories advanced by Joseph Story). Subrin notes that "[e]quity without law would be too discretionary," while "[l]aw without equity would be too stagnant." *Id.* (describing theories advanced by Joseph Story); *see also id.* at 962–63 (describing theories advanced by Charles Clark); *id.* at 983 (describing theories advanced by Frederick Maitland); *id.* at 1000–02.

We need not here decide to what extent legislative powers to limit equitable trusts are themselves limited by the New York Constitution. *Cf. People v. Riley,* 188 Misc. 969, 973–74, 64 N.Y.S.2d 348, 353 (Sup.Ct. 1946) ("The equity jurisdiction of this court is constitutional, and the exercise of its inherent powers in equity may not be qualified or abridged by statute."). As one judge noted, there are implications arising from the constitutional basis of the New York courts' equity jurisdiction:

> Constitutionally, equity jurisdiction is an inherent element of the state court. If a litigant is entitled to an equitable remedy and has no adequate legal remedy, a destruction of such right of redress would be a denial of justice, and thus a violation of both State and Federal Constitutions.

*Aberdeen Restaurant Corp. v. Gottfried,* 158 Misc. 785, 788, 285 N.Y.S. 832, 835 (Sup.Ct. 1935). In the instant litigation, no statute or decision limits the Courts' equity powers to interpret New York substantive trust law. Acting as New York courts, the federal Courts must protect the rights of trust beneficiaries.

### E. New York Trust Law Permits Deviation

■ Under New York trust law, there are three situations in which a court will permit modification of a non-charitable trust: 1) where the settlor reserves the right to modify or revoke the trust; 2) under New York Estates, Powers & Trusts Law § 7–1.9, even absent express modification, if all the beneficiaries and the settlor agree to the modification; and 3) as a matter of the Courts' equitable powers where, due to unanticipated circumstances, deviation from the trust's provisions is necessary to effectuate the settlor's intent. *See, e.g., In re Herzog,* 301 N.Y. 127, 138, 93 N.E.2d 336, 341 (1950);

*In re Estate of Pulitzer,* 139 Misc. 575, 579, 581–82, 249 N.Y.S. 87, 93, 96 (Sur.Ct.1931), *aff'd,* 237 A.D. 808, 260 N.Y.S. 975 (1932); *In re·Oppenheimer's Estate,* 52 N.Y.S.2d 441, 444 (Sur.Ct.1945). *See generally Findley I,* 129 B.R. at 843–46.

Earlier in this litigation, the Courts held that authority to modify the TDP could also be found in the modification procedures described in Manville's bankruptcy reorganization plan, § 11.6, and in the Trust Agreement, § 6.03(a). *Findley I,* 129 B.R. at 844–45. The Courts held that even if the modification provisions described in the first settlement were determined not to apply to the Codefendant Procedures appended to the Trust Agreement, "the court may still order a deviation from the trust terms in order to effectuate the purpose of the trust" pursuant to its equitable powers. *Findley I,* 129 B.R. at 845.

The Court of Appeals for the Second Circuit disagreed with the Courts' determination that the explicit authority found in § 6.03(a) of the Trust Agreement carried over to the applicable annexes. *Findley II,* 982 F.2d at 746–47. Thus, the Courts' authority to permit deviation from the trust's terms rests on its New York-based substantive equitable jurisdiction over trusts and on traditional equitable principles.

■ It is well established that a court may permit deviation from the terms of a trust where, due to a change in circumstances, the settlor's intent and the trust's purpose would otherwise be frustrated. *See generally* Austin Wakeman Scott, *Deviation from the Terms of a Trust,* 44 Harv.L.Rev. 1025 (1931) [hereinafter Scott, *Deviation* ]. The Second Restatement (for which Professor Austin Wakeman Scott was Reporter) expresses this principle as follows:

> The court will direct or permit the trustee to deviate from a term of the trust if owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust; and in such case, if necessary to carry out the purposes of the trust, the court may direct or permit the trustee to

do acts which are not authorized or are forbidden by the terms of the trust.

Restatement (Second) of the Law of Trusts § 167(1) (1959).

The principle is often traced to *Curtiss v. Brown,* 29 Ill. 201, 230 (1862), in which the court stated:

> Exigencies often arise not contemplated by the party creating the trust, and which, had they been anticipated, would undoubtedly have been provided for, where the aid of the court of chancery must be invoked to grant relief imperatively required; and in such cases the court must, as far as may be, occupy the place of the party creating the trust, and do with the fund what he would have dictated had he anticipated the emergency.... From very necessity a power must exist somewhere in the community to grant relief in such cases of absolute necessity, and under our system of jurisprudence, that power is vested in the court of chancery.

The court's opinion in *Curtiss v. Brown* has been cited by many other courts sitting in equity as authority to prevent frustration of the trust's purpose or the settlor's intent. *See, e.g., In re Estate of Pulitzer,* 139 Misc. 575, 581–82, 249 N.Y.S. 87, 96 (Sur.Ct.1931), *aff'd,* 237 A.D. 808, 260 N.Y.S. 975 (App. Div.1st Dep't 1932); *Pennington v. Metropolitan Museum of Art,* 65 N.J.Eq. 11, 20 Dickinson 11, 55 A. 468 (Ch.1903); *see also* 2 Austin Wakeman Scott, *The Law of Trusts* § 167, at 1270 (3d ed. 1967).

English courts, drawing on the same common law sources and equity powers as American courts, have also adopted the rule. *Cf.* 1 Chester, *supra,* at 3 (noting cross-fertilization in legal developments in England and the New World). In the English case, *In re New,* 2 Ch. 534, 543 (1901), Justice Romer of the English Court of Appeals stated:

> The principle seems to be this—that the Court may, on an emergency, do something not authorized by the trust. It has no general power to interfere with or disregard the trust; but there are cases where the Court has gone beyond the express provisions of the trust instrument—cases of emergency, cases not foreseen or provided for by the author of the trust, where the circumstances require that something should be done.

*See also T.J. Moss Tie Co. v. Wabash Ry.,* 11 F.Supp. 277, 284 (S.D.N.Y.1935) (quoting *In re New* ).

New York courts have explicitly recognized the principle that a court may act equitably in the case of an emergency or unforeseen circumstances to prevent frustration of the trust's purpose by authorizing deviations. *See, e.g., In re Herzog,* 301 N.Y. 127, 138, 93 N.E.2d 336, 341 (1950) (citing principle, and permitting modification of trust to direct payments for benefit of children to husband instead of to wife, following change in custody arrangements); *Oberndorf v. Farmers' Loan & Trust Co.,* 208 N.Y. 367, 372, 102 N.E. 534, 535 (1913); *In re Estate of Annesley,* 97 Misc.2d 1047, 412 N.Y.S.2d 959, 962 (Sur.Ct.1979) (citing principle, and authorizing deviation from trust's terms in light of subsequent (contradictory) will provision); *Pulitzer,* 139 Misc. at 579, 581–82, 249 N.Y.S. at 93, 96 (citing principle, and implying power of sale of unproductive trust assets as a matter of the court's equitable jurisdiction even though will contained prohibition against sale); *Pulitzer,* 139 Misc. at 583, 249 N.Y.S. at 98 ("The widest equity powers exist in the Surrogate's Court of this State by grant of legislative authority in ... the Surrogate's Court Act."); *In re Oppenheimer's Estate,* 52 N.Y.S.2d 441, 444 (Sur.Ct.1945) (citing principle, and permitting trustee to deviate from trust's explicit language providing for payment in full of mortgage lien); *see also Mayer v. Chase Nat'l Bank,* 136 F.Supp. 83, 87 (S.D.N.Y.1955), *rev'd on other grounds,* 233 F.2d 468 (2d Cir.), *cert. denied,* 352 U.S. 841, 77 S.Ct. 64, 1 L.Ed.2d 58 (1956) (citing principle); *T.J. Moss Tie Co.,* 11 F.Supp. at 284 (citing principle).

When New York courts invoking equitable powers to modify trusts have been faced with the problem of infant remaindermen and others who might not otherwise be represented in the litigation, the courts utilized another equitable tool—appointment of a guardian to represent those interests. *See, e.g., Herzog,* 301 N.Y. 127, 93 N.E.2d 336; *Pulitzer,* 139 Misc. at 578, 249 N.Y.S. at 92. *But see In re Michael,* 70 Misc.2d 161, 333 N.Y.S.2d 301

(Sup.Ct.1971), *aff'd* 39 A.D.2d 865, 332 N.Y.S.2d 810 (App.Div.1st Dep't 1972) (guardian could not consent on behalf of infant beneficiaries where the trust was modified pursuant to N.Y.Est.Powers & Trusts Law § 7–1.9). In one case where a class of litigants was not fully represented in the litigation, a federal court sitting in New York and applying equitable principles was willing to forego full representation in favor of "feasible" representation. *See T.J. Moss Tie Co.,* 11 F.Supp. at 284, 286 (holding that 25.52% of bondholders under a mortgage "is as high a representation as is practicably feasible under the circumstances," and sufficient to "constitute an adequate class representation of the bondholders as cestuis que trusten under the circumstances"); *but cf. Mayer,* 233 F.2d 468 (refusing to permit deviation from terms of trust agreement by paying known holders of bonds the *pro rata* shares attributable to unknown holder, since interests of unknown bondholders in funds at issue in the litigation was several). The legal representative of future claimants in the instant litigation is the analogue of the guardian of infant remaindermen.

The judicial exercise of equitable power to prevent frustration of the trust's purpose often finds its modern expression in tax cases. New York courts permit "judicial construction" or "judicial reformation" of a trust's terms to enable trusts to receive favorable tax treatment. *See, e.g., In re Mainzer,* 151 Misc.2d 203, 573 N.Y.S.2d 129 (Sur. Ct.1991) (trust judicially reformed to comport with earlier draft of trust instrument to take advantage of clarification in tax law); *In re Estate of Martin,* 146 Misc.2d 144, 549 N.Y.S.2d 592 (Sur.Ct.1989) (trust judicially constructed to preserve marital deduction, citing testator's primary purpose); *In re Estate of Khadad,* 135 Misc.2d 67, 514 N.Y.S.2d 625 (Sur.Ct.1987) (trust judicially reformed to enable it to qualify for unlimited marital deduction given decedent's inferred "intent" to maximize tax savings); *In re Estate of Avery,* 124 Misc.2d 601, 476 N.Y.S.2d 1013 (Sur.Ct.1984) (testamentary trust judicially constructed to permit qualification as marital deduction under tax code); *In re Will of Stalp,* 79 Misc.2d 412, 359 N.Y.S.2d 749 (Sur. Ct.1974) (trust judicially reformed to bring it

in compliance with rule, where due to unfamiliarity with tax laws and drafting mistake, trust terms contravened Tax Reform Act); *cf. In re Estate of Cord,* 58 N.Y.2d 539, 462 N.Y.S.2d 622, 449 N.E.2d 402 (1983) (construction of will and trust to require payment of taxes out of estate in effectuating decedent's intent, where trust instrument provided for taxes to be paid out of trust corpus).

Earlier objectors to the Courts' exercise of equity jurisdiction in the instant case contended that 1) the Courts must obtain the consent of all beneficiaries before proceeding; 2) the Courts cannot exercise their equitable powers to permit deviation from a trust's terms where doing so will benefit some beneficiaries at the expense of others; and 3) a court has more latitude in permitting deviation from administrative provisions than from distributive provisions.

### 1. Consent of All Beneficiaries Not Needed

■ The contention that the consent of all beneficiaries is a condition precedent to the Courts' exercise of equitable substantive powers represents a misapplication of New York statutory law. The section relied upon as restrictive is in fact expansive of courts' powers.

The first two subsections of New York Estates, Powers & Trusts Law § 7–1.9, which explicitly permit revocation or modification of otherwise irrevocable trusts (but do not purport to exclude historical powers), provide for consent as an additional basis to the courts' inherent powers to approve changes in the trust. The section reads:

> (a) Upon the written consent ... of all the persons beneficially interested in a trust of property, heretofore or hereafter created, the creator of such trust may revoke or amend the whole or any part thereof by an instrument in writing....

> (b) For the purposes of this section, a disposition, contained in a trust created on or after September first, nineteen hundred fifty-one, in favor of a class of persons described only as heirs, next of kin or distributees (or by any term of like import)

of the creator of the trust does not create a beneficial interest in such persons. N.Y.Est.Powers & Trusts Law § 7–1.9 (McKinney 1992). Notwithstanding the language of the statute, courts citing § 7–1.9's consent requirement have properly permitted deviation in circumstances where consent was unobtainable. *See In re Estate of Cord*, 58 N.Y.2d 539, 546, 462 N.Y.S.2d 622, 449 N.E.2d 402 (1983) (where change did not effect an "unauthorized invasion," consent of the beneficiaries was not required); *In re Mainzer*, 151 Misc.2d 203, 573 N.Y.S.2d 129 (Sur.Ct.1991) (consent of infant beneficiaries not required where their interests were not impaired).

The legislative history of New York Estates, Powers & Trusts Law § 7–1.9 demonstrates that the statute was intended to enhance, not restrict, the modifiability of trusts. *See generally Recommendation of the Law Revision Commission to the Legislature Relating to the Revocation of Inter Vivos Trusts*, Report of the Law Revision Commission for 1951, at 83 [hereinafter *Law Revision Commission Recommendation*]. The highly respected and influential jurist, Stanley H. Fuld, and others were concerned over the technical difficulty of deciding when lack of consent of heirs or next of kin would block necessary modifications in trusts. They suggested a legislative solution. *See id.* at 85. There is no indication in the legislative history, nor have the courts held, that in seeking to expand the flexibility of trusts, the legislature intended to limit, abrogate or circumscribe the well-established equitable power of courts charged with enforcing trusts. *Cf. In re Dodge's Trust*, 25 N.Y.2d 273, 281, 303 N.Y.S.2d 847, 854, 250 N.E.2d 849, 854 (1969) ("The amendment is a narrow solution to a narrow problem."). Rather, the statute must be viewed as supplementing the courts' broad-based equitable authority to permit deviation to effectuate a trust's purpose.

The enactment of New York Estates, Powers & Trusts Law § 7–1.9 was designed to clear up an ambiguity in meaning in the phrase "persons beneficially interested" as used in Personal Property Law § 23 and Real Property Law § 118. *See Law Revision Commission Recommendation, supra,* at 83. These two provisions, the precursors to New York Estates, Powers & Trusts Law § 7–1.9, permitted the creator of a trust to revoke the trust with the written consent of all "beneficially interested" persons. The question the legislature sought to resolve was whether the settlor's heirs, as determined under the intestate laws, should be considered beneficially interested when the settlor directs that trust property be paid over to a class of "heirs or next of kin." *See generally id.*; I. Leo Glasser, *Trusts, Perpetuities, Accumulations and Powers Under the Estates, Powers and Trusts Law*, 33 Brook.L.Rev. 551, 559–60 (1966–1967); *see also* Irving Mariash, *Revocation of Intervivos Trusts in New York: A Study in Confusion*, 16 Brook. L.Rev. 41 (1950) (describing the confusion that preceded § 7–1.9's enactment, and calling for legislative action). The problem arose in the aftermath of Judge Cardozo's decision in *Doctor v. Hughes*, 225 N.Y. 305, 122 N.E. 221 (1919), and in the intricacies of the New York's approach to the Doctrine of Worthier Title that need not be explored for the purposes of this Memorandum. *See Dodge's Trust*, 25 N.Y.2d at 280, 303 N.Y.S.2d at 853, 250 N.E.2d at 853 (describing the background).

Given this history of New York Estates, Powers & Trusts Law § 7–1.9, together with its narrow focus, it is evident that the statute is inapplicable where the court draws on its equitable powers to prevent frustration of a trust's purpose. *See Scott, Deviation, supra,* at 1029 ("A court of equity has inherent jurisdiction apart from statute to control the administration of trusts."); *see also Mainzer*, 573 N.Y.S.2d at 131 (distinguishing between modification pursuant to N.Y.Est.Powers & Trusts Law § 7–1.9 and "judicial reformation"); *cf.* Cal.Prob.Code §§ 15409 & 15403–15405 (statutory scheme governing trust modification that differentiates between judicial modification and modification by consent of the beneficiaries).

Earlier objectors to the Courts' exercise of their equitable powers to effectuate the trust's purposes mistakenly cited not only section 7–1.9(a), but the following cases decided under that statute as mandating trust beneficiaries' consent in every case: *Cord*, 58

N.Y.2d at 546, 462 N.Y.S.2d at 625, 449 N.E.2d at 405; *Gilbert v. Gilbert*, 39 N.Y.2d 663, 669, 385 N.Y.S.2d 278, 281, 350 N.E.2d 609, 612 (1976); *Mainzer*, 151 Misc.2d 203, 573 N.Y.S.2d 129; *Rosner v. Caplow*, 90 A.D.2d 44, 456 N.Y.S.2d 50 (App.Div.1st Dep't 1982), *aff'd*, 60 N.Y.2d 880, 470 N.Y.S.2d 367, 458 N.E.2d 826 (1983); *In re Michael*, 70 Misc.2d 161, 333 N.Y.S.2d 301 (Sup.Ct.1971). As already demonstrated, reliance on these section 7–1.9–based cases for the general proposition that consent is required for trust modification in a case such as the instant one is misplaced.

The Distributors subclass, before it agreed to the Settlement, relied upon cases not decided under section 7–1.9 to support its contention that consent is required outside the parameters of that statute. Trial Brief of the Manville Distributor Class 13 (citing *Hatch v. Riggs Nat'l Bank*, 361 F.2d 559, 565 (D.C.Cir.1966); *In re Estate of Manville*, 112 Misc.2d 355, 359, 447 N.Y.S.2d 195, 198 (Sur. Ct.1982); *In re Estate of Annesley*, 97 Misc.2d 1047, 1051, 412 N.Y.S.2d 959, 962 (Sur.Ct.1979); *In re McCann's Will*, 36 Misc.2d 144, 145–46, 229 N.Y.S.2d 974, 976 (Sur.Ct.1962)). These cases do not support the earlier conclusion drawn by the Distributors.

The principal case cited for the proposition that consent of the beneficiaries is necessary outside of § 7–1.9's parameters is a case decided by the Court of Appeals for the District of Columbia, *Hatch v. Riggs National Bank*, which is not controlling in the instant litigation where New York law governs. In *Hatch*, the court satisfied the consent requirement with the "appointment of a guardian ad litem to represent interests of unborn or unascertained beneficiaries," 361 F.2d at 565, an equitable device serving a function similar to that served by class and subclass representation and appointment of the legal representative of future claimants. *See generally* Note, *Trusts: Modification of Irrevocable Trusts Through Appointment of a Guardian for Unborn Heirs—Repudiation of Worthier Title Doctrine*, 66 Colum.L.Rev. 1152 (1966) (case note describing *Hatch*).

Nor do the other three cases earlier cited by the Distributors support such a constrict-ed view of the Courts' authority. In *In re Estate of Manville*, the court did not explicitly consider the issue of consent, although it did refer to the appointment of a "guardian ad litem to protect the interests of the infant children" of the grantor's son. *Manville*, 447 N.Y.S.2d at 198. The court in *In re McCann's Will* did not address the issue of consent when it authorized sale of trust assets in contravention of a testamentary prohibition on sale so that the trust could meet its commitments to the income beneficiaries. In authorizing the sale, the court determined that no reserve need be set up for infants who were not parties to an earlier determination on the reserve issue that was res judicata. *McCann's Will*, 229 N.Y.S.2d at 976–77.

*In re Estate of Annesley* does not support the contention that consent is required in the instant litigation, but instead provides a useful precedent as a relatively recent example of a New York court's invocation of Restatement (Second) of Trusts § 167. The consent requirement considered by the court in *Annesley* was one created by the trust instrument rather than one imposed by the court. At issue in *Annesley* was whether the grantor's reservation of amending power in the trust instrument, which according to the trust instrument could only be exercised with the written consent of the trustee, could be exercised on the grantor's death through a provision in her will. Finding that the amending power reserved by the grantor could only be exercised during her lifetime, the court nonetheless authorized the deviation according to the Restatement principle. *Annesley*, 412 N.Y.S.2d at 962.

Finally, the fact formerly noted by the Distributors that "*all* beneficiaries of the trust [in *In re Estate of Pulitzer* ] had consented to the proposed modification" does not lead to the conclusion that such consent was *required* in that case. *See* Trial Brief of the Manville Distributor Class 13; *In re Estate of Pulitzer*, 139 Misc. 575, 578, 249 N.Y.S. 87, 92 (Sur.Ct.1931), *aff'd*, 237 A.D. 808, 260 N.Y.S. 975 (App.Div.1st Dep't 1932) ("The adult life tenants and remainderman [including fourteen infants represented by two special guardians] join in requesting the relief sought by the trustees.").

Some courts in other states are not as clear as are the New York courts regarding the broad power of a court to modify a trust to carry out the overriding intention of the grantor. *But cf.* Part IV.F, *infra* (demonstrating national acceptance of the general principle that courts should use their equitable powers to prevent frustration of a trust's purpose). Consent of the beneficiaries is sometimes required in narrow situations where there are limited numbers of known beneficiaries or where one beneficiary is being advantaged at the expense of another, contrary to the grantor's intent. *See Leonardini v. Wells Fargo Bank & Union Trust Co.,* 131 Cal.App.2d 9, 280 P.2d 81 (Dist.Ct. App.1955); *Probasco v. Clark,* 58 Md.App. 683, 474 A.2d 221, 223 (1984).

The instant case does not fall into such limiting categories because all remaining Beneficiaries will be treated in the same way in accordance with the Trust's overriding design. In any event, American courts applying the equitable principle embodied in Restatement (Second) § 167 emphasize effectuation of the trust's purpose over the benefits of modification to a beneficiary. *See, e.g., Rogers v. English,* 130 Conn. 332, 33 A.2d 540 (Sup.Ct. of Errors 1943) (it is the necessity of the situation, not the fact that deviation is good for beneficiaries, that is significant); *Reedy v. Johnson's Estate,* 200 Miss. 205, 26 So.2d 685 (1946) (advantage to beneficiaries is not significant compared to testator's intent in the court's determination of whether to permit deviation); *In re Wolcott,* 95 N.H. 23, 26, 56 A.2d 641, 643 (1948) (rejecting consent requirement since "[s]trictly applied, [a consent requirement] may prevent accomplishment of the testator's primary purpose").

### 2. Benefits of Deviation to Most

▮ In their earlier opinion in this litigation the Courts noted that "[i]t is an open question in some jurisdictions whether a court may permit a deviation from the terms of a trust agreement to effectuate the purpose of the trust which will have the effect of benefitting some of the beneficiaries at the expense of others." *Findley I,* 129 B.R. at

845 (citing Scott on Trusts § 167 (4th ed. 1989)).

The Courts noted, in determining that New York trust law would permit the type of deviation proposed in the instant case, that New York "give[s] its courts wide powers to effectuate [a] trust's underlying purposes." *Findley I,* 129 B.R. at 846 (citing *In re Oppenheimer's Estate,* 52 N.Y.S.2d 441, 443–44 (Sur.Ct.1945)). The opinion explained that the New York statute governing spendthrift trusts, New York Estates, Powers & Trusts Law § 7–1.6, is an example of "New York trust law['s] explicitly permit[ting] modification of trust terms that benefit some beneficiaries at the expense of others." *Findley I,* 129 B.R. at 846. New York Estates, Powers & Trusts Law § 7–1.6 expressly permits the invasion of a trust corpus for the benefit of an income beneficiary, even though the invasion may result in a reduction in the trust principal ultimately to be distributed to principal beneficiaries.

*Findley I* cited *In re Albert,* 111 Misc.2d 884, 445 N.Y.S.2d 355 (Sup.Ct.1981), for the proposition that the invasion of the trust principal for the benefit of the income beneficiary "is in limited circumstances authorized by [N.Y.Est.Powers & Trusts Law § 7–1.6]." *Findley I,* 129 B.R. at 846. The Court of Appeals for the Second Circuit, on review of that opinion, apparently misunderstood the Courts' purpose in citing *In re Albert. See Findley II,* 982 F.2d at 744–45. It stated:

> In the only instance cited by the Trial Courts in which a New York Court was asked to depart from the terms of a trust instrument to benefit one beneficiary at the expense of other beneficiaries[,] *In re Albert,* 111 Misc.2d 884, 445 N.Y.S.2d 355 (N.Y.Sup.Ct.1981), the court *refused* to do so, holding *inapplicable* even the limited statutory authority, *see* N.Y.Est.Powers & Trusts Law § 7–1.6 (McKinney 1992), authorizing invasion of a trust corpus to provide increased income to an income beneficiary where either that beneficiary himself is "indefeasibly" entitled to principal or consents are given by all person beneficially interested in the trust.

*Findley II,* 982 F.2d at 745 (emphasis in original).

*Albert* has been sufficiently distinguished *supra*, Part IV.A. It is enough now to note that the New York supreme court's refusal to grant relief in *Albert* was based in part on New York Estates, Powers & Trusts Law § 7–1.6(a), a provision which is not limiting in trusts created after the statute's enactment in 1966, when § 7–1.6(b) applies ("express trust, hereafter created," L.1966, c. 952). Section 7–1.6(a) required that all persons "beneficially interested" in the trust consent in writing to invasion authorized by the court under the statute. In trusts created after the statute's enactment, the court may authorize the invasion of principal for the benefit of the income beneficiary under the circumstances provided for in N.Y.Est.Powers & Trusts Law § 7–1.6 *without* the written consent of those beneficially interested in the trust. N.Y.Est.Powers & Trusts Law § 7–1.6(b). The principal reason given by the court for denying relief in *Albert* was not the court's concern about the effect of diversion on the principal beneficiary, but the impossibility of getting the consent required under § 7–1.6(a) and the lack of any emergency. *See Albert,* 111 Misc.2d at 892, 445 N.Y.S.2d at 361. The *Albert* court also cited the petitioner's failure to demonstrate that the relief sought would effectuate the settlor's intent, a prerequisite to the court's granting relief under both § 7–1.6(a) and 7–1.6(b). *Albert,* 111 Misc.2d at 892–94, 445 N.Y.S.2d at 361–62.

Neither *Albert* nor New York Estates, Powers & Trusts Law § 7–1.6 controls the instant case. New York Estates, Powers & Trusts Law § 7–1.6 governs the limited rights of income beneficiaries to invade a trust corpus. The case before the Courts, in contrast, involves the rights of principal beneficiaries to an equitable division of the trust corpus in order to avoid having a relatively few beneficiaries deny the vast majority any benefit—in contravention of the Trust's primary purpose of equal treatment for all. The provisions cited actually support the proposition that there are circumstances under which New York law will permit impairment of a remaindermen's interests where necessary to effectuate the settlor's purpose.

In a passage noted in the Courts' earlier opinion and emphasized by the Second Cir-cuit, the leading treatise on trusts explains that "[t]he court will not, of course, permit a deviation from the terms of the trust in such a way as to benefit some of the beneficiaries at the expense of others." 2 Austin Wakeman Scott, *The Law of Trusts,* § 167, at 1280 (3d ed. 1967); *see also* Scott, *Deviation, supra,* at 1037. The cases cited by the Scott treatise do not support this overbroad proposition.

A close reading of the cases reveals that Scott's statement is not an established principle of trust adjudication but rather an overgeneralizing synthesis. Almost without exception, the cases cited by Scott address the obligations of the courts in allocating assets *between income beneficiaries and principal beneficiaries.* Also almost without exception, the modern courts in the cases cited by Scott justify their results as an attempt *to effectuate the settlor's intent* as between the income and principal beneficiaries. *See, e.g., Taylor v. Hutchinson,* 17 Ariz.App. 301, 497 P.2d 527 (Ct.App.1972) (court would not permit diversion of income from life tenant where life tenant became incompetent and could not spend all of the income to which she was entitled); *Tree v. Rives,* 347 Ill.App. 358, 106 N.E.2d 870 (App.Ct.1952) (court would not permit invasion of trust corpus for benefit of income beneficiary where plaintiff failed to show "hardship" justifying an invasion); *In re Cosgrave's Will,* 225 Minn. 443, 31 N.W.2d 20 (1948) (court would not permit invasion of trust corpus where proceeds from widow's shares were insufficient to support her in accustomed style); *Hedges v. Hopper,* 118 N.J.Eq. 359, 179 A. 261 (Ch.1935) (court permitted invasion of trust principal, as provided by testator, to effectuate testator's intent with respect to income beneficiary, notwithstanding deleterious effect on remaindermen); *Morris v. Boyd,* 110 Ark. 468, 162 S.W. 69 (1913) (court rejected compromise settlement of will contest that would have distributed portion of corpus to life tenant in fee in contravention of the testator's intent); *Davis, Petitioner,* 14 Allen 24 (Mass.1867) (court would not permit sale of house and investment of proceeds as requested by life tenant where it was not clear that contingent remaindermen's interests would be promoted by the sale, and where in any event authori-

zation of the sale would "defeat [the testator's] intent"); *cf. Fidelity Union Trust Co. v. J.R. Shanley Estate Co.*, 113 N.J.Eq. 562, 566, 167 A. 865, 867 (Ch.1933) (court would not permit widow to exchange life right in homestead for annuity to be paid out of the income of residuary estate, where doing so would have the effect of "retriev[ing] the widow's loss out of the pockets of the sons' estates").

If courts of equity facing the type of problems posed by the instant litigation are constrained in fashioning a remedy, such constraints do not derive from a blanket rule against solutions that benefit different parties to different degrees. Rather, as the cases and history indicate, the critical constraint on a court endeavoring to construct a trust's provisions is the requirement that it accurately discern the settlor's primary intent and the trust's primary purpose and then attempt to effectuate them as fairly as possible in the context of changed circumstances.

A more accurate statement, then, of the holdings of the cases cited by Scott is that a court should not alter the relative rights of beneficiaries in a way that disregards the settlor's primary intent. The issue facing the Courts in this litigation is not whether the proposed deviation will benefit some and hurt others. It is, instead, whether the unintended preferred position of some trust beneficiaries under the pre-class action *status quo ante* (with those relatively few who joined the FIFO queue first developing a greater probability of payment than the huge majority of equally worthy beneficiaries, standing to lose more under the Settlement) was intended by the trust's creators and can therefore be permitted to persist. The federal Court of Appeals effectively rejected that position when it held that the Trust's provision for a FIFO queue was not intended to confer substantive rights. *Findley III*, 993 F.2d at 11.

### 3. Administrative vs. Distributive Provisions

■ Those initially challenging the Courts' authority to permit deviation also asserted that such power is limited to administrative rather than substantive terms of

trusts. Trial Brief of the Manville Distributor Subclass 13–17. They did not cite case law establishing this limitation, and provided instead examples of courts revising administrative provisions in support of their former view that: "the court can authorize the trustees to ignore administrative terms in trust instruments that have become unreasonable, but cannot authorize changes in the dispositive scheme." *Id.* at 17.

In practice, such a distinction would be impossible to apply. In many instances it would be difficult to distinguish between administrative and dispositive provisions. Even where the distinction is possible it may be meaningless, since altering administrative provisions may have a substantive effect, and altering substantive provisions may have an effect on administration. In the instant litigation, the proposed deviation could be characterized either way. The Settlement can be characterized as a change in administrative provisions since it theoretically does not alter the possibility of full compensation, but instead alters the time schedule under which payments will be made. Or, it can be characterized as a change in the distributive provisions since, as a practical matter, it is unlikely that claimants will see 100% of the value of their claims under the unrestrained tort system.

In any event New York has not adopted the distributive versus administrative distinction as a limitation on a court's equitable powers in trust adjudication. *Cf. In re Herzog*, 301 N.Y. 127, 138, 93 N.E.2d 336, 341 (1950) ("It is the avowed purpose of the payments rather than the method that is controlling."). Of the hundreds of reported New York cases addressing trust modification, the Courts have found only one—a case involving application of *cy pres* to a private charitable trust—squarely identifying the distinction. *In re Estate of Wilson*, 59 N.Y.2d 461, 465 N.Y.S.2d 900, 906–07, 452 N.E.2d 1228, 1234–36 (1983). Unlike some courts from other jurisdictions, New York courts applying the Restatement (Second) of Trusts § 167(1) do not distinguish between administrative and dispositive provisions. *See, e.g., Mills v. Ball*, 380 So.2d 1134, 1140–42 (Fla.Dist.Ct.App.), *cert. denied*, 388 So.2d

1116 (Fla.1980) (permitting deviation from trust's administrative—as distinct from dispositive—provisions); *In re Estate of Burdon–Muller,* 456 A.2d 1266, 1271 (Me.1983) (same); *In re Trust Under the Last Will and Testament of Scheele,* 517 N.E.2d 418, 426 (Ind.Ct.App.1987) (noting that authority to deviate, which is statutory in Indiana, is limited to administrative terms of trust).

## F. Trust Law in Other States

The overwhelming majority of states has adopted the American–New York rule that a court of equity may permit deviation from a trust's terms where, due to unanticipated circumstances, continuation of the trust under its explicit terms would defeat accomplishment of the trust's primary purpose.

### 1. Case Law

Courts in thirty-three states and the District of Columbia, in addition to New York, have recognized that a court of equity may modify or deviate from the terms of a trust where, due to a change in circumstances, compliance with the terms of the trust would frustrate the trust's design. Those states are Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Hawaii, Illinois, Indiana, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New Jersey, North Carolina, North Dakota, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Virginia, Washington, Wisconsin, and Wyoming. *See, e.g., Taylor v. Hutchinson,* 17 Ariz.App. 301, 304, 497 P.2d 527, 530 (Ct. App.1972) (states principle and finds that deviation requested is not necessary to effectuate the settlor's purpose); *Anderson v. Ryland,* 232 Ark. 335, 341–42, 336 S.W.2d 52, 56 (1960) (citing Restatement (Second) of Trusts § 167 and similar authority, permits deviation in charitable trust context—sale of trust property in contravention of trust instrument and reestablishment of youth center elsewhere); *In re Estate of Loring,* 29 Cal.2d 423, 436, 175 P.2d 524, 532 (1946) (permits deviation—building of smaller hospital—where shrinkage in trust assets; notes that even where *cy pres* is not applicable, court in

equity may permit modification of trust's terms to carry out testator's intention); *In re Petition of First Interstate Bank,* 767 P.2d 792, 796 (Colo.Ct.App.1988) (permits deviation—release of bond security and sale of bonds—to effectuate purpose of the trust); *Rogers v. English,* 130 Conn. 332, 33 A.2d 540 (Sup.Ct. of Errors 1943) (recognizes principle, finds insufficient need for deviation under the circumstances); *Woodlen v. Brodnax,* 30 Del.Ch. 227, 232–33, 57 A.2d 752, 755–56 (1948) (cites principle in dictum); *Penn Mut. Life Ins. Co. v. Abramson,* 530 A.2d 1202, 1212 (D.C., 1987) (recognizes principle but declines to reform instrument where requested reformation was at odds with intent of creator); *Mills v. Ball,* 380 So.2d 1134, 1140–42 (Fla.Dist.Ct.App.1980), *cert. denied,* 388 So.2d 1116 (Fla.1980) (permits deviation from trust's administrative provisions pursuant to court's equitable powers and statutory authority); *Hawaiian Trust Co. v. Gonser,* 40 Haw. 245, 251–52 (1953) (recognizes principle but declines to authorize sale of property where beneficiaries objected and sale not necessary to preserve corpus); *Johns v. Montgomery,* 265 Ill. 21, 106 N.E. 497 (1914) (recognizes principle and permits liquidation of trust assets following changed conditions where necessary to fulfill testator's intent); *Sendak v. Trustees of Purdue Univ.,* 151 Ind.App. 372, 379–80, 279 N.E.2d 840–45 (Ct.App.1972) (applies doctrine of "equitable deviation" to remove restrictive provisions on charitable trust given change in economic and social conditions, where *cy pres* was unavailable); *In re McDonough's Trust,* 252 Iowa 870, 872, 109 N.W.2d 29, 30 (1961) (cites Restatement (Second) of Trusts § 381 and §§ 165–167 in dictum); *Kelly v. Marr,* 299 Ky. 447, 452–53, 185 S.W.2d 945, 948 (1945) (permits deviation—sale of trust estate—where income insufficient to pay fixed charges, and beneficiaries' interests jeopardized by charges); *In re Estate of Burdon–Muller,* 456 A.2d 1266, 1271 (Me.1983) (permits modification of administrative, as opposed to distributive, provisions of charitable remainder testamentary trust in order to maximize tax benefits, citing Restatement (Second) of Trusts §§ 167, 381); *Staley v. Ligon,* 239 Md. 61, 70–71, 210 A.2d 384, 389 (1965) (permits deviation—mortgag-

ing of property to assure monthly payment to life tenant); *Sherry v. Little,* 341 Mass. 224, 229, 167 N.E.2d 872, 875 (1960) (recognizes principle but declines to permit deviation, finding a lack of necessity or material change in circumstances); *Young v. Young,* 255 Mich. 173, 237 N.W. 535 (1931) (recognizes principle and permits sale of property damaged by fire in contravention of instructions in will to prevent total depletion of estate by taxes); *In re Trusteeship Under Agreement With Mayo,* 259 Minn. 91, 96–97, 105 N.W.2d 900, 904 (1960) (permits trustee to deviate from investments authorized in trust instrument given changed economic conditions); *Merchants Bank & Trust Co. v. Garrett,* 203 Miss. 182, 33 So.2d 603 (1948) (permits diversion of trust corpus where, due to rising costs and' decreased income, trust income was insufficient to maintain Old Ladies Home created under the trust); *Bolles v. Boatmen's Nat'l Bank,* 363 Mo. 949, 255 S.W.2d 725 (1953) (permits deviation to effectuate trust's purpose); *Citizens' Nat'l Bank v. Morgan,* 94 N.H. 284, 51 A.2d 841 (1947) (permits deviation—investment in common stock—as justified by change in circumstances (change in interest rates and dividends paid)); *Hardy v. Bankers Trust Co.,* 137 N.J.Eq. 352, 44 A.2d 839 (Ch.1945) (recognizes principle and permits invasion of principal to pay taxes where change in circumstances existed in unforeseen amendment to tax code); *First–Citizens Bank & Trust Co. v. Rasberry,* 226 N.C. 586, 39 S.E.2d 601 (1946) (permits sale of estate heavily encumbered by debt due to tornado damage to preserve estate and protect cestuis); *Thompson v. Buford Township,* 445 N.W.2d 303, 305 (N.D.1989) ("[I]n an application of equitable principles, independent of the cy-pres doctrine, the court has the power to modify the terms of a trust in order to substantially carry out the intention or to effectuate the primary purpose of the creator of the trust."); *Papiernik v. Papiernik,* 45 Ohio St.3d 337, 544 N.E.2d 664 (1989) (citing principle, affirms removal of trust advisor named in instrument who acted irrationally and irresponsibly, and holds that eliminating position entirely would go beyond what was necessary to effectuate trust's purpose); *Faulk v. Rosecrans,* 264 P.2d 300 (Okla.1953)

(retroactively approves emergency deviation by the trustee—sale of trust assets—necessary to preserve corpus); *In re Longbotham's Estate,* 346 Pa. 94, 97, 29 A.2d 481, 482 (1943) (permits invasion of trust principal to pay for repairs and improvements to trust property); *Ex Parte Guaranty Bank and Trust Co.,* 255 S.C. 106, 177 S.E.2d 358, 361–62 (1970) (permits sale of property in contravention of trust terms where nearby commercial development rendered continued operation of farm relatively uneconomical); *Givens v. Third Nat'l Bank,* 516 S.W.2d 356, 360 (Tenn.1974) (recognizes principle but finds that acceleration of remainder interests was not necessary to prevent frustration of ·settlor's intent); *Smith v. Drake,* 94 S.W.2d 236, 238 (Tex.Civ.App.1936) (permits mortgage of trust property to pay taxes and make repairs); *Penn v. Keller,* 178 Va. 131, 143, 16 S.E.2d 331, 335–36 (1941) (notes, in context of charitable trust litigation, the general principle that where "the trust instrument obviously fails to conform to the intention of the settlor the court will sometimes modify it in conformity to the intention rather than set aside the trust" (citation omitted)); *Donnelly v. National Bank of Washington,* 27 Wash.2d 622, 625–28, 179 P.2d 333, 334–36 (1947) (permits deviation—payment of annual amount beyond cut-off date in trust instrument as necessary to aid beneficiary in completing education, where beneficiary's education was interrupted by active duty in the Marine Corps.); *Ruggles v. Tyson,* 104 Wis. 500, 79 N.W. 766, 768–69, *modified,* 104 Wis. 500, 81 N.W. 367 (1899) (permits sale of property to prevent destruction of trust corpus by taxes); *State v. Underwood,* 54 Wyo. 1, 86 P.2d 707, 725 (1939) (permits sale of unproductive trust assets to prevent their further depletion).

Courts in four additional states—Alabama, Georgia, Vermont and West Virginia—have commented more briefly on courts' general equitable powers to modify trusts. *See, e.g., Thurlow v. Berry,* 249 Ala. 597, 604–05, 32 So.2d 526, 532 (1947) (noting that doctrine of equitable deviation applies to both charitable and non-charitable trusts); *Bedgood v. Thomas,* 220 Ga. 262, 262, 138 S.E.2d 313, 313 (1964) ("[A] court of equity has power to do whatever is necessary to preserve a trust and may, under certain circumstances, modi-

fy the terms of a trust."); *Wilbur v. University of Vermont*, 129 Vt. 33, 45, 270 A.2d 889, 897 (1970) (in charitable trust context, court notes "[i]t was within the jurisdiction of the equity court to grant a deviation from the limitation to allow the trust estate to remain in the trustees of the university"); *Berry v. Union Nat'l Bank*, 164 W.Va. 258, 266, 262 S.E.2d 766, 771 (1980) (applies "equitable modification" to testamentary trust to solve rule against perpetuities problem). The Rhode Island courts, while not specifically addressing the courts' equitable jurisdiction over trusts, have indicated that they would permit deviation from a trust's terms as necessary to protect the trust corpus. *Weld v. Weld*, 23 R.I. 311, 311, 50 A. 490, 490 (1901) (dictum that court would authorize trustee to sell bonds held in trust below par in contravention of will if they were diminishing in value, citing testator's expectation that the bonds would appreciate).

The Oregon courts have considered the rule embodied in Restatement (Second) § 167 but have not ruled definitively on whether it applies in that state. *See In re Harrell*, 104 Or.App. 332, 336, 801 P.2d 852, 854 (Ct.App.1990), *review denied*, 311 Or. 166, 806 P.2d 1153 (1991) (suggesting that the Restatement (Second) of Trusts § 167(1) has not yet been adopted in Oregon); *Harrell*, 104 Or.App. at 338, 801 P.2d at 885 (dissent) (noting that the applicability of the Restatement (Second) of Trusts § 167 is an open question in the Oregon courts). *But see Lee v. Melone*, 19 Or.App. 301, 307, 527 P.2d 414, 417 (Ct.App.1974) (dissent) (describing equitable authority of courts to modify trusts to effectuate the settlor's intent, citing cases supporting that authority).

Courts in ten states have apparently not explicitly addressed the scope of the courts' equitable powers over trusts. Those states are Alaska, Idaho, Kansas, Louisiana, Montana, Nebraska, Nevada, New Mexico, South Dakota and Utah. As described below, Louisiana statutes confer explicit authority on the state's courts to modify trust provisions where "[o]wing to circumstances not known to a settlor and not anticipated by him, the continuance of the trust unchanged would defeat or substantially impair the purposes of

the trust." La.Rev.Stat.Ann. tit. 9, § 2026 (West 1993); *id.* § 2027; *id.* §§ 2065–2067 (miscellaneous provisions permitting deviation in specific circumstances).

### 2. Statutes

Five states, California, Georgia, Indiana, Louisiana and Texas, have adopted statutes codifying the American–New York rule. *See* Cal.Prob.Code § 15409 (West 1993) ("[T]he court may modify the administrative or dispositive provisions of the trust or terminate the trust if, owing to circumstances not known to the settlor and not anticipated by the settlor, the continuation of the trust under its terms would defeat or substantially impair the accomplishment of the purposes of the trust."); *id.* § 15408 (modification or termination where principal is low in comparison to the trust's administrative expenses); Ga.Code Ann. § 53–12–153 (1994) ("The court may direct or permit a trustee to modify the terms of a trust if it is established by clear and convincing evidence that, owing to circumstances not known to or anticipated by the settlor, compliance would defeat or substantially impair the accomplishment of the purposes of the trust."); Ind.Code Ann. § 30–4–3–26(a) ("[T]he court shall direct or permit the trustee to deviate from a term of the trust if, owing to circumstances not known to the settlor and not anticipated by him, compliance would defeat or substantially impair the accomplishment of the purposes of the trust."); La.Rev.Stat.Ann. tit. 9, § 2026 (West 1993) ("The ... court may order the termination or modification of a trust ... if ... owing to circumstances not known to a settlor and not anticipated by him, the continuance of the trust unchanged would defeat or substantially impair the purposes of the trust."); *id.* § 2027 ("The ... court may order the termination or modification of the trust if the purpose for which it is created becomes impossible of accomplishment or illegal."); *id.* § 2064 ("The ... court may direct or permit a trustee to deviate from a provision of the trust instrument concerning the administration of the trust if, because of circumstances not known to the settlor and not anticipated by him, compliance would defeat or substantially impair the purposes of the trust."); *id.* §§ 2065–2067 (miscellaneous

provisions permitting deviation in specific circumstances); Tex.Prop.Code Ann. § 112.054(a) (West 1994) ("[A] court may order that the . . . terms of the trust be modified . . . if . . . the purposes of the trust have . . . become illegal or impossible to fulfill; or . . . because of circumstances not known to or anticipated by the settlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of the purposes of the trust.").

Wisconsin recognizes by statute the equitable powers of courts to modify or terminate a trust in a provision generally entitled "Modification and Termination of Trusts by Court Action," Wis.Stat.Ann. § 701.13(6) (West 1993) ("Nothing in this section shall prohibit modification or termination of any trust pursuant to its terms or limit the general equitable power of a court to modify or terminate a trust in whole or in part"); *see also id.* § 701.13(3) (provides for termination of living trust where administrative costs make continuation of the trust impractical); *id.* § 701.12 (provides for modification or termination of trust on consent of settlor and all beneficiaries).

Arkansas, Montana and South Dakota by statute permit modification or termination of trusts by consent of all of the trust beneficiaries, but it is not clear that residual power in the court to modify without consent under the general American–New York rule has been eliminated. Ark.Code Ann. § 28–69–401(a) (1993) (modification or termination permitted on "written consent of the settlor and all named beneficiaries" where "the trust's purposes . . . as a result of circumstances not foreseen to the settlor are not effectively being fulfilled or are frustrated"); Mont.Code Ann. § 72–33–406 (1993) (modification or termination permitted with consent of all beneficiaries unless court, in its discretion, determines that unfulfilled material purpose outweighs reason for modification or termination); *id.* § 407 (modification or termination compelled where settlor and all beneficiaries consent, or where interests of beneficiaries who do not consent will not be "substantially impaired" by the modification or termination); S.D.Codified Laws Ann. § 55–3–5 (1994) ("A trustee must fulfill the purposes of the trust as declared at its creation, or as subsequently amended, and must follow all the directions of the trustor given at that time, except as modified by the consent of all parties interested, and upon approval by the court"); *cf.* S.D.Codified Laws Ann. § 55–3–22 ("A trust is extinguished by the entire fulfillment of its object or by such object becoming impossible or unlawful."). Arkansas and Montana provide for appointment of a guardian ad litem to represent the interests of beneficiaries who are not competent to consent. Ark.Code Ann. § 28–69–401(b); Mont.Code Ann. § 72–33–408.

Alabama and North Dakota, while not addressing trust modification in their codes, have nearly identical statutory provisions that permit termination of a trust "by the entire fulfillment of its object" or by its object "becoming impossible or unlawful." Ala.Code § 19–3–2 (1994); N.D.Cent.Code § 59–2–17 (1993). Connecticut, Florida, Mississippi, Oregon and Ohio have sections in their fiduciary or trustee's powers provisions that do not address modification of trusts, but permit a trustee to terminate a trust where the size of the trust's administrative expenses in comparison to its corpus make it pointless to continue the trust. *See* Conn. Gen.Stat. § 45A–235(20) (1992); Fla.Stat. § 737.402(3); Miss.Code Ann. § 91–9–107(4); Ohio Rev.Code Ann. § 1339.66 (Anderson 1993); *id.* § 2109.62; Or.Rev.Stat. § 128.009(4) (1993). Identical provisions in the Florida and Washington codes recognize the power of a court "to permit a fiduciary to deviate from the terms of any will, agreement, or other instrument relating to the acquisition, investment, reinvestment, exchange, retention, sale, or management of fiduciary property." Fla.Stat. § 518.13; Wash.Rev.Code Ann. § 11.100.040 (West 1993). The codes of Hawaii and South Carolina, while not specifically addressing modification or termination, contain provisions recognizing that such power exists. Haw. Rev.Stat. § 560:1–108 (Michie 1993) ("[F]or purposes of consenting to modification or termination of a trust or to deviation from its terms, the sole holder or all co-holders of a presently exercisable general power of appointment . . . are deemed to act for beneficiaries to the extent their interests . . . are

subject to the power."); S.C.Code Ann. § 62–1–108 (1993) (same).

Other types of statutes governing dispositions of property and future interests may also be implicated. *See, e.g.,* Ill.Comp.Stat. Ann. ch. 760, § 5/17.1. (West 1994).

### G. Application of Trust Law to the Facts

The trust instrument states that its purpose is "to deliver fair, adequate and equitable compensation to bona fide beneficiaries, whether presently known or unknown, without overpaying or underpaying any claims." Trust Agreement § 2.02(i). The relationship between Beneficiaries that the trust sought to effectuate was one of equality. This is the primary relationship that the Courts have the obligation of preserving. Approval of the Settlement will redress imbalances in entitlements that were neither intended nor anticipated by the settlors of the Trust. The result of the Courts' inaction, by contrast, would be to ratify a system that benefits the few at the expense of the many, an intolerable result in light of the Trust's stated purpose, the case law, and the bankruptcy law. *See* Part IX, *infra* (describing recent amendment to bankruptcy law). Under the circumstances, and in the spirit of "equality is equity," the Courts must approve the Settlement that effectuates the Trust's purpose of ensuring equitable compensation from the fund to the extent possible under the circumstances.

Arguably, it might have been desirable to require disgorgement by all claimants and their lawyers who rushed in to obtain as much of the corpus at 100% of their claims as they could without regard to other injured persons. This approach would not work. There is no practicable way to get this money back. All that can be done is to provide an equitable division for those who had not had their claims settled or reduced to judgment by November 19, 1990, when the instant class action was brought.

An earlier suggestion that the modification does not preserve distributors' contractual or common law indemnity claims is now irrelevant since the Distributors subclass has approved the Settlement. The Settlement supplements their ability to pursue contribution claims, or to receive credit for Manville payments to health claimants as verdict set-offs, with the creation of special funds to liquidate certain preexisting indemnity claims against the Trust. In any event, as previously noted,

> Arguably, to the extent some of the loss emanating from the Trust's limited funds may be shifted to the co-defendants by operation of section H, there is presented a question under [Restatement] section 167(1). The equities are so clearly in favor of the modification and so clearly required by the Trust's modus vivendi, its reason for being, that the Settlement must be held to conform to the principle of section 167(1) of the Restatement of Trusts and New York's statutory and case law.

*Findley I,* 129 B.R. at 846.

## V. State and Federal Law on Contribution and Settlement

The Settlement Stipulation left open one unresolved issue for the Courts: the calculation of set-offs in asbestos health claims arising under Maryland law ("the Maryland issue"). *See* Settlement Stipulation, ¶ 4. All other provisions of the Settlement Stipulation are binding on all of the parties. The Maryland issue was tried separately with the consent of the parties to determine how set-offs and contributions should be calculated in that state in light of the TDP's prohibition on impleading the Trust as a codefendant or otherwise subjecting it to the tort system. Before turning specifically to the Maryland problem, a number of preliminary points about the law generally are in order.

### A. Varied Approaches

The question of how a combination of settlements and judgments should be treated is complex, varies from state to state, and generally depends on both individual state statutes and case law. Settlement of a mass tort litigation involving all the states and many defendants is particularly difficult because of the enormous variation among the states in their set-off, contribution and related laws when some defendants settle and some do not.

Now largely statutory—and non-uniform—are the rules relating to contribution; the effect of a settling defendant's obligations with respect to joint tortfeasors' rights and liabilities; the effect of a settlement on reducing a plaintiff's recovery; the effect of set-offs on settlements; and the effect of joint and several liability on percentage of liability based upon fault. *See* Jean Macchiaroli Eggen, Understanding State Contribution Laws and Their Effect on the Settlement of Mass Tort Actions, Appendix (1994) (Table of State Contribution Laws and Statutory Modifications of Joint and Several Liability) (unpublished manuscript, on file in the instant case, prepared for National Mass Tort Conference, Nov. 13, 1994, Cincinnati, Ohio). *See generally* Friedrich K. Juenger, *Mass Disasters and Conflict of Laws,* 1989 U.Ill.L.Rev. 105; Edward S. Digges, Jr. & Michael T. Wharton, *Choice of Law in Product Liability Actions: Order for the Practitioner in a Reign of Chaos,* 12 U.Balt.L.Rev. 395 (1983). In many states the effect of bankruptcies, limited payments after bankruptcy, and other variations are undecided. As Professor Eggen summarizes the matter,

Early and satisfactory resolution of mass tort actions is often dependent upon applicable contribution rules. Most states provide for the right of contribution among tortfeasors. But state statutes vary widely on the effect of settlement between the plaintiff and fewer than all of the defendants. Lack of uniformity is especially apparent with respect to statutory rules that provide for a settlement credit against the plaintiff's judgment, as well as those that address the right of contribution between settling tortfeasors and [a] nonsettling tortfeasor.... Model legislation has not prevented fragmentation seen among state rules....

This ... is best seen in the rules of set-off that apply when the plaintiff settles with fewer·than all of the defendants. The set-off rules designate the amount to be credited against the plaintiff's ultimate judgment after trial with the nonsettling defendants so as to account for the occurrence of settlement. The Uniform Contribution Among Tortfeasors Act and the majority of states apply a pro tanto set-off

rule that typically employs the amount of the settlement as a credit. A minority of states employs the apportioned share rule, which uses as a credit the settling tortfeasor's equitable share of the verdict as determined by the finder of fact. Yet another group of states uses a combined approach according to which, in certain circumstances, the greater of the settlement amount or the settling tortfeasor's equitable share is used as the credit. Each state, in espousing one of these rules, has done so in the belief that the rule will enhance the likelihood of settlement and provide the most equitable means of assigning liability and compensating plaintiffs....

Other problems have arisen as well. Once a set-off rule is designated and the amount of the set-off is known, the method of calculation of the set-off may be an issue. The more complex the litigation, the more likely it is that calculation options affecting the liabilities of the tortfeasors and the recovery by the plaintiff will become an issue. Likewise, choice-of-law questions become a potential settlement deterrent when the litigation involves multistate parties and when the choices among contribution rules lead to different results for the parties. Further, punitive damages claims, and settlements that represent both compensatory and punitive amounts have been raised as an issue in contribution and set-off.

Eggen, *supra,* at 1–3. The fragmentation in the laws "can cause striking disparities in the recovery for the death or injury of victims of the same accident, and the plaintiffs' fates may depend less on the justice of their causes than on their selection of an initial forum." Juenger, *supra,* at 109.

A California district court explained in *In re Paris Air Crash,* 399 F.Supp. 732 (C.D.Cal.1975), that the obstacles presented by this esoteric and baroque area of the law can be insurmountable—particularly in a mass tort:

The law on 'choice of law' in the various states and the federal courts is a veritable jungle, which, if the law can be found out, leads not to a 'rule of action' but a reign of

chaos dominated in each case by the judge's 'informed guess' as to what some other state than the one in which he sits would hold its law to be.... Most of the cases [in this area] are involved with such a 'guess' as to the law of one other state or perhaps as many as three. Here, if the rule laid down in some cases ... were followed, this Court would have to 'guess' what the courts in 24 foreign and 12 domestic jurisdictions would hold on the facts in this case, including their 'choice of law' rules, and who knows what laws of what country or state that would lead to.

*In re Paris Air Crash,* 399 F.Supp. at 739–40 (applying California law to claims of all plaintiffs injured in air crash).

The Courts in *Findley I,* 129 B.R. at 891–94, described the explosion in tort litigation and subsequent statutory reforms that led to the current patchwork of statutes. Almost every state has enacted its own set of statutes governing the law of contribution, relative liability and set-off; the different states' approaches vary widely. Alaska Stat. § 09.17.080; Ariz.Rev.Stat.Ann. §§ 12–2501, 12–2504, 12–2506; Ark.Code Ann. §§ 16–61–202, 16–61–204, 16–61–205; Cal.Civ.Pro.Code §§ 875, 877; Cal.Civ.Code § 1431–1431.2; Colo.Rev.Stat. §§ 13–50.5–102, 13–50.5–105, 13–21–111.5; Conn.Gen.Stat. § 52–572h; Del.Code Ann. tit. 10, §§ 6302, 6304; Fla. Stat.Ann. §§ 768.31, 768.81; Ga.Code Ann. §§ 51–12–32, 51–12–33; Haw.Rev.Stat. §§ 663–10.9, 663–12, 663–14, 663–15; Idaho Code §§ 6–803, 6–805; Ill.Comp.Stat.Ann. ch. 735, §§ 5/2–1117, 5/2–1118; *Id.* ch. 740, § 100/2; Ind.Code §§ 34–4–33–5, 34–4–33–7; Iowa Code §§ 668.4, 668.5, 668.7; Kan.Stat. Ann. § 60–258a(d); Ky.Rev.Stat.Ann. §§ 412.182, 412.030; La.Civ.Code Ann. arts. 1803, 1804, 2324; Me.Rev.Stat.Ann. tit. 14, §§ 156, 163; Md.Ann.Code art. 50, §§ 16–20; Mass.Gen.L. ch. 231B §§ 1, 4; Mich.Comp. Laws § 27A.2925; Minn.Stat. § 604.02; Miss.Code Ann. § 85–5–7; Mo.Rev.Stat. §§ 537.060, 537.067; Mont.Code Ann. § 27–1–703; Nev.Rev.Stat. §§ 17.225, 17.245, 41.141; N.H.Rev.Stat.Ann. 507:7; N.J.Rev. Stat. §§ 2A:15–5.3, 2A:53A–2; N.M.Stat.Ann. §§ 41–3–2, 41–3–4, 41–3–5, 41–3A–1; N.Y.Civ.Prac.L. & R. §§ 1401, 1601, 1602; N.Y.Gen.Oblig. § 15–108; N.C.Gen.Stat.

§§ 1B–1, 1B–4; N.D.Cent.Code §§ 32–38–01, 32–38–04, 32–03.2–02; Ohio Rev.Code Ann. §§ 2307.31, 2307.32, 2315.19; Okla.Stat. tit. 12, § 832; Or.Rev.Stat. §§ 18.440, 18.455, 18.485; Pa.C.S.A. tit. 42 §§ 8324, 8326, 8327; R.I.Gen.Laws §§ 10–6–3, 10–6–5, 10–6–7, 10–6–8; S.C.Code Ann. §§ 15–38–20, 15–38–50; S.D.Codified Laws Ann. §§ 15–8–12, 15–8–14, 15–8–15.1, 15–8–17, 15–8–18; Tenn.Code Ann. §§ 29–11–102, 29–11–105; Tex.Civ.Prac. & Rem. §§ 33.012, 33.013, 33.015; Utah Code Ann. §§ 78–27–38, 78–27–40; Vt.Stat.Ann. § 1036; V.I.Code Ann. tit. 5, § 1451; Va. Code Ann. §§ 8.01–34, 8.01–35.1; Wash.Rev. Code §§ 4.22.030, 4.22.040, 4.22.060; W.Va. Code §§ 55–7–12, 55–7–13, 55–7B–9; Wis. Stat. § 885.285.

The parties to the Settlement have succeeded in narrowing or resolving these issues about as well as possible without uniform national legislation. Except for leaving all such issues to be decided by the state in which a claimant sued, the Courts cannot improve on the hard-fought series of compromises of the parties to the Settlement. The lawyers who hammered out the Settlement are among the most experienced in the country on these issues. They preferred the Settlement to the Courts' suggestion of letting the individual states decide. *Findley I,* 129 B.R. at 894–905.

Illustrative of the problem is the continuing saga in New York. *See* Burton N. Lipshie, *Court of Appeals Resolves Contribution Issue, or Does It?,* N.Y.L.J., July 22, 1993, at 1 (noting that the "murkiness ... continue[s]"). The Second Circuit Court of Appeals, the Eastern and Southern District Courts, and the New York supreme court, the appellate division, and the New York Court of Appeals have had great difficulty resolving these critical issues of contribution and set-off after partial settlements under New York law. For reasons described below, the Courts conclude that under *Erie* and New York choice of law principles, Maryland law is determinative in cases brought in Maryland and that law should be left to Maryland to decide. Aspects of the New York courts' recent dealings with these issues are summarized below to demonstrate, by touching on the law of one state, the complexity of

the issues implicated and why deference to the state courts is desirable if the parties cannot agree.

The question raised in New York with respect to bankrupt tortfeasors was whether to allocate their shares of liability solely to non-settling defendants, thus enabling plaintiffs to receive 100% recovery, or to allocate their shares to both settling and non-settling defendants—and how. *See In re New York City Asbestos Litig.*, 151 Misc.2d 1, 572 N.Y.S.2d 1006, 1010 (Sup.Ct.1991) , (bankrupt's shares allocated to both settled and non-settled tortfeasors), *aff'd as modified in part, and reversed in part*, 188 A.D.2d 214, 593 N.Y.S.2d 43 (App.Div. 1st Dep't 1993) (non-settling tortfeasors only), *aff'd*, 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993) (non-settling tortfeasors only); *In re E. & S. Dist. Asbestos Litig.*, 772 F.Supp. 1380, 1400–03 (E. & S.D.N.Y.1991) (non-settling tortfeasors only, declining to follow *In re New York City Asbestos Litig.*, 151 Misc.2d 1, 572 N.Y.S.2d 1006 (Sup.Ct.1991)), *aff'd in part, rev'd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.)*, 971 F.2d 831, 845 (2d Cir.1992) (non-settling tortfeasors only); *cf. In re New York Asbestos Litig.*, 847 F.Supp. 1086, 1110–11 (S.D.N.Y.1994) (liability of non-party defendants, consisting of "parties who were dismissed prior to trial, who were served but defaulted, who were not sued by the plaintiffs, or who are currently protected from suit by the bankruptcy statutes," reallocated only among non-settling defendants). The New York Court of Appeals resolved the issue in 1993 when it affirmed that liability should only be allocated to non-settling parties. *In re New York City Asbestos Litig.*, 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993).

A related issue was how to allocate various non-parties' shares of liability for Article 16 purposes. New York Civil Practice Law & Rules § 1601(1) limits a defendant's joint liability for non-economic damages by providing that only those defendants more than 50% at fault for the claimant's non-economic loss can be forced to pay more than their equitable share. The statute further provides that "the culpable conduct of any per-

son not a party to the action shall not be considered in determining any equitable share herein *if the claimant proves that with due diligence he was unable to obtain jurisdiction over such person* in said action (or in a claim against the state, in a court of this state)." N.Y.Civ.Prac.L. & R. § 1601(1) (emphasis added). The ambiguity ultimately resolved by the courts was what types of defendants to deem beyond the courts' jurisdiction as provided in the statute. *See In re E. & S. Dist. Asbestos Litig.*, 772 F.Supp. 1380, 1404, 1405 (E. & S.D.N.Y.1991) (bankrupts and parties not joined to preserve diversity deemed beyond the courts' jurisdiction for Article 16 purposes), *aff'd in part, rev'd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.)*, 971 F.2d 831, 845–46 (2d Cir.1992) (bankrupts deemed beyond the courts' jurisdiction for Article 16 purposes); *In re Joint E. & S. Dist. Asbestos Litig.*, 798 F.Supp. 940, 956–58 (E. & S.D.N.Y.1992) (bankrupts, impled third party defendants over whom the plaintiff could not have obtained jurisdiction, the United States Government (immune from suit due to sovereign immunity and worker's compensation laws), and Manville (as protected from suit by the Courts' stays) held beyond the courts' jurisdiction for Article 16 purposes), *rev'd on other grounds*, 995 F.2d 343 (2d Cir.1993) and *rev'd on other grounds sub nom. Malcolm v. National Gypsum Co.*, 995 F.2d 346 (2d Cir.1993); *but see Rezucha v. Garlock Mechanical Packing Co.*, 159 Misc.2d 855, 606 N.Y.S.2d 969, 971–73 (Sup. Ct.1993) (noting that in contrast to a defect in personal jurisdiction, "a lack of subject matter jurisdiction does not necessarily implicate [Article 16's] jurisdictional restriction," and requiring that the state's relative culpability be included in determining defendant's liability for non-economic damages).

It is illustrative of the confusion in this area that even the greatest experts in asbestos litigation who drew up the TDP "disagree as to whether the provisions of this TDP will render the Trust a party over whom plaintiffs are unable to obtain jurisdiction within the meaning of NY CPLR § 1601." TDP § H.3(d)(ii)(F). Accordingly, they provided for a special allocation of liability among themselves. *Id.*

Confusion has also attended calculation of jury offsets where there are multiple defendants, some of whose settlement figures exceed their equitable shares of liability. The question facing the New York courts was

> Which method for computing the amount of the General Obligations Law § 1501–8(a) offset to the jury award should be adopted: (1) the case-by-case method, under which each settling defendant is taken separately and, for that defendant, the amount of the settlement or the amount of the corresponding apportioned share, whichever is higher, is deducted from the verdict; or (2) the aggregate method, in which the settling tortfeasors are viewed collectively, the settlement amounts and corresponding apportioned shares are totaled, and the offset is allowed for the greater of the two totals.

*In re New York City Asbestos Litig.,* 82 N.Y.2d 342, 604 N.Y.S.2d 884, 885, 624 N.E.2d 979, 980 (1993). There was disagreement in both the state and federal courts over to how to resolve what appeared to be an ambiguity in the New York statute. *See, e.g., In re New York City Asbestos Litig.,* 151 Misc.2d 1, 572 N.Y.S.2d 1006, 1009 (Sup.Ct. 1991) (individual approach adopted), *aff'd as modified in part, and reversed in part,* 188 A.D.2d 214, 593 N.Y.S.2d 43 (App.Div. 1st Dep't 1993) (aggregate approach), *aff'd,* 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993); *In re E. & S. Dist. Asbestos Litig.,* 772 F.Supp. 1380, 1393–97 (E. & S.D.N.Y. 1991) (individual approach), *aff'd in part, rev'd in part sub nom. In re Brooklyn Navy Yard Asbestos Litig. (Joint E. & S. Dist. Asbestos Litig.),* 971 F.Supp. 831, 851 (2d Cir. 1992) (remanding "for reconsideration in light of the First Department's anticipated decision in *Didner v. Keene Corporation*"); *on appeal after remand, Bauman v. Keene Corp. (In re Joint E. Dist. & S. Dist. Asbestos Litig.),* 18 F.3d 126, 130 (2d Cir.1994) (affirming district court's use of aggregate approach); *In re Joint E. & S. Dist. Asbestos Litig.,* 798 F.Supp. 940, 949–50 (E. & S.D.N.Y.1992) (permitting use of individual approach with respect to one defendant and aggregate approach with respect to the other), *rev'd on other grounds,* 995 F.2d 343 (2d Cir.1993) and *rev'd on other grounds sub*

*nom. Malcolm v. National Gypsum Co.,* 995 F.2d 346 (2d Cir.1993).

The issue was ultimately resolved in favor of the aggregate approach in three decisions issued by the New York Court of Appeals on November 18, 1993. *See In re New York City Asbestos Litig. (Didner v. Keene Corp.),* 82 N.Y.2d 342, 351, 604 N.Y.S.2d 884, 889, 624 N.E.2d 979, 984 (1993) ("We agree with the conclusion reached by [state and federal courts considering the issue] that the aggregate method is preferable."); *see also Pollicina v. Misericordia Hosp. Medical Ctr.,* 82 N.Y.2d 332, 604 N.Y.S.2d 879, 883, 624 N.E.2d 974, 978 (1993) (adopting aggregate approach for reasons cited in *Didner v. Keene*); *In re New York City Asbestos Litig.,* 82 N.Y.2d 821, 605 N.Y.S.2d 3, 625 N.E.2d 588 (1993) (citing *Pollicina* and *Didner*).

The Supreme Court of the United States recently weighed in with its own analysis of the strengths and weaknesses of three different methods for calculating verdict set-offs due to pretrial settlements characterized by it as: *pro tanto* without a right a contribution; *pro tanto* with right of contribution preserved; and *pro rata. McDermott, Inc. v. AmClyde,* —— U.S. ——, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). At issue was recovery for damages to a crane and offshore platform. The Court considered the three approaches pursuant to its admiralty jurisdiction, 28 U.S.C. § 1333(1).

The Court unanimously adopted a "proportionate share" approach as the most equitable. *McDermott,* 114 S.Ct. at 1463, ("[W]e hold that the proportionate approach is the correct one."). The Court rejected at the outset the *pro tanto* with right of contribution preserved approach, noting that it "discourages settlement and leads to unnecessary ancillary litigation." *McDermott,* 114 S.Ct. at 1467; *see also Akzo Coatings, Inc. v. Aigner Corp.,* 30 F.3d 761, 769 (7th Cir.1994) (amplifying the pro-settlement policy considerations expressed in *McDermott*). The Court found choosing between *pro tanto* without contribution and proportionate share approaches more difficult. The Court ultimately selected the proportionate share ap-

proach because of its concern over the inequities that can result under the *pro tanto* approach without contribution, especially in the absence of an effective "good-faith hearing."

The *pro tanto* approach without contribution may lend itself to an inequitable result since a plaintiff may be motivated to settle with a given defendant for less than that defendant's equitable share in order to create a "war chest" to fund future litigation. *See McDermott,* —— U.S. at —— ——, 114 S.Ct. at 1467–68. The plaintiff can engage in such strategic behavior because under traditional principles of joint and several liability, any non-settling adjudicated tortfeasor is liable for the plaintiff's entire damages. In the Court's view, this potential for unfairness under the *pro tanto* without contribution scheme tipped the scales in favor of the proportionate share approach.

Aside from announcing its preference for what it denominated the proportionate share approach, the Court also emphasized its underlying view that under the "well-established principle of joint and several liability," plaintiffs should not bear the shortfall for factors beyond their control. *McDermott,* 114 S.Ct. at 1471. As the Court explained, the operation of joint and several liability in the maritime context

> can result in one defendant's paying more than its apportioned share of liability when the plaintiff's recovery from other defendants is limited by factors beyond the plaintiff's control, such as a defendant's insolvency. When the limitations on the plaintiff's recovery arise from outside forces, joint and several liability makes the other defendants, rather than an innocent plaintiff, responsible for the shortfall.

*McDermott,* 114 S.Ct. at 1471. The Court relied upon *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), where it refused to offset a judgment by the proportionate fault attributed to a third party whose liability was limited by statute.

The Supreme Court was unconstrained by state and federal statute or common law in its determination that a proportionate share approach was preferable. A district court

sitting in diversity and applying state law, however, is more limited in the law it can apply. *Cf. In re Del–Val Fin. Corp. Sec. Litig.,* 868 F.Supp. 547, 562 (S.D.N.Y.1994) (describing complication of rules on contribution by Second Circuit's "one-satisfaction rule, which provides that a plaintiff's total recovery may not exceed the amount of the judgment that it obtains in an action based on any given injury." (citing *Singer v. Olympia Brewing Co.,* 878 F.2d 596 (2d Cir. 1989))); *TBG, Inc. v. Bendis,* 36 F.3d 916, 923 (10th Cir.1994) (holding that since the right to contribution in Rule 10b–5 actions is statutory, a district court could not extinguish that right by approving a settlement that mandated a *pro tanto* set-off without right of contribution).

## B. Problem Solved by Settlement

The most convoluted provisions of the TDP govern relations among claimants with respect to contributions and set-offs. *See* TDP § H. These byzantine provisions reflect the complex nature of the states' multifarious laws on the subject. The parties have done as well as they could to simplify administration. They were free to agree to modify the effect of state laws to accommodate the needs of the litigants as part of a class action settlement, and this is what they have done. The TDP is the product of full discussion among the parties; it is eminently fair. There is no evidence that any group's interests were not fully represented as to any state's law. The Courts refuse the request of some attorneys—more particularly those representing plaintiffs from Pennsylvania and the District of Columbia—to engage in jockeying with the parties by interpreting the meaning of TDP § H to advantage any of them.

The Courts interpreted § H of the TDP in the previous settlement, which was similar to the one currently being proposed, as not precluding, but merely guiding the state courts in their own consideration of the parties' rights and liabilities. *Findley I,* 129 B.R. at 894–905. The Court of Appeals rejected this approach, holding that "whatever provisions may ultimately be ordered ..., [codefendant manufacturers'] rights must be

spelled out in the operative language of the Trial Courts' judgment." *Findley II,* 982 F.2d at 740.

The Courts find that the TDP established by the parties in the instant litigation furnishes sufficient guidance to forty-nine of the fifty states and the District of Columbia courts. Courts in all jurisdictions (both federal and state) will interpret the TDP's provisions in light of the Settlement and relevant local law. The Courts need not now resolve the many detailed problems of many jurisdictions that may possibly arise in future litigations.

The parties have not, however, been able to agree on how the TDP should affect Maryland cases. This is the matter to which we now turn.

## VI. Maryland Contribution and Set–Off Issue

"The parties consent to trial by the Courts of the issue of appropriate set-off rules that should be developed ... in connection with claims arising under Maryland law...." Settlement Stipulation, ¶ 4. This stipulation will apply to both state and federal courts applying Maryland law.

Cases brought in Maryland by law firms which represented Maryland Plaintiffs in the instant litigation are normally brought in the state courts in Maryland. Before examining the law underlying the Maryland claims, a few preliminary points should be noted.

First, the ratio of serious to less serious injuries appears to be lower in that state than in other states. Of the 12,554 health claims filed with the Trust on behalf of Maryland residents, only 195 represent mesothelioma claimants. Fairness hearings court exhs. 2 and 3 (Letters from David T. Austern, General Counsel, Manville Personal Injury Settlement Trust, dated November 23 and November 29, 1994); *see also* Tr. 8/2/94 at 157. Many of the claims that have been filed apparently result from the prosecution of cases arising from massive screenings of workers without symptoms. *Cf.* Roger C. Cramton, Memorandum to Participants in Cornell Law School Colloquium on Mass Tort Class Actions (Oct. 23–24, 1994) (unpublished manuscript on file in the instant case). This does not mean that a "less serious" case is less important to the individual litigant, or that each claimant is not entitled to compensation, but it does reduce the dollar impact of the set-off and contribution problem with respect to most Maryland individual plaintiffs.

Second, plaintiffs in Maryland, as a conglomerate group, will have received huge amounts in settlements and verdicts from defendants other than Manville. It was estimated at trial that the approximately 10,000 Maryland asbestos claims primarily represented by one law firm are worth approximately $1,700,000,000 in potential jury verdicts and settlements. Tr. 8/2/94 at 59, 71–72. From this number must be subtracted average attorneys' fees of 33⅓% plus expenses. *See* Tr. 8/2/94 at 63–64. Attorneys' fees for these Maryland cases would approximate over $550 million. However the Maryland issue is resolved, Maryland plaintiffs as a group and their skilled attorneys will receive substantial amounts for cases brought in that state.

Third, all the attorneys in the instant case including those from Maryland have agreed to a cap on their legal fees of 25% of the actual amounts paid claimants on Trust claims liquidated through the TDP. TDP § I. This reduction of fees and decrease of expenses on Trust claims provides a slight increase in Maryland plaintiffs' net recovery from the 10% to be paid by the Trust at the outset of payments.

Fourth, jury verdicts, and therefore settlements, tend to be higher in Maryland than in most of the rest of the country. A mesothelioma case in that state could be expected to receive in the order of $2.5 million at trial. *See* Maryland Plaintiff's trial exh. 12; Tr. 8/2/94 at 112. Assuming five defendants including Manville are held jointly and severally liable, under one view of Maryland law (as explained below) Manville's *pro rata* share would be $500,000 (ignoring the effect of the Manville bankruptcy and the Settlement), well above the TDP's Scheduled Value of $200,000. *See* TDP § D.

## A. Choice of Law

The Maryland issue is substantive. Federal courts sitting in New York look to New York law, *Erie R.R. v. Tompkins*, 304 U.S. 64, 80, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); 28 U.S.C. § 1652 (1988), including New York's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Almost all Maryland plaintiffs appear to reside in and to have been injured in Maryland, many in the Baltimore shipyards. As demonstrated below, New York courts would look to Maryland law under New York choice of law principles since the center of gravity and concern is in Maryland for these claims. *See generally* Harold L. Korn, *The Choice of Law Revolution: A Critique*, 83 Colum.L.Rev. 772 (1983).

New York traditionally looked to the place where the tort occurred in resolving the parties' substantive rights and liabilities (the principle of *lex loci delicti*). *See, e.g., Selles v. Smith*, 4 N.Y.2d 412, 414, 176 N.Y.S.2d 267, 269, 151 N.E.2d 838, 840 (1958); *Smith v. Clute*, 277 N.Y. 407, 410, 14 N.E.2d 455, 456 (1938); *Hopkins v. Amtorg Trading Corp.*, 265 A.D. 278, 38 N.Y.S.2d 788, 791–92 (App.Div. 1st Dep't 1942). The approach was rooted in the vested rights doctrine, specifically the view that the right to recover for a foreign tort originates in the law of the foreign jurisdiction. *See Babcock v. Jackson*, 12 N.Y.2d 473, 477–78, 240 N.Y.S.2d 743, 746, 191 N.E.2d 279, 281 (1963); *Hopkins*, 38 N.Y.S.2d at 791–92.

The "grouping of contacts" or "center of gravity" approach together with state interest analysis was subsequently developed in response to criticism that the *lex loci delicti* was insensitive to underlying policy considerations and to other jurisdictions' interests in resolution of the conflict between the parties. *See Babcock*, 12 N.Y.2d at 477–81, 240 N.Y.S.2d at 746–49, 191 N.E.2d at 281–83 & n. 3. *See generally* Korn, *supra.*

■■■■■ Under the standard enunciated in *Babcock*, the courts should "giv[e] controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." *Babcock*, 12 N.Y.2d at 481, 240 N.Y.S.2d at 749, 191 N.E.2d at 283. Maryland, by contrast, still apparently applies *lex loci delicti.* *See Hauch v. Connor*, 295 Md. 120, 123–24, 453 A.2d 1207, 1209 (1983) (declining to abandon *lex loci delicti* ); Edward S. Digges & Michael T. Wharton, *Choice of Law in Product Liability Actions: Order for the Practitioner in a Reign of Chaos*, 12 Balt.L.Rev. 395, 408 (1983).

In the area .of loss allocation for tortious conduct, the New York Court of Appeals in common domicile cases "favors the jurisdiction of common domicile." *Schultz v. Boy Scouts of America, Inc.*, 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 96, 480 N.E.2d 679, 685 (1985). With respect to split-domicile cases, the New York Court of Appeals has adopted the situs of the tort as a "tie-breaker" in the loss allocation context. *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 74, 595 N.Y.S.2d 919, 923, 612 N.E.2d 277, 281 (1993) (adopting situs of tort as "tie breaker" in true conflict cases).

In the instant case, the weight of contacts in almost all cases appears to point indisputably to Maryland. The parties assumed for purposes of trial that the Maryland claimants live, worked, and suffered injury in that state. The defendants in the asbestos cases, however, hail from a variety of domiciles and the asbestos they supplied was mined and processed in many other jurisdictions. The situation, consequently, is potentially a split-domicile situation akin to that in *Neumeier v. Kuehner*, but where neither the plaintiffs nor the defendants have significant New York contacts. *See Neumeier*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972) (out of state injury involved an Ontario domiciliary-plaintiff and a New York resident-defendant; the Ontario guest statute applied).

Comity as well as New York policy require the issue of calculating the appropriate contribution and set-offs in the Maryland cases to be resolved by looking to Maryland law. With respect to any findings that the Courts would make on the Maryland legal issue, it is the Maryland courts which would be charged with enforcing them. Maryland's policy interests in preserving the balances struck by

its unique statutory and case law scheme between plaintiff's right to full recovery and defendant's right to an equitable offset for other parties' culpable conduct are paramount.

The phrase "Maryland law" includes Maryland's choice of law principles. There may be some "Maryland cases" where contacts outside of Maryland predominate. In theory, the Courts could carve out these cases and develop a separate resolution for them, under the doctrine of renvoi, according to the law that would be applied were the Maryland courts deciding the issue under that state's choice of law. *But see Apton v. Barclays Bank, Ltd.*, 91 N.Y.S.2d 589, 591 (Sup.Ct. 1949), *aff'd*, 276 A.D. 910, 94 N.Y.S.2d 1 (App.Div.2d Dep't), *aff'd*, 301 N.Y. 601, 93 N.E.2d 495 (1950) (" '[R]envoi' ... has been consistently and universally rejected in this Country and, of more pertinence here, in this State."); *Lann v. United Steel Works Corp.*, 166 Misc. 465, 471, 1 N.Y.S.2d 951, 957 (Sup. Ct.1938) (" 'Renvoi' doctrine ... has been rejected almost unanimously."). Since Maryland applies a traditional *lex loci delicti* choice of law rule for tort actions, *Hauch v. Connor*, 295 Md. 120, 453 A.2d 1207 (1983), invoking renvoi in the instant case could theoretically lead to application of many states' laws chosen according to where the injury or exposure occurred or, possibly, where the plaintiff resided when he was exposed or fell ill. The Courts decline to carve out these cases, preferring instead to let the Maryland courts decide them on an individual basis according to Maryland law, including Maryland's choice of law provisions.

The law to be applied in a case brought in a state other than Maryland will depend on the rule of conflicts of that other state. It is possible that such other states may then apply the law of Maryland—"arising under Maryland law"—in particular fact situations. Such issues need not now be decided. Most theoretical choice of law questions tend to be ignored by practical litigators and judges who generally look to the law of the forum whenever possible in settling or even trying cases.

### B. Contribution Among Multiple Tortfeasors

The Maryland law of contribution among multiple tortfeasors derives from the 1939 version of the Uniform Contribution Among Tort–Feasors Act. *Chilcote v. Von Der Ahe Van Lines*, 300 Md. 106, 113–14, 476 A.2d 204, 208 (1984). It creates a statutory right of contribution among two or more joint tortfeasors. *See* Md.Ann.Code art. 50, § 16 *et seq.* Joint tortfeasors are defined under the Maryland statute as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." Md.Ann.Code art. 50, § 16(a).

Annotated Code of Maryland article 50, § 17 governs the right of contribution. Section 17 provides:

(a) Right exists.—The right of contribution exists among joint tort-feasors.

(b) Discharge of liability or payment of share.—A joint tort-feasor is not entitled to a money judgment for contribution until he has by payment discharged the common liability or has paid more than his *pro rata* share thereof.

(c) When joint tort-feasor enters into settlement.—A joint tort-feasor who enters into a settlement with the injured person is not entitled to recover contribution from another joint tort-feasor whose liability to the injured person is not extinguished by the settlement.

The term *"pro rata* share" is inherently ambiguous. *See Lahocki v. Contee Sand & Gravel Co.*, 41 Md.App. 579, 618–19, 398 A.2d 490, 512–13 (Ct.Spec.App.1979), *rev'd on other grounds sub nom. General Motors Corp. v. Lahocki*, 286 Md. 714, 410 A.2d 1039 (1980) (discussing possible interpretations); *see also McDermott, Inc. v. AmClyde*, —— U.S. ——, —— n. 9, 114 S.Ct. 1461, 1466 n. 9, 128 L.Ed.2d 148 (1994) ("We have deliberately avoided the use of the term 'pro rata.' "). The Maryland courts have construed the term *"pro rata "* to mean "numerical shares or proportions based on the number of tortfeasors." *Lahocki*, 41 Md.App. at 621, 398 A.2d at 514 (adopting this definition for § 20, the provision controlling when a release pro-

tects a settling party from a contribution claim); *see also Chilcote,* 300 Md. at 113, 476 A.2d at 208 (implying that *"pro rata* share" means the same thing for §§ 17 and 20 purposes); *Chilcote,* 300 Md. at 120, 476 A.2d at 212 (citing language identical to that in *Lahocki* ). For example, where a defendant is one of five parties held joint and severally liable to the plaintiff, his *"pro rata"* share of liability is 20%, and he can generally sue other parties held to have been joint tortfeasors for contribution to the extent that his payments to the plaintiff exceed that *pro rata* share.

Section 18 of the Maryland Code provides that "[t]he recovery of a judgment by the injured person against one joint tort-feasor does not discharge the other joint tort-feasor." Md.Ann.Code art. 50, § 18.

Section 19 of the Maryland Code governs the "[e]ffect of release on an injured person's claim." It provides:

> A release by the injured person of one joint tort-feasor, whether before or after judgment, does not discharge the other tort-feasors unless the release so provides; but reduces the claim against the other tort-feasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if greater than the consideration paid.

Md.Ann.Code art. 50, § 19; *see Martinez v. Lopez,* 300 Md. 91, 101, 476 A.2d 197, 202 (1984) (construing § 19, and holding that where consideration by the settling party exceeded the judgment amount, the total claim was satisfied and the non-settling party was not required to pay anything to the plaintiff).

A settling defendant must be adjudicated a joint tortfeasor for the verdict set-off to be applied unless the release provides otherwise. *See, e.g., Keene Corp. v. Levin,* 330 Md. 287, 293, 623 A.2d 662, 665 (1993); *Collier v. Eagle–Picher Indus., Inc.,* 86 Md.App. 38, 585 A.2d 256 (Ct.Spec.App.1991), *cert. denied,* 323 Md. 33, 591 A.2d 249 (1991). A release that simply provides that it is "not to be construed as an admission of liability" will not automatically result in a verdict reduction, absent a court determination that the releasee is a tortfeasor. *Swigert v. Welk,* 213 Md. 613, 618, 133 A.2d 428, 430 (1957).

A plaintiff and settling party may stipulate in the release to the settling party's joint tortfeasor status, in which case the verdict set-off will be automatic. In *Jones v. Hurst,* 54 Md.App. 607, 459 A.2d 219 (Ct. Spec.App.1983), the court considered the effect of a release in which the defendant expressly denied liability, but also included a statement by the plaintiff that: "I . . . agree that for the purpose of determining the amount of any judgments that may be recovered by me against any person, firm or corporation, except [the settling defendant] . . . that the said [settling defendant] shall be considered as joint tortfeasors [sic] to the same extent and effect as if judgments had been rendered against them [sic] as joint tort-feasors [sic]." *Jones,* 54 Md.App. at 610, 459 A.2d at 221. Despite the express denial of liability, the court held the language in the release was sufficient to "satisfy the statutory requirement of establishing [the settling defendant's] joint tort-feasor status." *Jones,* 54 Md.App. at 611, 459 A.2d at 222.

Notwithstanding extensive testimony at trial on the issue, the status of bankrupts within this statutory scheme appears to be unresolved. Maryland courts recognize that a stay in bankruptcy prevents proceedings against the bankrupt but not against the non-bankrupt codefendants. *See Collier,* 86 Md. App. 38, 585 A.2d 256. The trial testimony of those familiar with Maryland practice was that bankrupts' shares are reallocated to other defendants as if the bankrupt companies did not exist. Tr. 8/2/94 at 122–23. The Maryland courts, however, appear not to have ruled definitively on this issue in a published opinion. *See Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 475, 601 A.2d 633, 660 (1992) (declining to "determine, however, whether the trial court violated the automatic bankruptcy stay in granting the cross-claims against [a bankrupt settling party] for contribution").

Section 20 addresses settling parties' liability to other joint tortfeasors' contribution claims, and provides:

A release by the injured person of one joint tort-feasor does not relieve him from liability to make contribution to another joint tort-feasor unless the release is given before the right of the other tort-feasor to secure a money judgment for contribution has accrued, and provides for a reduction, to the extent of the *pro rata* share of the released tort-feasor, of the injured person's damages recoverable against all other tort-feasors.

Md.Ann.Code, art. 50, § 20. Thus, a settling defendant remains liable for contribution after the jury has found it to be a joint tortfeasor unless the plaintiff agrees in the release to reduce his claim against non-settling defendants by the settling defendant's *pro rata* share of the judgment.

According to testimony at trial, the statutory scheme has given rise to three principal types of releases used in Maryland practice: 1) a, *pro tanto* release, which provides a set-off against the judgment equal to the amount of consideration paid for the release if the settling party is found to be a joint tortfeasor; 2) a conditional *pro rata* release, which provides for a set-off against the judgment equal to the settling party's *pro rata* share if the settling party is found to be a joint tortfeasor (also referred to as a *Swigert* release, *see Swigert v. Welk*, 213 Md. 613, 133 A.2d 428 (1957)); and 3) an unconditional *pro rata* release, which provides for a set-off against the judgment equal to the settling party's *pro rata* share regardless of whether the settling defendant is adjudicated to be a joint tortfeasor (also called a *Jones* release, see *Jones v. Hurst*, 54 Md.App. 607, 459 A.2d 219 (Ct. of Spec.App.1983)). *See* Tr. 8/2/94 at 18–20, 203–04.

Virtually all of the parties agree that the amount of settlement drives the selection of the form of release. Plaintiffs will be generally willing to give a defendant a *pro rata* release if a settling party's payment represents a reasonable valuation of the defendant's anticipated *pro rata* share. Where the settling defendant pays substantially less than what the plaintiff believes to be the reasonable value of its *pro rata* liability, the plaintiff will generally provide only a *pro tanto* release; otherwise, the plaintiff might be undercompensated in the action, since the resulting set-off could exceed the consideration paid for the settlement. *See* Tr. 8/2/94 at 67–68.

It is not clear how the Maryland courts would treat a settling defendant such as the Manville Trust which stipulates to tortfeasor status, *see* TDP § H.1(d) ("[T]he Trust shall be treated in litigation between Beneficiaries of the Trust as a legally responsible tortfeasor under applicable law, without the introduction of further proof."), but is unable to pay substantially for plaintiffs' damages, except possibly (but almost inconceivably) over the very long haul. *See Welsh v. Gerber Prod., Inc.*, 315 Md. 510, 515–16, 555 A.2d 486, 488 (1989) ("A consent judgment does not necessarily include an actual adjudication of the issue of damages, and in appropriate circumstances a subsequent inquiry should be made to determine what the parties intended and whether the consent judgment represents an actual adjudication of a particular issue."); *Trieschman v. Eaton*, 224 Md. 111, 118, 166 A.2d 892, 896 (1961), *overruled in part on other grounds, Morgan v. Cohen*, 309 Md. 304, 523 A.2d 1003 (1987) ("The proviso that when the full $10,000 had been paid [the settling defendant] 'shall be released and discharged' was no more than a declaration of what would have been true without it. The payment of a judgment is satisfaction and constitutes discharge of the judgment debtor, and it is the fact of payment, not the entry of it, that constitutes the satisfaction.").

The Settlement's design that the Trust shall not appear in the Maryland courts in order to save it litigation expenses, even though it can be named, does not conflict with Maryland's policy or cases. As the Maryland Court of Appeals noted in *Swigert v. Welk*, "whether or not [a settling defendant] wishes to participate actively in the trial is a matter left for his selection." 213 Md. at 622, 133 A.2d at 433.

### C. Dispute Among the Parties

The Plaintiff Class and Maryland Plaintiffs believe that Codefendants and Distributors should bear any shortfall between Manville's *pro rata* share and what plaintiffs in fact

receive from the Trust. The Codefendants and the Distributors assert that, under Maryland law, the plaintiffs would bear the full burden. With the help of the Special Advisor to the Courts the parties have considered various compromise proposals that would have had the effect of dividing the difference, but the parties have not been able to agree.

While Maryland provides for *pro tanto* reductions in the absence of a release providing otherwise, the assumption that non-settling codefendants can seek contribution from settling defendants appears to underlie the statutory scheme. Under Maryland law as it was conceived to operate through contribution actions, when all the dust has cleared each defendant should only be out of pocket to the extent of its *pro rata* share, and the plaintiff should have received the full amount of his or her judgment from the responsible tortfeasors. Here, where no contribution substantially over 10% of matrix values is ordinarily available from the Trust, that scheme is subverted.

Assume a plaintiff, a mesothelioma victim, wins a verdict of $2.5 million, that four defendants are determined to be joint tortfeasors, and that two of them have settled previously and received *pro rata* releases. The verdict set-off due to the settling parties' releases is 50% (*i.e.*, two of four), or $1.25 million, with the judgment (non-settling) defendants liable for the remaining $1.25 million ($625,000 each). If Manville is added as a fifth tortfeasor, the verdict set-off due to the settling parties' releases (not including Manville) is diluted to 40% (*i.e.*, two of five) of the verdict, or $1 million. If Manville is treated as a *pro rata* settlor, no harm to the judgment defendants results since the *total* verdict set-off, including Manville's share, is 60% (*i.e.* three—two *pro rata* settling defendants plus Manville—out of five), or $1.5 million. In fact, judgment defendants benefit from Manville's inclusion, having to pay $1 million ($2.5 million verdict minus $1.5 million set-off) rather than $1.25 million ($2.5 million minus $1.25 million set-off). The plaintiff, however, now receives less from all defendants, giving up $250,000 from judgment defendants while receiving far less from Manville, presumably 10% of the $200,000 Scheduled Value for mesothelioma, or $20,000.

If Manville is treated as a *pro tanto* settlor, the effect of the dilution of the set-off attributable to the settling parties is to shift the entire burden of Manville's insolvency to non-settling defendants. Non-settling defendants in the above example would be responsible for $1.5 million (60%) of the total verdict amount (*i.e.* their two shares plus Manville out of the now total of five) less any amount paid by Manville ($20,000 under the TDP). Thus, non-settling defendants are better off if Manville is left off the jury form altogether, when they would have to pay only $1.25 million.

This result arises as a consequence of Manville's unique posture under the Settlement in litigation. Normally, tortfeasors forced to pay plaintiffs a portion of a settling *pro tanto* releasee's share can sue for contribution, thus recouping any excess and equalizing the shares. Here, however, contribution is not available, except in limited amounts obtained pursuant to the TDP procedures.

Distributors contend that if the Trust is treated as a *pro tanto* settlor, Distributors will be forced to choose between receiving credit for Manville's payment on the one hand, and increasing their *pro rata* shares on the other by leaving Manville off the verdict form entirely. Codefendants raise a similar point when they assert that treating the Trust as a *pro tanto* releasee under Maryland law would make codefendants worse off than when Manville was in bankruptcy; according to some testimony at trial, bankrupt defendants are not put on the verdict form at all, so no share is apportioned to them. Tr. 8/2/94 at 122, 200–02. *But see Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 475, 601 A.2d 633, 660 (1992).

The potential unfairness to codefendants is arguably compounded by the fact that under Maryland law it is possible for a plaintiff to collect more than 100% of a judgment. Amounts paid by settling defendants who give *pro tanto* or conditional *pro rata* releases and who are not found to be joint tortfeasors are not credited against the verdict. *See* Part VI.B, *supra.* Thus, in the above

example, if various other defendants ultimately adjudicated to be non-tortfeasors had settled before trial for a total of $625,000, a plaintiff could collect $3,125,000 ($2.5 million collected from verdict defendants under traditional joint and several liability plus $625,000 in pre-verdict settlements).

In response, the Plaintiff Class and the Maryland Plaintiffs note the unfairness to plaintiffs of treating the Trust as a *pro rata* settlor. Their argument is the flip side of the Codefendant Manufacturers'. Again, assume a $2.5 million verdict and four joint tortfeasors without Manville, with two tortfeasors settling in exchange for *pro rata* releases. After the verdict is offset according to the releases, the plaintiff can collect $1,250,000 from the verdict defendants. If Manville is added to the action and treated as a settling tortfeasor that executed a *pro rata* release, then each defendant's share drops to $500,000, the offset due to settling tortfeasors is $1.5 million, and the plaintiffs can only collect $1 million from the verdict defendants. Thus, the loss to the plaintiff in treating the Trust as having executed a *pro rata* release is $250,000, less whatever payments are conveyed by the Trust to the plaintiff under the TDP. *See* Post–Trial Brief on Behalf of Maryland Plaintiffs 11–12 (similar example using different numbers). Plaintiffs note further that permitting defendants to take a *pro rata* reduction for a Manville Trust settlement would defeat joint and several liability. *Id.* at 12.

The disagreement between Plaintiffs on the one hand, and Codefendants and Distributors on the other, is reflected in their analysis of the type of releases the Trust would acquire as a matter of Maryland practice. *See* Part VI.B, *supra.* Codefendants claim that Manville and the Trust "always received *pro rata* releases from Maryland plaintiffs." Post–Trial Brief of Subclass of Codefendant Manufacturers Regarding the "Maryland Issue" 3; *see also id.* at 7–8; *id.* at 21 ("It was unquestionably the Trust's practice to receive *pro rata* releases when it was a tort system defendant in Maryland.") (citing Taylor Aff. at 2–3; Tr. 8/2/94 at 206; Rice Dep. II at 2–32); Reply Post–Trial Brief of the Subclass

of Co–Defendant Manufacturers Regarding the "Maryland Issue" 12–14. Codefendants further assert that other major asbestos companies "frequently obtain[ ]" *pro rata* releases. Post–Trial Brief of Subclass of Codefendant Manufacturers Regarding the "Maryland Issue" 21–22 (citing examples of releases presented as exhibits at trial). Maryland Plaintiffs assert that, given the strategic concerns that go into determining the type of release a defendant will receive from a plaintiff, it is unlikely that the Manville Trust in its current position would be able to negotiate successfully for a *pro rata* release if it were in the tort system. Post–Trial Brief on Behalf of Maryland Plaintiffs 9–11. Since the Trust, under the TDP, will probably pay plaintiffs far less than its *pro rata* share of liability, no plaintiff would be willing, plaintiffs argue, to grant a *pro rata* release. *Id.; see* Tr. 8/2/94 at 178–79, 219–20. The Plaintiff Class joins with the Maryland Plaintiffs in contesting the Codefendants' assertion that in the normal course, the Trust would receive *pro rata* releases.

The positions of the Codefendants and the Plaintiffs differ less in terms of analysis than in the historical timing on which their arguments depend. Codefendants consider only the position of the Trust as it emerged from bankruptcy, when it was paying 100% of its tort liability and had a continuing vulnerability to suit for contribution; this position supports their contention that if left to the tort system, the Trust would be a *pro rata* releasee. Plaintiffs consider only the current position of the Trust, with its now-conceded inability to pay currently more than 10% on a claim, in declaring it would be a *pro tanto* releasee if left to the tort system.

The tables below summarize the different outcomes computed under a pure *pro rata* approach and pure *pro tanto* approach, assuming five defendants at trial, including Manville. It also assumes $625,000 in pre-verdict settlement amounts from parties who are not adjudicated to be tortfeasors in a jury trial. The numbers chosen may not be typical, but they do reflect the differences in position and their practical effect.

Table 5

MANVILLE AS PRO TANTO SETTLOR

| | |
|---|---|
| From settled defendants | $ 625,000 |
| Five defendants, including Manville Trust, found jointly and severally liable by jury under Maryland law | $2,500,000 |
| Manville Trust payment (10% of $200,000) | $ 20,000 |
| Set-off for Trust payment | ($ 20,000) |
| Total received by plaintiff | $3,125,000 |
| Each non-settling codefendant's net share (($2.5 million–$20,000)/4) | $ 620,000 |

Table 6

MANVILLE AS PRO RATA SETTLOR

| | |
|---|---|
| Settled by defendants | $ 625,000 |
| Five defendants, including Manville Trust, found jointly and severally liable by jury under Maryland law | $2,500,000 |
| Pro rata set-off for Manville (⅕ × $2.5 million) | ($ 500,000) |
| *Manville Trust payment* | $ 20,000 |
| Total received by plaintiff | $2,645,000 |
| Each non-settling codefendant's net share (($2.5 million – $500,000)/4) | $ 500,000 |

Of course, since most Maryland Plaintiffs have a far less severe disease than mesothelioma, in most cases the difference for each codefendant between the pure *pro tanto* and pure *pro rata* approach will be less than $120,000. *See* Tr. 8/2/94 at 42–44 (estimating that of approximately 10,000 Maryland claimants, no more than 200–250 represent mesothelioma; 800–900 represent lung cancer; 400–500 represent other cancers; with the remainder representing non-malignant asbestos related disease (3,000 bilateral pleural disease; 500 non-disabling bilateral interstitial lung disease; 5,000 disabling bilateral interstitial lung disease)); *see also* Tr. 8/2/94 at 156–57 (estimating 102 mesothelioma cases represented by the law firm representing the majority of Maryland cases); Fairness hearings court exh. 3 (Letter from David T. Austern, General Counsel, Manville Personal Injury Settlement Trust, dated November 29, 1994) (estimating 195 mesothelioma cases filed on behalf of Maryland residents). Even if the differences are modest per case, when multiplied by thousands of cases, they represents many millions of dollars.

D. Proposals

1. Plaintiffs

a. Maryland Plaintiffs

Maryland Plaintiffs propose leaving resolution of the Maryland issue to "Maryland law." They question the Courts' authority to vary the application of Maryland statutory set-off and contribution rules in the absence of an agreement by the parties that the Courts do so.

Their position questioning the authority of the Courts in view of the overall Settlement is wrong. To protect the Trust the Courts could vary the relationship of the claimants and codefendants and distributors in the pursuit of equality among the parties pursuant to the settlors' intentions. The question is not one of power, but of prudence.

b. Plaintiff Class

The Plaintiff Class representatives also assert that Maryland set-off law should apply under the TDP. They argue that the proposals by the Codefendants and Distributors amount to efforts to "rewrite state law simply because [they] impose[ ] the burden of the Trust's insolvency on co-defendants rather than plaintiffs." Post–Trial Reply Brief of the Plaintiff Class 2. They suggest that leaving set-offs in Maryland to state law is consistent with the TDP's approach to other states. *Id.* at 12–16. They cite various provisions of the TDP that direct that any set-off will be calculated according to the "applicable law." *Id.; see* TDP §§ H.2, H.3(c)(ii), H.3(f). They assert that if claims in Maryland were processed according to the TDP, Maryland would be treated as a *pro tanto* state since "judgments against nonsettling parties are reduced by 'the amount of the consideration paid for the release' unless the plaintiff agrees otherwise." *Id.* at 14 (citing Md.Ann.Code art. 50, § 19).

### 2. Third Party Defendants

#### a. Distributors

The Distributors advance a 4–part proposal to resolve the problems delineated above. Memorandum by the Manville Distributors Subclass Regarding Rules for Set–Off and Judgment Reduction of Personal Injury Claims Arising Under Maryland Law 7–10. First, they suggest not treating the Trust as a joint tortfeasor as defined by Maryland law. The major consequence would be that in determining the number of tortfeasors liable for *pro rata* shares after verdict, Manville would not be counted, resulting in higher shares for other defendants. In the example above involving four codefendants plus the Trust, each codefendant's *pro rata* share would be 25%, or $625,000.

Second, they propose permitting plaintiffs to choose between receiving payment directly from the Trust and assigning such claims to the codefendants. The proposal further provides that settlement directly with the Trust would reduce the plaintiff's recovery on a verdict dollar-for-dollar.

Third, Distributors propose that they be given the right to make a contribution claim against the Trust, the value of which would be "the difference between a *pro rata* share if the Trust is a joint tortfeasor and a *pro rata* share if the Trust is not treated as a joint tortfeasor." In the example above, the value of this contribution claim would be $125,000, the difference between $625,000 (the *pro rata* share if the Trust is not a joint tortfeasor) and $500,000 (the *pro rata* share if the Trust is a joint tortfeasor). A footnote in the Distributors' memorandum suggests that the value of the contribution claim would be reduced by any payments made by the Trust to the claimant. Distributors Memorandum on the Maryland Issue 8 n. 7. Thus, in the above example, the contribution claim would be reduced by another $20,000, to $105,000. In later papers filed by the Distributors, they further explained that "any contribution claim to be paid by the Trust would be subject to the same proportionate reduction claims." Distributors Reply on Maryland Issue 4 n. 2. Thus, given the above example and the currently proposed 10% payment rate on all claims processed against the Trust under the TDP, the codefendants would receive $10,500.

Fourth, Distributors propose certain adjustments to plaintiffs' recovery to reduce any recovery over the judgment value of their claims that they might receive due to "bonus payments" from settling parties not found liable by the jury. Where the plaintiff receives settlement money but no settling party is determined to be a joint tortfeasor, Distributors would reduce plaintiff recovery dollar-for-dollar by the bonus amount, subject to a maximum of 8% of the judgment. The maximum reduction, 8%, would apply where no settling parties were adjudged to be tortfeasors. Distributors would reduce plaintiff recovery by successively smaller percentages where one, two or three settling parties are determined to be tortfeasors (*e.g.*, for three settling parties, the reduction would be 2% of the judgment).

Adoption of the Distributors' proposal would yield the following results with respect to the hypothetical plaintiff.

#### Table 7

DISTRIBUTORS' PROPOSAL

| | |
|---|---|
| Settled by defendants | $ 625,000 |
| Four defendants, not including Manville Trust, found jointly and severally liable by jury under Maryland law | $2,500,000 |
| Manville Trust payment | $ 20,000 |
| Set-off for Manville Trust | ($ 20,000) |
| Bonus payment adjustment | ($ 200,000) |
| Plaintiff collects | $2,925,000 |
| Contribution claim against Manville | $ 10,500 |
| Non-settling codefendant's share (($2.5 million − $200,000 − 20,000 − 10,500)/4) | $ 567,375 |

While complex, this is not an unreasonable compromise. Other reasonable compromises have been suggested by attorneys for plaintiffs and other parties. The parties have not agreed to any compromises.

#### b. Codefendants

Like the Distributors, the Codefendants advance a proposal seeking to "split the dif-

ference" with plaintiffs with respect to the amount of recovery attributable to Manville liability that exceeds the Trust's distribution under the TDP. Codefendants propose treating the Trust as a *pro rata* settlor, but capping the amount of any set-off with respect to Manville's share at 20% of the verdict. Post–Trial Brief of Subclass of Codefendant Manufacturers Regarding the "Maryland Issue" 4. They assert that such a cap would protect plaintiffs in cases in which less than five parties are found to be joint tortfeasors while satisfying the goal of removing the Trust completely from the tort system.

Codefendants emphasize that the right to implead the Trust and to bring contribution claims was a right for which they bargained during the events leading up to the Second Amended Manville Corporation Plan of Reorganization. They assert that as a matter of equity, the Courts' resolution of the Maryland issue should strike a similar balance between the rights given up by the Codefendants and the benefits that accrue to them as a result. *Id.* at 3, 5. They note that "[o]verall, since July 1990, Co–Defendants have paid in excess of $3 billion in indemnity costs to resolve (by settlement and otherwise) asbestos personal injury claims." *Id.* at 6.

Responding to the proposals advanced by the plaintiffs, Codefendants assert that it would be meaningless for the Courts to simply determine that "Maryland law applies." Reply Post–Trial Brief of the Subclass of Co–Defendant Manufacturers Regarding the "Maryland Issue" 15. They believe that "[t]he Maryland Issue should not be delegated to state [or federal court] judges, with incomplete understanding of, or interest in, the web of accommodations that led to the Stipulation of Settlement." *Id.* at 21. Essentially, Codefendants are advancing a gestalt view of what constitutes Maryland law that takes into account not only the wording of statutes, but also the interplay between the nature of the releases a defendant obtains, the jury verdict and other factors. *See id.* at 15–16. Codefendants contend that an application of "Maryland law" that fails to consider Maryland's policy not to make codefendants shoulder more than their *pro rata*

share would not really be Maryland law. They do not, however, suggest why the Courts' decision to let the Maryland courts resolve this issue as a matter of Maryland law will prevent Codefendants from raising exactly the same arguments about what Maryland law is or ought to be to the Maryland courts.

Adoption of the Codefendants' proposal would yield the following results with respect to the hypothetical plaintiff.

Table 8

CODEFENDANT MANUFACTURERS' PROPOSAL

| | |
|---|---|
| Settled by defendants | $ 625,000 |
| Five defendants, including Manville Trust, found jointly and severally liable by jury under Maryland law | $2,500,000 |
| Capped pro rata set-off for Manville (⅕ × $2.5 million, capped at 20% of verdict) | ($ 500,000) |
| Manville Trust payment | $ 20,000 |
| Plaintiff collects | $2,645,000 |
| Non-settling codefendant's share ($2 million/4) | $ 500,000 |

As the above figures demonstrate, the result achieved under the Codefendants' proposal is identical to that under a pure *pro rata* approach when there are five or more defendants. If there are fewer than five defendants, the set-off under the Codefendants' proposal is capped at 20%, which is less than it would be if calculated under a pure *pro rata* approach but quite possibly greater than that calculated under a *pro tanto* approach.

3. Manville Trust

The Trust objects to the Distributors' proposal because it would involve extra payments to that subclass. As the Trust characterizes it, the Distributors' proposal would entitle them to two payments: 1) a "disease-based" payment (either assigned to them by the plaintiff or in the form of a credit at trial); and 2) a "difference payment" (reflecting the difference between treating the Trust as a joint tortfeasor on the verdict form and removing it completely). The Trust argues that this result would be unfair since no other class would be treated similarly under

the TDP. The Trust agrees with the Plaintiff Class that the Courts should resolve the Maryland issue by leaving the determination to Maryland state law.

No one has argued that the Trust should or can pay the Maryland Plaintiffs any more than it pays the hundreds of thousands of other plaintiffs in other jurisdictions. Payment of ten percent of the value of claims now, and a greater or lesser percentage in the future as the assets of the Trust are applied to future claims, must be the same for everyone. There is no longer any dispute between the Trust and the Maryland claimants. The claimants (or distributors and codefendants when standing in their shoes) will take all that they can fairly expect—the same percentage of settlements pursuant to the agreed on schedules as adjusted. The Maryland plaintiffs have agreed to all portions of the Settlement except § H.3 of the TDP. They are bound by the 10% payment schedule as is everyone else.

E. Resolution by Maryland State Courts

■ . A New York court faced with the issue of calculating the appropriate set-off for Maryland plaintiffs would apply Maryland law. It is not apparent what Maryland law is. It is unclear whether Maryland would fashion its law in the form of its statutes read literally, or in equity, or in some amalgam of both sources, and it is not apparent what the result would be under any of the myriad possible approaches. Prudence dictates leaving the issue for Maryland courts to resolve, either on a case-by-case basis, by some form of declaratory judgment, or by amendment to Maryland statutes. Deferring to Maryland does not interfere in the slightest with the Courts' approving the Settlement and ordering immediate payments of 10%.

In a particular case where a Maryland plaintiff was injured outside of that state, the Maryland courts could choose to apply another state's law under its own choice of law provisions. The Settlement does not prevent this result. In that event, the Maryland courts would look to the Settlement as setting the law of the other state for purposes of the individual litigation.

The Second Circuit Court of Appeals' mandate was that "whatever provisions may ultimately be ordered respecting [codefendant manufacturer's] rights, those rights must be spelled out in the operative language of the Trial Court's judgment." *Findley II*, 982 F.2d at 740. That mandate is obviously followed by the Settlement's detailed resolution as to forty-nine of the states and the District of Columbia.

It is also followed as to Maryland. Sufficient precision is provided by allowing the Maryland courts to apply Maryland law and equity, in the light of the facts that: 1) plaintiffs settled with the Trust for the full amount of any Manville share of a recovery and can be considered, for purposes of computation of liability and rights of codefendants, to have received a promise from the Trust to pay that full amount as and if funds become available; 2) plaintiffs will immediately receive, under the Courts' present orders, 10% of the scheduled amounts. They have the opportunity to receive from the Trust future payments of the additional 90% without interest in the unlikely event that claims are much less than predicted and the value of the trust corpus much greater. It is highly unlikely that Maryland Plaintiffs will receive much more than 10%, and that in the distant future; and 3) the Trust is prohibited from defending any case in the Maryland courts in order to prevent further dissipation of its limited funds.

VII. Fees

■ The Settlement Stipulation limits "attorneys' fees payable in connection with Trust Claims liquidated and paid through this TDP" to "the lower of the fee provided in the contract between claimant and counsel or 25%, exclusive of costs chargeable to the claimant." TDP § I. As the Courts explained in *Findley I*, 129 B.R. at 864, the "power to review attorney fee provisions stems both from Rule 23 and from the court's supervisory power over members of the bar." The Second Circuit Court of Appeals agreed that the Courts had the authority to approve a Settlement limiting lawyers' fees to 25% of recovery. *Findley II*, 982 F.2d at 757. The Courts find that the new Settlement's fee

limitation is both reasonable and enforceable. *See* the full discussion of fees in *Findley I*, 129 B.R. at 863–69, carried over and made a part of this Amended Memorandum, Orders and Final Judgment.

### A. Adoption of 25% Maximum

In the negotiations leading up to the first Settlement, the Courts initially requested that attorneys' fees for future representation of Trust claimants be limited to 20% of each claimant's recovery. *See* Order, *In re Joint E. & S. Dist. Asbestos Litig.*, 1990 WL 123830, at *1–2 (E. & S.D.N.Y. Aug. 21, 1990) (cap of 20% on attorneys' fees for exigent health and hardship claims); Order, *In re Joint E. & S. Dist. Asbestos Litig.* (E. & S.D.N.Y. May 30, 1991) (20% cap is exclusive of costs). Vigorous debate ensued between the parties. On the persistent insistence of plaintiffs' counsel, the contingency fee percentage was raised to a compromise figure of 25%, which the Courts approved as "reasonable" for reasons described in *Findley I*, 129 B.R. at 863–69.

On January 21, 1994, the 25% cap on attorneys' fees was also imposed, by an order issued by the Courts, on the liquidation of certain judgments and settlements fixed before this class action was commenced. In order to prevent unseemly conflicts between courts and other judges, the Courts recognized the power of other courts to modify this percentage cap for lawyers who had litigated in their jurisdictions. That order stated:

> [A]ttorneys for all Trust beneficiaries who are eligible for payments ... are limited to attorneys' fees, after deducting costs, of twenty-five percent (25%) of the amount paid to their clients unless a court of competent jurisdiction has previously entered an order permitting different attorneys' fees, and subject to the right of attorneys affected by this Order to apply to these Courts for modification....

Order, *In re Joint E. & S. Dist. Asbestos Litig.* (E. & S.D.N.Y. Jan. 21, 1994). A judge in Virginia and a judge in Texas did increase the cap to 33% in cases with large judgments, resulting in increased fees of many millions of dollars.

Some limitation on fees is appropriate given the diminished risk of claimant nonrecovery and the reduction in attorney effort required to liquidate claims. *See Findley I*, 129 B.R. at 863.

Courts in other mass tort litigations, including silicone gel breast implant cases and other asbestos cases, have considered and approved a 25% limit on attorneys' fees charged in connection with claims against a fund created pursuant to a class action settlement. *See, e.g., Georgine v. Amchem Prods., Inc.*, 157 F.R.D. 246, 285 (E.D.Pa.1994) ("[T]he fee that may be charged by [any attorney representing a claimant for compensation under the stipulation] will be limited to 25% of the compensation award received by the claimant."); *In re Silicone Gel Breast Implant Prod. Liability Litig.*, MDL No. 926, 1994 WL 114580, at *4 (N.D.Ala. Apr. 1, 1994) (provisionally approving settlement and, under it, creation of a designated fund "at 25% of the total settlement amounts" to pay attorneys' fees and expenses). *But see In re Silicone Gel Breast Implant Prod. Liability Litig.*, MDL No. 926, 1994 WL 578353, at *22 (N.D.Ala. Sept. 1, 1994) (noting that the court had not finally approved the 25% contingency amount and that objections were therefore premature). The facts of each mass tort case must be considered individually and the reasonableness of fees must be assessed in the light of circumstances unique to each litigation.

Undoubtedly, there are some instances where the 25% cap will lead to a large windfall for lawyers on an hourly basis. This is highly probable given the large concentration of asbestos cases in the hands of a few attorneys. In other instances, particularly in view of the relatively fixed and small amounts of recovery available under the TDP, the fee limitation may result in too small a fee to warrant legal representation.

Such unfairness is almost impossible to avoid without consideration of individual claims. The transactional costs that would accompany consideration of fees for each claim are too great in view of the small amounts involved. As to the relatively small claims, in almost all instances no attorney

will be required under the settlement arrangement. If an attorney is required, the claims structure insures that in almost all cases the amount of work will minimal.

Having determined that the 25% figure is reasonable, we now turn to a brief discussion of the Courts' authority to impose and enforce it.

### B. Authority to Limit Attorneys' Fees

#### 1. Obligations to Review Fees Under Rule 23

In any mass tort case, there is an opportunity for a small number of attorneys, each individually representing large numbers of potential claimants, to secure for themselves huge attorneys' fees under individual contingency contracts that bear little or no relation to the actual work to be done or the risks in the case. The problem is particularly acute in the context of a stipulated settlement such as the instant one, where subsequent legal work on behalf of most individual claimants will be relatively routine, mechanical and almost certain to result in recovery.

Courts must examine attorneys' fees carefully in the mass tort context to arrive at a fee fair to both members of the class and their attorneys. *See In re "Agent Orange" Prod. Liability Litig.,* 611 F.Supp. 1296, 1303–04 (E.D.N.Y.1985), *aff'd in part, rev'd in part,* 818 F.2d 226 (2d Cir.1987) (discussing incentive structure that makes court review of attorneys' fees in class actions necessary). *See generally* Lester Brickman, Michael J. Horowitz & Jeffrey O'Connell, *Rethinking Contingency Fees* (Manhattan Institute 1993); Christopher P. Lu, *Procedural Solutions to the Attorneys' Fee Problem in Complex Litigation,* 26 U.Rich.L.Rev. 41 (1991). "[T]he trial court [has] the authority to ensure that a contingent fee arrangement does not result in an unjustified windfall to plaintiff's counsel." *In Design v. K–Mart Apparel Corp.,* 13 F.3d 559, 568–69 (2d Cir. 1994) (citing *Wheatley v. Ford,* 679 F.2d 1037, 1041 (2d Cir.1982)); *cf. Jones v. Amalgamated Warbasse Houses, Inc.,* 721 F.2d 881, 884 (2d Cir.1983), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1929, 80 L.Ed.2d 474 (1984) (discussing district courts' broad discretion in

reviewing fees under the Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988).

Courts have wide discretion to approve, reject or limit fees earned by attorneys in prosecuting a class action. *See generally* 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1803 (1986 & 1994 Supp.); Alan Hirsch & Diane Sheehey, *Awarding Attorneys' Fees and Managing Litigation* 49–88 (Federal Judicial Center 1994). The courts' fee-setting authority in a class action context, where a victory by the class typically creates a benefit that goes beyond those few individuals who actually prosecuted the class action, stems from the courts' equitable powers and the powers of the chancellor. *See Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 164, 59 S.Ct. 777, 779, 83 L.Ed. 1184 (1939); *City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 469 (2d Cir.1974); *see also In re "Agent Orange",* 611 F.Supp. at 1305. This same power extends to consolidations, bankruptcies and other mass litigations. *Individual Justice in Mass Tort Litigation: The Effect of Class Actions, Consolidations, and Other Multiparty Devices* 81 (Northwestern University Press 1995).

The power to accept or reject fee agreements includes the power to reduce the agreed on fees as necessary to ensure the fees' reasonableness. *Jones,* 721 F.2d at 885. Overreaching of any kind may be checked. *In re "Agent Orange" Prod. Liability Litig.,* 818 F.2d 216, 218 (2d Cir.), *cert. denied,* 484 U.S. 926, 108 S.Ct. 289, 98 L.Ed.2d 249 (1987) (invalidating attorney fee agreement that provided for threefold return on funds advanced for litigation expenses). Courts reviewing fees pursuant to Rule 23, general equitable powers, or authority to control officers of the court, may override private, contractual fee agreements made by the attorneys representing the parties in the class action or related individual actions. *See, e.g., Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102, 120 (3d Cir.1976); *see also* Hirsch & Sheehey, *supra,* at 71 (citing *Lindy* ). *But cf. In re "Agent Orange",* 611 F.Supp. at 1317–18 ("The problem of dealing with class

counsel's private fee arrangements is difficult in theory.").

### 2. Court Authority to Limit Fees in Future Claims

There is no doubt that representatives of the class and their attorneys had the power to agree to a reasonable settlement of attorneys' fees with a 25% cap. The issue now presented is the Courts' authority to limit fees that will be earned in the future by attorneys representing future claimants in their individual claims against the Trust. The Second Circuit Court of Appeals has already found that the district courts in the instant litigation possess the requisite authority. *Findley II*, 982 F.2d at 757 ("We have no dispute with the curtailment of lawyers' fees."). The fee limitation in the Stipulated Settlement, as well as those provisions in the Courts' Order of January 21, 1994, bind future claimants as well as their attorneys.

In limiting fees prospectively, the Courts draw not only their equitable powers under Rule 23, but also on the courts' supervisory powers over members of the bar and their obligation to safeguard the rights of mass-litigation plaintiffs.

### a. Power of the Courts to Regulate Attorney Conduct

In exercise of "the inherent power of the courts to regulate the conduct of attorneys," courts may require setting aside contingency fee contracts deemed unconscionable or yielding excessive fees. *See Appellate Court's Power to Establish Contingent Fee Schedule Upheld*, 60 Colum.L.Rev. 242, 245 & nn. 13–14 (1960) (citing cases); *cf. In re Jacobs*, 44 F.3d 84, 87 (2d Cir.1994) ("A district court's authority to discipline attorneys admitted to appear before it is a well-recognized inherent power of the court."). This power includes the ability to establish schedules of presumptively reasonable fees for future litigations. The inherent power of a federal court to control fees, even in a case where state substantive law is applied under *Erie*, is not limited by state law. *Cf. People v. Terry*, 45 F.3d 17, 23 (2d Cir.1995) ("[I]t is quite anomalous to suggest that a federal

court must look to the New York state legislature to vindicate an abuse of the federal judicial power.").

Judge Cardozo, in *People ex rel. Karlin v. Culkin*, 248 N.Y. 465, 162 N.E. 487 (1928), explained the English origins of the courts' supervisory power over the bar, including the courts' ability to bind attorneys prospectively. While barristers were subject to discipline by the benchers of their inns,

> The attorney, unlike the barrister, was not a member of the inn, but an officer of the court, and subject to its orders. These orders might be general, not directed to a single attorney as the outcome of a controversy, but announcing rules of conduct to be adhered to in the future. Many prohibitions now imbedded in our law, often with the added sanction of a legislative enactment, came into being through regulations or orders adopted by the court of its own motion to put an end to some abuse.

*Karlin*, 248 N.Y. at 473, 162 N.E. at 490 (citations omitted) (finding that following a series of constitutional and legislative revisions, New York "[is] back to the law as it existed in 1777," 248 N.Y. at 477, 162 N.E. at 492); *see also Gair v. Peck*, 6 N.Y.2d 97, 110–11, 188 N.Y.S.2d 491, 501, 160 N.E.2d 43, 51, *remittitur amended*, 6 N.Y.2d 983, 191 N.Y.S.2d 951, 161 N.E.2d 736 (1959), *cert. denied*, 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960) (quoting *Karlin* and upholding power of Appellate Division to adopt schedules establishing presumptions of reasonableness of fees in contingency contracts cases); *cf.* Case Note, 26 Fordham L.Rev. 700, 703 n. 22 (1957) (in contrast to England, in New York " 'the fees of public officers has been a matter of public regulation from an early period' " (quoting 1 Chester, *Courts and Lawyers of New York* 143 (1925))).

Attorneys in all litigations are now bound by local ethical rules not to charge "unreasonable" fees. *See Model Rules of Professional Conduct* Rule 1.5 (adopted as modified by several states); *Model Code of Professional Responsibility* DR 2–106. *See generally* Brickman, Horowitz & O'Connell, *supra*, at 15–16 (describing significance of ethical canons and rules to fee-setting in class action

context); Stephen Gillers & Roy D. Simon, Jr., *Regulation of Lawyers: Statutes and Standards* 48–64, 443–44, 799–800, 825–30, 862–64 (1995). With respect to contingency fees, some state legislatures and courts have adopted a more aggressive stance than others by dictating schedules of maximum percentages to apply to contingency fee arrangements. *See, e.g.,* N.Y.Ct. Rules 603.7(e), 691.20(e) (McKinney 1993) (rules of the New York Appellate Division, First and Second Departments, delineating schedule of reasonable fees in personal injury and wrongful death actions, but excluding medical, dental or podiatric malpractice); N.Y.Jud.Law § 474–a (McKinney Supp.1995) (schedule governing contingency fee contracts in medical, dental or podiatric malpractice); Cal.Bus. & Prof.Code § 6146(a) (West 1993) (schedule governing contingency fee contracts in medical malpractice cases); *id.* § 6147.5(a) (schedule governing contingency fee contracts in claims for recovery between merchants); Fla.Stat.Ann.Bar Rule 4–1.5(f)(3) (1994) (schedule governing contingency contracts for personal injury claims); N.J.Gen.Application Rule 1:21–7 (1994) (schedule governing contingency fees in tort actions); *cf. In re Cooperman* 83 N.Y.2d 465, 611 N.Y.S.2d 465, 633 N.E.2d 1069 (1994) (prohibiting attorneys from charging nonrefundable retainer fees). An attorney who charges in excess of the prescribed amount may be subject to discipline under local ethical canons. *See, e.g.,* N.Y.Ct.Rules 603.7(e)(1), 691.20(e)(1).

With respect to the power of the courts to regulate fees in future litigations, the experience of the Appellate Division in New York State is instructive. In New York, this power was tested and upheld in the 1950s when the Appellate Division of the supreme court of the State of New York, First Judicial Department, adopted the precursors to the court rules cited above governing contingency fee schedules. *See Gair v. Peck,* 6 Misc.2d 739, 741, 165 N.Y.S.2d 247, 249 (Sup. Ct.1957), *aff'd,* 5 A.D.2d 303, 171 N.Y.S.2d 594 (App.Div.3d Dep't 1958), *rev'd,* 6 N.Y.2d 97, 188 N.Y.S.2d 491, 160 N.E.2d 43, *remittitur amended,* 6 N.Y.2d 983, 191 N.Y.S.2d 951, 161 N.E.2d 736 (1959), *cert. denied,* 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960)

(describing history of Rule 4). The New York supreme court held that adoption of the court rule exceeded the defendants' general disciplinary powers over the bar, and suggested that it represented an impermissible attempt to establish substantive law with respect to one segment of the State. *Gair,* 165 N.Y.S.2d 247; *see also* Case Note, *supra,* at 701–02. The Court of Appeals reversed, noting that other rules previously promulgated "prescribe[d] in advance standards of conduct for attorneys" and that:

> The rule-making power is not limited to prescribing only for the specific case after the event. The idea that imposition by lawyers on their clients, oppressive and unconscionable fee agreements or similar conduct is beyond the rule-making power of the court has no shadow of foundation.

*Gair,* 188 N.Y.S.2d at 499, 501; *see also Appellate Court's Power to Establish Contingent Fee Schedule Upheld, supra.* The Court of Appeals also explained that the scheduled percentages functioned merely to establish presumptions of reasonableness in connection with state ethical cannons. *Gair,* 188 N.Y.S.2d at 503, 504.

The power of supervisory courts to prescribe fees in order to protect the public is exercised as to whole classes of litigation. In an individual litigation involving future fee decisions that same power may be exercised by the judge supervising the case.

### b. Courts as Protectors of Litigants

Supplementing the assurance that the state ethical rules provide, courts have an obligation to ensure that the fruits of the settlement are not denied to plaintiffs by unnecessary and inappropriate legal expenses after the class action is complete. *See Lu, supra* ("only the court with its limited time and resources is left to safeguard the class's interests" with respect to attorneys's fees). A reality that the Courts cannot ignore is that the plaintiffs in class and other mass actions are typically less sophisticated and aware of the rights at stake and the fairness of legal charges than the attorneys who represent their interests. Amplifying on the potential implications of the imbalance in power between lawyers and their clients in

class action settlements, one theorist explained:

> [T]he client is generally unaware of the legal doctrines · that would predispose courts to give recovery and to force defendants to make settlement offers. So even if the courts relitigated settled cases, they would be highly one-sided. All the advantages would be enjoyed by the lawyers, not the clients, because the former often possess a near-monopoly of information on what the risks of the case had been when a contingency fee agreement had been entered into.

*Rethinking Contingency Fees,* Civil Justice Report (Manhattan Institute's Judicial Studies Program, Washington, D.C.), Mar. 1994, at 1, 2 (interview· with authors of *Rethinking Contingency Fees, supra* ).

In the instant case, attorneys' fees routinely calculated on the prevailing 33–45% contingency basis, if applied to present or future claims filed with the Trust, would massively overcompensate some attorneys while unreasonably denying money to the injured. The fee cap provision strikes an appropriate balance and assures reasonable compensation to future attorneys and claimants alike. Under the circumstances, the Courts must approve the fee provision as an integral part of the Settlement. The cap binds attorneys who may not be presently before the court as well as those who participated actively in prosecuting the class action and in forging the Settlement.

In any society there is a power to bind people even if they are not present and aware that they are being bound. *See, e.g.,* Deuteronomy 29:14, 15 ("I make this covenant and this oath ... also with him that is not here with us this day."); John Rawls, *A Theory of Justice* (1971). It is the basis for the United States Constitution, statutes and the binding nature of legal precedent. *Cf.* Evan H. Caminker, *Why Must Inferior Courts Obey Superior Court Precedents* 838–39 (1994) (doctrine of hierarchical precedent is not statutorily compelled). Bound by the past, the present holds the future in thrall. There is little basis for people of the future to complain if a decision of their past fairly took the future's needs into account and if

they have the capacity to challenge and modify what was done for and to them.

For future claimants and attorneys to be fairly and reasonably bound, it is necessary that a settlement: 1) project and take into account, so far as possible, the future needs of the parties and their attorneys; 2) draw an equitable balance between present and future needs and resources; and 3) provide for the possibility of change should unforeseen circumstances create unavoidable hardships. These requirements have been met in the instant litigation. While no representative of future attorneys has explicitly been named, it is apparent that those attorneys presently involved in the litigation will represent a large portion, and perhaps the bulk, of claims to be filed after settlement. In developing the Settlement, these attorneys had not only their present needs but also the future needs of themselves and their colleagues in mind. The attorneys have more of a stake in the outcome of the instant class action than any of the claimants. *Cf.* Lu, *supra* (noting that "[t]he perception that complex litigation exists solely for the attorneys and not for the clients" is reinforced in mass tort cases such as the instant one).

The reality is that the attorney and client must be considered together for purposes of deciding reasonable fees. In general, the claimants in a mass tort case receive less than they deserve under a perfect system of compensation, while the attorneys get more. Some of the "loss" in compensation can fairly be shifted from the clients to their attorneys.

The fee limitation does not prevent future contracts between attorneys and clients. The parties are always free to agree to a fee below the 25% contingency amount provided in the Stipulated Settlement.

Any upward deviation from the 25% contingency must be approved by a court. *Cf. In re Jacobs,* 44 F.3d 84, 88 (2d Cir.1994) ("The Supreme Court and circuit courts appear to have concluded that while regulation of attorney behavior should remain primarily within the discretion of each district court, it is contrary to fundamental notions of fairness to close of all avenues of review."). As already noted, such a departure occurred at an

earlier stage of this litigation, following the Courts' January 21, 1994 order limiting attorneys' fees to 25% of recovery when judges in Virginia and Texas allowed larger fees.

The Courts' conclusions on the attorneys' fees issue is not an "interpretation" of the type proscribed by the Court of Appeals in *Findley II, see* 982 F.2d at 740; *see also* Part VI.E, *supra.* Rather, it is a recognition of the power of other courts to handle future situations that do not directly affect the welfare of the Trust and other claimants.

The Courts trust that, in accordance with the letter and spirit of the Settlement, judges reviewing such applications in the future will not depart from the 25% contingency percentage unless absolutely necessary. The percentage adopted represents an accommodation of diverse interests that were ably and vigorously represented. Based on their experience with mass torts, the Courts believe that the fees calculated under the 25% contingency percentage will be reasonable, adequately compensating attorneys for their work without unnecessarily further reducing claimants' recovery. The intense and skilled negotiation of the parties, the complex factors and tensions represented in the choice of the contingency percentage in view of the overall Settlement, and the Courts' evaluation of the contingency fees' reasonableness in light of their first-hand observations of the negotiations and general familiarity with mass torts, should not be lightly disregarded by courts considering the issue in the future.

Unlike the resolution of the appropriate calculation of codefendants' set-off and contribution rights, the attorneys' fee issue does not present a choice of law problem. Some states have passed legislation limiting attorneys' fees in certain types of actions, usually personal injury or medical malpractice cases. The TDP does not mandate a 25% contingency fee, but simply provides a cap. The fee cap percentage of 25% mandated by the TDP will generally be below any figure set statutorily by a given state. If the fee amount agreed upon by the a claimant and an attorney exceeds a statutory limit while satisfying the TDP, the matter will be subject to the state's attorney disciplinary policies.

## VIII. Satisfaction of Procedural Requirements

### A. Jurisdiction

The Courts have jurisdiction of this matter pursuant to 28 U.S.C. § 1332. The named plaintiffs and defendants are citizens of different states and the matter in controversy exceeds the sum of $50,000, exclusive of costs.

The Courts have personal jurisdiction over the Trust and the members of the Class. The Court of Appeals has previously held in this case that "[t]he Trial Courts are fully entitled to exercise jurisdiction over the beneficiaries of a trust created in New York." *Findley II*, 982 F.2d at 735. Since the Trust was created in New York and is governed by New York law according to Trust Agreement § 6.11, and all members of the Class are Trust Beneficiaries, they are subject to the Courts' jurisdiction.

■■■ The Amended Complaint presents a "case or controversy." The Courts have Article III jurisdiction. To satisfy the requirements of Article III, there must be before the court "a claim of substantive right." *In re Keene Corp.,* 14 F.3d 726 (2d Cir.1993). The Amended Complaint seeks an equitable distribution of the Trust's assets, pursuant to New York state law regarding trusts, and alleges that if the requested relief is not granted, "the assets of the Trust are not and will not in the future be sufficient to pay all claims in full as they are liquidated." Amended Complaint, ¶ 6. A request for such relief asserts a "claim of right."

### B. Class Action

#### 1. Rule 23 Prerequisites

■■■ Rule 23(a) of the Federal Rules of Civil Procedure sets forth the basic criteria for maintaining a class action. In relevant part, it states:

> (a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of

the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Each of Rule 23(a)'s four requirements for maintaining a class action—numerosity, commonality, typicality and adequacy of representation—is met.

### a. Numerosity

The plaintiff class includes over 200,000 present Beneficiaries of the Trust, as well as hundreds of thousands of future Beneficiaries. Since it would be impracticable to name in a single proceeding over 200,000 Beneficiaries and hundreds of thousands of unknown future Beneficiaries, the numerosity requirement is satisfied.

### b. Commonality

The class is comprised of Beneficiaries of the Trust, whose rights against the Trust are defined by the same instruments, and whose rights against the Trust are all threatened by the same set of circumstances that has placed the Trust in its present predicament. *See Findley I*, 129 B.R. at 818–19. The Court of Appeals held that the Beneficiaries "shared a common interest in maximizing the resources of the Trust and assuring an equitable distribution of its funds." *Findley II*, 982 F.2d at 739–40. This single common interest is sufficient to satisfy Rule 23's commonality requirement. *See, e.g., Lewis v. Gross*, 663 F.Supp. 1164, 1167 (E.D.N.Y. 1986), *mot. for reconsideration denied*, 660 F.Supp. 169 (E.D.N.Y.1987).

### c. Typicality

Rule 23(a)(3) and (4) require that the class representatives have claims that are typical of the class's claims, and that they adequately represent the class's interests.

"Typicality refers to the nature of the claim of the class representative, and not to specific facts from which the claim rose or relief is sought. The proper inquiry is whether other members of the class have the same or similar injury." *In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F.Supp. 718, 750 (E.D.N.Y.1986) (quoting *Dura–Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 99 (S.D.N.Y.1981)). "As generally interpreted,

[Rule 23] requires that: (1) the named plaintiffs not have 'interests antagonistic to those of the remainder of the class,' and (2) the attorney for the plaintiffs be 'qualified, experienced, and generally able to conduct the proposed litigation.'" *County of Suffolk v. Long Island Lighting Co.*, 710 F.Supp. 1407, 1413 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir.1990) [*LILCO* ] (quoting *Eisen v. Carlisle & Jacquelin*, 391 F.2d 555, 562 (2d Cir.1968)).

Plaintiffs' claims are typical of the class as a whole. The claims of the representatives of the subclasses are typical of the members of each subclass. The class and subclass representatives adequately represent their respective classes and subclasses. There is no antagonistic interest within a subclass. All attorneys are highly qualified to conduct the litigation.

All class members share a common interest in restructuring the Trust so that all members will obtain the maximum partial payment of their claims. All share a common interest in minimizing the Trust's administrative and legal costs so that more of the Trust *res* will be available to pay claims. The named plaintiffs' claims are typical of, and the named plaintiffs are adequate representatives of, the class with respect to these common interests since they are Beneficiaries of the Trust with the same interest in restructuring the Trust shared by all other Beneficiaries.

### d. Adequacy of Representation

The Courts have already found that counsel for the plaintiff class have the requisite experience, qualifications, resources and competency to conduct this litigation. *Findley I*, 129 B.R. at 823. That finding was not challenged on appeal. This finding is extended to representation of the subclasses.

To the extent that under the Settlement the class members' interests diverge, their special interests are represented by subclasses appointed in accordance with the Court of Appeals' suggestions. Within each subclass there is no divergence of interests of subclass members, each of the subclass representatives has claims that are typical of those held by other members of the subclass and each representative adequately represented the

interests of his or her respective subclass. Counsel for each subclass has the qualifications and experience necessary to conduct the litigation. *See Ashe v. Board of Elections,* 124 F.R.D. 45, 50 (E.D.N.Y.1989); *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 80 (E.D.Pa.1987). The requirements of Rule 23(a)(3) and (a)(4) are satisfied with respect to the common interests shared by all class members.

### 2. Limited Fund

■■■ Rule 23(b)(1)(B) provides for the maintenance of a mandatory, non opt-out class action where

> (1) the prosecution of separate actions by or against individual members of the class would create a risk of

> . . . . .

> (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

As the Courts previously explained in connection with the first settlement of this action, subsection (b)(1)(B) was intended to apply " 'when claims are made by numerous persons against a fund insufficient to satisfy all claims.'" *Findley I,* 129 B.R. at 825 (quoting Fed.R.Civ.P. 23(b)(1)(B) advisory committee's note, 39 F.R.D. 69, 101 (1966)). The limited fund case is the "paradigm Rule 23(b)(1)(B) case." Arthur R. Miller, *An Overview of Federal Class Actions: Past, Present, and Future,* 4 Just.Sys.J. 198, 211 (1978). A 23(b)(1)(B) class action in such cases seeks "to preserve the limited fund for the entire class against the individual claims of class members" to prevent a depletion of the fund by the first claimants to reach it. *Waldron v. Raymark Indus.,* 124 F.R.D. 235, 238 n. 1 (N.D.Ga.1989); *see In re "Agent Orange" Product Liability Litig.,* 818 F.2d 179, 182 (2d Cir.1987), *cert. denied,* 487 U.S. 1234, 108 S.Ct. 2898, 101 L.Ed.2d 932 (1988) (approving a 23(b)(1)(B) class "as a method of establishing criteria for distributing a class settlement fund," and observing that " 'the allocation of an inadequate fund among com-

peting complainants is a traditional equitable function.'" (quoting *Curtiss–Wright Corp. v. Helfand,* 687 F.2d 171, 174 (7th Cir.1982))).

The Trust is a limited fund for the purposes of Rule 23(b)(1)(B). Its liabilities far outweigh its assets and, absent the instant class action, the current piecemeal liquidation and payment of some claims at full value by the Trust would deplete the Trust's assets and would deprive most present and future Beneficiaries of their right to be compensated for their claims by the Trust. Special master Marvin E. Frankel properly concluded that the Trust was in fact a limited fund, as he reported to the Courts after extensive hearings on the subject. *See* Special Master's Report dated November 3, 1990, *reprinted in In re Joint E. & S. Dist. Asbestos Litig.,* 120 B.R. 648, 661–68 (E. & S.D.N.Y. 1990). The special master noted that all parties who appeared before him concurred that the Trust is a limited fund, and argued only about the extent to which the Trust's liabilities outweighed its assets. *In re Joint E. & S. Dist. Asbestos Litig.,* 120 B.R. at 662–63. The trial of this proceeding and the fairness hearings demonstrated that the Trust's financial straits have substantially worsened in the intervening years as the stream of incoming claims continued to increase. The Trust satisfies the definition of a limited fund.

The Court of Appeals, following *In re Drexel Burnham Lambert Group,* 960 F.2d 285 (2d Cir.1992), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993), has ruled that the instant action may proceed as a Rule 23(b)(1)(B) limited fund class action:

> We are therefore willing to permit the use of such a class action in the pending case, so long as there exists, as occurred in *Drexel,* appropriate designation of subclasses to provide assurance that the consent of groups of claimants who are being treated differently by the settlement is being given by those who fairly and adequately represent only the members of each group.

*Findley II,* 982 F.2d at 739. The Courts have designated the appropriate subclasses

pursuant to the mandate of the Court of Appeals, and each of those subclasses has negotiated and consented to the terms of the Settlement now before the Courts for approval; a Rule 23(b)(1)(B) limited fund class action is therefore appropriate.

### 3. Future Beneficiaries

■ The Courts previously held that future Beneficiaries may properly be included as Rule 23 class members in this class action. *See Findley I,* 129 B.R. at 834, 837. The question was not raised on appeal so the Courts' holding is law of the case for the district courts. "[A] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C.Cir. 1987); 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* § 4478, at 801 (1981) ("If [a] matter is omitted from one appeal, ... it may be held foreclosed on a later appeal to the same court as a matter of law of the case.").

Due process arguments against the inclusion of future beneficiaries in a class action like this one are unconvincing. As the Second Circuit has held in another case in which the equivalent of a trust was established to compensate present and future claimants, future interests are best protected "by requiring that 'fair and just recovery procedures be[ ] made available to [future claimants]' ... and by ensuring that they receive vigorous and faithful vicarious representation." *In re "Agent Orange" Prod. Liability Litig. (Ivy v. Diamond Shamrock Chems. Co.),* 996 F.2d 1425, 1435 (2d Cir.1993), *cert. denied,* —— U.S. ——, ——, 114 S.Ct. 1125, 1126, 127 L.Ed.2d 434 (1994) (quoting 1 *Newberg on Class Actions* § 1.23, at 1–56 (3d ed. 1992)).

Future claimants were represented by the Legal Representative of Future Claimants at every step in this litigation, including court proceedings, settlement conferences and arms-length settlement negotiations with each of the parties. The Legal Representa-

tive took an active and aggressive role in protecting future claimants with not the slightest conflict of interest since he represented no present or past claimants. The "recovery procedures" established by this Settlement are "fair and just" to future Beneficiaries. The future Beneficiaries' subclass has received "vigorous representation." Its members will receive the same treatment as the present claimants.

Any contention that the future Beneficiaries' subclass cannot satisfy the constitutional "case or controversy" requirements of Article III has been rejected. As the Courts stated:

> On its face, the objection is without merit. The question of whether compensable injury has occurred [in an individual who has been exposed to asbestos but has not yet manifested an asbestos-related illness] is not subject to doubt by any court.

*Findley I,* 129 B.R. at 834.

Because future claimants, by definition, are individuals who were exposed to Manville asbestos products prior to the Manville bankruptcy and who will manifest an asbestos-related illness, they present a case or controversy. *Findley I,* 129 B.R. at 834–37; *accord In re "Agent Orange" Prod. Liability Litig.,* 996 F.2d at 1433–34 (holding that class properly included individuals who had been exposed to Agent Orange but had not yet manifested injury); *Carlough v. Amchem Prods., Inc.,* 834 F.Supp. 1437 (E.D.Pa.1993), *cert. denied,* 1993 WL 441720; *Unarco Bloomington Factory Workers v. UNR Indus.,* 124 B.R. 268, 271–72, 283 (N.D.Ill.1990) (dismissing appeals challenging bankruptcy court's confirmation of reorganization plan resolving asbestos claims against UNR for both known and unmanifested conditions); *In re A.H. Robins Co.,* 880 F.2d 709, 717, 752 (4th Cir.1989), *cert. denied,* 493 U.S. 959, 110 S.Ct. 377, 107 L.Ed.2d 362 (1989) (affirming approval of class settlement resolving claims of class members with unmanifested symptoms of disease resulting from use of the Dalkon Shield).

### C. Fairness, Reasonableness and Adequacy

### 1. Notice to Class

The Courts are required by Rule 23(e) to consider whether the Settlement is a fair

resolution of the class action proceeding after giving notice to members of the class. Rule 23(e) states:

(e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

. Full and adequate notice of the Settlement and fairness hearings was given to the class and to each subclass. Everyone who wished to be heard, to present evidence or to cross examine witnesses at the fairness hearings or subsequently was heard without any limit on time or opportunity.

## 2. Standards

■■ Rule 23 does not specify standards for approval of class action settlements. Federal courts approve class action settlements only when they are found to be fair, reasonable and adequate. *In re "Agent Orange" Prod. Liability Litig.*, 597 F.Supp. 740, 761 (E.D.N.Y.1984), *aff'd*, 818 F.2d 145 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 647 (1988). "Fairness, reasonableness and adequacy must be judged in light of the 'totality of the circumstances.'" *In re "Agent Orange" Prod. Liability Litig.*, 597 F.Supp. at 761 (quoting *Grunin v. International House of Pancakes*, 513 F.2d 114, 124 (8th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)).

A number of factors guide district courts in determining whether a settlement of a class action seeking money damages is fair, reasonable and adequate. These factors include: (1) the complexity, expense and probable duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action at trial; (7) the ability of the defendant to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the reasonableness of the settlement fund in the light of the attendant risks of litigation. *County of Suffolk v. LILCO*, 907 F.2d 1295, 1323–24 (2d Cir.1990); *Malchman v. Davis*, 706 F.2d 426, 433 (2d Cir. 1983); *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir.1974); *Burka v. New York City Transit Auth.*, 129 F.R.D. 80, 83 (S.D.N.Y.1990). Because "'[t]he allocation of an inadequate fund among competing complainants is a traditional equitable function,'" the fairness of a settlement in a limited fund case like this one must be judged "based on broad ethical principles rather than narrow rules." *In re "Agent Orange" Prod. Liability Litig.*, 818 F.2d at 182 (quoting *Curtiss-Wright Corp. v. Helfand*, 687 F.2d 171, 174 (7th Cir.1982)).

Additional related factors should also be weighed in determining a settlement's fairness: (10) The action being settled must have "a sufficiently plausible basis in state law to make the [s]ettlement a reasonable compromise of the lawsuit." *Findley II*, 982 F.2d at 745. (11) A court must examine the proposed settlement as a fiduciary of absent class members to ensure that the settlement does not unfairly compromise their rights. *LILCO*, 710 F.Supp. at 1437; *In re "Agent Orange" Product Liability Litig.*, 597 F.Supp. at 758. It must examine the negotiations that produced the proposed settlement to ensure that the interests of all class members were adequately considered. *In re "Agent Orange" Product Liability Litig.*, 597 F.Supp. at 762. As the Court of Appeals has stated: "In approving the proposed settlement of a class action, a district court has the fiduciary responsibility of ensuring that the settlement is fair and not a product of collusion, and that the class members' interests were represented adequately." *In re Warner Communications Sec. Litig.*, 798 F.2d 35, 37 (2d Cir.1986).

(12) The court should also consider the public interest in the settlement. *County of Suffolk v. LILCO*, 710 F.Supp. 1407, 1436 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir. 1990); *In re "Agent Orange" Product Liability Litig.*, 597 F.Supp. at 758–59; *see Carson v. American Brands, Inc.*, 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981). As a general matter, the public interest strongly favors the resolution of con-

troversies by settlement. *Carson,* 450 U.S. at 88 n. 14, 101 S.Ct. at 998 n. 14; *see also* Part III.F, *supra* (discussion of USF & G objections). Other matters of public concern may also determine the fairness of a class settlement. *In re "Agent Orange" Product Liability Litig.,* 597 F.Supp. at 762. That is particularly true in the asbestos litigations where so many companies have been driven into bankruptcy, courts' calendars are disrupted and transactional costs eat up much of the recoveries that should go to claimants.

An additional consideration that should bear on approval of a class action settlement is (13) the opinion of class counsel on the merits of the settlement. *Armstrong v. Board of School Directors,* 616 F.2d 305, 325 (7th Cir.1980); *Flinn v. FMC Corp.,* 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Patterson v. Stovall,* 528 F.2d 108, 114 (7th Cir.1976); *Chatelain v. Prudential–Bache Sec.,* 805 F.Supp. 209, 212 (S.D.N.Y. 1992) ("A substantial factor in determining the fairness of a settlement is the opinion of counsel involved in the settlement."); *Guardians Assoc. v. Civil Serv. Comm'n,* 527 F.Supp. 751 (S.D.N.Y.1981); *Meyer v. Citizens and S. Nat'l Bank,* 677 F.Supp. 1196 (M.D.Ga.1988). This factor is particularly important where there have been hard fought negotiations by many highly skilled attorneys and the settlement occurred during trial in an entirely non-collusive manner.

By all possible standards, the proposed settlement before the Courts is fair, reasonable and adequate. The Settlement's provisions are both proper and necessary when judged in the context of this limited fund action. They impose the burdens of the Trust's financial difficulties equally on all Trust Beneficiaries.

The underlying lawsuit is based on New York trust law. It could—and would—have been decided in the absence of settlement along lines close to those embodied in the TDP. Under New York state law a trust may be modified with court approval in circumstances such as exist here. *See* Part IV, *supra.*

Each subclass has given its consent to the Settlement. The Settlement is not the product of fraud or collusion; rather, it was negotiated and approved at arms length by the representatives of the class, each subclass and the Trust. Class and subclass counsel, highly experienced and representing a large proportion of the class and subclass members, strongly endorse the Settlement as the best compromise they could forge. Very few class members have objected to the Settlement. The public interest favors the expeditious conclusion of this action by settlement so that the Trust may resume paying the claims of its Beneficiaries, who have had to wait four years for this restructuring to be concluded and so that the courts can be relieved of many thousands of identical litigations against the Trust. The Courts find that the Settlement, as presented for approval, is fair, reasonable and adequate.

### 3. Settlement Provisions

Fairness, as noted above, must be judged in light of the "totality of the circumstances" of the class action and Settlement. Unlike the typical class action seeking damages where the amount of likely damages and the likelihood of success on the merits are the paramount fairness considerations, the principal issue in the instant case is whether the Settlement addresses the Trust's problems in a manner that treats all Beneficiaries equally. The Trust is indisputably a limited fund and is unable to satisfy in full all claims against it. If the *status quo ante* is not altered for the future, then the Trust will continue to incur enormous transaction costs while attempting to pay each claim in full as it is liquidated, until its resources are quickly exhausted. A few claimants will receive the full value of their claims, while most will be denied any recovery at all.

These consequences of the Trust's status as a limited fund compel approval of the Settlement that the parties now present to the Courts. The new TDP contained in the Settlement seeks to avert the inequity of the *status quo ante* by assuring that every Trust Beneficiary will be paid the same *pro rata* share of his or her claim's value, regardless of whether the Beneficiary is a health claim-

ant, codefendant, distributor or any other Trust Beneficiary. Such equality of treatment is fair. The Settlement's requirement that Beneficiaries forego the tort system except under unusual circumstances applies equally to all, preserves, to the extent possible, the existing balance in the tort system between Beneficiaries and will make more money available for all Beneficiaries. The system of scheduled disease categories and values is fair because it permits claimants to obtain reasonable historic settlement values for the great majority of claims without individual evaluation while preserving claimants' rights to individually negotiate, arbitrate, and try the value of their claims.

Unlike the settlement vacated by the Court of Appeals, the present Settlement does not distinguish between sicker and less-sick Trust Beneficiaries with regard to the time of payment or the *pro rata* share. It treats all Beneficiaries alike, without regard to the severity of their injuries, by paying them an equal fraction of their claims' values.

The Settlement is fair to all present and future Asbestos Health Claimants. Under the *status quo ante,* many present and all future claimants will receive nothing at all from the Trust. By contrast, the negotiators were careful to propose a settlement in which the *pro rata* share applicable to all claims will be set at a level designed to result in equal payments to present and future claimants. The TDP provides for periodic review of the Trust's assets and liabilities to ensure that future claimants share equitably in the Trust's assets even if circumstances change. The proposed Settlement provides mechanisms to amend the distribution process in the event that unforeseen future events endanger their recovery from the Trust.

The Settlement's treatment of Beneficiaries whose claims are for contribution and indemnity is reasonable. The preferred method of resolving Contribution Claims is by set-off for the Trust or Manville share at trial. Set-offs will be measured by reference to applicable state law and afford codefendants the opportunity to obtain immediate credit for the Trust share without the delay and expense of asserting a contribution claim against the Trust. Codefendants asserting

contribution claims will take the plaintiff's claim against the Trust, assert it in a special FIFO queue established for such claims and receive payment from the Trust "in the same amount ... the [health] claimant could have recovered from the Trust." TDP § H.4(c). The TDP allows the Trust, in valuing Contribution claims, to "take into account the size of the verdict returned against the Co–Defendant(s)." *Id.* That bargained-for treatment is fair.

The Settlement's treatment of indemnity claims is reasonable. Indemnity claims by Distributors may be processed by negotiating with the Trust agreed percentages of a Distributor's asbestos-related losses which will be treated as valid Indemnity Claims. This process will enable Distributors to expeditiously resolve their claims. All indemnity claims will be paid the same *pro rata* share applicable to all other claims by Beneficiaries. That bargained-for treatment is fair.

The Settlement's resolution of all present contribution claims, indemnity claims by Distributors and claims by MacArthur and J.T. Thorpe Co. for fixed sums is reasonable. The Trust is arguably liable on each such category of claims for substantial amounts and its potential liability substantially exceeds the Settlement amounts; the likelihood of these claims succeeding, if litigated, is not insubstantial. These settlements are also beneficial in that they relieve the Trust and its Beneficiaries of the delay and expense involved in individually negotiating or litigating these claims. Even if these claims could arguably have been settled for less money, given the total number of claims against the Trust and the Trust's total liability, any savings achieved would not have had a significant impact on the amount the Trust could pay other Beneficiaries. Certainly any such impact would be too small to affect the fairness of the Settlement overall. That bargained-for treatment is fair and reasonable.

The insurance companies have no cause for complaint. The parties are seeking to maximize the assets available to the injured. Other actions will decide whether or not an insurance company is liable. Plaintiffs and defendants often cooperate to maximize recovery in mass torts since the chief asset of a

defendant embroiled in a mass tort is often its insurance. There is nothing contrary to public policy in this practice, so long as there is no collusion. No collusion was shown here.

### 4. New York Trust Law

In assessing the fairness of the proposed settlement, the Courts must determine whether there is a "sufficiently plausible basis" for this suit under New York trust law to validate the fairness of the Settlement. *Findley II*, 982 F.2d at 745. Such a plausible substantive basis does exist. *See* Part IV, *supra.*

The New York Court of Appeals has explicitly recognized the equitable power of a New York court to control a trust in case of emergency problems. *See* Part IV, *supra.* Under *Erie*, in a diversity case such as the instant one, the federal courts have the same power as the state courts. In authorizing an equitable deviation or reformation the New York Court of Appeals, as already amply demonstrated, *supra*, has recognized that:

> [a]uthority is ample for the proposition that a court in the exercise of its equitable powers may control the administration of a trust so as to effectuate its avowed purpose, particularly when changing circumstances would otherwise defeat it.... It is the avowed purpose of the payments rather than the method that is controlling.

*In re Herzog*, 301 N.Y. 127, 138, 93 N.E.2d 336, 341 (1950) (citations omitted).

Modification of the terms of the Trust is essential to avoid frustration of its principal purpose to provide equitable compensation to all Beneficiaries. The insufficiency of the Trust's assets to pay claims in full was unexpected at the time the Trust was created.

### 5. Hard Fought, Arms–Length Negotiations

The Settlement is the product of long and often difficult negotiations that were conducted continuously over the course of more than a year, not including the long course of events surrounding the negotiation, approval and vacating of the first settlement agreement. The factual record presented at the fairness hearings establishes that the settlement negotiations were conducted at arms length and that the Settlement is not the product of fraud or collusion.

### 6. Opinion of Counsel and Reaction of Class Members

While a court may not abdicate its responsibility to protect the interests of absent class members by independently evaluating the fairness of a proposed settlement, it may and should give weight to the opinions of class counsel where a settlement is free of collusion. The Courts have observed Class and Subclass Counsel over the long and arduous course of this litigation, and have found them to be ethical, highly capable and vigorous advocates for their respective clients. Their opinion that this Settlement should be approved reinforces the Courts' own conclusions, based on the evidence.

Notwithstanding a relatively small number of objections, the reaction of the Class members to the Settlement supports its approval. Extensive and detailed notice was given, clearly spelling out both the problems giving rise to this suit and the terms of the Settlement proposed to resolve them. Dissemination of the notice included delivery by first class mail to some 211,000 Asbestos Health Claimants or their counsel who have previously filed claims with the Trust as well as to all known members of the Codefendant and Distributor subclasses. Comparing the small number of objections received to the vast number of class members who received full notice, the Courts conclude that the great majority of class members find the terms of the Settlement satisfactory. *See City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 462 (2d Cir.1974); *Armstrong v. Board of School Directors*, 616 F.2d 305, 332 (7th Cir.1980); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir.1975), *cert. denied*, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 734 (1976); *Weiss v. Drew Nat'l Corp.*, 465 F.Supp. 548, 552 (S.D.N.Y. 1979). The named plaintiffs all support the Settlement.

The Courts also take cognizance of the fact that Class Counsel represent approximately 21,000 Asbestos Health Claimants, or approximately 10% of the total present claim-

ants, in connection with their claims against the Trust. This contrasts sharply with the typical class action, in which it is not uncommon for the class counsel to represent only the named plaintiffs who are a tiny fraction of the class members.

### 7. State of the Litigation and Risk if It Continues

In considering whether to approve a class action settlement, a court should consider the progress of the litigation, and should be more disposed to approve a settlement in a case that is at an advanced stage. A settlement in such a case is likely to be based on more complete and accurate information. *County of Suffolk v. LILCO*, 710 F.Supp. 1428, 1442 (E.D.N.Y.1989), *aff'd*, 907 F.2d 1295 (2d Cir. 1990).

Here, after years of litigation and negotiation of a prior settlement set aside by the Court of Appeals and after substantial discovery by the parties, the trial was nearly complete when the Settlement Stipulation was signed. The parties have also been assisted by the considerable information contained in the Trust's records, which have been open to anyone who wished to see them. The level of knowledge and experience shared by all the parties weighs in favor of the Settlement's approval.

The risks of continuing the litigation must be considered. Failure of this Settlement would require a resolution imposed by the Courts. This, no doubt, would engender considerable further delay. Such a delay by itself could not justify a settlement, but here, where all other considerations counsel approval, it too weighs in the Settlement's favor.

### 8. Public Interest

This settlement is in the public interest because: 1) it will ensure that all Beneficiaries share equally in the Trust's limited assets; 2) it will permanently remove the Trust from congested court dockets around the country; 3) it will provide a uniform process for fairly determining the rights of all Beneficiaries; 4) it will conserve and enhance Trust assets for distribution to Beneficiaries by reducing the cost of processing claims and

of legal fees; and 5) it will bring this restructuring to an equitable end and allow the Trust to resume payments of its Beneficiaries' claims.

### 9. Suffering Claimants

The most important consideration is the needs of the claimants. Many of them suffer terribly and need whatever financial help they can get. Some have unpaid claims dating back to before the original bankruptcy proceedings. While the lawyers and judges collect their fees and salaries, those on whose behalf the machinery of justice slowly grinds on must wait.

The Manville bankruptcy proceeding blocking recovery of those injured by Manville asbestos commenced in August of 1982, more than twelve years ago. *See Findley I*, 129 B.R. at 751. Procedural niceties and legal perfectionism cannot forever control this *Jarndyce v. Jarndyce*-like proceeding. *See* Charles Dickens, *Bleak House* 3–10 (George Ford & Sylvère Monod, eds., W.W. Norton & Co.1977) (1853).

## IX. Amendment to Bankruptcy Statute

### A. Statute

The Bankruptcy Reform Act of 1994 added a new provision to the United States Bankruptcy Code addressing bankruptcy reorganizations of companies subject to claims from victims of asbestos exposure. *See* Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 111(a), 108 Stat. 4106, 4113–4117 (1994) (to be codified at 11 U.S.C. § 524). The Act authorizes issuance of an injunction immunizing an asbestos debtor from future claims where the debtor, as part of a bankruptcy proceeding, establishes a qualifying trust to compensate asbestos claimants. The law is expressly written "so that Johns–Manville and UNR, both of which have met and surpassed the standards imposed in this section, will be able to take advantage of the certainty it provides without having to reopen their cases." 140 Cong.Rec. H10,766 (daily ed. Oct. 4, 1994) (statement of Rep. Jack Brooks, Chair of the House Judiciary Subcommittee on Economic and Commercial Law).

The legislators involved with enactment noted the tension between the need to compensate claimants and the need to protect defendant-corporations so as to maximize the potential pool of assets from which claimants could recover. The legislators summarized their concerns:

> The Committee remains concerned that full consideration be accorded to the interests of future claimants, who, by definition, do not have their own voice. Nevertheless, the Committee also recognizes that the interests of future claimants are ill-served if ... asbestos companies are forced into liquidation and lose their ability to generate stock value and profits that can be used to satisfy claims.

*Id.* at H10,765.

Bankruptcy Reform Act § 111(a) is to be added to 11 U.S.C. § 524 as new subsections (g) and (h). For clarity, all references in the following discussion to the material contained in § 111(a) assume codification has taken place.

### 1. Future Reorganizations

Under the statute, the court that confirmed a reorganization plan of an asbestos debtor may

> enjoin entities from taking legal action for the purpose of directly or indirectly collecting, recovering or receiving payment or recovery with respect to any claim or demand that, under a plan of reorganization to be paid in whole or in part by a [qualifying] trust...., except such legal actions as are expressly allowed by the injunction, the confirmation order, or the plan of reorganization.

11 U.S.C. § 524(g)(1)(B). To qualify for the injunction, the trust established under the reorganization must (1) assume the debtor's wrongful death, personal injury and property damage liabilities for exposure to asbestos products; (2) be funded by the debtor, with an obligation by the debtor to make future payments; (3) own, or be entitled to, a majority of the voting shares of the debtor, the debtor's parent corporation or the debtor's subsidiaries who are also debtors; and (4) "use its assets or income to satisfy claims and demands." *Id.* §§ 524(g)(2)(B)(i)(I)-

(IV). In addition, the court must determine that the debtor is likely to be subject to "substantial future demands," *id.* § 524(g)(2)(B)(ii)(I), "the actual amounts, numbers and timing [of which] cannot be determined," *id.* § 524(g)(2)(B)(ii)(II), and the pursuit of which in separate proceedings would "threaten the plan's purpose to deal equitably with claims and future demands." *Id.* § 524(g)(2)(B)(ii)(III). The court must ensure that the terms of any proposed injunction are set out in the reorganization plan and any required disclosure statement, and that 75% of the class of claimants vote to approve the plan. *Id.* § 524(g)(2)(B)(ii)(IV). Methods for operating the trust must be established, "such as structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of numbers and values of present claims and future demands ... that provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." *Id.* § 524(g)(2)(B)(ii)(V).

The statute provides that transferees, successors and lenders shall not be liable simply by their succeeding to or lending assets, respectively, and that assets pledged to securitize loans will not be impaired. *Id.* §§ 524(g)(3)(A)(ii)-(iii). Section 524(g)(4)(A) authorizes injunctive protection of certain third parties who are alleged to be "directly or indirectly liable for the conduct of the" debtor.

An injunction issued pursuant to the statute will only be valid and enforceable as to future claimants if a legal representative was appointed to protect future claimants' rights in the proceedings, and if the court determines that applying the injunction to them is "fair and equitable, in light of the benefits the trust will confer on the future demanders." *Id.* §§ 524(g)(4)(B)(i)-(ii).

### 2. Existing Plans

Representative Brooks' statement in the Congressional Record affirms Congress' intention that Johns–Manville "be able to take advantage of" the new statute. 142 Cong.

Rec. at H10,766. Moreover, Bankruptcy Reform Act § 111(a) contains a provision that recognizes "existing injunctions" and provides for their continuation in harmony with the Act. *See* 11 U.S.C. § 524(h).

Under the Act, an "existing injunction" (one issued before enactment of the Act) will meet § 524(g)'s requirements if

(A) the court determined at the time the plan was confirmed that the plan was fair and equitable in accordance with the requirements of section 1129(b);

(B) as part of the proceedings leading to issuance of such injunction and confirmation of such plan, the court appointed a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands ... with respect to such plan;

(C) such legal representative did not object to confirmation of such plan or issuance of such injunction.

*Id.* §§ 524(h)(1)(A)–(C). The legislation provides further that trusts currently subject to court-ordered stays of payment need not comply with § 524(g)(B)(ii)(V) (identifying acceptable mechanisms for determining distribution amounts to claimants, *see supra* ) until "such stay is lifted or dissolved," at which point "the trust shall be considered to have met such requirements continuously from the date of the enactment of this Act." *See id.* §§ 524(h)(2)(A)–(B).

### B. Compliance by Settlement

■■■ The Manville Trust clearly falls within the provision of the Bankruptcy Act amendments described above relating to "existing injunctions." The injunction was issued many years before enactment of the Bankruptcy Reform Act. The legislative history is clear that the drafters had Manville in mind when they wrote § 524(h).

As to the first requirement under § 524(h), there can be no doubt that the bankruptcy court determined that the plan was "fair and equitable in accordance with the requirements of § 1129(b)" at the time the plan was confirmed. *See In re Johns–Manville Corp.,* 68 B.R. 618, 635 (Bankr.S.D.N.Y.1986), *aff'd,* 78 B.R. 407 (S.D.N.Y.1987), *aff'd sub nom.*

*Kane v. Johns–Manville Corp.,* 843 F.2d 636 (2d Cir.1988).

The second requirement—appointment of a legal representative to protect future claimants as part of the proceedings leading to the injunction and confirmation of the plan or reorganization—was also met. *See In re Johns–Manville Corp.,* 36 B.R. 743 (Bankr. S.D.N.Y.1984), *aff'd,* 52 B.R. 940 (2d Cir. 1985). The legal representative did not object to the plan's confirmation. *See In re Johns–Manville Corp.,* 68 B.R. at 622–23. The Trust, as it emerges with the Stipulated Settlement, now meets the third requirement: that it adopt the kind of distribution mechanisms contemplated by § 524(g)(2)(b)(ii)(V) to assure equitable compensation to all claimants. At the time the Trust was originally established, it was assumed that all claims would be paid in full; consequently, no special mechanism of the type described in the statute was required. *See* 11 U.S.C. § 524(g)(2)(b)(ii)(V) ("structured, periodic, or supplemental payments, pro rata distributions, matrices, or periodic review of estimates of numbers and values of present claims and future demands."). The TDP combines a number of these mechanisms, and will "provide reasonable assurance that the trust will value, and be in a financial position to pay, present claims and future demands that involve similar claims in substantially the same manner." *Id.*

### C. Continuing Injunction

A continuing injunction was issued with the Courts' Memorandum, Orders and Judgment dated December 15, 1994. It is reaffirmed.

### D. Implications as to Corpus

The effect of compliance with the statute and the continued injunction is to enhance substantially the value of the corpus. *See* Marj Charlier, *Manville Stock, Helped by Profit and Congress, Is on the Rebound as it Attracts Some Investors,* Wall St. J., Nov. 10, 1994, at C2; *Bankruptcy Reform Act Contains Channelling Provision,* Mealey's Litigation Reporter: Asbestos, Nov. 4, 1994, at 12. Assets of the Trust in Manville stock may now be monetized free and clear of any

possible asbestos claims against Manville at the trustees' discretion. Without such a guarantee the Corporation might have the cloud of future claims hanging over it, possibly reducing the value of the Corporation to potential purchasers of it or its stock and thus the amount available to the claimants.

## X. Appointments

The Courts appoint Leslie Gordon Fagen as Legal Representative of Future Claimants. The Settlement Stipulation provides for a Legal Representative of Future Claimants and requires the Legal Representative to discharge certain responsibilities in protecting the interests of such claimants, but it does not name the Legal Representative or provide a mechanism for replacing him as the need arises. Mr. Fagen has stated that he is willing to serve as Legal Representative under the terms of the Settlement Stipulation. The Bankruptcy Court will have the power to replace him or terminate his appointment.

The Courts need not make appointments with respect to the Selected Counsel to the Beneficiaries or the Special Advisor. With respect to the SCB, section K.3 of the TDP provides:

> In the event that the positions of the SCB are no longer filled as described in the Manville Corporation Second Amended and Restated Plan of Reorganization, the appointment of three attorneys to fill [those roles] shall be made from time to time by the President of the Association of Trial Lawyers of America or his/her designee.

The Special Advisor is Mark Peterson. Section K.3 of the TDP states: "The Special Advisor shall be appointed from time to time by the Trust with the concurrence of the SCB. Initially, that role shall be filed by Mark Peterson, Esq."

## XI. Future of Trust

There is an excellent board of trustees of the Trust now in place. The Courts can with confidence allow the Trust to proceed to pay promptly claimants and manage Trust assets.

It is the Courts' hope that the trustees will in the near future in effect, if not in theory, close the Trust down. They can monetize assets and consolidate operations with other asbestos bankruptcy-related trusts. They can also obtain an insurance policy or equivalent contract to handle disbursements; this is the method used in Agent Orange. *See, e.g., In re "Agent Orange" Prod. Liability Litig.,* 996 F.2d 1425, 1429–30 (2d Cir.1993), *cert. denied,* —— U.S. ——, ——, 114 S.Ct. 1125, 1126, 127 L.Ed.2d 434 (1994).

At this point it would be highly desirable to remove these types of mass tort cases from the courts entirely. One proposal that has been advanced is to consolidate the various trusts established to handle asbestos liability, and to turn over their claims processing functions to private companies. The most significant benefit of moving in this direction would be the potential to reduce transaction costs and possibly the courts' oversight functions. Nothing in the Settlement prevents the trustees of the Trust from taking such steps.

Now that Congress has by legislation decided how asbestos manufacturers may eliminate their future liability by establishing qualifying trusts under the auspices of the bankruptcy court, the Manville Trust, as already noted, is in a position to sell its holdings free of possible asbestos liability. It may then diversify its portfolio.

Four thousand years ago members of some societies were buried covered with "sheets of asbestos." Charles Higham & Rachanie Thosarat, *Thailand's Good Mound,* Nat. Hist., Dec. 1994, at 60, 64. Now, millions of our citizens are buried with asbestos in their lungs—not as a sign of filial respect, but of greed and incompetence. *See Findley I,* 129 B.R. at 734–45. We pay heavily for this mistake, but we ought to pay before the victims are laid to rest.

## XII. Orders and Stays

Previous stays of asbestos claims against the Corporation are continued permanently. No proceedings may be commenced or prosecuted against the Trust in any state or federal court arising from claimed exposure to asbestos, except as specifically set forth in the TDP. The assets of the Trust will remain subject to the Courts' permanent stay,

precluding payments to all Trust Beneficiaries with the exception of payments in accordance with the TDP and payments to the Codefendants, Distributors and MacArthur Funds, consistent with the terms of the Settlement.

The Courts recommend that no stay be imposed during the appeal since all parties are properly protected by the 10% *pro rata* payments the Trust will make. The long period claimants have been waiting suggests the need for prompt application of the TDP.

The Courts can see no reason to delay further payments to the hundreds of thousands of claimants, including Maryland claimants, and all other beneficiaries of the Settlement. They find that with the procedures implemented and the new computers and software installed and funds on hand, the Trust will be able to make matrix offers on some 100,000 claims in the first twelve month period after the Settlement is approved. Paying each of these claimants 10% will leave more than enough money to satisfy foreseeable contingencies.

A stay by the Courts to permit application for a further stay to the Court of Appeals is not necessary since payments under the TDP only "become effective 30 days after the entry" of this Amended Memorandum, Orders and Final Judgment. Settlement Stipulation, ¶ 16.

The Pacor Settlement Trust raised concerns during the litigation regarding the effect that settlement of this class action would have on a separate, pre-existing stipulated settlement between Pacor, Inc. and Pacor Material Supply Co., Inc. (collectively "Pacor") and the Manville Trust ("Pacor/Manville Stipulation"). That early settlement was approved by the bankruptcy courts presiding over the Pacor and Manville reorganizations. *See Findley I,* 129 B.R. at 786–87, 899–900.

The Pacor Settlement Trust, the Manville Trust and all the parties have reached an agreement with respect to this issue. A Stipulation and Order Approving Modifications to Pacor/Manville Stipulation signed by all of the parties and approved by the Courts provides:

With respect to Pacor/Manville claims, as defined in the Pacor/Manville Stipulation, which have been settled on behalf of the Trust but as to which Pacor has not been released, the Trust shall offer to settle each such claim for no less than an average of $500.00 per claim. With respect to those Pacor/Manville claims which have not been settled on behalf of either the Trust or Pacor, the Trust shall, in addition to any offer made to settle the beneficiaries' Trust claim, make a separate claim, in an amount greater than zero, to settle any Pacor liability. In addition, the Trust shall, upon demand by the Pacor Settlement Trust (the "Pacor Demand") made at any time after thirty days from the date of entry of the Order Approving the Stipulation of Settlement, (the "Order") provided no stay shall then be in effect, transfer to the Pacor Settlement Trust an amount equal to Five Million Seven Hundred Thousand ($5,700,000) Dollars plus interest accrued at the rate of six (6%) percent per annum from January 1, 1990 to the date of payment, compounded annually, provided that interest shall not accrue after December 31, 1994, less any payments by the Trust on account of Assumed Claims, as defined in the Pacor/Manville Stipulation, and further provided that the Pacor Settlement Trust agrees that it will process, defend and resolve all remaining Assumed Claims, and forever releases the Trust from any further responsibility with respect to remaining Assumed Claims. In the event the Order is stayed, the Pacor Demand may be made at any time after the thirtieth day following the termination of any such stay, provided the Order has not been reversed.

### XIII. Fee Application

Applications for legal fees and expenses of the class and subclass representatives are referred to the magistrate judge. This referral does not affect the finality of this judgment. *See* Fed.R.Civ.P. 54(d).

### XIV. Conclusions

As the Courts previously noted, the Settlement must be approved on the merits:

The equities are so clearly in favor of the modification and so clearly required by the Trust's ... reason for being, that the Settlement must be held to conform to the principle of Section 167(1) of the Restatement of Trusts and New York's statutory and case law.

*Findley I,* 129 B.R. at 846. This conclusion is now *a fortiori* true.

The class action is certified to include: "All past, present and future Beneficiaries of the Manville Personal Injury Settlement Trust each of whom has or will have a claim either for wrongful death or personal injury caused by exposure to asbestos, or a claim for warranty, guarantee, indemnification or contribution arising from an obligation of the Trust for the payment of death or personal injury claims."

The Settlement as amended is approved. The issue of Maryland law is left for resolution by Maryland federal and state courts.

This document constitutes the Courts' findings of fact and law, order and final judgment. *See* Fed.R.Civ.P. 23, 52, 54, 58; *Findley II,* 982 F.2d at 729 n. 4. It supersedes the document "Memorandum, Orders and Judgment" issued by the Courts on December 15, 1994.

SO ORDERED.

## APPENDIX

## ADDENDUM A

### Settlement Stipulation

*STIPULATION OF SETTLEMENT*

The Plaintiffs, on their own behalf and on behalf of all similarly situated beneficiaries of the Manville Personal Injury Settlement Trust ("the Plaintiff Class"), the Trustees of the Manville Personal Injury Settlement Trust ("the Trust"), the Legal Representative of Future Claimants, the Future Claimants Subclass, the Present Claimants Subclass, the Co–Defendant Manufacturers Subclass, the Manville Distributors Subclass, the MacArthur Subclass, J.T. Thorpe Co.[1] and the Pre–November 19, 1990 Judgments and Settlements Subclass (the "parties") hereby enter into the following Stipulation of Settlement.

WHEREAS, the Trust was established pursuant to a Trust Agreement dated as of November 28, 1988, which is Exhibit C to the Second Amended and Restated Plan of Reorganization of the Johns–Manville Corporation, *et al.* (the "Plan"), which Plan was confirmed pursuant to 11 U.S.C. § 1129; and

WHEREAS, pursuant to the Plan and Trust Agreement the Trust assumed all existing and future liabilities for all AH Claims and Other Asbestos Obligations and all persons having such claims are Trust Beneficiaries; and

WHEREAS, plaintiffs commenced the above-entitled action as a class action on behalf of all Trust beneficiaries seeking an equitable distribution of the assets of the Trust among all Trust Beneficiaries (hereinafter "the Class Action Lawsuit"); and

WHEREAS, the Courts have certified this action as a class action, appointed a Legal Representative of Future Claimants and have designated the following subclasses: Present Claimants, Future Claimants, Co–Defendant Manufacturers, Manville Distributors, MacArthur, and Pre–November 19, 1990 Judgments and Settlements.

WHEREAS, the Legal Representative of Future Claimants filed a subclass complaint on behalf of future asbestos health claimants seeking an equitable distribution of the assets of the Trust among all the Trust Beneficiaries; and

WHEREAS, the Trust and the Co–Defendant Manufacturers Subclass have answered the Plaintiff Class' amended complaint and the Legal Representative's subclass complaint and joined issue; and

WHEREAS, the Trust has received approximately 230,000 claims by Trust Beneficiaries of which almost 200,000 are pending against the Trust and many more claims are expected to be filed and the assets of the Trust are not and will not in the future be

1. As used herein, J.T. Thorpe Co. includes Thorpe Corporation, Thorpe Products Company, Thorpe Insulation Company, Sunbelt Construc- tors, Inc., and all other parents, subsidiaries, affiliates, successors and assigns of J.T. Thorpe Co.

sufficient to pay all claims in full as they are liquidated; and

WHEREAS, unless the Trust is restructured, it is likely that

(i) its assets will be dissipated at substantially less than their fair value;

(ii) enormous sums of money will be spent on defense and transaction costs which could and should otherwise be allocated to the payment of Trust Beneficiaries; and

(iii) certain Trust Beneficiaries will receive a disproportionately large payment on their claims in comparison to other Trust Beneficiaries while some Trust Beneficiaries will receive far less than is equitable or nothing at all; and

WHEREAS, the parties desire to resolve all issues raised by the amended complaint filed by the Plaintiff Class, the subclass complaint filed by the Legal Representative, the answers filed by the Trust and the Co–Defendant Manufacturers Subclass and all issues raised in the Class Action Lawsuit; and

WHEREAS, the parties agree that the Trust must be restructured, by adoption of a new Trust Distribution Process, and that *pro rata* apportionment of the Trust's assets among Trust Beneficiaries is appropriate with respect to all claims by Trust Beneficiaries other than those specifically resolved by this Stipulation; and

WHEREAS, each of the parties has been represented by competent counsel in the Class Action Lawsuit and in the negotiation of this Stipulation; and

WHEREAS, the terms of this Stipulation and the Exhibits thereto, are the product of arm's-length negotiation between the parties; and

WHEREAS, the parties desire to resolve all Contribution Claims by Trust Beneficiaries arising prior to the date of execution of this Stipulation; and

WHEREAS, the Co–Defendant Manufacturers Subclass asserts that, because of the Orders entered by these Courts staying all litigation against the Trust, its members have been forced to bear a large portion of the Trust's share of liability for claims by asbestos health claimants during the pendency of the stay and for this and other reasons hold Contribution Claims against the Trust; and

WHEREAS, the Co–Defendant Manufacturers Subclass asserts that its members have sustained in excess of $500 million in judgments in favor of asbestos health claimants between July 9, 1990, when these Courts first stayed all payments by the Trust, and the date of execution of this Stipulation; and

WHEREAS, the Co–Defendant Manufacturers Subclass and the Manville Distributors Subclass assert that Contribution Claims against the Trust based on judgments entered or verdicts returned against their members prior to November 19, 1990 are entitled to be treated similarly to claims by asbestos health claimant beneficiaries arising from judgments against or settlements with the Trust prior to November 19, 1990; and

WHEREAS, the Co–Defendant Manufacturers Subclass asserts that, under the Plan, its members were entitled to implead the Trust in pending cases as they were resolved in the tort system, thereby enabling Co–Defendants to obtain appropriate set-offs and credits with respect to the Trust at the time of trial against subclass members by asbestos health claimants; and

WHEREAS, the Manville Distributors Subclass asserts that its members have Indemnity Claims arising from asbestos-related losses incurred by them prior to the date of execution of this Stipulation based on contract and the common law; and

WHEREAS, the parties desire to resolve all Indemnity Claims held by members of the Manville Distributors Subclass arising prior to the date of execution of this Stipulation;

WHEREAS, the Manville Distributors Subclass asserts that Indemnity Claims against the Trust based on losses incurred prior to November 19, 1990 are entitled to be treated similarly to claims by asbestos health claimant beneficiaries arising from judgments or settlements with the Trust prior to November 19, 1990; and

WHEREAS, the Manville Distributors Subclass asserts that, under the Plan, its

members were entitled to implead the Trust in pending cases as they were resolved in the tort system, thereby enabling Manville Distributors to obtain appropriate set-offs and credits with respect to the Trust at the time of trial against subclass members by asbestos health claimants; and

WHEREAS, the Manville Distributors Subclass asserts that its members have a priority right in the proceeds of Manville's settlements with its insurers; and

WHEREAS, one member of the Manville Distributors Subclass, J.T. Thorpe Co., asserts that, pursuant to an April 25, 1989 agreement with the Trust, all of its asbestos-related losses constitute Indemnity Claims which cannot be paid on a *pro rata* basis pursuant to the restructuring of the Trust sought in the complaint; and

WHEREAS, the Plaintiff Class asserts that most, if not all, of the members of the Manville Distributors Subclass have waived their Indemnity Claims pursuant to the provisions of the Co–Defendants' Procedures; and

WHEREAS, the Plaintiff Class asserts that the members of the Manville Distributors Subclass have lost their right to assert any Indemnity Claims against the Trust as to which they failed to comply with the provisions of Section 2.04 of the Trust Agreement; and

WHEREAS, the Plaintiff Class asserts that in any event most, if not all, of the asbestos-related losses incurred by members of the Manville Distributors Subclass prior to the date of execution of this Stipulation did not give rise to Indemnity Claims under applicable law; and

WHEREAS, the parties desire to resolve all Trust Claims the members of the MacArthur Subclass ("MacArthur") have asserted or may assert in the future; and

WHEREAS, MacArthur asserts that it has Contribution Claims and Indemnity Claims against the Trust and will have many more such claims in the future; and

WHEREAS, MacArthur asserts that its claims are entitled to be paid in full, rather than on a *pro rata* basis, pursuant to a Stipulation and Order entered by the United States Bankruptcy Court for the Southern District of New York on October 30, 1989 in the Cases (the "Stipulation and Order"); and

WHEREAS, the Plaintiff Class asserts that MacArthur has lost its right to assert any Indemnity Claims against the Trust as to which it failed to comply with Section 2.04 of the Trust Agreement; and

WHEREAS, the Plaintiff Class asserts that in any event most, if not all, of the asbestos-related losses incurred by MacArthur prior to the date of execution of this Stipulation did not give rise to Indemnity Claims under applicable law; and

WHEREAS, the Plaintiff Class asserts that many of the Contribution Claims asserted by MacArthur are invalid under applicable law; and

WHEREAS, the Plaintiff Class asserts that the Stipulation and Order did not give MacArthur any right to have its claims paid in full, and that such claims should be paid on a *pro rata* basis;

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among the undersigned, subject to approval of the Courts pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, as follows:

1. This Stipulation is binding on all members of the Plaintiff Class and the Subclasses which are parties to it.

2. Unless otherwise specified herein, all capitalized terms employed herein shall have the meanings set forth in the Glossary which is Exhibit A to the Plan. In the event of any inconsistency between the provisions of this Stipulation, and any exhibit thereto, and of the Plan, the Trust Agreement, and any exhibits or annexes thereto, the provisions of this Stipulation and the exhibits thereto will govern. The settlement of the rights of Trust Beneficiaries against the Trust effected by this Stipulation does not otherwise affect any provision of the Plan or any document entered into in connection therewith.

3. The parties agree that the rights and duties of all Class Members, other than members of the MacArthur Subclass whose

Trust Claims are all resolved by this Stipulation, and the rights and duties of the Trust and Trustees with respect to such Class Members, shall be governed by the Trust Distribution Process annexed hereto as Exhibit A (the "TDP"), which is incorporated into this Stipulation, except with respect to those Contribution Claims described in paragraph 5 below, those Indemnity Claims described in paragraph 8 below and those issues which will be tried as set forth in paragraph 4 below. The Trust Claims of Class Members, other than those claims dealt with by paragraphs 5 and 8 below, shall be processed and paid only as provided in Exhibit A, and such payments shall constitute complete satisfaction of such claims.

4. Section H.3 of the TDP, which deals with calculation of set-off, shall not apply by operation of this Stipulation with respect to asbestos health claims arising under Maryland law. The parties consent to trial by the Courts of the issue of appropriate set-off rules that should be developed with respect to Manville or the Trust in connection with claims arising under Maryland law in the context of a fair and adequate resolution of these proceedings.

5. Any and all Contribution Claims by Trust Beneficiaries arising from judgments or verdicts entered against Trust Beneficiaries prior to the date of execution of this Stipulation shall be completely satisfied and released by the Trust's establishment of a fund of $35 million, to be held and distributed as set forth in the Statement of Co–Defendants' Distribution Principles annexed hereto as Exhibit B.

6. Any and all Contribution Claims arising after the date of execution of this Stipulation shall be governed by the TDP.

7. This Stipulation of Settlement is expressly conditioned on the Co–Defendant Manufacturers Subclass establishing that the members of that subclass have sustained at least $500 million of judgments in favor of asbestos health victims in the period from July 9, 1990, when these Courts first stayed payments by the Trust, to the date of execution of this Stipulation. The Co–Defendants shall establish the amount of such judgments by submitting to the Special Advisor such information as he deems necessary to satisfy himself that the amount exceeds $500 million. Information submitted to the Special Advisor shall be kept confidential by him. The Special Advisor shall notify all parties whether this condition has been satisfied prior to the effective date of this Stipulation. If the Special Advisor determines that this condition has not been satisfied, this Stipulation shall not become effective. Any determination by the Special Advisor that the condition has been satisfied shall be final.

8. Any and all Indemnity Claims by the members of the Manville Distributors Subclass arising from losses paid by them prior to the date of execution of this Stipulation, shall be completely satisfied by the Trust's payment of $9.5 million to be distributed among those members in accordance with the Manville Distributors Subclass Settlement Fund Distribution Procedures annexed hereto as Exhibit C. Any and all additional rights of J.T. Thorpe Co. created by the April 25, 1989 letter agreement with the Trust (annexed hereto as Exhibit D) shall be extinguished by the Trust's payment of $1.2 million to J.T. Thorpe Co. and the processing of the Distributor Indemnity Claims of J.T. Thorpe Co. at a fixed Distributor Indemnity Claim percentage of 100% as defined and set forth in Section H of the TDP.

9. Any and all Indemnity Claims arising from losses paid by members of the Manville Distributors Subclass after the date of execution of this Stipulation shall be governed by the TDP.

10. MacArthur forever waives and releases any Trust Claims it has asserted and also waives and releases any claims it has, may have or may have in the future, including but not limited to Trust Claims, against the Trust or Manville, except claims for a breach of this Stipulation and claims to a share of the $35 million fund to be established for Co-defendants pursuant to paragraph 5 of this Stipulation. In return for such release, the Trust shall pay $10 million to a segregated fund which shall be used by MacArthur solely to pay certain litigation expenses to be incurred by MacArthur (the "MacArthur

Fund"). The purposes of the MacArthur Fund, its governing principles and the uses to which its assets can be put are set forth in Exhibit D.

11. This Stipulation of Settlement is expressly conditioned upon the entry of a Final Order providing that claims by the MacArthur Subclass and the Pacor, Inc. Asbestos Settlement Trust shall not be asserted against or paid out of the Manville Distributor Subclass Fund created pursuant to Paragraph 8 hereof.

12. This Stipulation of Settlement is also expressly conditioned upon the entry of a Final Order approving the settlement reflected herein, and authorizing and approving the execution, delivery and performance by the Trustees and the Trust of this Stipulation, the exhibits hereto, the agreements and actions contemplated herein and therein and all other documents and agreements necessary to effectuate the settlement.

13. Without limiting the terms of the preceding paragraph, this Stipulation is expressly conditioned upon the entry of a Final Order finding that the named representatives of the Class fairly and adequately represent the interests of the Class, and that the Class Action Lawsuit otherwise complies with the provisions of Rule 23 of the Federal Rules of Civil Procedure.

14. This Stipulation and the exhibits hereto embody the entire agreement between and among the parties hereto with respect to the matters provided for herein. All prior negotiations between and among the parties are merged into this Stipulation and the exhibits thereto and there are no promises, agreements, undertakings, representations or warranties, oral or written, express or implied, between or among the parties other than as herein set forth.

15. The parties to this Stipulation consent to the extension of the existing stays on litigation against and payments by the Trust (subject to certain exceptions for Exigent Health and Hardship Claims) through the date of entry of a final order by the Courts with respect to approval of this Settlement.

16. This Stipulation of Settlement, and the TDP appended hereto as Exhibit B, shall become effective 30 days after the entry of the later of the Final Orders referred to in paragraphs 11–13 above.

Dated: July 25, 1994

MANVILLE PERSONAL INJURY
 SETTLEMENT TRUST
8260 Willow Oaks Corporate Dr.
Suite 600
P.O. Box 10415
Fairfax, VA 22031

 /s/David T. Austern
By: _____
 David T. Austern, Esq.

PAUL, WEISS, RIFKIND, WHARTON
 & GARRISON
1285 Avenue of the Americas
New York, New York 10019

 /s/Leslie Gordon Fagen
By: _____
 Leslie Gordon Fagen, Esq.

Legal Representative of
Future Claimants

DEBEVOISE & PLIMPTON
875 Third Avenue
New York, New York 10022

GRAIS & PHILLIPS
45 Broadway
New York, New York 10006

 /s/Lani A. Adler
By: _____
 Lani A. Adler, Esq.

Attorneys for Subclass
Pre–November 19, 1990
Judgment or Settlement
Creditors

NESS, MOTLEY, LOADHOLT,
 RICHARDSON & POOLE, P.C.
Suite 600, 151 Meeting Street
P.O. Box 1137
Charleston, SC 29402

CARTWRIGHT, SLOBODIN,
 BOKELMAN, BOROWSKY,
 WARTNICK, MOORE & HARRIS,
 INC.
26th Floor
101 California Street
San Francisco, CA 94111

By: /s/Anne E. Cohen
Roger E. Podesta, Esq.

Attorneys for Co–Defendant
Manufacturers Subclass

WEITZ & LUXENBERG
40 Fulton Street
New York, New York 10038

By: /s/Donald Marlin
Perry Weitz, Esq.

Attorneys for Present
Claimants Subclass

PEPPER, HAMILTON & SCHEETZ
3000 Two Logan Square
Eighteenth & Arch Streets
Philadelphia, PA 19103–2799

By: /s/Francis J. Lawall
Francis J. Lawall, Esq.
Attorneys for Manville

Distributors Subclass

LAW OFFICES OF JOHN H. FARICY, JR.
Metropolitan Centre
Suite 1550
333 South Seventh Street
Minneapolis, MN 55402
By: /s/John H. Faricy, Jr.
John H. Faricy

Attorneys for MacArthur
Subclass

*DONOVAN LEISURE NEWTON & IRVINE
30 Rockefeller Plaza
New York, NY 10112
By: /s/James L. Stengel
James L. Stengel

*NOTE: Handwritten on Original.

WILENTZ GOLDMAN & SPITZER
90 Woodbridge Center Drive
P.O. Box 10
Woodbridge, NJ 07095

BARON & BUDD, P.C.
The Centrum
3102 Oak Lawn Avenue
Suite 1100
Dallas, Texas 75219

ROSE, KLEIN & MARIAS
801 South Grand Avenue
Los Angeles, CA 90017

Of Counsel:

CAPLIN & DRYSDALE, CHARTERED
399 Park Avenue, 36th Floor
New York, New York 10022

By: /s/Elihu Inselbuch
Elihu Inselbuch (EI–2843)

Attorneys for Plaintiffs

FAIRCHILD, PRICE, THOMAS &
HALEY
413 Shelbyville Street
Center, TX 75395–1719

By: /s/Travis P. Clardy
Travis P. Clardy, Esq.

## A.

### Co–Defendants
### 7/23/94

## TRUST DISTRIBUTION PROCESS

### A. *Overview.*

The goal of the Manville Personal Injury Settlement Trust (the "Trust") is to treat all claimants equitably. This Trust Distribution Process ("TDP") furthers that goal by including procedures for processing and evaluating claims generally on an impartial, first-in-first-out ("FIFO") basis with the intention of paying all claimants over time as equivalent a share as possible of their claims' values.

This TDP also establishes a Schedule of Asbestos–Related Disease Categories and Values that will enable many claims to be resolved more quickly, while retaining for each claimant the right to elect individual claim evaluation.

The process for determining the liquidated value of a Trust Claim includes an initial determination of whether the claim meets the Categorization Criteria for one of seven Scheduled Diseases that are listed on the Schedule of Asbestos–Related Disease Categories and Values described in Section D below. The Scheduled Diseases are Bilateral Pleural Disease, Nondisabling Bilateral Interstitial Lung Disease, Disabling Bilateral Interstitial Lung Disease, Other Cancers, Lung Cancers (One), Lung Cancers (Two), and Malignant Mesothelioma. In general, if the claim qualifies for categorization, the claimant will be offered the Scheduled Value for the Scheduled Disease. The Scheduled Values for the seven Scheduled Diseases are based on the Trust's experience settling claims using the factors set forth in the Claims Resolution Procedures (the "CRP Factors") attached as Annex B to the Trust Agreement,[1] and on liquidated values of recent settlements experienced in the United States tort system.

If a claim does not meet the Categorization Criteria for a Scheduled Disease, or the claimant decides to reject the Scheduled Value for a Scheduled Disease, and in certain other circumstances, the claimant may elect to have the claim individually evaluated by the Trust based on the CRP Factors. All unresolved disputes over categorization and valuation of claims will be subject to arbitration under procedures described below, and claimants whose valuation disputes are not resolved by nonbinding arbitration may enter the tort system. However, if and when a claimant enters the tort system, the claimant's judgment will be payable out of a pool of funds with respect to which the payment, as provided in Section F below, will be limited to the Maximum Value for the Disease Category in which the claim is placed by the

Trust or by arbitration, except for an Extraordinary Claim, as defined below. The excess amount, if any, of any judgment will be payable from a second pool of funds which will not be available until all claimants have received 50 percent of the liquidated value of their claims.

After the liquidated value of a claim is determined by reference to a Scheduled Value, by individual evaluation, by arbitration, or by litigation, the claimant will receive a *pro rata* share of that value based on a percentage set by the Trust with the concurrence of the Selected Counsel for the Beneficiaries (the "SCB") and the Legal Representative of Future Claimants (the "Legal Representative"), after consultation with the Special Advisor to the Trust (the "Special Advisor"). The *pro rata* share may be adjusted upwards or downwards from time to time to reflect current estimates of the Trust's assets, its liabilities, and the estimated value of pending and future claims. To the extent that the *pro rata* share increases over time, claimants whose claims were liquidated in prior periods under this TDP will receive additional payments so as to equalize over time each claimant' *pro rata* share of the liquidation value of their claims. Because it is difficult to predict the number and severity of future claims, and the amount of the Trust's assets, no guaranty can be made of any *pro rata* share of a claim's liquidated value.

Indemnity Claims (except for claims processed using a Distributor Indemnity Claim percentage, as described in Section H.7, below) and Contribution Claims will be subject to the same categorization, evaluation, *pro rata* share, and payment provisions of this TDP applicable to all other Trust Claims.

**B. Ordering and Categorizing of Claims.**

**1. Ordering of Claims.** Claims will be ordered for processing on a FIFO basis. As a general practice, the Trust will review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO queue for processing in the near future. A claimant's position in the FIFO

---

1. All capitalized terms used herein and not otherwise defined have the meanings assigned to them

in Exhibit A to the Manville Corporation Second Amended and Restated Plan of Reorganization.

queue will be determined by the earlier of (i) the date of receipt by the Trust of an acceptable proof of claim form with the Trust or (ii) the date of filing a lawsuit for an asbestos-related injury against the Trust or any other defendant.

### 2. *Categorizing of Claims by Disease.*

(a) As a proof of claim is reached in the FIFO queue, the Trust will evaluate it to determine whether the claim meets the Categorization Criteria for a Scheduled Disease and shall advise the claimant of its determination. If a Scheduled Disease is determined, except for Non–Standard Claims, the Trust shall tender to the claimant an offer of payment of the Scheduled Value for the Scheduled Disease, together with a form of release. If the claimant accepts the Scheduled Value and returns the release properly executed, the Trust shall disburse payment within 30 days thereafter, subject to the terms of Section G.3 below.

(b) If the claimant does not respond to the Trust's offer within six months, the Trust's offer and the claim will be deemed to be withdrawn unless the claimant has requested in writing an extension of time, not to exceed six additional months, within which to respond to the offer. If the claimant still has not responded to the Trust's offer at the end of the additional six-month period, the Trust's offer and the claim will then be deemed to be withdrawn. A claimant may also elect to withdraw a claim at any time. A claim that is withdrawn or deemed to have been withdrawn may be refiled at any time, and shall be ordered in the FIFO queue based on the date of receipt by the Trust of the refiled claim.

(c) If the Trust determines that a claim does not meet the Categorization Criteria for a Scheduled Disease, or determines the claim is a Non–Standard Claim as defined in Section C, or if a claimant disagrees with the Scheduled Disease determination made by the Trust, the claimant may dispute the determination. Upon receipt of written advice from the claimant of such a dispute, coupled with the claimant's written statement of the basis for the dispute and any supporting documentation, the Trust shall reevaluate the claim in light of all then available documentation and advise the claimant of its determination. If on reevaluation the Trust determines that the claim qualifies for placement in a Scheduled Disease Category or in a different Scheduled Disease Category than the Trust originally determined, the Trust shall tender an offer in the amount of the Scheduled Value for the Scheduled Disease so determined, together with a form of release. If the claimant accepts the Scheduled Value and returns the release properly executed, the Trust shall tender payment within 30 days thereafter, subject to the terms of Section G.3 below.

(d) If the claimant still disputes the Trust's categorization of the claim or denial of categorization, the claimant may elect arbitration of the categorization or individual evaluation. If arbitration is elected, the arbitrator(s) shall decide, solely on the basis of the documentation in the claim file, which must be complete at least 60 days prior to the scheduled arbitration, whether the claim should be categorized as a Scheduled Disease. If the arbitrator(s) agree with the claimant's position, the decision shall be binding upon the claimant and the claimant shall not be entitled to any individual evaluation. If the claimant returns the release properly executed, the Trust shall tender payment of the Scheduled Value for the Scheduled Disease within 30 days thereafter, subject to the terms of Section G.3 below. If the arbitrator(s) do not agree with the claimant's position, the claimant may elect individual evaluation, as described below.

### C. *Individual Evaluation of Claims.*

Following the claims categorization process described above, any claimant, including one whose claim was not placed in a Scheduled Disease category, may elect to have his/her claim individually evaluated by the Trust. However, because the Scheduled Values represent an equitable settlement value for most claims that meet the criteria of a corresponding Scheduled Disease, and because individual evaluation will be costly and time-consuming, resulting in significant delay in claim payment, the Trust will not value a

claim for a liquidated amount in excess of its Scheduled Value unless a higher value is clearly justified. Moreover, if a claimant elects individual evaluation, and the Trust's final offer, or a subsequent arbitration award or judgment, is lower than the Scheduled Value for the claimant's Scheduled Disease category, the claimant cannot elect to receive a previously offered higher Scheduled Value.

1. *Valuation of Non–Standard Claims.*

(a) The Schedule of Asbestos–Related Diseases and Values set forth herein is based (1) on diseases that are generally recognized to be caused in part or in whole by asbestos, and (2) on values that reflect (a) the Trust's experience in liquidating claims for such diseases using the CRP Factors and (b) the liquidated values of current settlements in the tort system.

(b) The Trust anticipates it may be presented with claims involving new or different causation and valuation factors not reflected in the Schedule of Asbestos–Related Diseases and Values set forth herein, including claims filed on behalf of claimants whose asbestos exposure took place outside the United States and Canada. In the event the Trust determines that a claim(s) involves new or different causation and valuation factors, such claim(s) will not be eligible for valuation under the Schedule of Asbestos–Related Diseases and Values. Instead, such claims will be individually evaluated in accordance with the CRP Factors when they come up for processing in the FIFO queue. In evaluating such claims, the Trust may gather or request the claimant(s) to provide supplementary information, including the nature of the disease and the tort law, litigation practice, and liquidated values currently experienced in settlements and verdicts for similar claims in the jurisdiction in which the claim arose. The Trust, with the concurrence of the SCB, after consultation with the Special Advisor, may also use such information to develop separate Scheduled Values and new Disease Categories for such Non–Standard Claims.

2. *Failure to Meet Criteria for a Scheduled Disease.* A claimant's right to assert a valid claim for the liquidated value of an asbestos-related disease is not prejudiced by failure to meet the Categorization Criteria for a Scheduled Disease. There are no standard definitions or criteria that could fairly include or compensate all meritorious claims involving asbestos-related diseases. It is therefore assumed that many claims will be individually evaluated based on the CRP Factors, with no adverse presumption that the liquidated values of these claims are more or less than the Scheduled Value.

3. *Evaluation Factors.* All claims must present evidence of an asbestos-related injury resulting from exposure to Manville asbestos that will sustain a cause of action under applicable law. Individual evaluations of claims will be based on the CRP Factors affecting the amount of damages, including without limitation, disease, age, current settlements and verdicts in the tort system in the claimant's jurisdiction, Manville's relevant market share, whether the claimant is living or dead (as of the earlier of the filing of the claim or a lawsuit involving the claim), disability, dependency, special damages, pain and suffering, and evidence that the claimant's damages were (or were not) related to asbestos exposure (for example, alternative causes, strength of documentation of injuries).

4. *Maximum Values.* The Trust, with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor, has established a Maximum Value for each Scheduled Disease category. These Maximum Values are set forth on Attachment A to this TDP. The liquidated value of an individually evaluated claim may be higher or lower than the Scheduled Value for the Scheduled Disease category into which the claim would otherwise be placed, or which the claim most closely fits. However, unless the claim meets the standards of an Extraordinary Claim set forth below, the liquidated value of an individually evaluated claim is limited to the Maximum Value for the relevant Scheduled Disease. Moreover, the Maximum Value will only be offered to those claimants who present the most severe combinations of factors to be anticipated within the category, and will provide the

upper limit of a claim that will enter Pool A as described below. For purposes of determining the Maximum Value of any claim, the Trust will evaluate the claim and place it in the Scheduled Disease category with respect to which the claim most closely meets the categorization criteria. Any dispute over the Trust's determination of the closest Scheduled Disease category will be subject to arbitration as provided in Section E below.

**5. Claims Liquidated After November 19, 1990.** Claimants who liquidated a Trust Claim after November 19, 1990, under the original proposed Trust Distribution Process, may elect either to retain that liquidated value and be paid immediately under this process, or to return to their original place in the FIFO queue and have their claim processed under the procedures set forth below.

**6. Second (Malignant) Injury Claims.** Unless a general release was executed, a claimant may file a Second Injury Claim against the Trust for additional damages if the claimant subsequently develops an asbestos-related malignant disease. A Second Injury Claim shall be ordered in the FIFO queue based upon the date of receipt by the Trust of the Second Injury Claim, and shall be treated as a new claim to be categorized or individually evaluated, and paid, under this TDP. If the earlier claim for a non-malignant disease was liquidated after November 19, 1990, the amount already received and to be received, if any, from the Trust for the non-malignancy claim will not be deducted as a set-off against amounts payable for the Second Injury Claim. However, if the claimant liquidated his/her non-malignancy claim against the Trust on or before November 19, 1990, any amounts paid or to be paid pursuant to such liquidation shall be set-off against the liquidated amount arrived at hereunder for the Second Injury Claim.

**7. Supporting Medical Evidence.** The Trust will categorize or individually evaluate claims based on the medical evidence already submitted to the Trust as part of the claimant's proof of claim. A claimant may, but need not, supplement this information with more current medical evidence. Where the claimant has filed an incomplete proof of claim for categorization or individual evaluation, the Trust will notify the claimant of the need for additional information and the Trust need not process the claim until the file is complete. In addition to such medical evidence as claimants are required to submit under the CRP, the Trust with the concurrence of the SCB, after consultation with the Special Advisor, may require that additional kinds of medical evidence be provided.

**8. Audit Procedures.** In all cases, the Trust may require that medical x-rays, tests, laboratory examinations and other medical evidence comply with recognized medical standards regarding equipment, testing methods, and procedures to assure that such evidence is reliable. The Trust may develop methods for auditing the reliability of medical evidence, including independent reading of x-rays. If its audits show an unacceptable level of reliability for medical evidence submitted by specific doctors or medical facilities, the Trust can refuse to accept medical evidence from such doctors or facilities. In addition, the Trust may develop methods for auditing other types of evidence necessary to support a claim.

**9. Extraordinary Claims.** In extraordinary situations such as where a claimant was exposed only to Manville asbestos products, or where Manville asbestos products constituted the overwhelming majority of the claimant's asbestos exposure, or where special damages are exceptionally large, the Trust may individually evaluate and liquidate a claim for an amount that exceeds the Maximum Value for the particular Scheduled Disease asserted by the claimant. Any dispute as to Extraordinary Claim status shall be submitted to arbitration by a special Extraordinary Claims Panel established by the Trust with the concurrence of the SCB after consultation with the Special Advisor.

**10. Exigent Health and Extreme Hardship Claims.** Notwithstanding the FIFO order processing rules, the Trust may categorize or individually evaluate, and pay, Extreme Hardship Claims and Exigent Health Claims.

(a) A claim qualifies for payment as an Exigent Health Claim if the claimant pro-

vides: (i) documentation that a physician has diagnosed the claimant as having an asbestos-related illness and (ii) a declaration or affidavit made under penalty of perjury from a physician who has examined the claimant within one hundred twenty (120) days of the date of the declaration or affidavit which states that the physician believes there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit.

(b) A claim qualifies for payment as an Extreme Hardship Claim if the Trust, in its sole discretion, determines there is a causal connection between a claimant's financial condition and an asbestos-related disease, and the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income.

### D. Schedule of Asbestos–Related Disease Categories and Values.

For seven asbestos-related diseases, the Trust and the SCB, after consultation with the Special Advisor, have established the following Schedule of Asbestos–Related Disease Categories and Values. The Scheduled Values are based on extensive review of the current settlement and litigation environment and on the Trust's historic experience settling claims using the CRP Factors, and are believed by the parties to represent equitable settlement values for most of the claims that meet the criteria of a corresponding Scheduled Disease.

| Category | Scheduled Disease | Scheduled Value |
|---|---|---|
| I | Bilateral Pleural Disease | $ 12,000 |
| II | Nondisabling Bilateral Interstitial Lung Disease | $ 25,000 |
| III | Disabling Bilateral Interstitial Lung Disease | $ 50,000 |
| IV | Other Cancer | $ 40,000 |
| V | Lung Cancers (One) | $ 60,000 |
| VI | Lung Cancers (Two) | $ 90,000 |
| VII | Malignant Mesothelioma | $200,000 |

**Categorization Criteria.** The criteria that a claim must meet to receive an offer for the Scheduled Value for one of the seven Scheduled Disease categories are as follows:

**Category I: Bilateral Pleural Disease** (Scheduled Value: $12,000)

1. The claimant must document bilateral pleural disease (plaques or thickening) diagnosed on the basis of x-ray, CAT scan, or high resolution CAT scan; and

2. The proof of claim must establish a 10–year latency period between the date of first exposure to asbestos and the date of diagnosis of bilateral pleural disease; and

3. The proof of claim must identify exposure to Manville asbestos products.

**Category II: Nondisabling Bilateral Interstitial Lung Disease** (Scheduled Value: $25,000)

1. The claimant must document bilateral interstitial lung disease diagnosed on the basis of x-ray, CAT scan, or high resolution CAT scan, and submit either:

 a. A medical report stating that a causal relationship exists between asbestos exposure and the bilateral interstitial lung disease; or

 b. Documentation of the presence of either unilateral or bilateral pleural disease accompanying the bilateral interstitial lung disease; and

2. The proof of claim must establish a 10–year latency period between the date of first exposure to asbestos and the date of diagnosis of bilateral interstitial disease; and

3. The proof of claim must identify exposure to Manville asbestos products.

**Category III: Disabling Bilateral Interstitial Lung Disease** (Scheduled Value: $50,000)

1. The claimant must document bilateral interstitial lung disease diagnosed on the basis of x-ray, CAT scan, or high resolution CAT scan; and

2. The claimant must document disability or impairment evidenced by pulmonary function tests (PFTs), total lung capacity (TLC), forced vital capacity (FVC), or

diffusing capacity (DLCO) of less than 80%; and

3. The claimant must submit a medical report stating that a causal relationship exists between asbestos exposure and the bilateral interstitial lung disease; and

4. The proof of claim must establish a 10–year latency period between the date of first exposure to asbestos and the date of diagnosis of bilateral interstitial disease; and

5. The proof of claim must identify exposure to Manville asbestos products.

*Category IV: Other Cancers* (Scheduled Value: $40,000)

1. The claimant must demonstrate by medical report the existence of primary asbestos-related cancer of one of the following sites:
 a. Colo-rectal;
 b. Laryngeal;
 c. Esophageal; or
 d. Pharyngeal; and

2. The claimant must demonstrate by medical report the existence of one of the following:
 a. Bilateral interstitial lung disease;
 b. Bilateral pleural disease (thickening or plaques); or
 c. Pathological evidence of asbestosis; and

3. The proof of claim must establish a 10–year latency period between the date of first exposure to asbestos and the date of diagnosis of the cancer; and

4. The proof of claim must identify exposure to Manville asbestos products.

*Category V: Lung Cancers (One):* (Scheduled Value: $60,000)

1. The claimant must demonstrate by medical report the existence of primary asbestos-related cancer of the lung; and

2. The claimant must demonstrate at least 15 years of heavy occupational exposure to asbestos-containing materials in employment regularly requiring work

in the immediate area of visible asbestos dust; and

3. The proof of claim must establish a 10–year latency period between the date of first exposure to asbestos and the date of diagnosis of the cancer; and

4. The proof of claim must identify exposure to Manville asbestos products.

*Category VI: Lung Cancers (Two)* (Scheduled Value: $90,000)

1. The claimant must demonstrate by medical report the existence of primary asbestos-related cancer of the lung; and

2. The proof of claim must establish a 10–year latency period between the date of first exposure to asbestos and the date of diagnosis of the cancer; and

3. The proof of claim must identify exposure to Manville asbestos products; and

4. The claimant must:
 a. Be a nonsmoker (has not smoked cigarettes for at least 15 years prior to diagnosis), and demonstrate by documentation, such as Social Security records or a medical report with claimant's work history, occupational exposure to asbestos during an aggregate of three years or 12 quarters of employment;[2] or
 b. Demonstrate by medical report the existence of one of the following:
 (1) Bilateral interstitial lung disease;
 (2) Bilateral pleural disease (thickening or plaques); or
 (3) Pathological evidence of asbestosis.

*Category VII: Malignant Mesothelioma* (Scheduled Value: $200,000)

1. The claimant must demonstrate by medical report referencing pathological findings the existence of malignant mesothelioma; and

2. The proof of claim must establish a 10–year latency period between the date of first exposure to asbestos and the date of diagnosis of the cancer; and

3. The proof of claim must identify exposure to Manville asbestos products.

**2.** Daily exposure during such period of time is not required.

### E. Resolution of Categorization and Valuation Disputes.

1. *Contestable Matters.* Except for Non-Standard or Extraordinary Claims, if a claim otherwise meets the Categorization Criteria for a Scheduled Disease, the Trust will pay the Scheduled Value for that disease in accordance with the provisions of this TDP. If a claimant chooses individual evaluation, and if the claim is eligible to be placed in one of the seven Scheduled Disease Categories, and is supported by appropriate evidence, the Trust will not dispute the culpability of Manville's conduct, or, as a general proposition, that asbestos exposure caused such disease. Instead, the Trust will have the right to contest only the following matters:

— the type and seriousness of the claimant's injuries;

— the claimant's exposure to Manville asbestos products;

— other causation-in-fact issues;

— the amount of damages; and

— applicability of statutes of limitations to the extent the statute barred the claim as of October 1, 1990.

Nothing in this paragraph is intended to amend or alter the contestable issues the Trust is permitted to assert as defined in the Claims Resolution Procedures and the Trust Agreement.

2. *Arbitration.* Even a flawless claims resolution procedure may not always fairly meet a claimant's perceived deserved disease categorization or claims valuation. Accordingly, the Trust, with the concurrence of the SCB, after consultation with the Special Advisor, will institute binding and nonbinding arbitration procedures for resolving disputes over disease categorization for Scheduled Values and Maximum Values, individual evaluation of claims, and Extraordinary Claim status. These procedures may be modified by the Trust with the concurrence of the SCB, after consultation with the Special Advisor.

As provided in Section B above, a claimant may initially elect arbitration of categorization. Except for such arbitration of categorization, a claimant must first choose individual evaluation and the individual evaluation must be completed before the claimant can elect arbitration. Individual evaluation is completed when the claim has been individually reviewed by the Trust, the Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the individual evaluation, and the claimant has notified the Trust of the rejection in writing.

Arbitrator(s) may determine whether a disease falls in a higher or lower category of Scheduled Disease for purposes of determining both Scheduled Values and Maximum Values. After a claim is individually evaluated, arbitrator(s) may also determine a liquidated value which may be higher or lower than the Scheduled Value for the claim. However, except in the case of an Extraordinary Claim (as determined by the Trust or by the Extraordinary Claims Panel), arbitrator(s) may not return an award in excess of the Maximum Value for the appropriate Scheduled Disease category. In the case of individual evaluations, a claimant who submits to arbitration and who accepts the arbitral award will receive payments in the same manner as one who had accepted the Trust's original valuation of the claim and will be deemed to have released the Trust from any liability beyond the liquidated value determined by the arbitrator.

3. *Litigation.* Only claimants who, following individual evaluation, elect nonbinding arbitration and then reject their arbitral awards retain the right to trial against the Trust of the liquidated value, if any, of their claims. A judgment creditor is eligible for payment from the Trust's available cash, as provided below, 30 days after the judgment is final and nonappealable. However, under no circumstances shall the Trust pay any punitive damages which may be awarded to a claimant.

### F. Creation of Two Pools.

1. *Pool A.* Trust Beneficiaries will be compensated through two pools of funds. A Trust Beneficiary who accepts an offer from the Trust based on (i) a Scheduled Value for a Scheduled Disease, (ii) a value based on individual evaluation by the Trust, or (iii) an

arbitration award, will receive a *pro rata* share of that liquidated value from Pool A. A Trust Beneficiary who rejects an award in nonbinding arbitration, and who returns to the tort system and obtains a judgment for money damages, will also enter Pool A after the claim has been reduced to a final, nonappealable judgment. The liquidated value of a judgment creditor's claim entered in Pool A, however, will not exceed (i) the Maximum Value for the judgment Scheduled Disease, or (ii) such higher amount as may have been offered by the Trust or awarded through arbitration with respect to an Extraordinary Claim as described in Section C above.

**2. Pool B.** Judgment creditors with verdicts in excess of the limits set forth above and Trust Beneficiaries who have received less than 100 percent of the liquidated value of their claims entered in Pool A will enter Pool B where they may receive compensation for the excess amount of their respective verdicts and claims after all claims entered in Pool A have been paid 50 percent of their liquidated value.

**3. Distribution of Trust Funds Between the Pools.** The Trust's available cash for general distribution to Trust Beneficiaries shall be held by the Trust for distribution to Beneficiaries with liquidated Pool A claims until all such Beneficiaries have received 50 percent of the liquidated value of their claims entered in Pool A. Pool B shall not receive any funds available for distribution until all claims entered in Pool A have been paid 50 percent of the liquidated value of their claims. It is doubtful that Pool B will ever be funded.

**4. Extinguishment of Unpaid Trust Claims.** Upon the termination of the Trust in accordance with the provisions of the Trust Agreement and/or upon the distribution of all Trust Assets, any and all Trust Claims shall be extinguished.

**G. Payment of Claims.**

**1. Pro Rata Share to be Paid.**

(a) It is intended that all Trust Beneficiaries shall share in the Trust estate on a *pro rata* basis, with each Trust Beneficiary receiving a *pro rata* share of his or her claim's liquidated value, arbitration award, or judgment as equivalent as possible to the *pro rata* share received by all other Trust Beneficiaries under this TDP.

(b) The initial *pro rata* share has been set at ten percent (10%) by the Trust with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor. To determine the initial *pro rata* share, the Trust has forecast its anticipated annual sources and uses of cash until the last projected future claim has been paid or assets have been reserved for its payment. The Trust has calculated the appropriate *pro rata* share for all claims so that the Trust will have no remaining assets or liabilities after the last Trust Beneficiary has received his or her *pro rata* share.

(c) The initial *pro rata* share is based on information both with respect to valuations of the Trust's assets and expectations about the value of present and future Trust liabilities. It may be possible to make additional payments in the future to previously settled Trust Beneficiaries while simultaneously protecting future claimants from unreasonable risks.

(d) In order to ensure, as best as possible, that the basic assumptions which underlie this TDP remain valid so that all Trust Beneficiaries will be treated equally, the Trust shall, at least every 3 years, but as often and for so long as the Trust, the SCB, or the Legal Representative deem necessary, reestimate the values of its total assets and its total liabilities and determine whether a revised *pro rata* percentage should be applied to past, present or future claims.

(e) The Trust shall determine (i) if the anticipated values of assets have been so reduced and/or the expectation of the value of present or future claims so increased that a new lower *pro rata* share should be applied to all future claim payments, or (ii) if the anticipated values of assets have been so increased and/or the expectation of the value of present or future claims so reduced that a new higher *pro rata* share should be applied to all future claim payments, as well as any past settlements paid a lower *pro rata* share.

(f) Estimates have been and shall be performed in a flexible and pragmatic manner that considers the circumstances of the present claimants, the future claimants, the practical limitations imposed by the inability to predict with precision the future assets and liabilities of the Trust and the risks to all Trust Beneficiaries in not reaching agreement.

## 2. *Equalization of Pro Rata Shares.*

(a) Payment of *pro rata* amounts may be limited from time to time by available cash. In such case, or in the event a new higher *pro rata* share is applied, the Trust shall make, as cash is available, a subsequent additional *pro rata* payment to all Trust Beneficiaries with liquidated claims whose previous cumulative *pro rata* share was less than the existing or the new higher estimate. The purpose of such payment shall be to equalize Trust Beneficiaries' cumulative *pro rata* share. However, the Trust shall not be obligated to make such a catch-up *pro rata* adjustment more than once a year, or if in the judgment of the Trust with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor, the amount of any such catch-up *pro rata* adjustment is so small as not to justify its administrative burden.

(b) The Trust shall provide the SCB, the Legal Representative, and the Special Advisor with any proposal for adjusting the *pro rata* share supported by the results of the Trust's analysis and any valuations prepared by the Trust's investment bankers and other consultants. The proposal(s) shall take effect upon the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor.

## 3. *Order of Payment.* The Trust shall pay claims in the order in which the claims are liquidated, each such payment occurring within 30 days of the Trust's receipt of an executed release from the subject claimant. If at any time the Trust has insufficient available funds to pay any claim, payment shall be suspended until such time as the Trust monetizes additional assets. No Trust Claim shall be preferred over any other for purposes of payment, regardless of which processing queue the Trust Claim is in.

## 4. *Monetization of Assets.*

(a) The Trust shall monetize its assets at the earliest opportunity consistent with its obligation to preserve and enhance the value of the Trust estate and further the prompt, fair and equitable distribution of Trust assets to all present and future Trust Beneficiaries. In reaching decisions on these subjects, the Trust shall be guided by an investment banker or bankers selected by the Trust in its sole discretion, and such investment banker or bankers shall be available to discuss and explain their recommendations to the SCB, the Legal Representative, and the Special Advisor from time to time as they may be requested to do so.

(b) If in the future the SCB or the Legal Representative disagree with or are dissatisfied with the advice received from the Trust's financial or investment advisors concerning any matter as to which the SCB or the Legal Representative have concurrence rights, the SCB or the Legal Representative may notify the Trust in writing that they are withholding concurrence with respect to such matter on such ground, setting forth the reasons for such disagreement or dissatisfaction. Thereafter, either the Trust, on the one hand, or the SCB or the Legal Representative, on the other hand, shall have the right to request that the dispute with respect to such concurrence be resolved pursuant to the procedure set forth in Section J.3 below. If it is determined in such dispute resolution procedure that there is a reasonable basis for the disagreement or dissatisfaction of the SCB or the Legal Representative with such financial or investment advice, the SCB or the Legal Representative shall have the right to appoint their own financial or investment advisor to review the disputed issue, and in such case, the reasonable fees and expenses of such financial or investment advisor shall be paid for by the Trust; provided, however, that in any case where both the SCB and the Legal Representative withhold concurrence on the ground that they disagree or are dissatisfied with the financial or investment advice received by the Trust on a matter as to which they both have concurrence rights

and it is determined in the dispute resolution procedure that there is a reasonable basis for such disagreement or dissatisfaction by both the SCB and the Legal Representative, the Trust shall have the right to have determined in such dispute resolution procedure the issue of whether it is reasonable and necessary for the Trust to bear the fees and expenses of separate financial or investment advisors for the SCB and for the Legal Representative or whether instead the Trust's obligations in such case shall be limited to paying the fees and expenses of a single financial or investment advisor that may be consulted jointly or separately by both the SCB and the Legal Representative.

**5. Access to Financial Information.** Subject to entry into an appropriate confidentiality agreement where applicable, the Trust shall make available to the SCB, the Legal Representative, and the Special Advisor any other investment banking or other financial, accounting or statistical information available to the Trust relating to issues to be discussed with and/or as to which concurrence is required of the SCB or the Legal Representative.

**6. Amendments to Procedures Involving the Pro Rata Share.** The procedures set forth herein governing the *pro rata* share may be amended, altered, or adjusted to reflect changed circumstances, greater information, and/or improved procedures, with the concurrence of the Trust, the SCB, and the Legal Representative, after consultation with the Special Advisor.

**7. Resolution of Disputes Involving the Pro Rata Share.** Any dispute among or between the Trust, the SCB, and the Legal Representative, regarding any matter on which the Legal Representative's concurrence is required, shall be resolved in accordance with the dispute resolution process in Section J, and the Legal Representative shall have a role in the dispute resolution procedures equal to that of the SCB on such matters.

**3.** As used herein, Manville shall mean the Debtors, their successors, and their subsidiaries and

**H. All Trust Beneficiaries Treated Alike.**

In order to conserve the assets of the Trust, except as set forth below, Trust Beneficiaries—both plaintiffs and defendants—will dismiss, without prejudice, all present cases, are enjoined from filing future litigation against Manville [3] or the Trust, and are required to pursue their claims against the Trust only as provided in this TDP. Except as provided in Section E above and subsection 1(c) below, the Trust will make no appearance in any court, and no Trust Beneficiary will be permitted to proceed in any manner against the Trust or Manville in any state or federal court.

**1. Litigation between Trust Beneficiaries.**

**(a) Section H Applicable Only to Trust Beneficiaries.** The provisions of this Section H, including those relating to set-offs, are applicable only to Trust Beneficiaries. Asbestos health plaintiffs who are not Trust Beneficiaries because they were not exposed to Manville asbestos or asbestos-containing products shall not be subject to any of the provisions of this Section H and judgments they obtain against defendants shall not be governed by the provisions of this Section H, including the provisions relating to set-offs. Any dispute over whether an asbestos health plaintiff is a Trust Beneficiary whose claim is governed by this Section H shall be resolved by the trial court hearing the asbestos health plaintiff's case against defendants. The parties shall retain whatever rights of appellate review may be available under applicable law in respect of such ruling.

**(b) Right to introduce evidence.** In any litigation between Trust Beneficiaries, all Beneficiaries shall retain their respective rights provided by applicable law to introduce evidence at trial in state or federal court.

**(c) Where third-party claims permissible.** Third-party claims may be asserted against the Trust for the sole purpose of listing the Trust on a verdict form or otherwise as necessary to ensure that any verdict

affiliates.

reduction in respect of the Manville (or Trust) liability share is made pursuant to applicable law. No objection shall be made by the Trust or the claimant to the filing by a Co–Defendant of a third-party complaint or to the joinder of the Trust as a party for this limited purpose only. However, the Trust shall not be required to enter an appearance as to third-party or any other claims, nor shall it be subject to party discovery or to default judgment or levy and execution on any judgment. Under no circumstances shall the Trust be required to pay claims, whether for asbestos-related conditions or for contribution or indemnification, except in accordance with this TDP. Without enlarging any substantive rights accorded them by this TDP, Co–Defendants shall have such procedural rights (relating to procedural issues not expressly dealt with by this TDP) reasonably necessary to pursue or defend rights accorded them by this TDP.

(d) *Status of the Trust.* In return for limiting the right of Co–Defendants to implead the Trust, except under the circumstances described in subsection 3(d)(ii)(B), below, the Trust shall be treated in litigation between Beneficiaries of the Trust as a legally responsible tortfeasor under applicable law, without the introduction of further proof. Under no circumstances shall the Trust be treated as a bankrupt unless:

1) formal bankruptcy, liquidation or insolvency proceedings are commenced by the Trust; or 2) such proceedings are commenced against the Trust and applicable law provides for treating the Trust as a bankrupt in such circumstances.

(e) *Discovery and informational issues.* The Trust shall comply with the rules of discovery pertaining to non-parties under applicable law.

(f) *Verification of settlement information.* In response to a Co–Defendant request, the Trust and the claimant shall promptly verify, no later than the start of jury selection in the trial of an action by the claimant against the Co–Defendant, the fact of any settlement or any filing by the claimant of a claim with the Trust; and shall provide information regarding the amount and terms of any such settlement at the time and with the detail required by applicable law.

2. *Co–Defendant Contribution Claims against the Trust.*

(a) *General principles.* Co–Defendant Contribution Claims against the Trust may be satisfied in two ways: (*i*) in the circumstances set forth in subsection 4, below, Contribution Claims may be brought against the Trust and processed in accordance with this TDP and subsection 4, below, or (*ii*) Co–Defendants may receive credit at trial for the Trust (or Manville) share in the form of a set-off (defined herein as a reduction in the amount of a judgment) under the circumstances described in subsection 3, below, and calculated pursuant to applicable law. Except as described below, in order to preserve the Trust's assets for payment of claims asserted by asbestos health claimants and to limit transaction costs of all parties, set-off credit shall be the preferred method of satisfying Co–Defendant claims, regardless of whether the Trust and claimant have liquidated the underlying claim.

3. *Calculation of set-off.* The manner of calculating set-off shall be based on whether the claim has been liquidated by the Trust and the applicable law of contribution and verdict reduction or settlement credit.

(a) *Calculation of Trust's payment.* In situations where the amount of the Trust's payment or expected payment to a claimant is relevant to the set-off calculation, that amount shall be determined as follows:

(i) *For liquidated claims.* Where the underlying claim has been liquidated, the amount of the Trust's payment to the claimant (the "Liquidated Trust Payment") shall be (*a*) the actual amount received to date by the claimant or (*b*) if no funds have yet been received, the amount of the liquidated value agreed to by the claimant and the Trust, multiplied by the *pro rata* share in effect at the time the set-off is being applied (as described *above* in Section G).

(ii) *Unliquidated claims.* Where the claim has not been liquidated, the amount of the Trust's payment to the claimant (the "Unliquidated Trust Payment") shall be the

amount of the Scheduled Value, as further described in this TDP, for the applicable disease category, multiplied by the *pro rata* share in effect at the time the set-off is being applied (as described above in Section G).

**(iii)** ***Entitlement to subsequent Trust payment.*** Where the amount of a set-off is calculated on the basis of subsection 3(a)(i) or (ii), above, and a Co–Defendant has paid a judgment based on joint and several liability or entered into a post-judgment settlement with the claimant, the Co–Defendant shall receive that portion of any future payment made by the Trust in respect of the underlying asbestos health claim which is: 1) beyond the amount of the set-off calculated pursuant to subsections 3(a)(i) or (ii); and 2) attributable to that part of claims tried against the Co–Defendant for which the Trust is jointly and severally liable. The Co–Defendant shall have no entitlement to subsequent Trust payments when the amount of a set-off is calculated on the basis of the Trust's *pro rata* share or its allocated liability share.

**(b)** ***Pro tanto states.*** *Pro tanto* states are those in which any judgment against a non-settling defendant is reduced by the amount paid or agreed to be paid by a released party.

**(i)** ***Liquidated claims.*** Where the underlying claim has been liquidated, the amount of set-off shall be the Liquidated Trust Payment.

**(ii)** ***Unliquidated claims.*** Where the claim has not been liquidated, the amount of set-off shall be the Unliquidated Trust Payment.

**(c)** ***Pro rata states.*** In *pro rata* states, total liability is divided equally among all defendants found by the fact finder to be legally responsible tortfeasors (or agreed by the parties to be legally responsible tortfeasors, if applicable law so provides), including released parties. In such states, judgments against nonsettling defendants are reduced, as provided by applicable law, by either the *pro rata* share attributable to released parties or the amount paid or agreed to be paid by released parties. Solely for the purposes of obtaining a set-off in a *pro rata* state

pursuant to this subsection 3(c), regardless of whether the Trust has been given a release, or the wording of any such release, claimants in *pro rata* states shall be deemed to have given the Trust a joint tortfeasor release and indemnified the Trust against contribution and indemnity claims by Co–Defendants against the Trust arising from a judgment obtained by such claimants.

**(i)** ***Liquidated claims.*** Where the underlying claim has been liquidated, the set-off amount shall be either (*a*) the Liquidated Trust Payment, *or* (*b*) the Trust's *pro rata* share of the judgment, as provided by applicable law.

**(ii)** ***Unliquidated claims.*** Where the underlying claim has not been liquidated, the set-off amount shall be either (*a*) the Unliquidated Trust Payment, *or* (*b*) the Trust's *pro rata* share of the judgment, as provided by applicable law.

**(d)** ***Allocation or apportionment states.*** Allocation or apportionment states provide that the amount of any judgment shall be reduced with reference to the apportioned share of released or absent parties. The burden of proving the percentage liability share of the Trust or Manville shall be allocated as provided by applicable law.

**(i)** ***Liquidated claims.*** Where the underlying claim has been liquidated, the set-off shall be the larger of (*a*) the Liquidated Trust Payment, *or* (*b*) the liability share allocated by the fact finder to the Trust or Manville.

**(ii)** ***Unliquidated claims.*** Where the underlying claim has not been liquidated, the claimant shall make the following election:

(A) To pursue his or her claim against the Trust, in which event any Co–Defendant(s) against whom a judgment is returned shall receive a set-off equal to the larger of (*i*) the Unliquidated Trust Payment, *or* (*ii*) the liability share allocated by the fact finder to the Trust or Manville. If there are multiple settling tortfeasors, state law shall govern whether the set-offs attributable to such settlements are calculated in the aggregate or individually for each settling tortfeasor; *or*

(B) To agree not to pursue his or her claim against the Trust in which event there

shall be no set-off in respect of the Trust, except in the circumstances set forth in subsection 3(d)(ii)(E), below. At such time as a Co–Defendant remaining at verdict pays the resulting judgment or enters into a post-verdict[4] or post-judgment settlement with the claimant, the Co–Defendant shall have the right to bring a Contribution Claim against the Trust, as set forth in subsection 4, below. Nothing in this paragraph shall modify the several liability of the Trust or Co–Defendants in jurisdictions providing for several liability as set forth by subsection 3(e) below.

(C) The election required under this subparagraph shall be made by the claimant either (*i*) in open court on the record, or (*ii*) in writing to the Trust and to those Co–Defendants then remaining at trial no later than the point in time described in subsection 3(d)(iii)(D), below.

(D) The election required under this subparagraph shall be made after the completion of jury selection and before opening argument, unless the claimant chooses to make the election earlier. In the case of bifurcated or multiphase trials, the claimant shall make the required election before opening argument (or, if no opening argument is had as to that phase, before the presentation of evidence commences) in the first trial phase addressing any issue, such as damages, product exposure or identification, or specific causation, which is individual to that claimant. For this purpose, issues such as Co–Defendant negligence, product defect and liability for punitive damages shall not be considered issues individual to a particular claimant.

(E) Notwithstanding any other provision of this subparagraph, a claimant may elect to pursue his or her claim against the Trust following a previous election not to do so if any of the Co–Defendants that went to judgment declare bankruptcy before paying the judgment or entering into a post-judgment settlement with the claimant. The plaintiff shall be required to make such election within 60 days of the Co–Defendant's bankruptcy

filing and shall notify the Trust and the Co–Defendant of such election in writing. If the claimant makes such an election, any other nonbankrupt Co–Defendant(s) that went to judgment shall receive a set-off pursuant to subsection 3(d)(ii)(A) above, except that a nonbankrupt Co–Defendant which had previously paid the judgment or entered into a post-judgment settlement prior to the plaintiff's revised election shall retain its rights to make a Contribution Claim against the Trust under subsection 4, below.

(F) The beneficiaries of the Trust disagree as to whether the provisions of this TDP will render the Trust a party over whom plaintiffs are unable to obtain jurisdiction within the meaning of NY CPLR § 1601. To resolve this controversy, the parties stipulate and agree for themselves and all members of their respective classes, that in cases to which the limitation on joint liability provided by NY CPLR § 1601 would apply they shall divide the Trust's or Manville's share of liability among themselves as follows, notwithstanding any contrary provision of this Section H (including subsection 1(d) above to the extent, if any, it may be deemed to be contrary to this subsection), law or judicial decision: 80% of the Trust's or Manville's share shall be allocated as if the Trust were a party over whom jurisdiction could not be obtained, and the other 20% shall be borne by the plaintiffs. The burden of proving the Trust's or Manville's share of liability shall be allocated as provided by applicable law.

(e) *Several liability states.* Where the applicable state or other law provides for several liability (as distinguished from joint and several liability) for all or part of a cause of action, applicable law shall determine the effect of the several liability of the Trust and/or the Co–Defendants on the amount of any set-off and the entitlement of Co–Defendants to future payments from the Trust. In such jurisdictions, claimants shall retain their claims against the Trust to the extent those claims are based on several liability regardless of the other provisions of this Section H, and Co–Defendants shall bear no responsibil-

---

**4.** As used in this Section H, the term "post-verdict settlement," shall refer to a settlement reached after the fact-finder has rendered a ver-

dict establishing the amount of the claimant's compensatory damages.

ity for the several liability of the Trust, except as mandated by applicable law.

**(f)** *States with multiple set-off rules.* In some states, different set-off rules (*pro tanto, pro rata* or apportionment) govern different causes of action or parts thereof or different elements of damages. In such states, applicable law shall govern which set-off rules apply to each cause of action or part thereof and each element of damages.

**(g)** *Application of set-off to claims tried and categories of damages.* Where the judgment against Co–Defendant(s) resolves only a portion of the claimant's Trust Claim (for example, personal injury as distinct from wrongful death claims), the dollar amount of the Liquidated Trust Payment used in calculation of any reduction or set-off shall reflect any apportionment made by the Trust and the claimant reasonably and in good faith with regard to rights of the Co–Defendants under this TDP, *provided* that the Co–Defendants shall retain any rights available to them under applicable law to challenge such apportionment. If the claimant has not liquidated his or her Trust Claim, the trial court shall allocate the Unliquidated Trust Payment between claims tried and not tried for purposes of calculating the set-off. In addition, wherever applicable law calls for apportionment of economic and non-economic damages, the value assigned to the set-off in respect of the Trust's share shall be allocated between economic and non-economic damages in the same proportion that the judgment or underlying verdict against the Co–Defendant allocated such damages, notwithstanding any apportionment set forth in individual settlement documents between the Trust and the claimant.

**(h)** *Determination of disease category.*

Unless the plaintiff elects otherwise prior to the time the verdict is returned, the disease category to be used for purposes of calculating set-off shall be as set forth below:

1. If the plaintiff claimed at trial that the disease was mesothelioma, Category VII

2. If the plaintiff claimed at trial that the disease was lung cancer, Category VI

3. If the plaintiff claimed at trial that the disease was other cancer, Category IV

4. If the plaintiff claimed at trial that the disease was a non-malignant condition caused by asbestos, Category III

In the event the plaintiff claimed two diseases at trial, the categorization shall be that of the disease with the higher Scheduled Value, unless the jury specifically finds that the plaintiff does not have that disease.

If the plaintiff elects not to follow the procedure set forth above for determining the disease category to be used in calculating set-off, the following procedures shall govern. At or before the verdict molding stage, Co–Defendant and claimant Beneficiaries shall use their best efforts to agree on the appropriate disease category for purposes of establishing the Unliquidated Trust Payment of a claim. In the event of disagreements, the issue shall be decided by the trial court, based on the disease criteria set forth at Section D and the medical records and testimony submitted by plaintiff at trial. The parties shall give notice to the Trust of the agreed-upon disease category or of the submission of the issue to the trial court. The Trust shall be bound by the court's ruling or the parties agreed-upon determination.

**4.** *Contribution Claims.*

**(a)** *Right to pursue Contribution Claims retained.* Co–Defendants shall have the right to pursue Contribution Claims (*i*) in connection with claims arising under the circumstances described in subsection 3(d)(ii)(B) above; and (*ii*) in any circumstance where no set-off credit is allowed by the trial court although this TDP would provide for a set-off. In addition, in cases where the claimant and the Trust have not liquidated the claim, a Co–Defendant may, at its sole discretion, pursue a Contribution Claim against the Trust, rather than taking a set-off credit, provided that if the Co–Defendant chooses to appeal the judgment in respect of the claim, the Co–Defendant shall have first paid an amount equal to the Unliquidated Trust Payment to the claimant. Any such choice by a Co–Defendant need not be made until the amount of the set-off credit is calculated by the trial court, and the Co–Defendant shall not be eligible to make the Contri-

bution Claim until it has paid the judgment or entered into a post-judgment or post-verdict settlement with the claimant. Under no circumstances shall the right to make any Contribution Claim under this TDP be lost by virtue of the fact that a Co–Defendant has paid the judgment against it or entered into a post-judgment or post-verdict settlement with the claimant.

(b) *Notification of Contribution Claims.* If a claimant accepts a Trust settlement, having obtained a verdict establishing the amount of the claimants' compensatory damages and one or more of Co-defendants' liability therefor, or a judgment against Co-defendant(s), and thereafter the Trust pays a Contribution Claim arising from such verdict or judgment, the claimant shall be liable to the Trust for the amount of the Trust payment to the claimant. Co-defendants shall notify the Trust within 60 days of the return of a verdict or a judgment in favor of a claimant on which they may base a Contribution Claim. If a Co-defendant fails to notify the Trust within the 60–day period, the Co-defendant's right to be paid with respect to the Contribution Claim is preserved only if such notice is received by the Trust prior to the Trust making a payment to the claimant who obtained the verdict or judgment against Co-defendant(s). The Trust shall notify Co-defendants of the asbestos health claimants to whom it intends to make offers no later than 60 days before such offers are made.

(c) *Processing, valuation and payment of Contribution Claims.* Contribution Claims made to the Trust based on payment or settlement of a judgment shall be processed in FIFO order of their receipt by the Trust, without reference to any queue established for claims of asbestos health claimants. Contribution Claims shall be processed in the same fashion as claims of asbestos health claimants except that all arbitrations of Contribution Claims shall be binding. Such claims shall be valued as if the Co–Defendant(s) had stepped into the shoes of the claimant whose verdict against Co–Defendant(s) gave rise to the claim for contribution; all Co–Defendant(s) with valid Contribution Claims shall therefore be entitled to recover from the Trust on their Contribution Claim(s) the same amount, in aggregate, the claimant could have recovered from the Trust. In determining the value of the claim, the Trust may take into account the size of the verdict returned against the Co-Defendant(s). Contribution Claims shall be paid in the same manner as claims of asbestos health claimants are paid pursuant to Sections F and G, above, and shall be subject to the same *pro rata* share provisions applicable to all other claims by Trust Beneficiaries. Any information submitted by a Co–Defendant to the Trust pursuant to this subsection 4 shall be kept confidential by the Trust and shall not be disclosed to any other Beneficiary.

(d) *Co–Defendants' Contribution Claims pursued jointly.* All Co–Defendants with Contribution Claims arising from the same judgment by a claimant shall use their best efforts to pursue such contribution claims in a coordinated fashion.

5. *Right to make individual allocation agreements.* Nothing in this Section H shall prevent claimants and Co–Defendants from agreeing in writing in individual cases to allocate their respective claims against the Trust in such manner as they deem appropriate.

6. *Indemnity Claims.* Any Trust Beneficiary holding an Indemnity Claim valid under applicable law, which was not waived pursuant to the applicable provisions of the Co–Defendants' Procedures, and who is not a Distributor within the meaning of subsection 8 below, may assert such Indemnity Claim either in the Cases, as provided by the Co–Defendants' Procedures, or may present it to the Trust. If a Beneficiary elects to present an Indemnity Claim to the Trust, it shall be processed in the same fashion as Contribution Claims are processed under subsection 4, above. Indemnity Claims shall be valued by the Trust as provided by applicable law and shall be subject to the provisions relating to payment and *pro rata* shares that are set forth in Sections F and G, above.

7. *Distributor Indemnity Claims.* Any Trust Beneficiary that is a Distributor may present Distributor Indemnity Claims to the

Trust for processing and payment pursuant to the provisions of this subsection 7.

(a) *Definitions.* A Distributor is any entity that: 1) was engaged in the business of distributing Manville asbestos or asbestos-containing products; 2) was not engaged in the business of mining asbestos or manufacturing asbestos-containing products; and 3) is not a member of the MacArthur Subclass. A Distributor Indemnity Claim means any Indemnity Claim by a Distributor which constitutes a valid claim for indemnification under applicable law. Distribution means the purchase, shipment, storage, sale and delivery of asbestos or asbestos-containing products which were not remanufactured, altered, relabelled or installed by the Distributor.

(b) *Distributor Indemnity Claims Not Waived.* No Distributor shall be deemed to have waived Distributor Indemnity Claims by any of the following: 1) failing to comply with the provisions of Sections II and III.D.1 of the Co–Defendants' Procedures, including not filing a timely proof of claim for Indemnity in the Cases; 2) the making of the Contribution Claim Election; or 3) the expungement of any Proof of Claim for Indemnity by the Bankruptcy Court.

(c) *Distributor Indemnity Claim Percentage.* The Distributor Indemnity Claim percentage is the proportion of a Distributor's asbestos-related loss in any particular case which shall be treated by the Trust as constituting a Distributor Indemnity Claim. Distributors who meet the following two requirements shall have the right to process Indemnity Claims against the Trust using the Distributor Indemnity Claim percentage described below: 1) 35% or more of the asbestos or asbestos-containing products purchased by the Distributor were distributed by it; and 2) 35% or more of the asbestos or asbestos-containing products distributed by the Distributor were purchased from Manville.

Except as specifically provided otherwise in the Stipulation of Settlement, the Distributor Indemnity Claim percentage shall be equal to the product of: (i) the percentage of asbestos or asbestos-containing products distributed by the Distributor that it purchased from Manville; (ii) the percentage of asbestos or asbestos-containing products purchased by the Distributor which were distributed by it; and (iii) 95% if the Distributor filed a proof of claim for indemnity in Manville's bankruptcy which was not expunged and 86% otherwise.[5] Thus, by way of example only, a Distributor that purchased 50% of the asbestos it dealt in from Manville, and which distributed 50% of the asbestos it purchased, and that filed a timely proof of claim would be assigned a Distributor Indemnity Claim percentage of 23.75% (50% × 50% × 95%).

(d) *Setting a Distributor Indemnity Claim Percentage.* The Distributor Indemnity Claim percentage applicable to a particular Distributor shall be determined by the following procedures.

First, a Distributor must make a written submission to the Trust setting forth its position concerning the proper Distributor Indemnity Claim percentage for that Distributor and each component of that percentage. The Trust shall promptly notify the SCB of the Distributor's submission, the proposed Distributor Indemnity Claim percentage and each component thereof. The SCB may share such information only with those persons necessary to enable the SCB to respond to the Distributor's submission. The SCB shall have 45 days from receipt of such notice to make its own written submission to the Trust concerning the proper Distributor Indemnity Claim percentage for the Distributor, together with such supporting documents as the SCB deems appropriate.

By the same date the SCB's submission is due, the Distributor shall submit to the Trust all documents in support of its position it wishes the Trust to consider. Such information provided by the Distributor shall be kept confidential by the Trust and shall not be shared with any other Beneficiary. Within 10 days following the date the SCB's submis-

---

**5.** These three factors are hereinafter referred to as the components of the Distributor Indemnity Claim percentage.

sion is due, the Trust shall determine the Distributor Indemnity Claim percentage, and shall notify the Distributor and the SCB of its determination. If either is dissatisfied, they may present the issue to the Special Advisor for mediation.

The Special Advisor shall receive copies of all submissions presented to the Trust. If the Special Advisor is unable to resolve the issue through mediation, it shall be resolved by binding arbitration. The Special Advisor shall nominate three potential arbitrators (none of whom shall be counsel representing any Trust Beneficiary), each party shall strike one and the remaining nominee shall be the arbitrator. If both parties strike the same nominee, the Special Advisor shall select the arbitrator from the remaining two nominees. The arbitrator shall determine the procedures for the arbitration. The arbitrator's determination of the appropriate Distributor Indemnity Claim percentage shall be final and binding on the Distributor, the Trust and the SCB.

If this process results in a determination that less than 35% of the asbestos purchased by a Distributor was distributed by it or less than 35% of the asbestos or asbestos-containing products it purchased was from Manville, the Distributor shall not have the right to process its claims using a Distributor Indemnity Claim percentage (unless special circumstances are presented to and accepted by the Trust, as described below) and shall instead process its claims on a case-by-case basis as provided by subsection 7(f), below. Upon demonstration of special circumstances warranting such treatment, the Trust may in its discretion permit a Distributor to process its claims using a Distributor Indemnity Claim percentage even if the Distributor fails to meet the requirement set forth in the preceding sentence.

(e) *Processing Distributor Indemnity Claims with a Percentage.* Once a Distributor Indemnity Claim percentage has been established for a Distributor, the Distributor shall make any Distributor Indemnity Claims by submitting proof to the Trust that it has sustained an asbestos-related loss in a case which has been finally resolved by settle-

ment, judgment or otherwise. Upon proof of such a loss, the Trust shall process and pay, in accordance with the procedures set forth in Section F, an amount equal to the Distributor Indemnity Claim percentage of such loss times the same *pro rata* share applicable to all Trust Claims, as described in Section G.

Distributor Indemnity Claims shall be processed and paid by the Trust in FIFO order in a queue separate from the queues for other Trust Claims. The Trust, in consultation with counsel for the Manville Distributors Subclass, shall establish appropriate forms and procedures for processing Distributor Indemnity Claims.

(f) *Processing Distributor Indemnity Claims With No Percentage.* Distributors who do not have the right to process claims using a Distributor Indemnity Claim percentage shall present any Indemnity Claims to the Trust on a case-by-case basis. The Distributor must establish that the particular loss it suffered gives rise to a right of indemnity against the Trust under applicable law. The Trust shall value such claims as provided by applicable law. They shall be processed and paid their *pro rata* share in FIFO order, in accordance with the procedures set forth in Sections F and G. The Trust, in consultation with counsel for the Manville Distributors Subclass, shall establish appropriate forms and procedures for processing such Distributor Indemnity Claims.

(g) *Distributor Information Confidential.* Any information submitted by a Distributor to the Trust pursuant to this subsection 7 (other than a proposed Distributor Indemnity Claim percentage and the components thereof) shall be kept confidential by the Trust and shall not be disclosed to any other Beneficiary.

8. *No modifications without consent.* The terms of this Section H of this TDP may not be modified without the concurrence of the SCB. In addition, subsections 1–5 and 8–9 of this Section H may not be modified without the concurrence of counsel for the Co–Defendant Manufacturers Subclass and subsections 7–10 may not be modified without the concurrence of counsel for the Manville Distributors Subclass. In addition, any changes to subsections 1–5 of this Section H

which would explicitly treat members of the Manville Distributors Subclass less favorably than members of the Co-defendant Manufacturers Subclass shall also require the concurrence of counsel for the Manville Distributors Subclass. No procedures relating to arbitration of Trust Claims, to be established pursuant to Section E of this TDP, shall be instituted or modified without the concurrence of counsel for the Co–Defendant Manufacturer Subclass; such counsel shall also receive the same notice, in the same form and at the same time, given to the SCB with respect to any matter for which the Trust must consult with, or seek the concurrence of, the SCB.

**10. *Applicable Claims.*** The provisions of this Section H shall apply to all Contribution Claims and Indemnity Claims except those resolved pursuant to the Stipulation of Settlement, executed on July 25, 1994. The set-off provisions of this Section H, set forth in subsection 3, shall apply with respect to all cases tried among Trust beneficiaries after the effective date of this TDP, regardless of whether the plaintiff's Trust Claim was liquidated or otherwise resolved by the Trust prior to or after that date.

**11. *Concurrence and Consultation Procedures.*** The procedures set forth in Section J shall apply with respect to any matter as to which counsel for the Co–Defendant Manufacturers Subclass or the Manville Distributors Subclass have concurrence or consultation rights under this Section H.

### I. *Attorneys' Fees.*

Attorneys' fees payable in connection with Trust Claims liquidated and paid through this TDP after this TDP is finally approved by the Courts, where calculated as a percentage of recovery, shall be the lower of the fee provided in the contract between claimant and counsel or 25%, exclusive of costs chargeable to the claimant. The recovery shall be measured by the actual payments from the Trust to the claimant, not the liquidated value of the claim. Legal fees shall be paid as payments to claimants are made by the Trust.

### J. *Consultation Procedures; Concurrence Procedures; Resolution of Disputes Involving Concurrence of the SCB.*

**1. *Consultation Procedures.*** With respect to any matter relating to the Trust as to which the SCB have expressly been given the right to be consulted, the Trust shall provide to the SCB, through their counsel, as much advance notice of such matter as is reasonably practicable in the circumstances. Upon such notice, the Trust will provide the SCB with such reasonable access to experts retained by the Trust and to the Trust staff as the SCB may reasonably request during the time that the Trust is considering such matter and will provide the SCB with the opportunity, at reasonable times and for reasonable periods of time, to discuss and comment on such matter with one or more Trustees and senior management of the Trust. In determining when to give such advance notice to the SCB with respect to a matter as to which the SCB have such consultation rights, the Trust will take into consideration the time required for the SCB, if they so wish, to engage and consult with their own independent financial or investment advisors as to such matter and to ask the Trust whether the Trust would be willing to bear the cost of such engagement and consultation (it being expressly understood and agreed that the Trust shall have no obligation or duty of any kind whatsoever to bear any such cost or otherwise to provide any such independent financial or investment advice). Unless the Trust shall, in its sole and absolute discretion, expressly elect in writing to bear some or all of such cost, any such engagement of or consultation with financial or investment advisors shall be at the SCB's sole cost and expense.

**2. *Concurrence Procedures.*** "Concurrence" means the unconditional consent (expressed to the Trust in writing, if requested by the Trust, in form and substance reasonably satisfactory to the Trust) to a Trust action or decision as described by the Trust in its request for such concurrence. In any circumstance hereunder where the Trust makes a decision with respect to matters which require the concurrence of the SCB, the Trust shall:

(i) provide the SCB and the Special Advisor with reasonable access to experts retained by the Trust and Trust staff *during such time as the decision is being made;*

(ii) bring the proposed decision to the attention of the SCB and the Special Advisor; and

(iii) provide the SCB no fewer than 45 days to comment with respect to such proposed decision.

In the event the SCB disagree with the Trust's decision, they shall express their views as fully as possible to the Trust and make such counterproposal as may be appropriate. The Trust and SCB shall thereupon consult together with the Special Advisor in an effort to reach concurrence.

### 3. *Dispute Resolution.*

(a) While it is anticipated that the mutual interests of the Trust and the SCB, together with the sharing of information which is envisioned under this TDP, are likely to yield concurrence whenever called for under this TDP, there may be situations where a genuine disagreement arises which would have the effect of preventing or permitting steps to be taken to which either the Trust or SCB do not agree. In such event, either the Trust or the SCB may request that the dispute be resolved and, pending resolution of the dispute, the actions in questions shall remain in abeyance.

(b) If and when the Trust or the SCB shall ask that a dispute be resolved, the following procedure shall be applied:

(i) the Trust and SCB may agree upon an individual to serve as a dispute resolver;

(ii) if there is no agreement, the Special Advisor shall nominate three separate individuals to serve as the dispute resolver, selecting them based upon the Special Advisor's knowledge of the issues in dispute and of the competencies of the individuals to be selected;

(iii) the Trust shall strike one of the three nominees;

(iv) the SCB shall next strike one of the remaining two nominees; and

(v) the remaining nominee shall serve as the dispute resolver and his/her decision shall be final and binding on the Trust and the SCB.

(c) If the dispute resolver finds in favor of the Trust, the SCB shall be deemed upon the issuance of such finding to have given their concurrence to the matter for which their concurrence had been sought and had been withheld, and the SCB will execute and deliver such documents, and take such other action, as the Trust may reasonably request to evidence or confirm such concurrence.

(d) In such a dispute resolution process, the Trust and the SCB shall have an opportunity to fully explain their positions to the dispute resolver and the Special Advisor shall be available to assist. The dispute resolver shall be empowered to engage such expert advice as he/she shall deem appropriate.

(e) With respect to any matters that require the concurrence of the Legal Representative, the concurrence and dispute resolution procedures set forth herein shall apply and be followed with equal force with respect to the Legal Representative as they apply and are followed with respect to the SCB. Thus, when a dispute on such a matter arises, and the parties fail to agree on an arbitrator, the Special Advisor shall nominate four individuals to serve as the dispute resolver, and the Trust, the SCB, and the Legal Representative shall each strike one of the nominees.

(f) In the event that a dispute involves distribution of Trust funds, any distribution of amounts covered by the dispute shall await conclusion of the dispute resolution process.

(g) Any dispute relating to concurrence with respect to an amendment of the Trust Agreement or the Amended and Restated Supplemental Agreement dated as of November 15, 1990 between the Trust and the Company (the "Amended and Restated Supplemental Agreement") will be resolved in accordance with, and will otherwise be subject to, the special provisions with respect to such disputes set forth in Section K below.

### K. *Miscellaneous.*

1. Except as provided in the next sentence and in Section H, all aspects of this TDP may be amended, altered or adjusted by the Trust to reflect changed circumstances, greater information and/or to improve procedures with the concurrence of the SCB, after consultation with the Special Advisor. The procedures set forth herein governing the *pro rata* share, the Scheduled Diseases, Categorization Criteria, and Scheduled Values set forth in Section D above, and the Maximum Values set forth in Attachment A, may be amended, altered or adjusted to reflect changed circumstances, greater information and/or improved procedures by the Trust, with the concurrence of the SCB and the Legal Representative, after consultation with the Special Advisor.

2. Any amendment of the Trust Agreement or the Amended and Restated Supplemental Agreement will require the concurrence of the SCB, which concurrence shall not be unreasonably withheld or delayed. If the Trust believes that the SCB are unreasonably withholding or delaying such concurrence, the Trust shall have the right, at its option, either:

 (i) to seek an Order from the Courts permitting the Trust to make such amendment without the concurrence of the SCB, and if such Order is granted and becomes final and nonappealable, the Trust shall have the right to make such amendment without such concurrence; or

 (ii) to request that the dispute be resolved pursuant to the procedure for final and binding resolution of disputes involving concurrence of the SCB provided in Section J above; and in the case of a request pursuant to this clause (ii), the following terms shall apply:

 (A) the SCB, the Trust and the Special Advisor shall cause the dispute resolver to be selected within five days after such request is made, in accordance with subsection J.3(b)(i)–(v) above;

 (B) it shall be a condition to the selection of such dispute resolver that he/she agree to render his/her determination within ten days of his/her selection to act as dispute resolver for such dispute; and

 (C) the SCB and the Trust shall jointly direct such dispute resolver (and shall each use best efforts to cause and assist such dispute resolver) to make his/her final and binding determination, and to notify the parties thereof, within ten days after such selection is made.

3. In the event that the positions of the SCB are no longer filled as described in the Manville Corporation Second Amended and Restated Plan of Reorganization, the appointment of three attorneys to fill that role shall be made from time to time by the President of the Association of Trial Lawyers of America or his/her designee. The Special Advisor shall be appointed from time to time by the Trust with the concurrence of the SCB. Initially, that role shall be filled by Mark Peterson, Esq.

4. Subject to the terms of subsection G.4, the reasonable expenses of the SCB and the Legal Representative, together with the reasonable fees and expenses of their counsel, and the reasonable charges and expenses of the Special Advisor and of any dispute resolver, shall be borne by the Trust; provided, however, that if the Trust believes that any concurrence with respect to an amendment of the Trust Agreement or the Amended and Restated Supplemental Agreement is being unreasonably withheld or delayed, the Trust reserves the right to refuse to pay the fees and expenses of counsel to the SCB in connection therewith (including, without limitation, counsel fees and expenses incurred in connection with any opposition or challenge by the SCB or their clients to the action(s) with respect to which such concurrence is being withheld or delayed). However, if the SCB obtain an Order from the Courts directing the Trust to pay such fees and expenses

on the ground that the Trust's refusal to do so is improper, and such Order becomes final and nonappealable (or if the Trust elects to have the dispute concerning such concurrence resolved pursuant to the Section J ADR Process as provided in subclause (ii) of this Section K and the dispute is resolved in favor of the SCB), the Trust will pay such fees and expenses as are specified in such final and nonappealable Order (or in the determination made by the dispute resolver).

5. Solely with respect to those issues on which their concurrence is required under this TDP or on which the Trust is required to consult them, the Trust shall bear the reasonable fees and expenses of counsel for the Co–Defendant Manufacturers Subclass and the Manville Distributors Subclass subject to the same reservation applicable to the fees and expenses of the SCB set forth in Section K.4 above.

6. No one acting in his/her capacity as one of the Trustees, the SCB, the Legal Representative, the Special Advisor, and/or dispute resolver shall be liable to any entity or person except for his/her own gross negligence or willful misconduct. Solely to the extent they are exercising their concurrence or consultation rights under this TDP, counsel for the Manville Distributors Subclass and the Co–Defendant Manufacturers Subclass shall have the same limitation on their liability.

### *ATTACHMENT A—MAXIMUM VALUES*

The Maximum Values listed below for each of the seven Scheduled Diseases represent a ceiling or upward limit on the liquidated value of any claim settled by individual evaluation or by arbitration, except for Extraordinary Claims as described in Section C. In addition, if a claimant litigates a claim and obtains a judgment in excess of the Maximum Value, any *pro rata* payment with respect to the excess amount will be made only from Pool B, which, as described in Section F, may never contain funds from which such payment can be made.

| Category | Scheduled Disease | Maximum Value |
|---|---|---|
| I | Bilateral Pleural Disease | $ 30,000 |
| II | Nondisabling Bilateral Interstitial Lung Disease | $ 40,000 |
| III | Disabling Bilateral Interstitial Lung Disease | $300,000 |
| IV | Other Cancer | $200,000 |
| V | Lung Cancers (One) | $400,000 |
| VI | Lung Cancers (Two) | $400,000 |
| VII | Malignant Mesothelioma | $500,000 |

### B.

### DISTRIBUTION PRINCIPLES

### CONTRIBUTION CLAIM FUND

Pursuant to the Stipulation of Settlement, dated as of July 25, 1994 (the "Stipulation"), among the Plaintiffs, the Manville Personal Injury Settlement Trust (the "Trust"), the Legal Representative of Future Claimants, the Present Claimant Subclass, the Pre–November 19, 1990 Judgments and Settlements Subclass, the Distributor Subclass, the MacArthur Subclass ("MacArthur") and the Co–Defendant Manufacturers Subclass, a $35 million fund (the "Fund") has been established for the benefit of those entities holding Contribution Claims against the Trust ("Co–Defendants") as of the date of execution of the Stipulation (the "Effective Date"). The Distribution Principles set forth below are designed to divide the Fund among Co–Defendants expeditiously and equitably, recognizing the difficulty of achieving precision and the inadvisability of adopting a methodology that could result in significant transaction costs. Therefore, distribution of the Fund shall be governed as follows:

(1) Upon signing of the Stipulation, the Trust shall place $35 million in a segregated interest-bearing account to be maintained by the Trust;

(2) Within 180 days of the date the funds are deposited (the "Allocation Date"), the proceeds of the Fund shall be allocated proportionally among Co–Defendants against whom compensatory damage judgments were entered (or, in certain circumstances set forth *below,* ver-

dicts returned) in favor of asbestos health claimants prior to the Effective Date. The allocation shall be done by subclass counsel for the Co–Defendant Manufacturers subclass ("Fund Administrators"), who may consult from time to time with the Special Advisor, with the assistance of Trust personnel (as set forth *below*, in Paragraph 4). Each Co–Defendant shall be entitled to allocation from the Fund based on its proportionate share of the total of such compensatory damage judgments and verdicts. The amounts of such judgments and verdicts shall be calculated as follows:

(a) In respect of compensatory damage judgments entered after January 1, 1989 and prior to the Effective Date (or verdicts such as those described in subparagraph (g), *below*, returned in that same time period), and paid, satisfied or settled by a Co–Defendant no later than 90 days after the Effective Date (the "Payment Date"), at 100 percent of the sum paid or agreed to be paid by the Co–Defendant;

(b) In respect of compensatory judgments entered after January 1, 1989 and prior to the Effective Date but on appeal or otherwise unresolved as of the Payment Date, at 70 percent of the amount of a Co–Defendant's share of the judgment;

(c) In respect of compensatory damage judgments entered after August 26, 1982 and prior to January 1, 1989 which have been paid, satisfied or settled by a Co–Defendant, at 25 percent of the sum paid by the Co–Defendant;

(d) As used in these Distribution Principles, any reference to a Co–Defendant's share of a compensatory damage verdict or judgment shall include the Co–Defendant's liability, if any, under applicable law, for all or part of the liability of bankrupt or insolvent entities;

(e) Judgments against bankrupt Co–Defendants (defined herein as those in a pending bankruptcy or insolvency proceeding as of the Effective Date)

which were resolved in accordance with subparagraphs (a) or (c) *above*, shall be calculated as set forth in that subparagraph; *however*, such bankrupt Co–Defendants shall not be entitled to distribution from the Fund based on (*i*) amounts agreed to be paid as described in subparagraph (a), *above*, but not actually paid prior to the Co–Defendant's bankruptcy filing or (*ii*) judgments in the category described in subparagraph (b), *above*;

(f) Regardless of whether the Co–Defendant has paid, satisfied or settled the judgment, a Co–Defendant shall not be entitled to allocation of any share of the Fund in respect of contribution claims based on a judgment where (*i*) the Trust (or Manville) resolved the underlying asbestos health claim prior to entry of judgment *or* the Trust (or Manville) was present as defendant(s) at verdict *and* (*ii*) the Co–Defendant previously received set-off credit for the Trust's (or Manville's) share. Upon request by a Co–Defendant or Fund Administrators, the Trust shall promptly make available information regarding the status (*e.g.*, settled or unsettled; paid, unpaid or partially paid; and the date of any settlement or payment) of claims against it (or Manville) on which Contribution Claims are based;

(g) A Co–Defendant shall be entitled to allocation of a share of the Fund based on verdicts returned after January 1, 1989 and prior to the Effective Date which established the sum of compensatory damages to which an individual plaintiff would be entitled and which verdict is paid, satisfied or settled by the Co–Defendant prior to the Payment Date. However, under no circumstances shall allocation be made in respect of judgments or verdicts which did not so establish an individual plaintiff's compensatory damages;

(h) No allocation shall be made in respect of awards for punitive damages, or settlement of such awards. Where such damage awards have been re-

solved in conjunction with a compensatory award, the Co–Defendant's allocation from the Fund shall be based on an amount no greater than the Co–Defendant's share of the compensatory award, plus pre-and/or post-judgment interest, as provided by applicable law;

(i) If judgment was entered (or verdict returned, as described *above* in subparagraphs (a) and (g)), against more than one Co–Defendant, each such Co–Defendant shall be entitled to make a claim for allocation of the Fund, *provided*, however, that each such Co–Defendant may make such a claim only for the amount of its share of such damages, as calculated in subparagraphs (a) through (h), *above;*

(j) MacArthur shall be entitled to seek allocation of a share of the Fund in respect of judgments and verdicts totalling no more than $20 million, as calculated under the principles set forth in subparagraphs (a) through (i), *above;* and

(k) Based on the principles set forth in subparagraphs (a) through (j), *above,* upon the determination of the amount of judgments and/or verdicts against each Co–Defendant making valid claims for allocation and subject to production of the information required in paragraph (3), *below,* each such Co–Defendant shall be allocated a share of the Fund, based on its proportionate share of the total dollar amount of judgments and verdicts so calculated.

(3) In order to be allocated a share of the Fund, each Co–Defendant shall provide the following information, which shall be kept strictly confidential by Fund Administrators, the Special Advisor and designated Trust personnel and shall not be provided to any other person, including any other party in these proceedings, except as set forth herein:

(a) A list of all verdicts and/or judgments on which its claim to payment is based, including (i) the name of the injured asbestos health claimant (the "Claimant") in whose favor (or in whose estate's favor) the verdict was returned or judgment entered; (ii) the Claimant's social security number, if available, or other information (such as court docket number, plaintiff's counsel, or date of birth) sufficient for the Trust to identify the Claimant; (iii) the court and date judgment was entered (or, if unavailable or inapplicable, the verdict date); (iv) the total compensatory damage award and the Co–Defendant's share thereof; and, if applicable (v) the date the verdict or judgment was paid, satisfied or settled and (vi) the amount of such payment. To the extent that a Co–Defendant has access to the necessary technology, the list shall be provided on computer disk, as well as in hard copy.

(b) The list described in subparagraph (a), *above,* shall be accompanied by a brief explanation of the Co–Defendant's method of calculating its share of verdicts and/or judgments.

(4) The material described in paragraph (3) shall be provided to the Trust which shall make available designated personnel to calculate, in consultation with Fund Administrators, the amounts of damages against each Co–Defendant as set forth in paragraph (2). Allocations from the Fund shall then be made by Fund Administrators using such calculations. In doing so, Fund Administrators may request clarification of information received from Co–Defendants pursuant to paragraph (3) and may in their discretion, ask a Co–Defendant to submit satisfactory proof that judgment was entered and, if applicable, that payment was made as to no more than the greater of ($i$) 10 percent of the total number or ($ii$) 50 of the judgments on which the claim for distribution is based. Among the documentation considered satisfactory for purposes of this paragraph shall include the order of judgment, court opinion, correspondence between the Co–Defendant and Claimant's counsel or the trial court, cancelled checks and releases.

(5) Any disputes that may arise among or between Co–Defendants, the Fund Administrators or Trust personnel as to the application of these Distribution Principles shall be resolved by the Special Advisor to the Trust. To the extent possible, such disputes shall be presented in a single proceeding to the Special Advisor, whose decisions shall be final and unreviewable.

(6) Co–Defendants may draw on their allocated shares of the Fund as follows:

(a) No later than ten (10) business days prior to the Allocation Date, the Trust shall notify each Co–Defendant of its proportionate share of the Fund.

(b) Co–Defendants may draw on their allocated shares solely to make indemnity payments to asbestos health claimants, and may not use such funds for any other purpose, (*e.g.*, the payment of asbestos personal injury litigation defense fees and expenses).

(c) Commencing 20 days after the "Allocation Date," a Co–Defendant may draw on its allocated share of the Fund by making a written request to the Trust. This request shall include the names of asbestos health plaintiffs to whom the Co–Defendant is or will be obligated (by settlement or judgment) to make payment and the amount of that obligation. The Co–Defendant shall also provide other identifying information as to each plaintiff (including, but not limited to, the date and court in which suit was filed and a copy, as applicable, of the judgment, verdict or proposed release).

(d) Upon receipt of such information, the Trust shall have a check drawn in the asbestos health plaintiff's name and sent to the requesting Co–Defendant for further transmittal to the plaintiff or, as applicable, plaintiff's counsel. The Trust shall deduct such amount from the Co–Defendant's allocated share of the Fund and, upon its receipt, shall promptly provide a copy of the cancelled check to the Co–Defendant.

(e) Each Co–Defendant allocated a share of the Fund shall notify the Trust in writing of the name, title, address, and telephone and telecopier numbers of the Co–Defendant's representative authorized to request that checks be written from the Fund.

(f) Any and all information provided to the Trust by Co–Defendants for the purpose of drawing on their allocated Fund shares shall be kept strictly confidential and not provided to any other person, including any other party in this litigation, except that such information may be provided to the Special Advisor, pursuant to his dispute resolution role described in paragraph (5), *above.*

(7) Within 30 days of the date the form of notice is approved is *Findley v. Falise*, notice of the Stipulation and these Distribution Principles shall be provided by the Trust to all Co–Defendants included on lists maintained by the Trust or reasonably identifiable as the holders of Contribution Claims based on verdicts and judgments returned prior to the Effective Date. This notification shall be in addition to any class notice approved by the Courts and disseminated in *Findley v. Falise.*

(8) In their sole discretion, but with notification to all known Co–Defendants as described in paragraph 7, *above,* Fund Administrators may delay allocation of all or part of the Fund, except that the Fund shall be allocated in full within one year of the Effective Date. Also in their sole discretion, Fund Administrators may modify or amend procedural aspects of these Distribution Principles, in order to effectuate the purposes of this document.

(9) The costs of administering the Fund shall be borne by the Trust.

(10) The Trust, Trustees, Trust personnel, Fund Administrators, and the Special Advisor shall not be liable, except for willful misconduct, for any losses or damages resulting from all further

claims, liens, demands, or actions made by others because of the payment or non-payment of any amounts to plaintiffs and/or Co–Defendants pursuant to the provisions of this exhibit.

(11) Within sixty (60) days after the last of the Fund's $35 million is paid out, or 36 months from the Allocation Date, whichever shall occur first, upon notice and hearing, the Trust shall apply for an order discharging it from any responsibility for administration of the Fund. In the event any Co–Defendant's proportionate Fund allocation has not been exhausted 36 months from the Allocation Date, the remaining balance shall be reallocated among those Co–Defendants who have drawn upon their allocated shares, *provided,* however, that such amounts shall be drawn upon within 180 days of the reallocation, at which point the Trust shall apply for the order of discharge.

(12) Nothing in these Distribution Principles shall be construed to mean that Co–Defendants shall receive allocations from the Fund if the Stipulation of Settlement is not approved by the Court.

December 12, 1994

**To: Holders of Manville Contribution Claims**

**From: Counsel for Subclass of Co–Defendant Manufacturers**

### *Clarification of the Administrative Procedures for the Contribution Claim Fund*

The Fairness Hearings regarding the proposed settlement in *In re: Joint Southern & Eastern District Asbestos Litig. (Findley v. Falise),* C.A. No. 90–3973 (E.D.N.Y.), C.A. No. 90–7158 (S.D.N.Y.) were closed as of December 9, 1994. Based on comments received prior to and during the hearings, Fund Administrators, acting in accordance with the discretion accorded them under the Distribution Principles of the Contribution Claim Fund ("Distribution Principles"), have

decided to make several clarifications to certain administrative procedures of the Contribution Claim Fund (the "Fund").

These clarifications make reference to the following two documents you should have previously received in separate mailings from the Manville Personal Injury Settlement Trust (the "Manville Trust"): ( *i* ) the Distribution Principles of the Fund, and (*ii* ) a Summary of the Contribution Claim Fund which reviewed the administrative procedures for the Fund in greater detail. Copies of both these documents have been attached for easy reference.

1. *Calculation of Shares.* The date by which a judgment or verdict must be satisfied or settled in order to receive 100 percent credit for that amount in the calculation of each Co–Defendant's share of the Fund **has been extended from October 23, 1994 to January 6, 1995.** *See* Distribution Principles ¶ 2(a); Summary ¶ D(a).

2. *Procedures for Calculating Shares.* The date by which all Co–Defendants *must provide information* to the Manville Trust about their contribution claims **has been extended from January 15, 1995 to March 15, 1995.** *See* Summary ¶ F. Due to this extension, **the decision as to how the Fund proceeds will be divided has been postponed an additional sixty days to May 30, 1995.**

3. *Bankrupt Co–Defendants.**

a. Bankrupt Co–Defendants (defined as those that instituted bankruptcy or insolvency proceedings as of July 25, 1994) will receive the same credit as non-bankrupt Co–Defendants for judgments or verdicts paid by January 6, 1995. *See* Distribution Principles ¶ 2(e); Summary ¶ E.

b. It is expected that most Co–Defendants will draw on their shares fairly promptly to pay asbestos health claimants. However, a bankrupt Co–Defendant cannot pay asbestos health claims against it prior to confirmation of its plan of reorganization. Accordingly, Fund Administrators (in conjunction with the Trust) will devise a mechanism by which a bankrupt Co–Defendant shall receive the interest attributable to its share of the Fund from the date funds can

---

* Supplemented by "Summary of Contribution Claim Fund" dated 10/11/94.

first be drawn upon by solvent Co–Defendants to the date the bankrupt Co–Defendant's plan is confirmed. When establishing this mechanism, the Fund Administrators will seek to minimize administrative costs to the Manville Trust in consideration of its financial situation and the Fund's purpose.

c. When a trust fund, or other settlement vehicle, is established by a bankrupt Co–Defendant for the benefit of its asbestos personal injury creditors, the bankrupt's share of the contribution claim fund may be transferred to that trust upon the confirmation of Co–Defendant's reorganization plan. Prior to such transfer, however, the trust fund (or other settlement vehicle) shall provide Fund Administrators with a written statement that the transferred funds shall be paid only to asbestos health claimants and shall not be used for any other purpose (including but not limited to the payment of administrative or defense costs of the bankrupt Co–Defendant's trust). *See* Distribution Principles ¶ 6(b); Summary ¶ A.

Questions related to this memo can be directed to Anne Cohen or Sandra Cobden at Debevoise & Plimpton, (212) 909–6078, or Patricia Dansbury at the Manville Trust, 1–800–536–2722.

## C.

## MANVILLE DISTRIBUTOR SUBCLASS SETTLEMENT

## FUND DISTRIBUTION PROCEDURES

### *INTRODUCTION*

Pursuant to a settlement in the class action litigation styled *Findley v. Falise,* a special Fund in the amount of $9.5 million will be established for the benefit of the subclass of distributors of Johns–Manville asbestos product. To qualify as a Distributor, a company must satisfy the requirements set forth in Section I below. The purpose of the Fund is to compensate Distributors for asbestos related liabilities incurred as a result of their sale of JM Asbestos Product. Because of the limited resources available to the Fund, it will not be possible to reimburse Distributors

for 100% of the liabilities incurred by them. However, after Distributors' claims are liquidated as provided herein, it is hoped that a meaningful payments can be made based on compensatory damages charged against those Distributors because they distributed JM Asbestos Product.

One distribution is intended to be made from the Fund, which shall be made as soon as reasonably possible after the settlement has been approved by the Court and all appeals thereof, if any, have been resolved or no stay of distribution is entered.

The $9.5 million Fund will be deposited by the Trust in a separate, interest bearing escrow account upon entry of an Order approving settlement of the Litigation, with such interest to accrue thereafter, for the benefit of Distributors.

Due to the complex nature of asbestos litigation, and the long periods of time that have passed since many Distributors handled JM Asbestos Product, it is expected that the documentation of claims will be a difficult task. Therefore, the Distributor Committee shall be charged with broad discretion, in the first instance, to determine the amount of JM Asbestos Product handled by a particular Distributor and the degree to which such Distributor was involved in Fabrication and/or Installation. It shall be the burden of the Distributor to provide complete and accurate data in support of its claim prior to the Bar Date. It shall also be the burden of the Distributor to cooperate fully with the Distributor Committee during claims processing. Failure to cooperate or to provide complete and accurate claims information may result in the forfeiture of a Distributor's claim.

All information submitted to the Distributor Committee shall remain confidential unless otherwise ordered by the Court. The only information expected to be disclosed shall be the Distribution Percentage and the recipients thereof, which the Distributor Committee will seek to have presented to the Court, for approval under seal on notice to those Distributors which have submitted claims, and the Manville Personal Injury Settlement Trust.

## SECTION I

### DEFINITIONS

1. **Bar Date**—October 1, 1994—Last date by which a Distributor may file a claim against the Fund. Only claims paid by Distributors on or before July 25, 1994 may be submitted to the Distributor Committee for consideration for payment. All claims received by the Distributor Committee shall remain confidential wherever reasonably possible, subject to final approval by the Court in records submitted under seal. No claims received by the Distributor Committee after the Bar Date shall be eligible for payment from the Fund.

2. **Court**—The United States District Court for the Eastern District of New York.

3. **Distributor or Distributors**—In order to qualify as a Distributor for purposes of receiving a distribution from the Fund a company must:

a. has been in the business of selling JM asbestos or asbestos-containing products in substantially the same form in which it existed when it was received from JM and neither it nor an affiliate thereof have been engaged in the mining of asbestos-containing products or the manufacturing of any asbestos containing products.

b. For purposes of this Fund Distribution Process, MacArthur Co. and its affiliates and Pacor, Inc. or the Pacor Asbestos Disease Settlement Trust are not and shall not be a Distributor.

4. **Distributor Committee**—Individuals or entities chosen to distribute the Fund as set forth more fully herein.

5. **Fund**—Proceeds of settlement in the Litigation made available for distribution solely to Distributors in accordance with the terms set forth herein.

6. **Installation**—The act of applying substantially finished insulation product manufactured by an unaffiliated company at a premises not owned by Distributor or an affiliated entity.

7. **JM**—Johns–Manville Corporation or one of its successors, subsidiaries, or affiliated entities.

8. **Litigation**—Class action litigation pending before the United States District Courts for the Eastern and Southern Districts of New York styled *Findley, et. al. v. Falise, et. al.*

9. **JM Asbestos Product**—Raw asbestos, and finished or substantially finished asbestos insulation products manufactured by JM.

10. **Subclass Counsel**—Counsel appointed by the Court for the Manville Distributor Subclass.

## SECTION II

### DISTRIBUTION PROCEDURES

In order to determine the amount that any Distributor may recover from the Fund, it will be necessary to identify the Distributor's total pay out of damages in asbestos litigation, whether it filed and maintained a proof of claim in the Manville bankruptcy, the volume of JM Asbestos Product sold by the Distributor as a percentage of total asbestos product sold by such Distributor, and the proportion of the Distributor's business which was devoted to distribution. This distribution process operates upon the assumption that a Distributor is entitled to a greater return on its claim for compensatory damages paid to asbestos health claimants if its business consisted primarily of selling rather than Installing or Fabricating JM Asbestos Product, and that it is entitled to a greater return if it acted successfully to preserve its rights in the Manville bankruptcy.

It is important to note that the limited resources of the Fund make it impossible to process every claim on an individual basis. Rather, it is expected that each Distributor will present all of its claims as of the Bar Date together with the information required below. The Distributor Committee will then process all claims. Negotiation of disputes will be the preferred method of resolution, however, provisions are made for mediation and binding arbitration.

11. **Determination of the Indemnity Amount**—Each Distributor will be required

to submit proof of all damages paid by the Distributor to plaintiffs on asbestos health claims on or before June 1, 1994 ("Total Damages"). Each Distributor shall also be required to prove that it .had, on June 1, 1994, a valid proof of claim for indemnity pending in the JM bankruptcy proceeding (a "Pending Claim"). A Distributor which has a Pending Claim shall have an Indemnity Amount equal to its Total Damages. A Distributor which does not have a Pending Claim shall have an Indemnity Amount equal to 40% of its Total Damages.

12. ***Determination of Product Share Claim***—Each Distributor will be required to establish to the satisfaction of the Distributor Committee, the percentage share of asbestos product sold, Fabricated and/or Installed by such Distributor that was manufactured by JM. The Distributor's Product Share Claim shall be the product of this percentage times the Indemnity Amount.

13. ***Determination of Fund Claim***—After the Product Share Claim is determined, the Distributor Committee shall determine the portion of the Distributor's revenues which it received from the sale of asbestos product generated by the sale of such asbestos product in an unaltered form, and not from sales in connection with Fabrication or Installation by such Distributor. The Distributor's Fund Claim shall be the product of this percentage times the Product Share Claim.

14. ***The Distribution Percentage***—Once all Fund Claims have been determined, the Distributor Committee, subject to Court approval, shall determine the amount of the Fund to be distributed, subject to reserves for administrative expenses (the "Gross Distribution Amount"). The amount to be paid to each Distributor shall be determined by dividing the Gross Distribution Amount by the sum of all Fund Claims (the "Distribution Percentage"). Thereafter, each Distributor shall receive a payment equal to the product of their Fund Claim multiplied by the Distribution Percentage.

## SECTION III

### CLAIMS INFORMATION AND VERIFICATION

1. ***Information to be supplied to the Distributor Committee.*** On or before the Bar Date, each Distributor must supply to the extent reasonably practicable the following information, together with all available documentation to assist the Distributor Committee to verify such information:

a. Summary of all payments made by the Distributor for or on account of compensatory damages to asbestos personal injury claimants. This summary should include for each personal injury claim the following information: the claimant's name, the settlement or verdict amount, the dates of settlement or verdict and payment, the docket number, and jurisdiction in which the claim was pending.

b. For each ten year period commencing in 1940, provide the following:

(1) The name of each manufacturer whose asbestos product the Distributor sold, installed and/or fabricated;

(2) The percentage of such asbestos product manufactured by JM;

(3) The percentage of such asbestos product sold that was not altered, fabricated or installed;

(4) The percentage of such asbestos product that was fabricated by the Distributor;

(5) The percentage of such asbestos product that was installed by the Distributor;

(6) Two affidavits supporting the information supplied in accordance with the requirements set forth herein; and

(7) Copies of all available purchase orders, invoices, and financial records which support the information requested above.

2. ***Verification of Claims Information by Distributor Committee.*** The Distributor Committee shall be responsible for determining the accuracy of the claims information supplied by Distributors. Consequently, the Distributor Committee shall be authorized to retain accountants and other professionals necessary to assist in this process. The Distributor Committee may consult with JM, the

Trust or other Distributors in its efforts to verify the information submitted by the Distributor. Once the available information is gathered, the Distributor Committee shall issue its determination of the amount of the Distributor's Fund Claim.

If the Distributor disagrees with the decision of the Distributor Committee, the issue shall be presented to Mark Peterson, Esquire, Special Advisor to the Trust for mediation, provided the Distributor gives the Distributor Committee written notice of its intent to appeal within ten days of receipt of the Distributor Committee's determination of Fund Claim. If either the Distributor Committee or the Distributor disagrees with the mediator's determination of Fund Claim, the issue shall be submitted to binding arbitration in accordance with the procedures established under paragraph 8(d) of Section H of the Trust Distribution Process, provided the appealing party provides the other party with written notice of its intent to appeal within ten days of receipt of the mediator's determination of Fund Claim.

In the event the mediator or the arbitrator agree with the decision of the Distributor Committee, all costs incurred in connection with the processing of the Distributor's claim, including attorneys' fees, shall be deducted from any claim awarded to such Distributor. If it is determined that the affidavits submitted by the Distributor to the Distributor Committee are materially inaccurate, and this inaccuracy is the result of wilful misconduct or gross negligence, the Distributor will be deemed to have automatically waived all rights to recover from the Fund.

*SECTION IV*

*THE DISTRIBUTOR COMMITTEE*

1. *Composition of the Distributor Committee*—the Distributor Committee shall consist of nominees of (a) the subclass representatives of the Manville Distributor Subclass and (b) the two Distributors, other than the subclass representatives, with the greatest Total Damages. Until such time as Total Damages are established for all Distributors,

it shall be presumed that the Porter Hayden Company and Thorpe Insulation Company are the two Distributors with the greatest Total Damages. If after Total Damages for all Distributors are determined under these procedures, it is discovered that a different Distributor has paid greater total damages, that Distributor shall receive the right to appoint its nominee to the Distributor Committee, who shall replace upon appointment the nominee of the Distributor with lesser Total Damages.

If at any time a Distributor whose nominee serves on the Distributor Committee relinquishes its right to have a nominee serve, any vacancies thus caused shall be filled by a majority vote of the remaining members of the Distributor Committee.

2. *Duties of the Distributor Committee*—The Distributor Committee shall be responsible for the collection of information from Distributors for the purpose of processing Fund Claims. The Distributor Committee may consult with its counsel, with other Distributors and the Trust as necessary for the proper liquidation of claims. No member of the Distributor Committee shall participate in the determination of the Fund Claim, or any of the components thereof, of the Distributor of which the member is the nominee, except that the member may represent that Distributor before the Distributor Committee. The Distributor Committee shall exercise all concurrence rights provided to the Manville Distributor Subclass in the Trust Distribution Process.

3. *Compensation of the Distributor Committee*—Members of the Distributor Committee shall be reimbursed for reasonable fees and expenses incurred, all of which shall be paid from the Fund. Neither the Distributor Committee, any member thereof, or any professional retained by the Distributor Committee shall be liable to any entity or person except for his/her own gross negligence or wilful misconduct. The reasonable fees and expenses incurred by Mark Peterson, Esquire for mediation in connection with this Fund Distribution Process, shall be borne by the Trust.

## SECTION V

### MISCELLANEOUS

All aspects of this Fund Distribution Procedures may be amended, altered or adjusted by the Distributor Committee with the concurrence of Subclass Counsel to reflect changed circumstances, greater information and/or to improve procedures, upon approval of the Court.

Upon request, the Trust shall provide the Distributor Committee with reasonable assistance in connection with the processing of claims filed against the Fund. The Trust, however, shall not be primarily responsible for analyzing and resolving such claims.

To the extent the reasonable fees and expenses incurred by counsel for the Manville Distributors Subclass are not paid by the Trust, such fees and expenses shall be borne by the Fund.

Prior to making any distribution from the Fund, the Distributor Committee shall have the duty to move the Court for an order approving the proposed distribution, and shall have no obligation to make a distribution in the absence of a final and non-appealable Court Order approving same.

### D.

April 25, 1989

Thorpe Corporation
P.O. Box 33403
Houston, Texas 77233

Re: Defense of Future Asbestos Related Litigation

Gentlemen:

This letter will serve to confirm the agreement made by the undersigned as the General Counsel for the Manville Personal Injury Settlement Trust ("the Trust") and Hartford H. Prewett, the attorney for Thorpe Corporation and its subsidiaries, Thorpe Products Company, JT Thorpe Company, Thorpe Insulation Company, and Sunbelt Constructors, Inc. ("Thorpe"), concerning the handling of future asbestos related lawsuits that may be filed against Thorpe.

Subject to the exception noted in the next paragraph, from this date forward, for all asbestos health civil actions in which Thorpe is named as a Defendant, Thorpe is immediately to notify the Trust of such litigation and provide copies of all suit papers to the attention of the undersigned at the address indicated above. The Trust will in turn forward such papers to the attorney of its choice for defense. All expense incident to the defense of such litigation will be borne by the Trust, and Thorpe's portion of any settlement agreed to by such attorneys as well as any judgment that may be rendered against Thorpe will likewise by borne by Manville.

Notwithstanding the terms of the preceding paragraph, in the event the Trust determines that a plaintiff who has sued Thorpe was exposed to asbestos sold by Thorpe by such asbestos was not distributed or sold to Thorpe by the Manville Corporation or its predecessor companies, the Trust shall have the right to reject in whole or in part the civil action and its defense forwarded to the Trust by Thorpe as described above.

Should you or your insurance carrier desire any further clarification of this agreement, please direct your questions to my attention and I will respond promptly.

Very truly yours,
/s/ David T. Austern
David T. Austern
General Counsel

AGREED TO:

Thorpe Corporation
(s) Richard A. Nowland
Name: Richard A. Nowland
Title: Executive Vice President
DTA/fph

### E.

### MACARTHUR FUND PRINCIPLES

1. *Establishment of Fund.* In settlement of liquidated Trust Claims asserted in an aggregate amount exceeding $10 million by the MacArthur Subclass in the Class Action, the Trust agrees to make an aggregate amount of $10 million (the "Settlement Amount") available for the purposes, and in

accordance with the terms, described below. Within 30 days after the date (the "Effective Date") on which the stipulation of settlement in the Class Action (the "Stipulation") is approved by the United States District Courts for the Eastern and Southern Districts of New York, the Trust will deposit the Settlement Amount into a segregated account (the "Fund") opened in the Trust's name with Bankers Trust Company or such other financial institution having a comparable or better rating by Moody's Investors Services, Inc. as may be selected by the Trust (the "Depositary"). The date on which the Trust makes such deposit is referred to as the "Fund Creation Date." The Trust will notify MacArthur Company ("MacArthur") of the name and address of the Depositary and the account number of the Fund promptly after the Fund Creation Date. The Trust will have the right to transfer the Fund from time to time to one or more other financial institutions selected by it which have a comparable or better rating by Moody's Investors Services, Inc. than the rating applicable to Bankers Trust Company on the Fund Creation Date. The Trust will notify MacArthur within five business days of any such transfer, indicating the name and address of the new Depositary and the new account number of the Fund. The Trust will have no responsibility for obtaining or maintaining a particular rate of interest or yield on the Settlement Amount or for any loss of principal comprising the Settlement Amount (except, in the case of loss of principal, if such loss consists of withdrawals from the Fund made by the Trust for purposes other than those authorized by these Principles). No UCC–1 filings or other perfection of a security interest will be made with respect to the Fund.

In exchange for the establishment of the Fund, MacArthur Group (as defined below) forever waives and releases any Trust Claims, liquidated or otherwise, that it has asserted or that it now has or may have in the future against the Trust or Manville Corporation, except for MacArthur Group's right to make claims against the $35 million fund established for Codefendants pursuant to paragraph 5 of the Stipulation or as other-wise expressly provided for in the Stipulation.

2. *Disbursement of the Settlement Amount for Fund Purposes.*

a. In accordance with the procedures described below, the Settlement Amount will be available for disbursement from the Fund for the following purposes (the "Fund Purposes"): (i) paying legal fees and expenses of outside counsel that have been incurred by MacArthur and/or its subsidiaries, related entities (including, without limitation, Western MacArthur Company, Western Asbestos Company and Bay Cities Asbestos Company) and the predecessors and successors of the foregoing (collectively with MacArthur, "MacArthur Group") or that are in the future incurred by MacArthur Group in its claims or litigation against the current and/or former insurers of MacArthur Group (together with the respective successors-in-interest to such insurers, the "Insurance Companies") asserting that MacArthur Group and/or its predecessors or successors are entitled to further insurance coverage from the Insurance Companies for asbestos-related losses incurred or to be incurred by MacArthur Group (the "Insurance Litigation") or (ii) paying legal fees and expenses of outside counsel incurred by MacArthur Group in the defense of lawsuits or settlement of claims against MacArthur Group asserting that it is liable for personal injuries caused by exposure to asbestos or asbestos-containing products (but in the case of this clause (ii), only after all insurance coverage currently available for such costs (including insurance guarantee association funds) has been so applied and exhausted).

b. Disbursements for Fund Purposes will be made by the Trust on an as-needed basis, but in no event more often than once per month. Such disbursements must be requested in writing by MacArthur. In addition to the amount of the requested disbursement, the written request must include copies of the invoice(s) received from the service provider for which the disbursement is being requested (which invoice(s) must indicate the period during which the relevant fees and

expenses were accrued and the nature of the services rendered) and a statement certified by a senior officer of MacArthur that he/she has reviewed the invoice(s) and that, to the best of his/her knowledge and belief, the disbursement requested is for Fund Purposes only and the fees and expenses for which the disbursement is requested are reasonable in his/her judgment in relation to the services performed.

c. Unless the Trust disputes that the disbursement requested is for Fund Purposes only, it will pay the service provider directly with a disbursement from the Fund within 15 business days of its receipt of the disbursement request from MacArthur. If the Trust disputes the disbursement request, it will so notify MacArthur within 15 business days after its receipt of the disbursement request, and will describe the dispute. If the parties are unable to resolve the dispute to their mutual satisfaction within 15 business days after MacArthur's receipt of such notice, the dispute will be submitted for resolution to the Special Advisor, whose decision will be final and binding on the Trust and MacArthur Group. The Trust will have no liability to MacArthur Group's service providers for the payment of any invoices or for any other reason. Disbursements from the Fund pursuant to this Section 2 will be limited in aggregate amount to the Settlement Amount. Each disbursement from the Fund pursuant to this Section 2 will be deducted from and will reduce the unused balance of the Settlement Amount. If the Insurance Litigation is "successful" (as defined below), no further disbursements will be made from the Fund for Fund Purposes pursuant to this Section 2.

3. *Other Withdrawals from the Fund.* The portion of the Fund balance in excess of the unused balance of the Settlement Amount will at all times belong exclusively to the Trust, including any interest or other earnings credited to the Fund, and will not be subject to disbursement in accordance with Section 2 or deemed to be part of the Settlement Amount. The Trust will have the

right to withdraw all or any portion of such excess at any time and from time to time, and MacArthur Group will have no right or claim to such funds. If the Insurance Litigation is "successful," MacArthur Group will have no further right or claim to the unused balance of the Settlement Amount, and the Trust will have the right to withdraw the entire balance of the Fund and to use all such funds, including the unused balance of the Settlement Amount, for any purposes whatsoever.

4. *Fund Reports.* Until such time as the Settlement Amount has been disbursed in full in accordance with Section 2 or withdrawn in accordance with Section 3, the Trust will prepare and deliver to MacArthur and the SCB written reports concerning the Fund within 30 days after the end of each calendar quarter. Each report will list by recipient the amount of each disbursement from the Fund made during the relevant quarter pursuant to Section 2, together with the description of services contained in the service provider's invoice(s) relating to such disbursement. The Trust will not be responsible for the truth or accuracy of such descriptions. Copies of the actual invoices supplied to the Trust by MacArthur will not be included in the Fund reports. Each report will also set forth the unused balance of the Settlement Amount as of the beginning and the end of the relevant quarter. The form of the report will be submitted to MacArthur for prior approval (it being understood that such approval cannot be withheld for failure to include items other than those described above). Simultaneously with its delivery of each report to MacArthur, the Trust will also provide MacArthur with copies of check stubs or other reasonable proof of payment with respect to disbursements made from the Fund during the relevant quarter pursuant to Section 2.

5. *Status of Insurance Litigation.* MacArthur will notify the Trust concerning the status of the Insurance Litigation no less frequently than quarterly (within 30 days after the end of each calendar quarter), and reasonably promptly after any material de-

velopment (including a "successful" outcome, as defined below). Such information will be considered confidential and will not be disclosed by the Trust unless the Trust is expressly ordered to do so by a court, administrative or regulatory authority or arbitral tribunal of competent jurisdiction. In addition to such periodic notification, MacArthur agrees to provide information reasonably requested from time to time by the Trust concerning the Insurance Litigation.

6. *Success Payment.* The Insurance Litigation will be deemed to be "successful" if and at such time as insurance proceeds (and/or damages or other monetary awards) in an aggregate amount since the Fund Creation Date equal to or exceeding $20 million covering claims against MacArthur Group for personal injuries caused by exposure to asbestos or asbestos-containing products are (i) paid to MacArthur Group and/or to third parties for MacArthur Group's benefit by or on behalf of the Insurance Companies, (ii) agreed by the Insurance Companies to be payable to or for the benefit of MacArthur Group, or (iii) held by one or more final, nonappealable judgments to be payable to or for the benefit of MacArthur Group by the Insurance Companies. If the Insurance Litigation is "successful," MacArthur Group will make a cash payment to the Trust (the "Success Payment") equal to $10 million (less any portion of the Settlement Amount that has not been disbursed in accordance with Section 3) adjusted for the change, from the Fund Creation Date to the date on which the Success Payment is paid, in the Consumer Price Index for urban wage earners and clerical workers (U.S. City Average) unadjusted for seasonal variation, published by the Bureau of Labor Statistics of the United States Department of Labor. MacArthur Group will pay the Success Payment within 30 days after the date on which the Insurance Litigation becomes "successful." If a dispute arises between the Trust and MacArthur as to whether the Insurance Litigation is "successful," either party may submit the dispute for resolution by the Special Advisor, whose

decision will be final and binding on the Trust and MacArthur Group.

ADDENDUM B

Amendments to Settlement Stipulation

*AMENDMENTS*

1. In accordance with the order of the Courts dated July 22, 1993, the Trust offered to pay a percentage of the amounts owed to the approximately 7,600 claimants whose claims had been settled prior to November 19, 1990 or who held judgments against the Trust prior to November 19, 1990. Although most of those claimants have accepted the Trust's offer and have received payment, a very small number of claimants have not responded to the Trust's offer. Accordingly, by motion dated October 11, 1994, the Trust has requested permission to discontinue offering discounted payments to those claimants previously determined to be Eligible Claimants, as defined by order of the Courts dated July 22, 1993, who have not returned a Discounted Value Addendum or Judgment Release to the Trust by December 31, 1994. If that motion is granted, this amendment would reflect the fact that such offers have been discontinued. This amendment would require the insertion of the following new paragraph into the Stipulation of Settlement after paragraph 5 on page 3:

WHEREAS, by order of the Courts dated July 22, 1993, a copy of which is annexed hereto as Exhibit ___, the Trust offered to pay a percentage of amounts owed to the approximately 7,600 claimants whose claims were settled prior to November 19, 1990, or who held judgments against the Trust prior to November 19, 1990, which judgments were final and nonappealable as of July 22, 1993, at a discounted rate specified in the July 22, 1993 order, and computed in accordance with the formula set forth in the order, and whereas the Trust has paid as of November 2, 1994 approximately $193 million to claimants who have accepted the Trust's offer, and whereas 119 claimants have rejected the Trust's offer; and whereas approximately 40 claimants had failed to respond to the

Trust by November 8, 1994 after having had repeated notices of the Trust's offer; and except that, as to such claimants who may not have had notice of the Trust's offer or those claimants who sought and were granted extensions due to circumstances beyond their control, the Trust may extend the period of time in which they may accept or reject the offer for good cause shown; and

2. The parties propose the following changes to ensure that *all* claims other than those specifically addressed in paragraphs 5 and 8 of the Stipulation of Settlement will be paid as provided for in the TDP. These amendments are proposed to eliminate any possibility that, contrary to the clear intention of the Stipulation, a claimant could recover more than the *pro rata* percentage payment contemplated by the Stipulation, by asserting claims against third parties (including directors, officers, employees or agents of the Johns–Manville Corporation and all other entities defined as "debtors" in the Second Amended and Restated Plan of Reorganization of the Johns–Manville Corporation, *et al.*) which would give rise to Indemnification Liabilities of the Trust to such third parties. The result of these amendments is that Trust Beneficiaries agree to reduce their claims and/or judgments against third parties which give rise to Indemnification Liabilities, on a dollar-for-dollar basis, to the full extent necessary to extinguish any such Indemnification Liability. These changes are necessary in this regard:

(a) In the Stipulation of Settlement at page 5, paragraph 3, line 6, the following language should be deleted:

The Trust Claims of Class Members, other than those claims dealt with by paragraphs 5 and 8 below, shall be processed and paid only as provided in Exhibit A, and such payments shall constitute complete satisfaction of such claims.

And replaced with:

The claims of Class Members, payable from the assets of the Trust, other than those claims dealt with by paragraphs 5 and 8 below, shall be processed and paid

only as provided in Exhibit A, and such payments shall constitute complete satisfaction of such claims.

(b) The TDP, Section A, page 1, line 10, should be changed to delete:

The process for determining the liquidated value of a Trust Claim

and that language replaced with:

The process for determining the liquidated value of any claim to be paid from the assets of the Trust.

(c) In the TDP, at Section H., page 12, line four, at the end of footnote 3, the following should be inserted:

To the extent that Trust Beneficiaries assert claims against third parties which a court of competent jurisdiction determines by order give rise to Indemnification Liabilities on the part of the Trust, those Trust Beneficiaries agree to reduce such claims and/or judgments on such claims, on a dollar-for-dollar basis, to the full extent necessary to extinguish any such Indemnification Liabilities. Provided, however, that this provision is not intended to otherwise restrict or interfere with the rights of Trust Beneficiaries to proceed against third parties.

3. The parties propose the following clarification to allow immediate implementation of the Settlement upon entry of an order by this Court approving the Settlement, rather than after resolution of any appeals challenging such approval: Stipulation of Settlement, page 6, insert new paragraph 17:

For purposes of this Stipulation of Settlement, the term "Final Order" means the Order entered by the United States District Court for the Eastern and Southern Districts of New York.

4. The parties propose the following paragraph to ensure that the definition of Exigent Health Claim in the TDP is consistent with the currently existing Exigent Health criteria. This paragraph provides that Trust claimants with confirmed mesothelioma or lung cancer will not be required in every case to provide a letter from a physician stating that their life expectancy is

six months or less. Claimants with confirmed mesothelioma will be presumed in all cases to satisfy this requirement, and persons with lung cancer will initially be presumed to satisfy this requirement, subject to review by the Trust in appropriate cases. Thus, in the TDP at Section C.10., page 5, (a) should be deleted and the following should be inserted:

(a) For Exigent Health claims: (i) there will be an irrebuttable presumption that there is substantial medical doubt that living Trust claimants with confirmed mesothelioma will survive beyond six months and thus, if they settle their Trust claim, they qualify for Exigent Health treatment; and, (ii) there will be a rebuttable presumption to be exercised at the discretion of the Trust that there is substantial medical doubt that living Trust claimants with confirmed lung cancer caused by exposure to asbestos will survive beyond six months and thus, if they settle their Trust claim, they qualify for Exigent Health treatment. (b) All other living Trust claimants can qualify for Exigent Health treatment by providing: (i) documentation that a physician has diagnosed the claimant as having an asbestos-related illness and (ii) a declaration or affidavit made under penalty of perjury from a physician who has examined the claimant within one hundred twenty (120) days of the date of the declaration or affidavit of which states that the physician believes there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit.

5. The following are necessary typographical changes: TDP, Section C.10., page 5, change (b) to (c). TDP, Section H.10., page 21, change 10. to 9. TDP, Section H.11., page 21, change 11. to 10.

6. The parties propose the following amendment which pertains to those claimants who settled their claims under the first settlement vacated in *Findley v. Blinken* because it is fairer and more efficient to process and pay these claims immediately. This amendment provides that a claimant who liquidated a Trust claim after November 19, 1990 under the original Trust Distribution Process proposed in connection with the first settlement of this case, and who elects not to take immediate *pro rata* payment of that

claim at the value at which it was liquidated, will be placed at the front of the FIFO queue and processed under the TDP, instead of being placed in his or her original place in the FIFO queue as presently provided in the TDP. Thus, the TDP, Section C.5., page 4, line 5, should be changed to delete:

or to return to their original place in the FIFO queue and have their claim processed under the procedures set forth below.

and that language replaced with:

or to have their claims placed at the front of the FIFO queue and be processed under the procedure set forth below.

Dated: New York, New York
 November 9, 1994